**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| SRAM, LLC,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>PRINCETON CARBON WORKS INC.,<br><br>　　　　　　　　Defendant. | Case No. 9:21-cv-80581 RKA<br><br>**JURY TRIAL DEMANDED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE**
**<u>EXPERT TESTIMONY AND REPORT OF GLENN W. PERDUE</u>**

## Table of Contents

Page

I.      INTRODUCTION ...............................................................................................1

II.     RELEVANT LAW ............................................................................................2

III.    ARGUMENT .....................................................................................................3

        A.      Mr. Perdue's Faulty Reasonable Royalty Analysis is Not Tied to the Facts
                of this Case and is Therefore Inadmissible ............................................................3

                i.      The Perdue Report Fails to Properly Apportion its Reasonable
                        Royalty Analysis, and is Impermissibly Based on the Entire Market
                        Value of the Accused Products ....................................................................4

                ii.     The Perdue Report Failed to Analyze the Value of the Asserted
                        Patents, or of the Patented Features ............................................................8

                iii.    The Purdue Report Improperly Ignores the Already-Established
                        Royalty for the Patents in Suit (Georgia-Pacific Factor 1) ......................10

                iv.     Mr. Purdue Improperly Relies on Other Licenses Without
                        Explanation as to How those Products or Inventions are Analogous
                        to the Ones At Issue (Georgia-Pacific Factor 12) ....................................12

        B.      Mr. Perdue's Lost Profit Analysis is Methodologically Flawed and Should
                Also be Excluded .....................................................................................................14

                i.      Mr. Perdue Arbitrarily Defines an Overly Restrictive "Market" That
                        Does Not Exist and Fails to Account for Competitors Even Within
                        this Contrived Market ...............................................................................15

                ii.     The Perdue Report Ignores Non-Infringing Substitutes ...........................15

                iii.    Mr. Perdue's Fictitious "Carbon Undulating Wheel" Market Is
                        Comprised of Multiple Competitors ..........................................................17

                iv.     Mr. Perdue Failed to Demonstrate Demand for the Patented Product
                        ...................................................................................................................18

IV.     CONCLUSION..................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ass'n for Molecular Pathology v. United States PTO*,
    702 F. Supp. 2d 181 (S.D.N.Y. 2010)....................................................................11

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015)...........................................................................9

*Calico Brand, Inc. v. Ameritek Imports, Inc.*,
    527 F. App'x 987 (Fed. Cir.), *decision clarified on reh'g*, 547 F. App'x 966
    (Fed. Cir. 2013).................................................................................................18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    526 U.S. 579 (1993)................................................................................ *passim*

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)...............................................................................18

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)....................................................................4, 11, 13

*Ericsson, Inc. v. Harris Corp.*,
    352 F.3d 1369 (Fed. Cir. 2003)..........................................................................19

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)..........................................................................5

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F. Supp 1116 (S.D.N.Y. 1970) .........................................................9, 10, 11, 12

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
    7 F.4th 1320 (Fed. Cir. 2021) ............................................................................17

*Grain Processing Corp. v. Am. Maize-Prod. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)..........................................................................15

*Hughes v. Kia Motors Corp.*,
    766 F.3d 1317 (11th Cir. 2014) .......................................................................2, 11

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..........................................................................................17

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)..............................................................................7

*McDowell v. Brown,*
   392 F.3d 1283 (11th Cir.2004) ............................................................................2

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
   851 F.3d 1275 (Fed. Cir. 2017)................................................................7, 14, 17

*Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.,*
   362 F. App'x 332 (3d Cir. 2010) .......................................................................13

*Micro Chem., Inc. v. Lextron, Inc.,*
   318 F.3d 1119 (Fed. Cir. 2003)..........................................................................16

*Omega Patents, LLC v. CalAmp Corp,*
   No. 20-1793 (Fed. Cir. Sept. 16, 2021) ............................................................13

*Panduit Corp. v. Stahlin Bros. Fiber Works, Inc.,*
   575F2d 1152 (6th Cir. 1978) ........................................................................1, 14

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
   904 F.3d 965 (Fed. Cir. 2018)..............................................................................6

*Quashen v. Carnival Corp.,*
   No. 1:20-cv-22299-KMM, __ F. Supp. 3d __, 2021 U.S. Dist. LEXIS 241507
   (S.D. Fla. Dec. 17, 2021) ...................................................................................19

*Rink v. Cheminova, Inc.,*
   400 F.3d 1286 (11th Cir. 2005) ...........................................................................2

*Rite-Hite Corp. v. Kelley Co.,*
   56 F.3d 1538 (Fed. Cir. 1995).......................................................................14, 19

*SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.,*
   926 F.2d 1161 (Fed. Cir. 1991)..........................................................................16

*Uniloc USA, Inc. v. Microsoft Corp.,*
   632 F.3d 1292 (Fed. Cir. 2011).......................................................................6, 18

*United States v. Frazier,*
   387 F.3d 1244 (11th Cir. 2004) .....................................................................17, 19

*VirnetX, Inc. v. Cisco Sys.,*
   767 F.3d 1308 (Fed. Cir. 2014)............................................................................8

**Federal Rules**

Fed. R. Civ. P. 26 ....................................................................................................1

Fed. R. Evid. 702 ...........................................................................................*passim*

Fed. R. Civ. P. 403 ................................................................................................................18

## I.      INTRODUCTION

Defendant Princeton Carbon Works Inc. ("PCW") respectfully submits this memorandum of law in support of its motion to exclude the expert report and testimony of Glenn W. Perdue. On December 14, 2021, Plaintiff SRAM, LLC served the written disclosure of Mr. Perdue, a purported expert in the area of economic damages, pursuant to Fed. R. Civ. P. 26(a)(2)(B). A copy of the Perdue Report, excerpted to the relevant portions, is attached hereto as **Exhibit A** (the "Perdue Report").

PCW does not make this request to exclude Mr. Perdue's opinions lightly. But given several fundamental deficiencies infecting Mr. Perdue's opinions on economic damages, this Court should exercise its gatekeeping function to prevent exactly the harm of admitting unreliable expert evidence that the *Daubert/Kumho* line of cases is designed to avoid. In short, Mr. Perdue's opinions on economic damages do not come close to meeting the critical "reliability" requirement of Federal Rule of Evidence 702, and therefore present a real and present danger of improperly confusing the jury. This is true for two principle reasons.

First, contrary to law, Mr. Perdue's Reasonably Royalty analysis ignores material facts, fails to properly apportion the value of the specific patent claims asserted in this case as compared to other features of the accused products or tie his opinions to the claims-at-issue in any meaningful way, and strays far afield from established economic principles. Second, Mr. Perdue's Lost Profits analysis is untethered from the facts, provides little (if any) evidence or support for his ultimate opinion, and fails to reliably address the four required factors laid out in *Panduit Corp. v. Stahlin Bros. Fiber Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

In particular, Mr. Perdue advances the remarkable opinion that a purportedly reasonable royalty in this case is ***up to 34 times greater*** than the one established by the single most relevant data point available for assessing any damages: the prior license SRAM entered into that covers

the exact same patents that SRAM now asserts against PCW. Worse yet, the entire basis for Mr. Perdue's vault from the single most relevant license into the stratosphere is an inapt analogy to licensing in the pharmaceutical industry—a comparison that Mr. Perdue himself admits is not relevant. He also opines that SRAM is entitled to lost profits despite overwhelming evidence that the market for carbon bicycle wheels is ***not*** a two-player market, and that numerous non-infringing alternatives exist. Ultimately, Mr. Perdue's opinions are devoid of any proper methodology, and are divorced from the facts and the law. They occupy the heartland of unreliable and legally impermissible testimony wrapped in the veneer of expert say-so.

Mr. Perdue's damages opinion is unreliable, unhelpful and irrelevant. Its admission at trial will confuse the jury and prejudice PCW. This Court should exclude Mr. Perdue's report and prevent his testimony.

## II.   RELEVANT LAW

Expert testimony is only admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (citing Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

"Under Rule 702 and *Daubert,* district courts must act as gatekeepers which admit expert testimony *only* if it is both reliable and relevant. District courts are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (emphasis added) (internal quotations omitted). "The

decision to exclude expert testimony is committed to the sound discretion of the District Court." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014). "[S]omething doesn't become scientific knowledge just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *McDowell v. Brown,* 392 F.3d 1283, 1299 (11th Cir.2004) (alteration in original) (internal quotation marks omitted).

## III.   ARGUMENT

The econometric opinions set forth in Mr. Perdue's expert report suffer from critical, predicate infirmities in basis and methodology that infect the entire analysis. These infirmities render the damages opinion so unreliable as to be inadmissible under the Federal Rules of Evidence and the *Daubert/Kumho* line of cases. This Court should exercise its gatekeeping function to prevent the jury confusion and prejudice to PCW that will be inevitable if Mr. Perdue is permitted to offer his deeply flawed opinions at trial.

### A.   Mr. Perdue's Faulty Reasonable Royalty Analysis is Not Tied to the Facts of this Case and is Therefore Inadmissible.

Mr. Perdue's reasonable royalty opinion fails to meet the "reliability" requirement of Rule 702 and should be excluded, at least because he ignores essential data points—including the single most comparable license agreement in evidence, the SRAM License to the Asserted Patents themselves—and fails to tie his opinions to the actual facts of the case. These baseline infirmities take the form of three principle errors, each one independently justifying exclusion. Taken together, they compound and underscore the overall unreliability of Mr. Perdue's opinion.

First, contrary to the law, Mr. Perdue fails to apportion his royalty and impermissibly attempts to apply the Entire Market Value rule to accused products with multiple components and features. Second, Mr. Perdue entirely fails to analyze the value of the asserted claims to the accused

products. Instead of recognizing that the claims are directed to discrete and limited features of multi-component bicycle wheels, analyzing the products as a whole with no viable reason to do so is plainly erroneous. Third, Mr. Perdue ignores the already-established reasonable royalty for the Asserted Patents set by the SRAM License and bases his analysis, *instead*, on licenses for wholly inapposite technology in an entirely different sector. His comparison of the bike wheel industry to the pharmaceutical small-molecule industry is not just an improper apples-to-bananas analysis, it is an unsupportable attempt to sidestep the single most relevant piece of damages-related evidence in this case: the SRAM License itself. Indeed, in order to arrive at an allegedly reasonable royalty rate that is up to 34 times greater than the one established by the license covering the patents-in-suit, Mr. Perdue employs unreliable methodology—not properly apportioned or tied to the claims-at-issue—and strays far from established economic principles.

       i.     *The Perdue Report Fails to Properly Apportion its Reasonable Royalty Analysis, and is Impermissibly Based on the Entire Market Value of the Accused Products*

As a matter of law, accurately and reliably assessing damages in a patent case requires determining the value that the patented feature contributes to an accused product, as compared to the unclaimed features of that product. This follows logic. For example, the value that an intermittent windshield wiper patent contributes to an automobile is not the same value as provided by that car's engine. The Perdue Report fails altogether to take this critical step of apportionment. In fact, Mr. Perdue expressly states in his report that he undertook no such analysis. Ex. A, Perdue Report at ¶51.

This approach runs headlong into binding Federal Circuit precedent, which holds that apportionment is a *fundamental* requirement of the patent damages analysis: "apportionment is required even for non-royalty forms of damages: a jury must ultimately 'apportion the defendant's profits and the patentee's damages *between the patented feature and the unpatented features*' using

'reliable and tangible' evidence." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (emphasis added) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). "The essential requirement is that the ultimate reasonable royalty award must be based on the *incremental value* that the patented invention adds to the end product." *Id.* (emphasis added). The Perdue Report offers zero analysis, evidence, or opinion in this regard.

The accused products here are bicycle wheels. Along with the accused variable depth rim component, these products have multiple additional components and features. These include, for example, spokes, spoke nipples (the component that joins a spoke to the rim), tire hooks, a tire bed, axles, hubs, bearings, a freehub body (on rear wheels), and skewers to fix the wheel onto a bike frame. A SRAM corporate designee confirmed as much during deposition.[1] *See, e.g.*, Ex. B, January 14, 2022, Jason Fowler Excerpted Depo. Tr. at 87:13-21; 175:24-176:12; 177:15-18; 182:7-183:21. The Perdue Report entirely fails to acknowledge, let alone account for, any of the value independently provided by any of these other, additional components of the accused wheels. Instead, Mr. Perdue ignores them, opting not to follow binding Federal Circuit law requiring him to apportion the proposed royalty based on the value of the Asserted Patents. Instead, the Perdue Report tersely opines: "[t]he entire wheel provides the clearest and most obvious royalty base and does not require apportionment." Ex. A, Purdue Report at ¶51.

Underscoring the critical importance of apportionment, the Federal Circuit has gone as far as ordering a new trial where an expert improperly ignored unpatented components, as the Perdue Report does here. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1350-51 (Fed. Cir. 2018) (ordering new trial on damages where expert opinion "lacked

---

[1] To further underscore that bicycle wheels include many more features than the alleged inventions of the Asserted Patents, SRAM also confirmed in discovery that its own "undulating" wheels are covered by numerous other patents. *See, e.g.*, Ex. C, SRAM's Answers to PCW's Second Set of Interrogatories (Nos. 18-20). This necessarily concedes the point.

sufficient ties to the facts of the case"). In that case, the court noted that "[m]erely concluding that other components do not affect the value of the accused [product] amounts to *nothing more than speculation*." *Id*. (emphasis added). That impermissible speculation is exactly what the Perdue Report did here: conclude, without any analysis or evidence, that the "entire wheel provides the clearest and most obvious royalty base." Ex. A, Purdue Report at ¶51. This admitted failure to perform any apportionment analysis renders the royalty opinions in the Perdue Report inadmissible as a matter of law.

The only exception to the apportionment requirement is "where the patented feature creates the basis for customer demand or substantially creates the value of the component parts," referred to as the "entire market value" approach to patent damages. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (internal quotations omitted). However, this is an extremely narrow exception to the default apportionment requirement. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2018) (noting that "strict requirements limiting the entire market value exception ensure that a reasonable royalty 'does not overreach and encompass components not covered by the patent.'" (citation omitted)).

In fact, the entire market value rule "is appropriate *only* when the patented feature is *the sole driver of customer demand* or substantially creates the value of the component parts." *Id*. at 979 (emphasis added) (citing *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 67 (Fed. Cir. 2012) (a patentee cannot use the entire market value of an accused product as a royalty basis "without showing that the demand for the entire product is attributable to the patented feature"); *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) (same); *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (same)). Here, the Perdue Report failed to do *any* analysis in this regard: it did not conduct a single survey (either on the market, or on actual or potential consumers), offer any evidence of such consumer or market data, or otherwise do

*anything* to verify this essential point. In short, the Perdue Report contains zero attempt to demonstrate that "the patented feature is the sole driver of customer demand" as required to avoid the also absent apportionment. *Power Integrations, Inc.*, 904 F.3d at 979.

This failure to engage with the critical customer demand aspect of the entire market value rule is even more egregious in light of the evidence. In particular, as SRAM's own corporate designees acknowledged, bicycle wheels are comprised of numerous components and features that can drive demand, including, for example, the hubs and spokes used in their construction, the fabrication material and methods of construction that translate into weight savings, strength, and durability, the technology on the tire bed, on the tire-seating portion of the rim, on the rim sidewall, as well as other consumer-enticing features such as graphics, colorways, and branding. *See, e.g.*, Ex. D, January 6, 2022, Kevin Wesling Excerpted Deposition Transcript at 236:20-24 (noting features on sidewall of wheel rim); 235:10-236:2 (noting different features different of hubs used).

The accused wheels are no different. Yet the Perdue Report failed to account for these facts or do any analysis of how the alleged patented feature, the "undulating inner rim," affects demand, as compared to any of the multiple non-patented features. Instead, the Perdue Report simply based its proposed royalty on the entire wheel, without explaining why or providing any support. If an expert asserts such a position, he is "*required* to support h[is] opinion to that effect with sound economic reasoning." *LaserDynamics*, 694 F.3d at 67–68 (emphasis added). The Perdue Report's failure to apportion, and failure to provide *any* support for the opinion that it was somehow not required, violates this fundamental tenet. This fundamental error at the outset of his analysis infects the entirety of Mr. Perdue's reasonable royalty disclosure. As a result, his entire reasonable royalty opinion is unreliable and thus inadmissible as a matter of law.

ii.   *The Perdue Report Failed to Analyze the Value of the Asserted Patents, or of the Patented Features*

Mr. Perdue's failure to apportion stems from another critical deficiency in his opinion: the lack of analysis of the Asserted Patents and apparent lack of understanding of what the Asserted Claims specifically cover. Mr. Perdue at once admits that "there are differences in claims that distinguish these two patents," while further noting that he "offer[s] no opinions on these technical and legal issues and only note[s] this information for the sake of context." Ex. A, Purdue Report at ¶19. Yet the Federal Circuit has been clear that any damages awarded *must* be "commensurate with the value of *the patented **features***" and nothing more. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287-88 (Fed. Cir. 2017) (emphasis added). The Perdue Report lacks any analysis—or attempted analysis—of the value of the patented features. This predicate error also infects Mr. Perdue's opinion, making it inadmissible as unreliable for this reason too.

As described above, bicycle wheels are multi-component devices comprised of, among other things, spokes, spoke nipples, tire hooks, a tire bed, axles, hubs, bearings, a freehub body, and skewers. Hubs, as just one example—that connect the rim to the bicycle—come in numerous grades with different attributes, performance, selling points, and prices. As SRAM's category manager for wheels and Rule 30(b)(6) witness, Jason Fowler, testified, SRAM's own bicycle wheels work as a system with multiple different features. Ex. B, January 14, 2022, Deposition Transcript of Jason Fowler at 22:25-23:10 (discussing multiple components and features incorporated in SRAM wheels); 57:14-58:25 (discussing selling points of wheel components and features to consumers). Mr. Fowler also testified that SRAM's bicycle wheels have many different components and attributes that affect performance and allegedly provide different benefits and

selling points. *Id.* at 75:19-101:17.[2] According to SRAM's contentions in this case, however, the purported patented feature is merely the "undulating inner rim" portion of a bicycle wheel. *See, e.g.*, Dkt. No. 57, SRAM's Opening Claim Construction Br. at 4 (Jan. 24, 2022) (stating that the Asserted Patents "disclose novel and unique solutions … through a design with an undulating or wavelike configuration for the radially inner edge of the wheel rim").

Under the law, a damages expert must first determine the smallest salable unit of the accused product and, if the smallest salable unit is "a multi-component product containing several non-infringing features with no relation to the patented feature," the expert must "estimate what portion of the value of that product is attributable to the patented technology." *Virnetx, Inc.*, 767 F.3d at 1327 (vacating damages award and remanding where, among other things, patent owner failed to determine the contribution to the value of the patented component). If, on the other hand, "the claims recite both conventional elements and unconventional elements," the expert must "account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015). Here, the Asserted Patents claim numerous conventional elements, known for decades before the patents were filed, such as spokes, hubs, and rims about which tires can be mounted.

Despite this, the Perdue Report made no attempt to attribute any portion of its reasonable royalty calculation to any asserted claim, or even any allegedly infringing feature. Mr. Perdue performed no analysis of the value of the patented features versus the unpatented features. Nor did he analyze the relative value of the features, or explain why the unpatented features were irrelevant.

---

[2] SRAM alleges that its NSW Products practice the patents, but SRAM's own corporate witness confirms that different components, features, and attributes of those wheels create different benefits ***and selling points***.  Therefore, customers are not only buying SRAM's own wheels for their undulating configuration.

Mr. Perdue admits that there are differences in the asserted claims, but fails to account for that fact in his analysis. All of these required analytical elements are wholly lacking from the Perdue Report. This predicate and overriding error infects the rest of his reasonable royalty opinion, rendering it entirely unreliable and thus inadmissible as a matter of law.

### iii.     The Purdue Report Improperly Ignores the Already-Established Royalty for the Patents in Suit (Georgia-Pacific Factor 1)

Beyond the fundamental analytical flaws and omissions outlined above, the Perdue Report additionally gives improperly short shrift to the fifteen long-established patent damages factors, laid out in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp 1116 (S.D.N.Y. 1970)[3]. Even worse, Mr. Perdue contorts his analysis to avoid critical facts that would materially lower his aspirational royalty rate, and also introduces a novel and inapposite theory of "commercialization risk" that does not appear to have ever been advanced in a patent infringement case.

Factor 1 in the *Georgia-Pacific* analysis focuses on royalties received by the patentee for the patent(s) in suit in order to prove an established royalty. *Id.* Mr. Perdue acknowledges, as he must, that a highly relevant license exists for the very patents SRAM is asserting in this case against PCW. SRAM is very familiar with this license, because it agreed to its terms with the actual owner of the Asserted Patents. Yet the Perdue Report does everything it can to avoid confronting the reality that this SRAM License sets a royalty rate that is up to 34 times *less* than the rate proposed by the Perdue Report. The SRAM License is the single most relevant piece of evidence as to what the reasonable royalty should be here—but the Perdue Report waves this off, claiming that the

---

[3] *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).

SRAM License somehow "does not provide a relevant basis for the assessment of a royalty rate" in this case. Ex. A, Purdue Report, ¶¶16-17.

In this effort, Mr. Perdue presents a strained analogy to the pharmaceutical industry of all things—purportedly to show "increased value being driven by reduced commercialization risk," without citation to evidence. *Id*. at 17. In the next breath, perhaps in recognition of the fact that bicycle wheels are nothing like small molecule pharmaceutical compounds, the Perdue Report acknowledges that the specifics of this example are not relevant to this case. *Id.* Despite this, though, Mr. Perdue goes on to suggest that the purported "commercialization risk" phenomena seen in the pharmaceutical industry can be applied to the bicycle wheel industry, without any explanation as to why that is the case. It hardly need be said, but there is no extensive regulatory overlay that exists as a per se barrier to entry in the bicycle industry like the FDA—which is the apparent animating cause of Mr. Perdue's novel commercialization risk theory. *Id*. at 17-18. Mr. Perdue does not explain why his novel commercialization risk theory is at all applicable in the bicycle wheel market and, even if it is, what attributes of that industry suggest the theory applies.

Moreover, PCW is unaware of a *single case* in any federal court in the United States in which this novel Perdue "commercialization risk" theory has ever been advanced as a damages basis—let alone survived *Daubert* scrutiny. In fact, a Lexis case law search of every federal district court in the country returned exactly two opinions (from the same dispute) containing the phrase "commercialization risk." Neither opinion uses the phrase more than once, and neither does so in the context of patent damages. *See Ass'n for Molecular Pathology v. United States PTO*, 702 F. Supp. 2d 181, 211 (S.D.N.Y. 2010); 2010 U.S. Dist. LEXIS 35418, at *81 (S.D.N.Y. Apr. 2, 2010) (unpublished). The novel Perdue "commercialization risk" damages theory is thus thoroughly untested in the realm of patent damages. This fact alone neuters its reliability. And there is no indication or suggestion, whether in the Perdue Report or otherwise, that this damages theory "is

the product of reliable principles and methods." *Hughes*, 766 F.3d at 1328. Absent that, there is simply no basis to conclude that any opinion on the "commercialization risk" theory is reliable.[4]

In this context, the Perdue Report's *Georgia-Pacific* factor analysis is bare window-dressing in an attempt to justify an enormous leap above and beyond the already-established royalty rate set by the SRAM License. This approach has been rightly rejected by the Federal Circuit. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014) ("often, damages experts resort to the *[Georgia-Pacific]* factors to justify urging an increase or a decrease in a royalty calculation, with little explanation as to why they do so, and little reference to the facts of record."). By providing no genuine explanation or evidence beyond his say-so for increasing the established royalty for the patents in suit by up to 34 times per wheel, Mr. Perdue's ultimate opinion is untethered from the facts of this case or the legal framework he elected to use. This error infects his entire royalty rate opinion, and it should be excluded.

> iv.    *Mr. Purdue Improperly Relies on Other Licenses Without Explanation as to How those Products or Inventions are Analogous to the Ones At Issue (Georgia-Pacific Factor 12)*

In order to overcome the established royalty for the patents in suit set by the SRAM License, Mr. Perdue relies on licenses that SRAM has entered into for very different patents and very different technology, related to certain bicycle drivetrain technology However, Mr. Perdue fails to independently verify the underlying data for his analysis, including the actual price at which the licensed products sell. Instead, Mr. Perdue parrots a SRAM representative for an essential data

---

[4] Also unaddressed in the "commercialization risk" section of the Perdue Report are the following facts that Mr. Perdue himself highlights in other sections. First, it took SRAM years to develop the Zipp 454 NSW. *Id.* at 9. Second, confidential discussions with industry participants to "begin preparing the market" occurred in late 2015, commercial launch event planning began in early 2016, and the first shipments of the product were made in October 2016. *Id.* Third, SRAM did not execute the license with the owner of the patent it asserts now until July 15, 2016. *Id.* at 6. Taken together, this means that SRAM began investing in R&D in or around 2012, four years before taking a license to the Asserted Patents. Yet Mr. Perdue nonetheless opines that SRAM is entitled to a commercialization risk royalty rate multiplier to compensate for the time, effort, and money it incurred long before it ever took a license to the Asserted Patents. This too underscores the unreliability of the opinion.

point—without explanation or independent verification—and then uses that number as the sole basis for his opinion. A quick internet search, however, discredits the figure Mr. Perdue used and reveals how unreliable the methods truly are.

Despite the availability of the SRAM License, which set an established royalty rate for the patents-in-suit for bicycle wheels, Mr. Perdue performs the bulk of his analysis on licenses that SRAM produced for low-dollar drivetrain technology. Mr. Perdue, however, does not attempt to explain how this technology is an analogous invention to the "undulating rim" configuration bicycle wheels of the Asserted Patents as required under *Georgia-Pacific* factor 12.[5] Nor does he account for the fact that the two products have drastically different uses, features, price points and manufacturing costs.

The Perdue Report, however, fails to cite a single document or independent source for the information it relies on for the pricing information on which its analysis rests. Nor does it explain how SRAM ascertained the price at which third-parties sold similar technologies to other third-parties. *Id*. An internet search and documents produced in this case reveals that, in fact, these products retail for multiples of the amount Mr. Perdue relied upon. Ex. E, Excerpted Expert Report of Phil Green at ¶145. Mr. Perdue's opinion on this point should be excluded for this reason alone. *Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*, 362 F. App'x 332, 334 (3d Cir. 2010) (exclusion of expert was proper where expert relied on client's data without independent verification and "the facts belied the expert's conclusions").

Further, Mr. Perdue fails to connect the effective royalty rate for the drivetrain technology to the incremental value, if any, provided by the patents-in-suit to PCW's accused wheels. As discussed, Mr. Perdue did not undertake any incremental value analysis at all regarding what the

---

[5] *Georgia-Pacific* Factor 12 takes into account the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or ***analogous inventions.***

relative contribution the patented features contribute to the accused products. Mr. Perdue likewise provides no analysis or support for the central, underlying assumption that the relative contribution of SRAM's drivetrain technology to the relevant components is *equal* to the relative contribution provided by the patents-in-suit to PCW's accused wheel models. "[T]o prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *Omega Patents, LLC v. CalAmp Corp*, No. 20-1793 (Fed. Cir. Sept. 16, 2021).

For all of these reasons, the ultimate royalty rate opinion, therefore, is untethered from the facts, lacking a proper methodology, and will be highly confusing to the jury. As such it should be excluded in to avoid the harm the Rule 702 and *Daubert* are designed to prevent.

### B.     Mr. Perdue's Lost Profit Analysis is Methodologically Flawed and Should Also be Excluded.

Mr. Perdue's lost profit analysis does not meet the Rule 702 threshold. It omits material facts, provides little support for his opinion, and fails to squarely address the four factors laid out in the seminal case, *Panduit Corp. v. Stahlin Bros. Fiber Works, Inc.*, 575F2d 1152 (6th Cir. 1978). "In order to recover lost profits damages, a patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1557 (Fed. Cir. 1995) (quotations omitted). This requires an earnest assessment of non-infringing alternatives in the relevant market.

But not only does Mr. Perdue fail to analyze the non-infringing alternatives in the relevant market—high-performance carbon fiber bicycle wheels—he also fails to address other undulating rims in the overly constrained market he contrives in order to argue for lost profits. "Damages under *Panduit* are not easy to prove…. The second factor, absence of acceptable non-infringing alternatives, often proves the most difficult obstacle for patent holders. Under this factor, if there is a noninfringing alternative which any given purchaser would have found acceptable and bought,

then the patentee cannot obtain lost profits for that particular sale." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017). This failure results in exclusion of the opinion.

      i.     *Mr. Perdue Arbitrarily Defines an Overly Restrictive "Market" That Does Not Exist, and Fails to Account for Competitors Even Within this Contrived Market*

For his lost profits analysis, Mr. Perdue arbitrarily defines the relevant market as a contrived market for "carbon undulating wheels."[6] In doing so, Mr. Perdue ignores or downplays other competitors in that space, and also ignores numerous non-infringing alternatives. Undermining Mr. Perdue's foundational assumption that a fictitious "carbon undulating wheel" market exists, however, is the fact Mr. Perdue admits that PCW only sells two types of wheels and that "[t]hese wheels represent two segments of ***the market for high performance bicycle wheels*** noted in Exhibit 6." Ex. A, Purdue Report at ¶60 (emphasis added). Mr. Perdue's acknowledgement that PCW products are sold in the market for *'high performance bicycle wheels'* is the accurate definition of the market in which PCW and SRAM compete, and belies his belief that a "carbon undulating wheel" market exists. And this market is rife with carbon fiber bicycle wheel options, some undulating and some non-undulating. As to non-undulating rims, SRAM itself sells these in direct competition with its own undulating wheels. The evidence points to the exact opposite of Mr. Perdue's contentions: the market is not "carbon *undulating* wheels" and, even if it were, *that* market is not comprised exclusively of PCW and SRAM.

      ii.     *The Perdue Report Ignores Non-Infringing Substitutes*

"Consumer demand defines the relevant market and relative substitutability among products therein." *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1355 (Fed. Cir. 1999). The reality of the carbon fiber bicycle wheel market is that consumers demand fast, strong, stable, and lightweight wheels. Ex. D, January 6, 2022, Kevin Wesling Excerpted Depo.

---

[6] Ex. A, Perdue Report ¶ 57 (analysis of *Panduit* factor 2).

Tr. at 46:5-47:18 (the benefits derived from different wheel technologies and consumer preferences). As admitted by SRAM's own witnesses, constant depth rims—which are non-infringing alternatives—often outperform undulating rims and remain in high demand. Ex. F, January 5, 2022, Joshua Poertner Depo. Tr. at 60:1-63:14 (various conventional rims outperform variable-depth rims in certain scenarios); *Id*. at 112:7-9 ('wavy rims' do not perform better than anything else, including conventional rims); Ex.D, January 6, 2022, Kevin Wesling Excerpted Depo. Tr. at 47:20-48:2 (the same customers buy SRAM's undulating and conventional wheels); Ex. G, January 13, 2022, Deposition Tr. of Michael C. Hall at 79:2-81:20. Indeed, as admitted by the named inventor himself, the first tests on his wheel with an undulating rim did *not* produce better results than a conventional rim and SRAM, in fact, decided to pass on taking a license after seeing the initial results. Ex. H, January 11, 2022 Depo. Tr. of Dimitris Katsanis at 96:19-97:16; 139:9-140:25.

"Once the market is defined, it generally becomes an easier task to determine how many suppliers operate in the defined relevant market. That inquiry focuses on the number of companies involved, not the number of alternatives in the relevant market." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124–25 (Fed. Cir. 2003). SRAM's own corporate witnesses admit that SRAM competes with numerous other bicycle wheel manufacturers and that SRAM's own non-undulating wheels compete with its undulating wheels. Ex. D, January 6, 2022, Kevin Wesling Excerpted Depo. Tr. at 226:14-228:1 (discussing various manufacturers of high performance carbon fiber bicycle wheels); *see also* Ex. I, SRAM.com Wheel-Finder, accessed December 10, 2021, PCW_0010163 (showing that SRAM advertises undulating wheels next to non-undulating wheels, some of which have identical consumer criteria and uses).

In sum, the true market—high performance carbon bicycle wheels rather than undulating wheels—has numerous competitors and non-infringing alternatives. The fictitious market that Mr.

Perdue created is untethered from the facts and will be highly confusing to the jury. As such, Mr.

Perdue's opinions that are based on it should be excluded in to avoid the harm the Rule 702 and

*Daubert* are designed to prevent.

> iii.    *Mr. Perdue's Fictitious "Carbon Undulating Wheel" Market Is Comprised of Multiple Competitors*

Mr. Perdue attempts to circumvent the true market because it leads to the logical conclusion

that consumers have numerous acceptable options that do not infringe the Asserted Patents offered

by many more than two suppliers. Any other argument would not credible. *SmithKline*

*Diagnostics, Inc. v. Helena Lab'ys Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) (rejecting

testimony "that there were not acceptable, non-infringing substitutes as pure conjecture and as

totally contrary to the great weight of the evidence and the commercial realities of the marketplace

and not credible.")

Even when artificially narrowing the market to "carbon undulating wheels," Mr. Perdue

fails to account for the other competitors in that space. *E.g.,* Ex. J, Excerpted Expert Report of

Ronald E. Hanson, Ph.D at pgs. 40-43 (showing undulating rims produced by Mavic, Fulcrum,

and Shimano); Ex. E, Excerpted Expert Report of Phil Green at ¶102 (noting six undulating rim

competitors)[7]. Mr. Perdue does not attempt to differentiate these undulating substitute products.

Nor does he rely on a technical expert to do so. These other competitors and the variety of non-

infringing alternatives in the marketplace, however, show that SRAM cannot as a matter of law

prove that it is entitled to lost profits. See *Mentor Graphics*, 851 F.3d at 1286; *see also*

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1341 (Fed. Cir. 2021) ("the

---

[7] The manufacturers of undulating rims identified by Mr. Green include: Controltech, Pearson, Shimano, Mavic, and Top Carbon. Ex. E, Excerpted Expert Report of Phil Green at ¶102

presence of noninfringing alternatives precludes an award of lost profits."). In other words, even if PCW did not exist, SRAM would still have to compete against numerous other entities.

Despite these facts, Mr. Perdue still opines that the parties compete in a two-supplier market. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999). "The trial court's gatekeeping function requires more than simply taking the expert's word for it," and the reliability prong of Rule 702 *cannot* be established "merely by the ipse dixit" of a purported expert. *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Where, as here, "the patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1315 (Fed. Cir. 2011).

Allowing Mr. Perdue to offer his unsupported opinion will confuse the jury. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) ("Given the realities of litigation, the opinion of a witness impressed by the court with the label of 'expert' may carry a great deal of weight with a lay jury.... Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which Rule 403 defends.") (citing Fed. R. Civ. P. 403). Mr. Perdue's definition of the market defies the evidence. This, coupled with his failure to address the multitude of non-infringing substitutes, even in the market he defined, demonstrates that his opinion is unreliable and inadmissible.

    iv.  *Mr. Perdue Failed to Demonstrate Demand for the Patented Product*

"[L]ost profits must be tied to the intrinsic value of the patented feature." *Calico Brand, Inc. v. Ameritek Imports, Inc.*, 527 F. App'x 987, 996 (Fed. Cir.), *decision clarified on reh'g*, 547 F. App'x 966 (Fed. Cir. 2013). Mr. Perdue devotes but two sentences to his analysis on demand

for the patented product: "Demand for the patented product is sufficiently demonstrated in the sales of SRAM and PCW. As noted in the previous discussion of Georgia Pacific Factor #8, demand for the patented products increased sharply in 2020 and 2021." Ex. A, Perdue Report at ¶56. Mr. Perdue, however, provides zero analysis of whether it is the allegedly patented technology (the undulating inner rim), specifically, that is driving that consumer demand. As discussed earlier, bicycle wheels have multiple components, each of which may have unique attributes, technology, or other selling features that can effect demand. Or, they may not—but Mr. Perdue never tells us, let alone supports a position in this regard with competent evidence. For example, as discussed earlier, Mr. Purdue did no market or consumer analysis to ascertain which features of the accused wheels were, in fact, driving demand for the products at issue.

In contrast, there is evidence that other, non-patented features drive demand for the Accused Products. *See, e.g.,* Ex. E, Excerpted report of Phil Green ¶¶108-123 (showing how price and customization differences drive demand for PCW wheels). Where such evidence exists, Mr. Perdue cannot reliably show that SRAM would have made all of PCW's sales "but for" PCW's alleged infringement. "To show 'but for' causation, the patentee must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003). Without that proof, which the Perdue Report fails entirely to offer, SRAM cannot be entitled to lost profits. *See Rite-Hite Corp.*, 56 F.3d at 1557 (Fed. Cir. 1995) ("In order to recover lost profits damages, a patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer.").

As it is, the failure to even attempt to offer evidence of the sort that could support a lost profits contention distills to Mr. Perdue opining that, as an expert, SRAM is entitled to lost profits because he says so. If admissibility could be established "merely by the ipse dixit of an admittedly

qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *U.S. v. Frazier*, 387 F.3d at 1261; *see also Quashen v. Carnival Corp.*, No. 1:20-cv-22299-KMM, __ F. Supp. 3d __, 2021 U.S. Dist. LEXIS 241507, at *33 (S.D. Fla. Dec. 17, 2021) (the "court's gatekeeping function requires more than simply taking the expert's word for it.") (citations omitted).

On its face, Mr. Perdue's say-so lost profits opinion is unreliable and inadmissible. The Court should exclude it entirely.

## IV.   CONCLUSION

**WHEREFORE,** PCW respectfully requests that the Court enter an order excluding the report and testimony of Glenn W. Perdue in their entirety at trial.

Dated: February 2, 2022

Respectfully submitted,

*/s/ David S. Brafman*
David S. Brafman (Florida Bar No. 68289)
Email: david.brafman@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Tel: (561) 653-5000

*Of Counsel*

James M. Wodarski (admitted *pro hac vice*)
Andrew H. DeVoogd (admitted *pro hac vice*)
Matthew S. Galica (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, PC
Boston, MA 02111
Tel: (617) 542-6000
Facsimile: (617) 542-2241
JWodarski@mintz.com
AHDeVoogd@mintz.com
MSGalica@mintz.com

*Counsel for Defendant Princeton Carbon Works
Inc.*