*UNITED STATES DISTRICT COURT*

*SOUTHERN DISTRICT OF FLORIDA*

*MIAMI DIVISION*

*CASE NO. 21-80581-CIV-RKA*


*SRAM, LLC,* .
                                        . *Miami, Florida*
             *Plaintiff,*      .
                                        . *April 20, 2022*
             *v.*                . *11:08 a.m.*
                                        .
*PRINCETON CARBON WORKS INC.,* .
                                        .
             *Defendant.*        .
. . . . . . . . . . . . . . .


                    - - - - -

          *Transcript of Markman Hearing had*

       *before the Honorable Roy K. Altman,*

          *United States District Judge.*

                    - - - - -


*Proceedings recorded by mechanical stenography, transcript
produced by computer.*

**APPEARANCES:**

```
For the Plaintiff:     Richard B. Walsh, Jr., Esq.
                       Michael J. Hickey, Esq.
                       Lewis Rice, LLC
                       600 Washington Avenue
                       Suite 2500
                       St. Louis, MO  63101


For the Defendant:     Andrew H. DeVoogd, Esq.
                       Matthew S. Galica, Esq.
                       Mintz Levin Cohn Ferris
                         Glovsky and Popeo, P.C.
                       One Financial Center
                       Boston, MA  02111


Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 207
                       Fort Lauderdale, Florida 33301
                       (305)301-3276
```

- - - - -

```
1              WEDNESDAY, APRIL 20, 2022, 11:08 A.M.

2              (The Judge entered the courtroom)

3         ROOM CLERK:  All rise.

4         THE COURT:  He's back.

5         ROOM CLERK:  United States District Court is now in

6    session, the Honorable Roy Altman presiding.

7         THE COURT:  Good morning.  Please be seated.

8         MR. WALSH:  Good morning, Your Honor.

9         MR. DE VOOGD:  Good morning, Your Honor.

10        THE COURT:  I said, "Where's Ajay?"  They said, "He

11   might be in the Bahamas."

12        COURTROOM SECURITY OFFICER:  Not yet.

13             (Laughter)

14        ROOM CLERK:  Calling case --

15        THE COURT:  People are trying to take your job like

16   you wouldn't believe.

17        COURTROOM SECURITY OFFICER:  Yeah, I know.

18        THE COURT:  It's like Game of Thrones over here.

19        COURTROOM SECURITY OFFICER:  Exactly.

20        ROOM CLERK:  Calling case 21-Civil-80581,

21   SRAM, LLC vs. Princeton Carbon Works, Inc.

22        Counsel, please state your appearances for the record.

23        MR. WALSH:  It's Rick Walsh on behalf of SRAM LLC.

24   And with me is a partner, Michael Hickey, on behalf of

25   SRAM, LLC.
```

```
 1              THE COURT:  All right.  Good morning, folks.
 2              By the way, if you want to, you can take your mask off
 3    if you feel comfortable.  You don't have to.
 4              MR. WALSH:  Thank you, Your Honor.
 5              MR. HICKEY:  Thank you.
 6              MR. DE VOOGD:  Thank you, Your Honor.
 7              Good morning.  Drew DeVoogd from Mintz Levin on behalf
 8    of the defendant, Princeton Carbon Works.  And with me is my
 9    partner, Matthew Galica.
10              THE COURT:  All right.  Good morning to you all.
11              MR. DE VOOGD:  Good morning.
12              THE COURT:  All right.  We're here for the Markman
13    hearing.  I've read everything you've submitted.  Very
14    interesting case.  I'm glad you brought the bike.  Tell us how
15    you'd like to handle it.
16              MR. WALSH:  Well, Your Honor, we'd like to begin with
17    just a short tutorial to explain kind of the background of the
18    technology.  And when I say "short," I mean five to
19    eight minutes, something like that.
20              THE COURT:  That's fine with me.
21              MR. WALSH:  Describe what's going on, and then
22    discuss -- you know, we can go through the terms, you know,
23    as -- a number of them we've now been agreed to, Your Honor.
24              THE COURT:  We're only talking about the three that
25    are left.
```

1          MR. WALSH:  That's right, Your Honor.  And then we

2     would begin with discussing the first term, which is the

3     "continuously varies."

4          THE COURT:  Okay.  Any objection to that?

5          MR. DE VOOGD:  No, Your Honor.  The only thing I would

6     add is that I think it would be useful if we cover the

7     "continuously varies" claim term, we exhaust whatever questions

8     you may have as to both parties on that claim term, and then

9     turn to the "peaks" and "troughs" term, so it's sort of a

10    round-robin.  I think that may be more helpful.

11         THE COURT:  I wasn't necessarily going to do it that

12    way.  I was just going to have you make your arguments and

13    then -- well, let me just tell you a little secret.  I already

14    pretty much know which way I'm thinking of leaning, but there's

15    a little bit of wiggle room on the margins.  I'd like to see if

16    we can get some agreement on some of these things.

17         I think, you know, you take extreme -- for example, on

18    "peaks" and "troughs," you both take an extreme view.  I think

19    there's a middle ground that makes a lot of sense.  And so I

20    might just tell you how I feel, and you could tell me what you

21    think about it.

22         The last one I did, in that *Venus vs. Edge*

23    *Systems (sic)* case that you all cited, we showed up with like

24    ten disputed terms.  And by the end of verbal bludgeoning from

25    me, we had agreement on like seven of them.  So I'm hoping we

1  can do something like that here.

2         Now, it's a little bit of a different situation, so we

3  may not be able to.  I mean, there may be reasons why you just

4  don't think it's viable for your client to move a little bit

5  towards the middle, and I understand that.  But I'm going to

6  try to make you move.  So we'll see how we go.

7         MR. DE VOOGD:  Well, we welcome whatever verbal

8  bludgeoning you're willing to deploy today, Your Honor.

9         THE COURT:  All right.  Sounds good.

10         And there may be a time when I venture -- jump on that

11  bike.  We'll see what happens.

12         All right.  So you want to play a video.

13         MR. WALSH:  No.  I was just going to discuss it.

14         THE COURT:  Oh, come on up, then.

15         MR. WALSH:  Yes, okay.  Thank you.

16         Is that working in terms of -- all right.  Thank you.

17         So, Your Honor, we wanted to begin by talking about

18  what the general technology is.  Obviously, this is a bicycle.

19         You know, wheels, according to archeologists, have

20  been around for 6,000 years.  I'm also told archeologists said

21  that the first time that they had wheels that weren't full, you

22  know, they had something empty in the middle, was 4,000 years

23  ago.

24         The first bicycle patent was 1818.  When it was first

25  invented, it's kind of in dispute, because sometimes they just

1   had a reel here, and they didn't have gears before that, but

2   about 1818.

3          Fast forward almost 200 years, and you come to the

4   patent -- Katsanis patent about these particular wheels.  This

5   particular bicycle is a -- you know, these -- the wheels in

6   question are about very sophisticated wheels.  And here I'll

7   give it to you.

8          So this is a, you know, the type of bicycle that

9   people would ride in the Tour de France or something like that.

10          THE COURT:  So it's that level of bike that we're

11   talking about.

12          MR. WALSH:  Yeah.  This sells for $17,000.  So it's

13   very -- and as you can see, there's a lot of things on here

14   that are made to be aerodynamic, because in bicycling, that's

15   extremely important, right?  Because you're going into the wind

16   generally.  So you may have seen wheels that are full.

17          In other words, when air comes and hits here, it

18   creates drag.  And drag is just air resistance, right?  And

19   then it goes around this leading edge into this trailing edge,

20   and it spins on both sides of it.

21          And you can almost feel that yourself, if you're in a

22   pool, and, you know, water up to your neck, and you move your

23   arm through it, you can feel you're pushing against something.

24   That's drag.  And then you can feel things going behind you,

25   the water circling; those are the eddies and vortices that go

1    around behind it.

2         And what this is trying to do -- you know, the most

3    aerodynamic bike or bicycle wheel is one that's solid.  It's

4    completely solid, because then the air just keeps flowing, and

5    it only has that time at the end where it creates those, you

6    know, vortices, as opposed to having it happen multiple times

7    at different levels, because you have a leading edge --

8         THE COURT:  And the issue with that is what, that the

9    solid wheel is too heavy?

10        MR. WALSH:  Well, it's not too heavy.  They can make

11   them extremely light.  But, for example, if you were cycling in

12   a dome, you know, covered arena, for example, and there was no

13   ambient air around or wind, it would be fine to use those

14   disks, because all you're doing is going forward, and you don't

15   have any crosswinds.

16        But, of course, when you're outside, you have

17   crosswinds all the time.  And that's what this is designed to

18   do.  Because the thicker you have this wheel, in general, the

19   thicker you have it, the more aerodynamic it is going forward.

20   So less energy.  You can go faster/further using less energy

21   the thicker this rim is.

22        However, when you do that, the tradeoff is stability

23   if you get a crosswind.  And, of course, there's always a

24   crosswind.  And if you have a crosswind, it starts putting

25   pressure on both sides of this wheel, and it starts to push it

1   this way.  Just kind of like if you're in a car, you know, and

2   it's really windy, especially if it's, you know, a larger car,

3   and you start being pushed on the highway, and you have to kind

4   of steer back a little, that's what happens.

5           Because what happens is, the center of pressure, which

6   is normal if you have no wind, is right on this hub, starts to

7   go backwards.  And that makes the wheel unstable to use.  And

8   so the rider has to keep adjusting.  And that takes away

9   energy.  And that's why you want to avoid it.

10          So what this is designed to do is to kind of have the

11  best of both worlds.  It's designed to stop that crosswind from

12  affecting it and pushing it as much, because what they found

13  with the bumps on these wheels, that are sometimes called

14  tubercles, kind of like the whales have on their fins, on the

15  back of their fins --

16          THE COURT:  When ones are the tubercles?

17          MR. WALSH:  These bumps that are on here.

18          THE COURT:  Oh, I see.  Okay.

19          MR. WALSH:  And then you have bumps on other wheels.

20  They can also be this way as well, Your Honor.

21          MR. DE VOOGD:  Your Honor, I'm going to object to

22  this.  It is black-letter Federal Circuit law that claim

23  construction cannot be performed with any reference whatsoever

24  to the accused products.  That is my client's wheel.  It has no

25  bearing on how the claim should be construed to a person of

1  ordinary skill in the art at the time of the invention.

2       THE COURT:  I don't think that's what he -- I think

3  you're right about that.  It's just -- I don't think that's

4  what he was doing.  I think I asked a very superficial,

5  probably silly question, "What is a tubercle," and it's not as

6  defined in his as it might be in yours, so he was just showing

7  me what it was.

8       MR. DE VOOGD:  I appreciate that, Your Honor.  And you

9  can take that for what it's worth, but I don't think it's

10 proper for that wheel to even be in the courtroom.  So I'll

11 just make the objection to --

12      THE COURT:  Your objection is sustained.

13      I'm not going to look at it then.  I just asked a

14 question about what a tubercle is, and I think he was just

15 trying to highlight one for me.  That's all.

16      MR. DE VOOGD:  He can hand you one of his own client's

17 wheels, Your Honor.

18      THE COURT:  Yeah, that's fine.  No problem.

19      I think I understand what it is.  Just for the record,

20 before that was -- the objection was made, the counsel for the

21 plaintiff had shown me a tubercle on his own wheel.  And

22 they're close enough to me that I can see it, and I know the

23 answer, so we can move on.

24      MR. WALSH:  Right.  And, Your Honor, just for that,

25 defendant cited for the first time in their reply brief the

1    *NeoMagic* case for the proposition that he just said, that you

2    can't look at the accused product.  That's a 2002 Federal

3    Circuit case.  That is not the current law.  A 2006 case,

4    *Wilson Sporting Goods vs. Hillerich Bradsby*, that's at

5    442 F.3d 1322 --

6             THE COURT:  Hold on.  Let me -- we can resolve this

7    issue now.

8             MR. WALSH:  Okay.

9             THE COURT:  It's really neither here nor there,

10   though, is it?

11            MR. WALSH:  No, it's really not.  It just -- but it

12   says you can consider that for the basic parameters of the

13   technology, including claim construction.

14            THE COURT:  Right.  But my point is, are you really

15   relying on what their wheel looks like at all?

16            MR. WALSH:  No.

17            THE COURT:  So do we have to get into this?

18            MR. WALSH:  No, no.

19            THE COURT:  Not at all.  Okay.

20            MR. WALSH:  Absolutely.  Okay?

21            So the -- and so what these do is they break up,

22   they -- these, you know, undulating parts of this wheel break

23   up that air coming around.  And so when it breaks it up, it

24   makes it less likely to have drag, and so it keeps that -- it

25   moves the center of pressure.

1          Like if you have a strong wind going this

2     way (indicating), the center of pressure would move to the back

3     from the hub, from back here -- I'm sorry -- back this way.  It

4     would then move it back toward the hub.  So it would be easier,

5     ride longer, et cetera.  So that's the whole thing.

6          And the patent talks about this, specifications,

7     column one, begins on line 28, and then also specifically in

8     line 40 through 52 talks about the aerodynamic benefits of what

9     these claims, you know, are about.

10          And that's the background of it, Your Honor.

11          THE COURT:  And the idea is that -- well, I guess

12     you're going to get into it, so go ahead.

13          MR. WALSH:  Well, the idea is that this allows you not

14     only to be aerodynamic, but also to be more stable.

15          THE COURT:  For a crosswind.

16          MR. WALSH:  Exactly.  That's the whole benefit of it.

17     So you wouldn't use this on a track, like a Velodrome.  But

18     outside, you would use it, because it would give you a benefit.

19          And if you think about it, these benefits are really

20     small, you know, they're, you know, small percentages.  But if

21     you think, these bicycles are ridden in these big races a

22     hundred miles.  So if you have a 2 percent advantage,

23     1 percent, 3 percent advantage, it's a big advantage --

24          THE COURT:  Over a long haul.

25          MR. WALSH:  Right.  Because you have more energy at

1    the end.

2              THE COURT:  Okay.

3              MR. WALSH:  All right.  Thank you.

4              MR. HICKEY:  So, Your Honor, Michael Hickey.  I'm on

5    behalf of SRAM.  I'll be presenting with respect to the three

6    terms that we have remaining in dispute.

7              THE COURT:  Okay.

8              MR. HICKEY:  So if I can, just to take a step back,

9    Your Honor, just preliminary, I know that you're fully aware of

10   the briefs.  I don't want to repeat all the arguments that are

11   set forth there and all the case law.  You understand the law

12   with respect to claim construction well.  So I'm just going to

13   focus on the most salient points.

14             I think just to kind of start, as Mr. Walsh was

15   describing, this is a wheel that's never been seen before.

16   It's got a unique configuration of undulating curves that are

17   on the interior edge of the rim, and that form gives rise to

18   enhanced aerodynamic and stability performance.

19             What we find a little surprising here today is, we

20   don't think there's really any real dispute about the plain

21   meaning of the terms that remain.  In fact, Princeton told the

22   Patent Office in these IPRs that no terms needed to be

23   construed.  And now Princeton's telling the Court something

24   completely different.

25             In fact, what Princeton is saying is not only that

1  terms need to be construed, but that those terms were

2  specifically defined or changed during the prosecution of the

3  patent, or that the terms were so vague that they're indefinite

4  under the patent laws.

5       And our view is that those disputes were created to

6  avoid infringement, but not really trying to help the jury

7  understand the terms.  And there's really no evidence, even,

8  that the claims were actually in dispute.

9       Princeton's own expert didn't say that he disputed the

10 plain meaning of these terms.  He said he understood the

11 parties to dispute the meaning of certain claim terms and

12 simply that he agreed with Princeton's proposed constructions.

13 That's at paragraph 38 of Princeton Exhibit A, the Hanson

14 declaration.

15       So if we look at --

16      THE COURT:  How do you distinguish those two

17 propositions?  One is that he didn't dispute the plain meaning

18 of the terms, and the other is that he took Princeton's side

19 with respect to the dispute.

20      MR. HICKEY:  Sure.  So he obviously -- it -- I guess

21 the point is, from a person of ordinary skill in the art, he

22 wasn't starting with the proposition that the claim terms had a

23 different meaning, that they had a different plain meaning.  So

24 I take it from the standpoint of let's start with where you

25 should start in the claim construction process, is that claim

1  terms are presumed to have their ordinary and plain meaning.

2  That's where we start.

3        Now, he can, you know, then say, I agree with

4  Princeton, because there were certain things that happened in

5  the prosecution history that he believes changed that plain

6  meaning.  But we have to start where we know we are, which is,

7  there's this heavy presumption that the claim terms mean what

8  they say and that the ordinary meaning that would be attributed

9  to those words by persons skilled in the art.  That's the

10 *Superguide Corp. vs. DirecTV Enterprises, Inc*. case.  That's

11 358 F.3d 870, 874 to '75, Fed. Cir., 2004.

12       So remembering what you set out in the *Edge* case what

13 that hierarchy of claim construction is.  You start with the

14 claims themselves.  And you look not just at the asserted

15 claims, but the unasserted claims.  Because you don't want to

16 render dependent claims superfluous.  And you pointed that out

17 in *Edge*.

18       And, in fact, you appropriately, in our view, cited to

19 the Honorable Justice Scalia in terms of talking about the

20 interpretation of text, because in the same way that you

21 shouldn't add words to a statute, you shouldn't add words to a

22 contract, you shouldn't add words to a patent.  You start with

23 the plain meaning, and you look to the construction that stays

24 true to the claim language and most naturally aligns with the

25 patent's description of the invention.

1          After that, after you've looked at the claims and the

2     words in context, you move to the specification.  You know,

3     obviously, you can't import limitations from the specification

4     if they're not in the plain language.  You look to see if

5     there's a special definition.  There's no contention by

6     Princeton that there's any special definition of these terms in

7     the specification.

8          So then next you go to the prosecution history, which

9     is this series of communications between the Patent Office and

10    the applicant.  And as you've noted, as well, that's an ongoing

11    negotiation.  It's not the final product of that negotiation,

12    and, therefore, it may lack clarity.  And if there's a

13    disclaimer or a special definition, a disclaimer has to be

14    clear and unmistakable.  And then you can look to extrinsic

15    evidence.  You can look to dictionaries, expert testimony as

16    necessary.

17         I do want to make a point that was raised in the reply

18    of Princeton objecting to our reference to Princeton's patent

19    application and marketing materials and saying that we were

20    opening our discussion of each claim term with extrinsic

21    evidence, and that all of our extrinsic evidence postdated the

22    relevant time period for claim construction.  We believe

23    they're wrong on multiple counts.

24         First of all, when we reference that application and

25    those marketing materials, it's not to interpret the claims.

1  We're not offering that to interpret the claims.  It was simply

2  to show, again, that the plain meaning was not really in

3  dispute, because Princeton knew what those terms meant, and

4  they used them as well.  And, again, they told the Patent

5  Office that no claim construction was necessary.

6         THE COURT:  Is there a difference to your mind -- the

7  exercise here, as I said in *Edge*, and as I'm going to repeat

8  here today, it seems to me is of course one of interpreting the

9  claims.  But it's also of construing them with an eye towards

10 the reality that one day we're going to be before eight -- I

11 pick eight, but six to eight everyday people, who they maybe

12 know who Lance Armstrong is, but they don't know much else

13 about these bicycles.  And so there may be a difference between

14 what's clear and plain with respect to them and what needs to

15 be construed with respect to the Patent Office.  Isn't there?

16        MR. HICKEY:  Well, what I would --

17        THE COURT:  Well, I guess maybe that difference

18 redounds to your benefit, because one would think that if it

19 doesn't need construction to the Patent Office, maybe it by

20 definition doesn't need construction to the jury.  Although I

21 guess you could see them arguing the opposite, which is, one

22 thing is to say it doesn't need construction to the expert

23 because the expert lives in that field, but it may need to be

24 made more plain to the jury.

25        I mean, the problem is that their definitions are much

```
 1    less plain.  And that's a problem I'll address with them.  But
 2    this -- my point is, it doesn't necessarily follow, does it,
 3    that because they said to the Patent Office that the claim
 4    doesn't need to be construed, that, therefore, we should all
 5    agree it doesn't need to be construed when we're talking about
 6    eight everyday people off the street?
 7            MR. HICKEY:  I understand that point, Your Honor.  I
 8    think that -- our point is that -- of course, you can take
 9    different positions before the Patent Office and this Court.
10    Their position before this Court is not that, A, we just need
11    some kind of restatement in order to make this more
12    understandable to a jury member; it is there were special
13    definitions, there were -- you know, clear and unmistakable
14    disclaimers, in their view, during the prosecution history that
15    totally redefined these terms.  And those special definitions
16    are what should control.
17            Now, if that's the case, that's fine.  I understand
18    that's their position.  We think it's created to avoid
19    infringement.  They didn't say that to the Patent Office.  They
20    didn't -- if that was their position, that these terms had been
21    redefined specially by the applicant during prosecution, they
22    should have put that before the Patent Office.  To me, it's
23    totally inconsistent.
24            And so I understand from your standpoint and from a
25    jury's standpoint, we -- obviously, we want to make this
```

1   understandable to a jury.  We think that we can do that.  We

2   think that the plain language can do that.  Obviously, there's

3   a difficulty or a challenge when you start restating terms that

4   the applicant picked himself to explain his invention.  And do

5   those substitutions accurately reflect, or do they create more

6   problems?

7        So I hope that addresses your --

8        THE COURT:  I think it did.

9        MR. HICKEY:  -- question.

10       THE COURT:  Thank you.

11       MR. HICKEY:  So from our standpoint, our discussion in

12   our brief of claim construction starts with claim language

13   first, goes to the specification, goes to the file history,

14   confirms those plain meanings with dictionaries and testimony

15   of one of ordinary skill in the art at the time of the

16   invention, in 2011.

17       And actually, the extrinsic evidence that we use for a

18   claim construction doesn't postdate the invention.  The

19   dictionaries are from 1986 and 1991.  The testimony of a person

20   of ordinary skill in the art is direct and to the perspective

21   of 2011.

22       THE COURT:  I think they were referring to the

23   marketing materials.  But I take your point that you were

24   making a different point when you were using those.

25       MR. HICKEY:  Yes.  Those -- obviously, those

1   dictionaries and that testimony from one of ordinary skill in

2   the art I think is appropriate for a construction of the terms,

3   to the extent that you even need to go there.

4          So where are we?  We're down to these three terms.

5   Note that eight months ago, we started with 20 terms that

6   Princeton said needed to be construed.  We agreed to the

7   construction of one term, which was "radial distance" --

8          THE COURT REPORTER:  I'm sorry.

9          MR. HICKEY:  The parties agreed to the construction of

10  one term, "radial distance," a month later.

11         Then in October, Princeton told the Patent Office that

12  zero terms needed to be construed.  In December of 2021,

13  Princeton withdrew its request to construe ten of the terms as

14  indefinite.  So that left us with nine that we briefed before

15  the Court in January and February.

16         Princeton has now stipulated to SRAM's construction of

17  three of the terms -- "undulating configuration," "undulating

18  curve configuration" and a "radius."  And even though we don't

19  think the terms need to be construed, we're fine, again, to the

20  extent that it helps the jury to restate the meaning of those

21  terms in a way that we think is plain meaning.

22         So now we're left, really, with these three sets of

23  terms.  And so I would like to turn to "continuously varies."

24         Our view on that is that an average juror would

25  understand that term.  It's plain language.  It's so plain --

1    again, not for purposes of interpretation, but it's so plain

2    that Princeton's used that -- the same or similar terms in its

3    marketing to the public.  At SRAM Exhibit 11, they describe

4    their Wake and Grit wheels to include an edge that's

5    "continuously varying," almost the identical language.  And

6    SRAM Exhibit 10, Princeton Wake wheels described of "having the

7    use of a constantly varying trailing edge."

8            So these are terms that are common.  We don't think

9    that a restatement is necessary.  But if restated, our proposal

10   of changes without interruption we believe follows that

11   meaning.  We think that that's consistent with the usage of the

12   phrase in the context of the claims.

13           And if we could pull up slide 2.

14           And so just for your convenience, Your Honor, we've

15   highlighted the terms that are in dispute in Claim 1 of the

16   '800 patent.

17           You can see that that's referencing "a radial distance

18   that continuously varies between adjacent peaks and troughs,"

19   and then we'll get to the other terms.

20           If we could go to slide 3.

21           Again, that "continuously varies" language appears in

22   independent claim 17 of the '800 patent.

23           And then if we go to slide 4, I want to make very

24   clear that "continuously varies" language with respect to the

25   radial distance is not present in any of the claims of the '188

1    patent, the continuation patent.

2         We believe that --

3         THE COURT:  And why is that?

4         MR. HICKEY:  Well, so if we get to the prosecution

5    history, we look, and there are prior art references.

6         THE COURT:  Mercat.

7         MR. HICKEY:  The Mercat reference, for example, that

8    were cited by the examiner as being relevant to this

9    circumstance.  Now, Mercat just --

10        THE COURT:  To the '800, but not to the '188.

11        MR. HICKEY:  It was identified for the '188 as well.

12   In fact, it was brought back up again.  And let me just

13   describe Mercat for a second, just so you know, Your Honor.

14        In contrast to these wheels, what Mercat was -- and

15   there's a corollary product called the Mavic wheel that

16   Princeton has relied on from a validity standpoint -- it was an

17   aluminum rim, a metal rim.  Okay?  And what Mercat did was

18   shaved out the area or kind of milled out or machined out a

19   portion of the rim between where the spokes were (indicating)

20   so that it left a little bit more metal as spoke supports for

21   the stability of the spokes.

22        But they machined out that metal to save weight.

23   Okay?  Like Mr. Walsh said before, like every little bit

24   matters.  And believe it or not, shaving out that metal to

25   reduce the weight is something that cyclists wanted, or at

1    least Mercat thought that they did.  And so that's what

2    happened.  And so there are kind of long areas that, you know,

3    align with and have kind of a constant radial distance.  And

4    then it rounds up a little bit, and then there's another

5    section that is the spokes support.

6           So in the '800 patent prosecution, what the applicant

7    identified and added language to say that the radial distance

8    continuously varies between adjacent peaks and troughs.  Okay?

9           The reason that that same language doesn't appear in

10   the '188 is because you can draw different distinctions with

11   the prior art.  And that's what the applicant did in the second

12   patent.  They said, Okay, we're not going to talk about the

13   continuously variation of the radial distance, we're going to

14   come up with another reason that we think that we're different

15   from the prior art.  And that was that Mercat didn't have

16   convex profiles.  It didn't have convex peaks.  So you're

17   allowed to do that.  You're allowed to make different

18   distinctions.

19          THE COURT:  Would that have been sufficient in the

20   '800 patent to say "convex and concave peaks" as opposed to

21   "continuously varies"?

22          MR. HICKEY:  Yeah, I think so.  I mean it's -- you

23   have a choice of -- you can say that you're different -- you

24   know, I -- I mean, I like to think that my wife thinks that I'm

25   different than other guys that she's dated.  Hopefully there

1   are multiple reasons.

2            THE COURT:  Mostly for the worst, probably.

3            MR. HICKEY:  Probably.  You know, I'm lazy here, I

4   don't pick up after -- like the other guy did, you know.

5            But you can come up with a series of reasons that

6   you're different than the prior art.  And your patent can issue

7   over that prior art for those different reasons.  And that's

8   what happened here.

9            That's why "continuously varies" isn't a requirement

10  of the '188 patent.  And that's part of our problem with the

11  additional limitations that Princeton is trying to --

12           THE COURT:  Is it fair to say, then, in your view,

13  that "continuously varies," as they have defined it, is --

14  would be a sufficient but not a necessary means of

15  distinguishing the Mercat prior art patent?

16           MR. HICKEY:  When you say "they defined it," you mean

17  Princeton.

18           THE COURT:  Yes.

19           MR. HICKEY:  So I think that our definition of

20  "continuously varies" in terms of just restating it as changes

21  without interruption is a plain meaning construction.  The

22  issue that we have with their construction is this idea of

23  referencing two abutting points.

24           THE COURT:  Hypothetical points, right?

25           MR. HICKEY:  Hypothetical, geometric.  They have no

```
1    size or shape.
2            Now, I'll grant you that there are other places where
3    we refer to a point in a definition, but that's because it's on
4    a known coordinate.  If we talk about a point on a
5    circumference, you can identify the circumference.  If you talk
6    about a point on the circle --
7            THE COURT:  We were going to get to that.
8            MR. HICKEY:  Yes.
9            THE COURT:  "Peaks" and "troughs."
10           MR. HICKEY:  Correct.
11           THE COURT:  I took you to be denying in a strange way
12   in the "peaks" and "troughs" section of your brief that there
13   are these singularity moments in the claim, and that you were
14   denying that.  But you're not, is what you're saying.
15           MR. HICKEY:  We're not denying that there are
16   obviously references to singular points at certain aspects of
17   the claim or within the specification.
18           Our problem with their constructions of "continuously
19   varies" and "peaks" and "troughs" is this reference to abutting
20   points.  Because that gets you to this infinitesimally
21   impossible measurement.  You can't distinguish where two
22   abutting points actually are.  You could go to the atomic level
23   and have things that, you know, are they really abutting or
24   not.
25           Now, they've come up -- we're jumping to some of their
```

1    arguments on "peaks" and "troughs" where they say Mercat --

2              THE COURT:  We'll talk about it later.

3              MR. HICKEY:  Sure.

4              THE COURT:  I guess what I'm getting at is that there

5    are multiple -- I take your point that there are multiple

6    different ways to distinguish the Mercat patent.

7              MR. HICKEY:  Correct.

8              THE COURT:  One of them, I guess, is their way.  But

9    that's not the only way.  And I guess that's your point.

10   Right?

11             MR. HICKEY:  That's right, that's right.

12             And so we think that in the '800 patent, the way that

13   that was done was through the insertion of continually -- there

14   were two words that were inserted.  One was "continuously" in

15   front of "varying," and the other was "adjacent" in reference

16   to "peaks" and "troughs."  And we don't deny that.  We don't

17   deny that that happened.  We've submitted the full file history

18   of both patents to you.  There's nothing that we're afraid of

19   in the file history.

20             That was not a disclaimer of scope.  Those were words

21   that were added to distinguish the prior art.  The applicant

22   was not trying to change the meaning of "continuously."  And

23   we're not asking -- if you read the cases that have been cited

24   by Princeton, the *Amgen* case, *Omega* case, those are instances

25   where a patentholder got certain claims and then comes into

1  claim construction and either tries to remove a restriction or

2  to try to add something back in that they gave up during

3  prosecution.  That's what happens when you have a disclaimer if

4  there's a clear and unmistakable giving up of that.

5       Here we just added the word "continuously" to

6  distinguish the prior art.  We're not asking you to remove the

7  term "continuously."  We don't think it needs to be construed,

8  but I understand maybe for a jury it would be better to say

9  "without interruption" or "constantly" or -- I mean, there are,

10 you know --

11      THE COURT:  Here's one -- you're going to see this a

12 lot today.  But why do we have to have one or the other?  For

13 example, "changes without interruption" is confusing to me.

14      MR. HICKEY:  Okay.

15      THE COURT:  More confusing, I think, than

16 "continuously varies."  Although, I could see a jury saying the

17 word "varies" -- we're in Miami, by the way.  I don't know

18 where you guys are from, but not everybody speaks English the

19 way you all speak English in Miami.  And that's not a knock on

20 anybody.  If my parents were on this jury, their English isn't

21 that good either.

22      MR. HICKEY:  Well, I grew up in rural Missouri, so

23 hopefully --

24      THE COURT:  Your English is perfect, I guess is what

25 you're saying.

1          *(Laughter)*

2          THE COURT:  So the point is that maybe "varies" is --

3     sounds like kind of a technical word.  Why couldn't we use

4     something like "continuously changes"?  "Changes" being a

5     synonym of "varies."  "Continuously" being the word that's in

6     there.  And nobody has any question about what the word

7     "continuously" means.  It's in there, and it's a very clear and

8     plain word.  I think "varies" is generally a plain word,

9     although, "changes" might just be more commonly used.

10          MR. HICKEY:  We have no objection to "continuously

11    changes."  That's totally fine.

12          THE COURT:  What about Princeton, "continuously

13    changes"?

14          MR. GALICA:  I think --

15          MR. DE VOOGD:  Stand up.

16          MR. GALICA:  I think in --

17          THE COURT:  I don't mean to get into a huge argument.

18    I'm going to hear from you later.

19          MR. GALICA:  Yeah.

20          THE COURT:  I just mean maybe we can circumvent this

21    the whole thing if we can agree to something like "continuously

22    changes," or something else like that.

23          MR. GALICA:  Yeah, I think we're open to considering a

24    middle ground.  I think in view of this right now, we think

25    that our proposed construction offers more precision and

1    accurately --

2         THE COURT:  I disagree with you about that.  And we

3    can get into that.  I mean I'm happy to get into that.  I think

4    your definition imports limitations that aren't necessary both

5    to the construction and to what the claims meant at the time of

6    the prosecution.  I think it also is indecipherable in salient

7    ways.

8         And it's also wrong in the point that I just made,

9    which is not technically a point they made in their brief, but

10   it's an important point, which is this "necessary" versus

11   "sufficient" point.  And I guess it's what he was getting at

12   when he was talking about '188 versus '800, that there are many

13   ways to distinguish the prior art.  Your best point has to do

14   with Mercat, but I just see it a little bit differently than

15   you.

16        Anyway, that's all stuff we can get into later.  I'm

17   just saying, do you like "continuously changes," or should we

18   let him keep talking?

19        MR. DE VOOGD:  I think we'll let him keep talking.

20        THE COURT:  All right.  Fair enough.

21        Go ahead, sir.

22        MR. HICKEY:  Well, Your Honor, I think that you

23   understand our position on "continuously varying."  We're fine

24   with "continuously changing," "continuously changes," that's

25   fine.  I don't really have anything further --

```
 1              THE COURT:  All right.  Well, then I'll hear from you
 2    on "continuously varies."
 3              Did you say something, Fran?
 4              THE COURT REPORTER:  No.
 5              THE COURT:  Okay.
 6              MR. DE VOOGD:  Your Honor, we may have some slides as
 7    well, and we printed hard copies --
 8              THE COURT:  Sure.  You can just put them on the ELMO,
 9    and we'll just switch over to it.
10              MR. DE VOOGD:  We can use the computer.  I have hard
11    copies for you.
12              THE COURT:  Oh, great.  That's fine.  Thanks.
13              Thank you.
14              MR. GALICA:  Okay.  All right.
15              I'll skip ahead to I think what will be the relevant
16    portions of our discussion of this term.
17              I think from the outset -- of course, we're not
18    attempting to inject ambiguity.  The purpose of our proposed
19    construction is to seek precision and clarity as to what falls
20    within the scope of the claims as negotiated by the patent
21    owner and patent applicant with the Patent Office.  And what we
22    believe occurred during the prosecution history with respect to
23    the Mercat reference was a clear and unmistakable disclaimer of
24    claims by both argument as well as amendment.
25              And the point that Mr. Hickey was raising in the
```

1   discussion you were having with him about whether it was the

2   necessary, sufficient, or exclusive distinction made over the

3   prior art is not actually required for disclaimer to be found.

4         The fact of the matter is, with respect to the '800

5   patent claims, the examiner advanced the Mercat reference in

6   front of the patentee.  In view of that, the patentee said,

7   "Our patent, these claims that we want granted do not include

8   radial distances -- constant radial distances for any portion

9   of the undulating rim."

10        And I think the concern with SRAM's construction from

11  our perspective and why we think it requires additional clarity

12  can be found in the reply brief towards the end of their

13  discussion of the "continuously varying" section.

14        THE COURT:  In their response?

15        MR. GALICA:  In their responsive brief.

16        THE COURT:  Let me pull it up.

17        MR. GALICA:  Sure.  And I'll direct your attention to

18  page 6.  And starting at the end of the paragraph that spills

19  over from page 5, what SRAM appears to be doing is offer a

20  plain and ordinary meaning with a proposed restatement "change

21  without interruption" that in and of itself seems ambiguous.

22  It's unclear what an actual interruption would be, what would

23  constitute an interruption.

24        THE COURT:  Well, that's why but "continuously

25  changes," there's no objection to that.  I agree with you that

1   "with interruption" or "without interruption," can be

2   confusing, because we don't think of interruptions as being

3   imperfections in a sloping line.  But "continuously" removes

4   that potential ambiguity, doesn't it?

5         MR. GALICA:  I think "continuously" should.  Our

6   concern is that the discussion of presenting the question to

7   the jury to determine whether the accused products effectively

8   interrupt, on the bottom of the paragraph on page 6, spilling

9   over from page 5 --

10        THE COURT:  But that's not what I'm going to be

11  telling the jury.  I'm not proposing to take in the word

12  "effectively" or the word "interrupt."  I'm proposing to say

13  "continuously changes."

14        MR. GALICA:  Understood.  And what I think what --

15  where PCW is coming from is that's the concern.  It appears

16  that SRAM is attempting to broaden the scope of "continuously

17  varied" to include small portions of unchanging radial

18  distance.  And that's why PCW believes a more precise

19  construction --

20        THE COURT:  I take your point on that.  I just -- I

21  just don't really care what they're trying to do.  I care

22  what -- that we're getting it right with the claim, and that

23  we're giving it to the jurors in a digestible and discernible

24  way.  And I think "continuously changes" ameliorates both of

25  the concerns you've just advanced.  It doesn't sweep in more

1  than what the claim actually tries to accomplish.  Right?  It's

2  continuously changing, therefore, it doesn't sweep in the

3  "essentially" ambiguity you were concerned about.

4       And, two, it uses language that unlike, for example,

5  "without interruption," cannot be misconstrued even by the most

6  rudimentary English speaker.  Don't you think?

7       MR. GALICA:  I understand and conceptually agree.  And

8  that's what -- from --

9       THE COURT:  So why don't we --

10      MR. GALICA:  And it may be a semantic discussion.

11      THE COURT:  This is what verbal bludgeoning looks

12  like.

13      *(Laughter)*

14      THE COURT:  What is the difference between

15  conceptually agreeing with me and just agreeing with me?

16      MR. GALICA:  I think our concern is that we believe

17  SRAM, based on arguments and contentions that they've advanced

18  to this point in the case, would adopt the same positions if

19  the claim were construed to be "continuously changing."  And

20  what we think is more helpful --

21      THE COURT:  I'm sorry.  What positions are you talking

22  about?  I'm talking about what will actually be included in a

23  hopefully no more than 25-page document that I will have to

24  read to the jurors just before you all give your closing

25  arguments.  I'm talking about none of the things that are in

```
 1    their brief.  I'm talking about two words.  And the words are
 2    "continuously changes."
 3          I'm not requiring any importing of "essentially" or
 4    "without interruption" or any of the other things you might be
 5    concerned about.
 6          Now, they may get up in closing argument and say
 7    things you might find objectionable, in which case you should
 8    object at that time.  But you'll be free, also, to come in, in
 9    your response closing argument and say why the things they said
10    were objectionable and why that's not the meaning or the ambit
11    of the two words I've included in the instructions,
12    "continuously changes."  But that's not a reason not to put the
13    right words into the instructions.  Does that make sense?
14          MR. GALICA:  Absolutely, yeah.  Completely understood.
15          So with respect to the proposal that you've offered,
16    "continuously changes," if it's acceptable to you, we would
17    like to take it under advisement but strongly consider adopting
18    it.
19          THE COURT:  Absolutely.  That's totally fine.  How
20    about a week?  Does that sound fair?
21          MR. GALICA:  Yeah, more than enough.
22          THE COURT:  Okay.  So within seven days -- I take it
23    that SRAM accepts that proposal?
24          MR. HICKEY:  Yes.  We already accept that proposal,
25    Your Honor.
```

```
 1              THE COURT:  All right.  So within seven days -- if you

 2   think it can be sooner, that's easier -- but seven days is fine

 3   with me.  Within seven days, you'll file a notice on the docket

 4   telling me whether you approve of it or not.

 5              Just in case, I'm going to give you my ruling today on

 6   why I think "continuously changes" is the instruction that I

 7   think makes the most sense, so that we don't have to have

 8   another hearing later, and I'll lay that out at the end.

 9              MR. GALICA:  Okay.

10              THE COURT:  Okay.  Do you have any more argument on

11   "continuously changes"?  Excuse me -- "varies"?

12              MR. GALICA:  The only addition I would add -- and I

13   think it's well briefed, so I'm weary of restating it -- but a

14   concern of PCW's as well, is that the construction reflects the

15   fact that a disclaimer occurred.  And we think, as you've

16   proposed it, conceptually that seems to capture how the

17   patentee distinguished the claim scope from Mercat, otherwise

18   the claims would not have been granted.  But with that said,

19   we'll take your proposed construction under advisement and

20   we'll have that to you within a week.

21              THE COURT:  Okay.  Thank you.

22              All right.  So, we're on to "peaks" and "troughs."

23              Let me try to circumvent here, too, because this is

24   the simplest one.  In most places, I don't know that we would

25   need to do anything with "peaks" and "troughs."  The problem as
```

1    I see it is that you've taken a couple of positions that are on

2    the extreme edge of each other, and I'm wondering whether we

3    can meet in the middle.  Let me give you an example.

4            So, there are points in the patents where what we're

5    talking about when we say a "peak," is not just the zenith.

6            MR. HICKEY:  Or "apex," as used by the patent clerk.

7            THE COURT:  Right.  Not just the apex or zenith or

8    apogee, if you will, not just those, but the full ascent,

9    right?

10           So -- and those aren't inconsistent.  Princeton calls

11   them "indefinite."  I don't think they are indefinite for that

12   reason.  I think in common parlance we talk about mountains and

13   peaks in that way.

14           For example, I was talking to my law clerks today.

15   Pikes Peak is an example.  You would say Pikes Peak is not just

16   the summit, the zenith, or the apex; it's also the entire

17   structure of the mountain that rises above whatever

18   hypothetical sea level is.

19           And that's true of course with Death Valley for the

20   trough.  All valleys include both the nadir, and the descent

21   from sea level all the way down to that nadir point.

22           So, it seems to me that concave and convex, undulating

23   waves are just the same.  The peak is the entire structure at

24   times.  The peak, as Princeton I think rightly points out, can

25   sometimes be a singularity, the apex of that undulating

1    mountain or the nadir of that undulating wave or valley.

2         But I think what we can do to help the jurors,

3    because, again, we're trying to get it right in a way that

4    helps the jurors.  The second caveat should not be lost on us.

5         I think something we can do -- I think "elevations"

6    and "recessions" is harder to understand than "peaks" and

7    "troughs."  I think "peaks" and "troughs" is harder to

8    understand than the way we would normally in everyday English

9    refer to this situation which is, of course, as you probably

10   guessed it by now, "peaks" and "valleys."  That's what we

11   always say.  That's obviously what this means.

12        And both allow us to capture exactly what I've just

13   articulated, which is the I think important point that

14   Princeton was making, which I took you to be denying, but

15   you're telling me today you're not, which is that a peak

16   includes not just the apex, but also the ascent and that a

17   valley includes not just the nadir, but also the descent.

18        And that it may make sense -- and this is where I'm

19   going to give you all some homework if you agree that what I've

20   just said makes sense, it may make sense to say, okay, we are

21   going to define them as "peaks" and "valleys," but we're going

22   to make clear to you in a separate sentence in the instructions

23   that you all can work out -- not now, but one day if we ever

24   get to a jury -- you can work out, a separate sentence that

25   makes this point clear, this common language English point that

1    sometimes the -- when we refer to a "peak," we refer to the

2    "zenith," other times we refer to the "ascent," "the whole

3    mountain," and what -- other times when we talk about a

4    "valley," we refer to the "nadir," and at the times when we

5    refer to the "valley," we refer to the "full," to the "full

6    descent."

7            How does that sound?

8            MR. HICKEY:  We are totally fine with that, Your

9    Honor, and agree to that.  We -- it's funny that you say that,

10   because I always try to explain my cases to my kids and to

11   my -- this one, my seven-year-old daughter was asking me what I

12   was doing, and I was trying to explain "peaks" and "troughs."

13   And I was talking about how a "peak" can be the whole thing,

14   or, in her language, it can also refer to the tippity-top.

15           THE COURT:  The tippity-top.  That's right.  That's an

16   important word.  And maybe we use that word.

17           MR. HICKEY:  So, we're fine with that, your Honor.  So

18   I --

19           THE COURT:  Let me hear from Princeton.

20           MR. HICKEY:  -- have nothing further on that.

21           MR. GALICA:  We'll put the slides up again, although

22   we may not need to use them.

23           So, with respect to the discussion you were just

24   having with Mr. Hickey, I think you've put your finger on what

25   the question is from Princeton Carbon Works' perspective.  When

1   we use the word "peak" or we use the word "trough" in the

2   claims, does it mean we're referring to that single point, the

3   tippity top, or an elevation, which would be a collection of

4   points near the top.

5          THE COURT:  Sometimes one, sometimes the other.

6   That's clear from the context.

7          MR. GALICA:  Well, I think the interesting thing there

8   is no party has proposed that the term "peak" or "trough" be

9   construed differently in different claims.  So, we're operating

10  under the assumption and endeavor to propose a single meaning

11  for the term as used in all the claims.

12         THE COURT:  You can't do that, because it's clear from

13  the -- we got to view this thing in context, right?  The

14  Federal Circuit has told us a million times.  And the context

15  of each of these appearances of these words makes pellucid that

16  they mean slightly different things in each of those contexts,

17  but that doesn't make the term indefinite.  Just as when you

18  say, "I reached the peak of Pikes Peak," you can make that

19  sentence in English, that's a perfectly valid English sentence.

20  "You reached the peak of Pikes Peak," two words in the same

21  sentence that are the same exact word but mean slightly

22  different things from the context.  Any normal English speaker

23  would understand exactly what you were talking about, right?

24  And I think that's true here.

25         In the '188 patent, for example, in Claim 11, where it

1    says "Wherein the troughs of the undulating curve

2    configurations are points of maximum radius of the undulating

3    curve configuration," it's clear that the trough they're

4    talking about is the nadir, the absolute singular point at the

5    very tippy-top bottom of that curve.

6          On the other hand, in Patent '800, it says, "Each peak

7    of the undulating configuration has a convex exterior profile

8    in a plain of the wheel."  Again, it's clear that that means

9    the entire peak itself, as with Pikes Peak, and not the

10   singular point at the top, because a singular point cannot have

11   a profile, obviously.

12         So, any English speaker would understand those two

13   things, although they are using the same word, to be referring

14   to slightly different aspects of a "peak" or a "trough" or my

15   preference a "peak" or "valley."

16         So, I actually think you had the better side of this

17   argument in your brief in pointing this out.  And I maybe

18   mistakenly assumed they were pushing back against this

19   distinction you were drawing.  I just think that, again,

20   inserting other very complicated words like you do with

21   complicated hypothetical measurement points, like you do, is

22   not a helpful way of, A, construing the claim or, B, explaining

23   what it means to the jury.  And I think my -- obviously I think

24   my construction is both the right one and the most helpful one

25   for the jurors to understand.

1          Does that make sense?

2          MR. GALICA:  I completely understand.  And if I might

3   try to better articulate our position with respect to "peaks"

4   and "troughs" being required to be single points, fully

5   understanding your position.

6          On slide 23, in discussing whether "peaks" and

7   "troughs" mean the same thing in every claim, with specific

8   reference to independent Claims 1 and Claims 17 of the '800

9   patent, we believe that if "peaks" and "troughs" don't mean

10  single points, then it would be impossible to determine where

11  the radial distance continuously varies.  And I think that SRAM

12  in their own arguments actually visually depicted what we're

13  attempting to say.

14          In the figure on the right hand of the slide, SRAM

15  describes visually what it means for the radial distance to

16  constantly or continuously vary between adjacent peaks and

17  troughs.  And where the radial distance varies, as they've

18  drawn it, is between the single highest points on one

19  protrusion and the next single highest point on the adjacent

20  protrusion.  So what they're saying is that the peak, when

21  you're going peak to peak, you're going highest point to

22  highest point.

23          Similarly, with respect to the trough, you see that

24  the area they've drawn with red lines depicting where the

25  radial distance continuously varies between troughs, it goes

1  from the single lowest point to the adjacent single lowest

2  point.

3          So, with that understanding, or requirement within the

4  claims that we need to navigate from adjacent peaks to troughs

5  to determine whether the radial distance continuously varies,

6  if it were just an elevation to an elevation, the question

7  becomes where does that begin, where does that end, and which

8  area of the radially inner edge are you analyzing to determine

9  whether the radial distance continuously varies?

10          And we would submit that the easiest and more precise

11  way to do that would be going from highest point to highest

12  point, lowest point to lowest point.

13          THE COURT:  Why is that different than saying "peaks"

14  and "valleys"?

15          MR. GALICA:  Because I think "peaks" and "valleys" is

16  subject to different interpretations as we've seen with SRAM's

17  proposed construction of just "elevation."  It's unclear where

18  that elevation would begin --

19          THE COURT:  I'm not proposing to take "elevation" or

20  "recession."  I don't like them.  I'm proposing "peaks" and

21  "valleys" for the reason that, A, "peak" is the word in there,

22  and, B, "valley" is the obvious synonym for "trough."  And the

23  second reason is because it's what everyday people would use in

24  describing this scenario.

25          MR. GALICA:  And -- understood.  I think the concern

1   from PCW's perspective is when you use that word "peak" or

2   "trough" or "peak" or "valley," are you referring to the single

3   point or some undefined region at the top of protrusion or near

4   the bottom of a valley?

5          THE COURT:  This is why I say to you that what I

6   proposed to do is to give them a definition that says "peaks"

7   and "valleys."  I mean, you can come back and say you prefer

8   "peaks" and "troughs," but you know that nobody talks like that

9   anymore.  So, that would be fine, if that's what you all agree

10  to, but they're not going to know what that means, I don't

11  think.

12         So I just think "peaks" and "valleys" is something

13  they'll understand.  And then we can all work together on

14  writing up a proposed instruction Number 17B that we'll include

15  in the instructions that makes exactly the point that you're

16  describing, which is -- and maybe -- I don't want to go too far

17  along on this because it's not necessary for today's purposes.

18  I think this is something we really only need to go down if we

19  get to a jury, which maybe we won't ever have to do.  But

20  assuming that we do, maybe what we negotiate is, along two

21  axes.

22         One is, we're going to say generally speaking, there

23  are sometimes in these patents where "peak" means the zenith,

24  and sometimes when it means the full mountain.  And that should

25  be clear to you from the context.  And we leave it to them.

1          Or you might find some agreement, or, if you don't,

2   you might convince me to include a longer instruction that

3   says -- sorry, we lost the page -- but it doesn't matter -- in

4   '188, Claim 11, when we say the word "trough," we mean the

5   lowest point of the valley.  In Patent '800, when we say the

6   "peak's profile," we mean the full profile of the mountain, of

7   the peak.

8          And we actually go through each of the times that

9   those words appear and we specify for them, "in this context,

10  'peak' means the full mountain or just the point or the full

11  valley or just the point."  And that would, I think, satisfy

12  all of your valid concerns and it sounds like it's something

13  they're willing to live with.  Correct?

14          MR. HICKEY:  Yes, Your Honor.

15          THE COURT:  So, why don't we just do it that way?

16          MR. GALICA:  I think from PCW's perspective, there's

17  only one way to interpret it and we believe that would always

18  have to be "peaks" are the single highest point or --

19          THE COURT:  That can't be.  If you look at Patent

20  '800, that's not what that -- the part that I quoted for you

21  cannot be read in that way.

22          MR. GALICA:  But it leads us to our next issue, which

23  I think is the indefiniteness concern.  And I don't want to

24  dive into it, but what gets created with the drafting of these

25  claims is, you would have to interpret "peaks" to be in the

1   same claim limitation a single point and an unbounded region.

2   And we don't think that that is the appropriate way to construe

3   the claims.  We think that "peaks" have to be single highest

4   points, "troughs" have to be single lowest points --

5        THE COURT:  But you agree with me, I thought, in

6   standard English, that's not how we use either the word "peak"

7   or the word "valley" or "trough," right?

8        MR. GALICA:  Sorry, repeat the question?

9        THE COURT:  I thought you had agreed with me initially

10  that in standard English that's just not how we use the word

11  "peak" or the word "trough" or "valley."

12       MR. GALICA:  Well, I think the issue that's brought to

13  us is there isn't a common way, and we've both -- as everybody

14  seems to have agreed, that it could be the tippity top, it

15  could be the region towards the top.

16       THE COURT:  Okay.  So, that's what I'm getting at is

17  that you agree with me that in common English today, the "peak"

18  can mean both the full mountain, like Pikes Peak, and the

19  zenith, the apex of the mountain, the summit.  Right?

20       MR. GALICA:  Outside the context of these claims,

21  totally agree.  I think --

22       THE COURT:  No, no.  And I thought you agreed with me

23  that in some of these places -- maybe like the one you've

24  highlighted, also Claim 11 of '188 -- it seems clear that

25  "peak" or "trough" means the point.

```
 1            But in other places, like '800, when it says "the peak
 2    of the undulating configuration has a convex exterior profile
 3    in a plain of the wheel," that cannot mean the point, because a
 4    point cannot have a profile.  It has a full undulating peak,
 5    just like Pikes Peak has a profile.  And I wouldn't say Pikes
 6    Peak is undulating -- it's maybe more jagged -- it has a jagged
 7    profile, but it's still a peak even though it has not -- even
 8    though we're not just describing the zenith.  Right?  I mean
 9    that seems obvious from the way these things are written.
10            MR. GALICA:  We respectfully disagree.  We think that
11    when you look at "peak" in isolation --
12            THE COURT:  Can't look at "peak" in isolation.
13            MR. GALICA:  -- within the context of the claims and
14    specification, we think that "peak" has to be construed
15    consistently as single highest point and "trough" would have to
16    be construed as single lowest point.
17            THE COURT:  Okay.  I disagree with you about that.
18            Is that something you want to take to your client and
19    take under advisement, or you're going to stand firm on this
20    issue?
21            MR. GALICA:  We're open to the discussion of trying to
22    find which claim term -- which uses of "peak," "trough" may or
23    may not be appropriately construed as the elevation as opposed
24    to the highest point.  I think as I stand here right now, it's
25    our perspective that they would always be the highest or lowest
```

1   points.  But we're happy to have the conversation with opposing

2   counsel and see if there's a way we can work it out.

3           THE COURT:  Okay.

4           And that brings me then to the third one, which is

5   "convex profile," "convex exterior profile," and "convex

6   regions."

7           MR. HICKEY:  So, Your Honor, I'll let you start.

8           THE COURT:  You know, my issue with this one actually

9   is that -- and maybe this reflects more about me than it would

10  the jurors, but I don't think so -- I always get confused

11  between "convex" and "concave" and I think most people do, too.

12  And I just think that we have to come up with a way that

13  doesn't stray too far from what was said and doesn't inject too

14  much that isn't there into the definition that will actually

15  help these people understand what we're talking about.  Again,

16  that's a common theme today.  And I'm not so sure that either

17  of you are doing that.  I like SRAM's construction better in

18  some respects, because it's shorter and cleaner and doesn't

19  inject concepts that aren't already in there, but it's a little

20  bit wordy for my tastes.  So -- first of all, I don't think we

21  should give them "convex exterior profile."  I just think

22  that's --

23          MR. HICKEY:  "Convex."

24          THE COURT:  -- very scary.

25          So, what I was thinking was we could say something

1    like -- you start with "outer side view having a rounded or

2    curved form bulging towards the wheel's center."

3         So, what you're saying, I guess, is that we're

4    judging -- like the wheel's center is like the sun and the

5    convex shape is the mountain towards the sun and the concave

6    shape is the valley away from the sun, is that the idea?

7              MR. HICKEY:  Correct.  Yes.

8              THE COURT:  Okay.  So, an "outer side view" means

9    basically like the way I'm looking at that wheel now is from

10   the side?

11             MR. HICKEY:  Yeah.  So, if you -- that would be an

12   outer -- could be an "outer side view" or an "exterior side

13   view" and then "side view" obviously.  I mean, there are

14   different ways that you could turn it.

15             THE COURT:  What's the difference between "outside

16   view" -- "outer side view" and "side view"?  I was going to ask

17   you about that.

18             MR. HICKEY:  Yeah.  So -- I mean this is my own

19   personal -- could you pull up -- if we can shift to our

20   slides -- the slide that has Figure 1 and Figure 3?  Right

21   there.  Back there.

22             So, these are two different views of one of the

23   embodiments in the '800.  So, I would view Figure 1 as kind of

24   being that outer side view that you're looking at it directly,

25   kind of orthogonal to the wheel.  And that Figure 3 would be a

1   side view.  It's just slightly turned.

2          THE COURT:  And why do you think that the view matters

3   between "convex exterior profile" and "convex profile"?

4          MR. HICKEY:  I think those are fairly interchangeable

5   terms.

6          THE COURT:  Okay.

7          MR. HICKEY:  I'm not saying that it's a -- they

8   obviously use different words.  There's --

9          THE COURT:  What is the difference between "convex

10  exterior profile" and "convex profile" to your mind?

11         MR. HICKEY:  I guess the idea would be that you have

12  regions, you have areas.  You could have a profile that is

13  viewed from different perspectives.  And that exterior profile

14  is just pulling yourself back to see that from the outside.

15         THE COURT:  And so that's the distinction you're

16  making in this --

17         MR. HICKEY:  Yeah.

18         THE COURT:  -- slide here?

19         MR. HICKEY:  Correct.

20         THE COURT:  But, let me ask you for a second, do you

21  understand the difference between "convex exterior profile" and

22  "convex profile"?

23         MR. GALICA:  I'm happy to take the question.

24         THE COURT:  You guys are alternating.

25         MR. DE VOOGD:  We are.  I was going to handle this set

1    of terms, your Honor.

2              THE COURT:  Okay.  I just had a question about that.

3              MR. DE VOOGD:  And I'm happy to address it now or when

4    I stand up at the podium.

5              THE COURT:  Yeah, now is fine.

6              MR. DE VOOGD:  Okay.  I think you're putting your

7    finger on a critical issue with the way these patent claims

8    have been drafted.  And I understand that you've discussed the

9    "peak" and "trough" issue with Mr. Galica.  And I have one

10   follow on point that I'll raise later.

11             We take the position that if you construe "peaks" and

12   "troughs" as we propose, these convex terms are necessarily

13   indefinite.  And that is because it's extremely difficult, if

14   not impossible, for one skilled in the art reading these claims

15   in context to actually understand the very question that you're

16   asking Mr. Hickey.  And that flies in the face of black letter

17   Fed. Circuit precedent that requires the patent applicant to

18   define their inventions adequately and then use consistent

19   claim language across different patents within the same family.

20             And that flows from the principle that the same claim

21   term in the same patent or related patents within the same

22   family, like the '188 and '800 here, carry the same construed

23   meaning.

24             So, when you ask Mr. Hickey whether there is a

25   difference, a discernible difference, to me, my daughter,

```
1    Mr. Hickey's daughter, you, one skilled in the art, between
2    "convex exterior profile" and "convex profile," I'm not sure
3    you can answer that question, which gets us to the point that
4    we made in our briefs that the claims are insolvably ambiguous
5    for that reason alone.
6           Now, one -- something that Mr. Hickey just said I
7    found very interesting.  He said, "It depends on how you look
8    at the device."  That is not how apparatus claims work, Your
9    Honor.  It's either claimed and embodied in a device like SRAM
10   claims that their Zipp wheels do, or it's not.  A matter of
11   perspective is, has nothing to do with whether you can map
12   claims onto an apparatus.  That's just not how patent law
13   works.  And so I think you've highlighted a really important
14   question that I don't believe can adequately be answered.
15          THE COURT:  Is it possible to say that -- because the
16   800 came first, right?
17          MR. HICKEY:  Correct.
18          THE COURT:  So, as with the situation where the
19   inventor used one mechanism to distinguish Mercat from the
20   prior art in '800 and then drop that one and used a different
21   one in the '188, is it feasible to say he defined the profile
22   of this undulating wave as a "convex exterior profile" in the
23   '800; and then in the '188 realized that the word "exterior" is
24   just superfluous, dropped it.  The examiner had no problem with
25   it because it was.  That doesn't make the '800 deficient.  It's
```

1   a word that helps explain what we mean by "profile," but since

2   "profile" necessarily means from the side and since "exterior"

3   in this context also means from the side, the examiner was fine

4   with the deletion, is that a proper way of construing this

5   claim to your mind?

6        MR. HICKEY:  We have no -- we have no objections to

7   that.  We have no issue with that.  I mean I think --

8        THE COURT:  I just mean is that a fair construction of

9   what occurred here as a matter of fact?

10       MR. HICKEY:  I think so.  I think that "exterior"

11  was -- and I take issue with what Mr. DeVoogd said in terms of

12  the ability to claim views or to describe the object.

13       THE COURT:  Well, you definitely need a view.  I

14  disagree with --

15       MR. HICKEY:  That's right.

16       THE COURT:  -- you about that.  And you definitely

17  need a view because whether something -- for example, whether

18  something is concave or convex necessarily depends on what your

19  view of it is.  If you're viewing it from the behind the wheel,

20  then what is that?  The leading edge, the trailing edge?

21       MR. HICKEY:  Right.

22       THE COURT:  Then you wouldn't see anything at all, so

23  the definition would be meaningless.

24       MR. HICKEY:  Right.

25       THE COURT:  Similarly, the perspective matters as I

1  said earlier, if you're looking at the concavity of it, from

2  the perspective of the outer rim of the wheel, then you would

3  concave and convex precisely the opposite.

4          MR. HICKEY:  Correct.

5          THE COURT:  Since we're looking at it from the

6  perspective of the center of the wheel, then that perspective

7  starts to make sense.  So the perspective view matters.

8          I still take his point as being the right one in some

9  respect, which is when we see that, I don't know that what

10  you've given me in the slide is actually what the distinction

11  is between "profile" and "exterior profile."  I could be wrong.

12  I don't know.  I'm not an inventor.  That's why I only make

13  $200,000 a year.

14          But it seems to me that what happened here -- unless

15  you show me evidence to the contrary -- is an inventor's gone

16  through two iterations of a similar family of inventions, and

17  like anyone who goes to edition two of a Tale of Two Cities, it

18  tends to get shorter because there are redundant words that one

19  realizes one didn't need.

20          And "exterior profiles" seems to be just such a word.

21  I don't know.  That's just seems to me my initial take on that,

22  but I'm happy to hear from both of you on that.

23          MR. HICKEY:  Sure.  I mean, I think, that it's --

24  what's funny is the parties have agreed that "exterior" is,

25  means outer, and that "profile" means side view.  There's not

54

1    really any dispute about that.

2            But I would agree, Your Honor, that whether the

3    addition of "exterior" in the second patent was necessary, it

4    wasn't.

5            THE COURT:  Yeah.

6            So, I guess, "convex exterior profile" -- all right.

7    I'll hear from Princeton before I give too much of my own sense

8    of this thing.

9            MR. DE VOOGD:  Might we switch over to our slides?

10            THE COURT:  Sure.

11            MR. DE VOOGD:  Thank you.

12            Thank you, Your Honor.  Drew DeVoogd again for

13    Princeton Carbon Works.

14            Just a couple initial comments.  I already mentioned

15    that concept that the Fed. Circuit has stated that the same

16    claim term in the same patents or related patents within the

17    same family carry the same construed meaning.  You cannot

18    construe the same term differently within the same patent or

19    even in a child patent, as the '800 and the '188 patent are

20    here.

21            So, to the extent that there was a suggestion that you

22    could interpret "peaks" or "troughs" differently --

23            THE COURT:  We're not interpreting them differently.

24    We're using them as English users always use them.  They're not

25    different meanings; they're just two aspects of the same word.

```
1    A "peak" can be Pikes Peak, the mountain, or it can be the

2    summit of Pikes Peak.  "I came to the peak" -- "I got to the

3    peak of Pikes Peak."  You agree with me that that's a perfectly

4    natural English usage.  So, while there may be a presumption

5    against having multiple aspects of a definition in different

6    parts of a claim, it's clear here.  I mean it -- we couldn't

7    take a Federal Circuit case as suggesting to us that we should

8    ignore the clear import of the words that are in the patent.

9    That would be absurd.  And the words in this patent are clear

10   as to what they mean.  There is no necessity for construing the

11   word "peak" as it appears in '188 or '800, because everybody

12   knows what it means in English.

13          Or, I mean, I don't like "trough."  I think that's,

14   you know, a little bit antiquated.  And I think "valley" is a

15   better word than "trough" because that's how we use those two

16   in common.

17          But, again, it's clear where the "valley" is the nadir

18   and it's clear where the "valley" is the entire descent.  And I

19   think what -- to the extent you're concerned about any

20   ambiguity or any concern about the jurors being confused, as

21   I've proposed to you, what I suggest is that we hammer out an

22   extra definition that we give to them that will say, at this

23   point, it's this; at this other point, it's the full mountain,

24   that kind of thing.  And I think that would, A, be perfectly

25   consistent with what the claims terms are; and, B, I think that
```

1   would be very helpful to the jurors in trying to understand

2   what we're talking about.

3          MR. DE VOOGD:  Okay.  Thank you, Your Honor.

4          At the risk of belaboring it, I'll move on.

5          THE COURT:  No, go ahead.  Go ahead.

6          MR. DE VOOGD:  Thank you.

7          So, in the context of the "convex" terms here, I think

8   we've already discussed this issue of indefiniteness and our

9   indefiniteness position flows at least in part from our view of

10  the construction of peak as a point.

11         So, understanding that you're not going with us on the

12  "peak" construction, I think I can jump right to why I think a

13  more precise definition in the constructions is necessary here.

14         THE COURT:  And, by the way, I agree with you.  And I

15  think they agree with you.  I don't think it makes sense to

16  come to the jury and say "convex exterior profile" or "convex

17  region," because I don't know that they're going to know what

18  that means.

19         MR. DE VOOGD:  No, I appreciate that, your Honor.  And

20  I chuckled a bit when I heard you say you have difficulty

21  keeping the two apart, "concave" or "convex."  I can't tell

22  which part of the funhouse mirror I'm looking at.

23         THE COURT:  Right.

24         MR. DE VOOGD:  That said, if I could direct your

25  attention to the slides we've got here.  And I just want to

1  walk through momentarily what the patentee did to limit

2  necessarily the claim scope of these "convex" terms.

3       All right.  So we've talked about the Mercat reference

4  a couple times already today.

5       In the prosecution of the '800 patent -- and, by the

6  way, the prosecution of a parent patent takes the full import

7  in a child patent, because the prosecution of the parent

8  essentially becomes part of the file history and the

9  prosecution history of the child patent.

10       So, everything that Dimitris Katsanis, who's the

11  inventor -- who, by the way, has an arm's length business

12  relationship with SRAM -- they don't own the patents, they

13  didn't invent the patents, they're just asserting the patents

14  against our client.

15       With that said, everything that --

16       THE COURT:  Which is you're not raising a standing

17  contention.

18       MR. DE VOOGD:  I am not raising a standing issue

19  today, Your Honor.

20       THE COURT:  Okay.  But you might later is what you're

21  saying.

22       MR. DE VOOGD:  I don't believe we are.  But I don't

23  know the full contours of the business relationship.

24       THE COURT:  Because there's an assignment there, isn't

25  there?

1          MR. DE VOOGD:  There is a license agreement --

2          THE COURT:  A license.

3          MR. DE VOOGD:  -- that has been amended multiple

4    times.  I'm not sure of the current status of that, but it's an

5    issue for another day.

6          THE COURT:  In any event, not relevant for our

7    purposes today.

8          MR. DE VOOGD:  Absolutely.

9          THE COURT:  Okay.

10          MR. DE VOOGD:  The point here, though, Your Honor, is

11    that everything that Mr. Katsanis told the Patent Office during

12    the prosecution of the '800 patent is also relevant to

13    understanding the terms of the '188 patent.

14          So, we start with the prosecution of the '800 patent.

15    And the examiner said none of your claims are valid in view of

16    this Mercat reference, this existing prior art that Mr. Hickey

17    described to you.  It's a company called Mavic in France that

18    came up with this innovative wheel.

19          And what did Mercat disclose?  Well, the examiner

20    said, your claims are invalid in view of Mercat under 102,

21    meaning every single element of all of your claims are already

22    disclosed by this reference Mercat.  And if you look at the

23    diagram on the right-hand side of Slide 38, that is Figure 2

24    from the Mercat patent.

25          And what did Mr. Katsanis say about this figure?  He

1    said, well, Mercat teaches a rim with these boring zones 26 and

2    27, which I've circled in blue, as well as a region of reduced

3    thickness, 29, essentially between those two zones.

4          Okay.  And then he says those elements of the existing

5    wheel disclose an undulating configuration.  So, Katsanis is

6    saying, hey, someone did this first.  But then in order to get

7    over the Mercat reference, in order to persuade the Patent

8    Office that it should grant him an exclusive right to the

9    invention claimed in his patents, he said -- he told the Patent

10   Office and he told you and the public, if you ever wanted to go

11   into the wheel business, Your Honor, you would know that he

12   told the Patent Office and you this is why Mercat does not

13   define a "convex profile."

14         And he said, my words -- or his words, not mine,

15   rather -- "the zones of spoke attachment taught by Mercat

16   follow an annular path and are concave in profile."

17         "This teaches persons skilled in the art that peaks

18   have a concave profile, which is the opposite of what I'm

19   claiming.  That is the opposite of my invention."

20         So, he points out to the Patent Office and to the

21   world that those boring zones, 26 and 27, are not convex

22   profiles and they cannot be.  That is the sine qua non of

23   prosecution history disclaimer, because after he made that

24   argument, the patents issued.

25         What else did he say?  Now, this is important.  SRAM

1   accused us of pulling the additional limitations that we

2   proposed in our claim construction out of thin air.  Couldn't

3   be further from the truth.  It's precisely what

4   Mr. Katsanis told the Patent Office.  That's how he was

5   defining the "convex" terms.

6         He went on to say, in response to another rejection,

7   that -- and you see this on slide 41 -- that "Mercat discloses

8   a radially inner edge having peaks with concave, or at least

9   nonconvex exterior profiles."  "Mercat only discloses a peak

10  with a constant radial distance from the radial (sic) outer

11  edge of the rim.  Therefore, Mercat does not disclose a peak

12  having a convex exterior profile."  And, Mr. Patent Examiner,

13  you should give me the exclusive right to practice my

14  invention, because I am not Mercat.  Okay?

15        What else did he say?  He also told the patent

16  examiner and the world that the constant thicknesses of the

17  median portion, 29a, and the boring zone of rim 1 in Mercat

18  define concave profiles, respectively.  Accordingly, neither

19  define a convex profile.

20        So, we have, Your Honor, within our proposed

21  construction, the very language that Mr. Katsanis used to the

22  Patent Office to get the patent granted.  That is the heartland

23  of prosecution history disclaimer and estoppel.

24        So, while I hear you that there may be a more artful

25  and perhaps a more accessible way of describing our proposal,

1    whatever we tell the jury these "convex" terms mean, they

2    necessarily have to understand the claim scope that the Patent

3    Office actually granted.

4              THE COURT:  And why is -- so all of the -- all of your

5    constructions seem basically to copy theirs and then to add

6    some, is that fair to say, on this issue?

7              MR. DE VOOGD:  That's precisely it, Your Honor.

8              THE COURT:  Okay.  And so let's get to that.

9              So, you don't have a problem, in other words, with

10   "outer side view" -- I don't like that, I have a problem with

11   it -- I'd like something cleaner and we can come up with

12   something like that.  I don't know if it makes sense to say

13   like "profile view" or you all can work that out.  But I like

14   something like "profile view" or "side view having a rounded or

15   curved form bulging towards the wheel's center."  You're okay

16   with that latter part.

17             MR. DE VOOGD:  We're okay with that, Your Honor.  But

18   we --

19             THE COURT:  So, then the next part is, so you want to

20   add in, "and does not" -- in all three -- "and does not include

21   any portion of constant thickness or constant radial distance,"

22   right?

23             MR. DE VOOGD:  That's correct, Your Honor.

24             THE COURT:  Why isn't that just built in to the first

25   part of it when you read that together with "continuously

1    changes"?

2            MR. DE VOOGD:  I think that's a fair point, Your

3    Honor.  So long as the jury fully understands that the claims

4    have to be -- the claim terms have to be read in harmony.

5            THE COURT:  Oh, a hundred per -- we're going to give

6    them that instruction.

7            MR. DE VOOGD:  Absolutely.  Absolutely.

8            I just think that there is -- and Mr. Galica has

9    touched on this already -- I think there is a risk that the

10   import of the binding narrowing that the patent owner made

11   during prosecution, in order to get the exclusive right to this

12   invention, purported invention, that -- those limitations in

13   claim scope necessarily have to be applied during --

14           THE COURT:  "Continuous changes" is absolutely an

15   element.  It's just -- but it's in the same sentence, just a

16   few words earlier than this part.  Isn't -- these parts come at

17   the end of the sentence, right?  "Convex profile"?

18           MR. DE VOOGD:  That's right.  It's the last element of

19   each claim.

20           THE COURT:  And then "continuously changes" is in the

21   middle portion of the sentence.  That's right.

22           MR. DE VOOGD:  Right.

23           THE COURT:  I'm happy to do whatever you think makes

24   sense to highlight that all of this has to be read -- that the

25   sentence has to be read fully together and that all the

1   elements sort of play off or feed off of each other.  And maybe

2   there's a sentence in a jury instruction that we can give them

3   on that point.

4        But I was actually looking at the jury instructions.

5   That is already in there.  There's already a pattern

6   instruction on this exact proposition.  So, when we get to

7   trial, that instruction's going to be given.

8        So, I don't know why we would need this sort of

9   redundant, superfluous, basically constantly changing addition

10  to the last part of the sentence when they're already going to

11  be told that's an element of the thing in the middle part of

12  the sentence.

13       MR. DE VOOGD:  So, I understand those comments,

14  absolutely agree that we need to have precise and helpful

15  instructions to the jury.

16       I guess I would come back to our discussion of the

17  Mercat reference.  And if you look at that diagram on slide 42,

18  the reference to "constant thickness" is essentially, are there

19  any flat portions or concave portions within the convex region?

20       THE COURT:  That's what we get at when we say

21  "constantly changing," right?

22       MR. DE VOOGD:  I agree, Your Honor.  I agree, fairly

23  read.  And I guess our proposal is that the --

24       THE COURT:  You just say the same thing twice.

25       MR. DE VOOGD:  Well, a modest clarifying language

1    would actually provide help to the jury.

2            THE COURT:  I don't know.  I see that as -- it could

3    be confusing.  And it might actually do -- see sometimes we do

4    these things and it redounds to your detriment, because

5    "constantly changing" is what you want.  And it's in there.

6    And if you add something like this there, they might give some

7    other meaning to "constantly changing," because they may

8    justifiably believe -- because there's another instruction,

9    right, that says you got to read different words differently,

10   et cetera -- and so they might justifiably then be confused and

11   say "constantly changing" must not mean what I thought it

12   meant, which I thought it meant does not include any portion of

13   constant thickness or constant radial distance.

14           And then they may be off to the races.  God knows what

15   they import as the meaning of "constant changing," when if we

16   kept it simple and just said it one time in words that

17   everybody could understand, it must be constantly changing.

18   It, A, addresses your justifiable concern about all the things

19   you just mentioned; and, B, assures us that they are not

20   artificially injecting an inappropriate definition for the

21   previous phrase "constantly changing," don't you think?

22           MR. DE VOOGD:  I tend to agree with that, Your Honor.

23           THE COURT:  Okay.  So, let's then work on -- I'm

24   sorry, I interrupted you.

25           MR. DE VOOGD:  No problem.  I assume you're about to

```
1    suggest that we work on it --
2         THE COURT:  I just want to work on -- it sounds like
3    you're all fine with having a "rounded or curved form bulging
4    towards the wheel center."  I'm fine with that, too.
5         So, I just don't like "outer side view" or "side
6    view."  I just prefer something like "profile view."  But maybe
7    you don't like that as much.  I mean, the difference is I'm
8    with jurors all the time, so I feel like I have a sense of what
9    they -- how they think.  But I always get my verdict
10   predictions wrong, so maybe I don't.
11        What do you think?
12        MR. HICKEY:  Your Honor, we're fine with "profile
13   view."
14        THE COURT:  What do you think?
15        MR. DE VOOGD:  I think that could work --
16        THE COURT:  Okay.
17        MR. DE VOOGD:  -- but I'll need to discuss with my
18   colleague and with our client.  I think if you'd allow us the
19   opportunity to have further discussion with the plaintiff, and
20   we'll come back in the same time line that you suggested.
21        THE COURT:  All right.  Let's do that.  Why don't you
22   then, in that same notice that you file with me within seven
23   days, tell me, in light of everything I've said today, your
24   view of each of these three terms and make a joint notice.  One
25   page.  Not more than one page.  Just the two of you together, a
```

1    joint notice, "we've agreed on one and three, here's what it

2    should be," and "as to two, we've come closer, but we're still

3    a little bit apart."  And then I can just tell you what I think

4    about two.  Or you might hopefully say, "here's the agreement

5    we've reached as to one, two, and three."

6            Does that seem fair?

7            MR. DE VOOGD:  It does, your Honor.  Thank you.

8            And just one last point on --

9            THE COURT:  Sure.

10           MR. DE VOOGD:  -- I wanted to take us to claims six of

11   '188 patent on the screen there.

12           THE COURT:  Sure.

13           MR. DE VOOGD:  I think, I think what I've heard you

14   say is that the "continuously varies" or "continuously

15   changes," as your proposed construction would enter,

16   incorporates the notion that there is no region of constant

17   radial distance in Claim 1.

18           And so I just want to point out that to the extent

19   that element, which is already required in Claim 1, is the sole

20   additional limitation in Claim 6, Claim 6 is necessarily

21   invalid as violation of 35 U.S.C. 112(d), because that statute

22   requires that any dependent claim add an additional limitation.

23   And as I understand our colloquy just now, Claim 1 already has

24   that limitation.

25           THE COURT:  The limitation of being constantly

1    changing?

2              MR. DE VOOGD:  Yes.

3              THE COURT:  So, let's see, Claim 1 -- this is Claim 6

4    or Claim 1?  This is Claim 6.

5              MR. DE VOOGD:  Claim 6, yes, your Honor.

6              THE COURT:  "The wheel is claimed in Claim 1,

7        wherein the undulating curve configuration has the

8        convex profiles in a plain of the wheel, such that

9        the convex regions do not comprise a region of

10       constant radial distance."

11             What does that add to Claim 1?

12             MR. DE VOOGD:  Nothing, Your Honor.

13             THE COURT:  Well, let me ask Mr. Hickey.

14             MR. HICKEY:  Your Honor, I think we're mixing and

15   matching a little bit, because Claim 1 of the '188 patent does

16   not have the "continuously varies" language.  That's in

17   Claim 1 --

18             THE COURT:  That's true.

19             MR. HICKEY:  -- and 17 of the '800.

20             THE COURT:  What he's saying, though, is that the

21   "continuous varies" has to be an element of the '188, because

22   it's a child patent.  But I take your point from earlier that

23   it doesn't need to be, because there are many different things

24   that distinguish the Mercat prior art.  Is that your point?

25             MR. HICKEY:  That's right.  That's right.  And that --

```
 1    and different distinctions were drawn with the prior art.  The
 2    requirement of the radial distance constantly changing or
 3    continuously changing was not a requirement, and the different
 4    requirement with respect to describing the convexity of the
 5    peaks.
 6            And so I just want to be clear, we're fine with the
 7    plain meaning definition.  We can work out the "side view" or
 8    the "profile view" issues.
 9            But in terms of identifying that as "having a rounded
10    or curve form bulging towards the wheel center" --
11            THE COURT:  Anyway, the validity or invalidity of
12    dependent Claim 6 is for summary judgment, it's not for today,
13    right?
14            MR. HICKEY:  Correct.
15            THE COURT:  Don't you agree?
16            MR. DE VOOGD:  I do in principle, Your Honor, but for
17    the fact that I just wanted to raise that to underscore the
18    notion that, to the extent we are going to essentially let the
19    remainder of the claim describe for the jury this concept that
20    there cannot be a portion of constant radial distance based on
21    the patentees' express and unequivocal disclaimer during
22    prosecution --
23            THE COURT:  That was during the '800 patent.
24            MR. DE VOOGD:  It applies and carries through --
25            THE COURT:  It only does -- but again, you all do this
```

1  over and over again like with the word "peak" and "trough."

2  That is certainly a presumption that that prosecution history

3  would carry over, but prosecution history can never trump the

4  plain meaning of the words in the claim itself.

5       And the claim itself, in '188, it's clear, decided to

6  use a different distinguishing marker to the Mercat prior art

7  than the "constantly changing" distinction that was made in the

8  '800.  Isn't that clear to you from the '188 claim --

9       MR. DE VOOGD:  It --

10      THE COURT:  -- since that language was actually

11  dropped and it was still approved?

12      MR. DE VOOGD:  I agree with that much, Your Honor.

13  But two quick points on that.  So, if I could direct your

14  attention to slide 42.  And I neglected to say that this second

15  disclaimer referencing "constant thicknesses" is pulled

16  directly out of the '188 patent prosecution history.  So, they

17  are talking about the claims that issued in the child patent,

18  not the '800 patent.

19      And there Mr. Katsanis re-edified the point that his

20  invention, the convex profiles of his invention, as claims in

21  Claim 1 of the '188, cannot include a portion of constant

22  thickness.  That's the point, Your Honor.  That's a direct

23  statement from the patentee made in order to get over the prior

24  art.

25      And we cited for Your Honor over a hundred years of

1   Supreme Court precedent for this very proposition, that

2   statements made -- unequivocal statements made during

3   prosecution in order to get the patent granted comes with the

4   burden that if claim scope is narrowed during prosecution, you

5   cannot expand that claim scope during litigation.

6           THE COURT:  Remind me, what was the distinction that

7   was made in the '188 that wasn't made in the '800?

8           MR. HICKEY:  So, what the applicant said was that the

9   prior art did not have these convex profiles.

10          And in describing what "convex profile" meant, the

11  examiner recounted what definition the applicant was using.

12          And if we could pull up on our slide deck the

13  interview -- pull up the applicant interview -- so, on that --

14  this is the examiner saying that the applicant stated in the

15  context of this interview that the claims are attempting to

16  define the convex profile as the common definition, having a

17  rounded or circular shape.

18          And so then they said -- the applicant said, Mercat

19  doesn't have a convex profile, and another reference, Herting

20  doesn't have a convex profile.

21          THE COURT REPORTER:  I'm sorry, the last....

22          MR. HICKEY:  Herting, H-E-R-T-I-N-G.

23          So, what the applicant did was included terminology,

24  namely "convex" and "convex profiles," to distinguish the prior

25  art.  That was -- and using "convex" in its plain and ordinary

1    meaning without any –– you know, what ––

2              THE COURT:  Here's what I propose we do.  I propose

3    that within seven days you file your joint notice with me

4    telling me where you've come to on hopefully agreement on one

5    and three, and maybe even on two.  If you haven't gotten

6    agreement on two and three, you can tell me hopefully that

7    you've gotten closer on two and on three.

8              And once I've reviewed that, if you're in agreement

9    with everything, obviously that will govern.  The ones that ––

10   if you're on agreement on some things, those will govern.  For

11   the ones that you're not on agreement on, if there are any,

12   then I'll bring you back and I'll tell you my ruling as to

13   that.

14             Because I anticipate it's premature for me to rule

15   now, given that I think probably you're only going to disagree

16   on one or at most two of these, not three.  And I think the

17   disagreement, if any, that you have within seven days will

18   probably have a much narrower berth than it does now.  So, I

19   rather not just opine on something you all actually aren't

20   fighting over.

21             Does that make sense?

22             MR. HICKEY:  Totally fine, with that, Your Honor.

23             MR. DE VOOGD:  It does, Your Honor.

24             THE COURT:  All right.

25             MR. DE VOOGD:  Just one final point on this, on the

```
1    applicant interview.  "A rounded or circular shape cannot have
2    any portion of constant thickness."  That's the point.  So
3    necessarily narrowed to exclude anything remotely resembling
4    the Mercat or the Herting.
5         THE COURT:  Do you agree with that?
6         MR. HICKEY:  I think that a rounded shape could
7    obviously have imperfections in it and it still would be
8    rounded.
9         THE COURT:  It obviously could.  Although that would
10   be with -- I mean, that's where we get into this question of
11   what the claim is, and what an embodiment that's like a
12   physical imperfection looks like.  Right?
13        I mean, I gather that -- maybe this isn't true -- but
14   I gather that on some molecular level, right, on some molecular
15   level there has to be some like machine or human imperfection
16   injected into the process that does in fact result in some
17   aspect of the concave or convex shapes that are not constantly
18   changing.  Is that true do you think or --
19        MR. HICKEY:  I think that in any -- if you took any
20   surface, you go down to the microscopic level, you can see
21   incredible images of roughness.  So -- and that's our point is,
22   I think that a jury will understand what "rounded or curved
23   form bulging towards the wheel center," that means and
24   understanding they're -- you know, the question of whether an
25   embodiment infringes is a fact question for the jury.
```

1      THE COURT:  Don't you agree with that?

2      MR. DE VOOGD:  In general, yes, Your Honor.

3      THE COURT:  Yeah.

4      MR. DE VOOGD:  No one skilled in this art of making

5  bicycle wheels is busting out an electron microscope to

6  investigate whether something meets the claim limitations.

7      So even the Mercat reference, it's clear that people

8  in the field at the time of the purported invention design

9  their wheels to tolerances of a tenth of a millimeter.  That's

10  a measurable distance.  We're not talking about the microscopic

11  level here.

12      THE COURT:  Okay.  All right.  So let's do this.  You

13  all file your joint notice with me within seven days.  What's

14  today?  Today's the 20th.  So that will be by April the 27th.

15      And, again, just one page, Claim 1, we agree,

16  hopefully; Claim 2, we agree or disagree.  But as -- you know,

17  give me your separate positions.  Hopefully they're closer than

18  what we have now -- same with Claim 3.

19      Anything else I could help the plaintiff with here

20  today?

21      MR. HICKEY:  No.  Appreciate the time, Your Honor.

22      THE COURT:  I appreciate all of you.

23      Anything I can help the defense with today?

24      MR. DE VOOGD:  Also appreciate your time, Your Honor.

25      I just have one minor housekeeping matter --

```
 1          THE COURT:  Sure.
 2          MR. DE VOOGD:  -- if you will indulge us?
 3          THE COURT:  Yeah.
 4          MR. DE VOOGD:  We have a conflict with our damages
 5  expert with the trial dates as presently set.
 6          THE COURT:  Oh, that's no problem.  When is the trial
 7  set?
 8          You want this back, by the way?
 9          MR. DE VOOGD:  If you'd like to hang onto our
10  excellent graphics, you are welcome to them.
11          THE COURT:  They are excellent.
12          MR. DE VOOGD:  I'll take it off your hands.  Thank
13  you.
14          THE COURT:  When is the trial?
15          MR. DE VOOGD:  It's set for two weeks, April -- it's
16  set for two weeks starting April 15th.
17          THE COURT:  April 15th?
18          MR. DE VOOGD:  I'm sorry --
19          THE COURT:  August 15th.  Okay.  I was like we've
20  already passed April 15th.
21          Okay.  August 15th.  So, you would like to go to
22  where?
23          MR. DE VOOGD:  Just a modest extension, next available
24  date.  We just -- our damages expert is testifying at an
25  International Trade Commission matter that actually spans those
```

1     two weeks.

2          THE COURT:  And when does he get back?

3          MR. DE VOOGD:  I think that trial's scheduled to end

4     the middle of the second week.  I don't have the precise dates

5     here.

6          THE COURT:  So that's like August 24th through the

7     6th or so?

8          MR. DE VOOGD:  That's right.  That's right.

9          THE COURT:  Any objection to that extension?

10         MR. WALSH:  Yes, your Honor.  We took -- obviously we

11    tried to accommodate everyone's schedules.  The problem is

12    every time it's rescheduled, there's a problem with everyone.

13         This expert, we just took his deposition.  He had only

14    begun doing work in that case.  He had done almost ten times as

15    much work in this case.

16         In that case, when I asked, well, what specific time,

17    date is it?  Well, I haven't gotten anything when it would be,

18    et cetera.  Can you do that remotely?  Well, they are doing

19    some of those things remotely as well.  We offered to

20    accommodate them.  We said, look -- we can do his remotely if

21    he has to, we can accommodate him to come in at a different

22    time.  We can do it beforehand and put it, canned up.

23         But our point is, your Honor, we're trying to get this

24    done as soon as possible to stop this infringement.

25         At the same time, they've used this, these previous --

1   the resetting of the case to go back to the PTO and say, hey,

2   you know, trial's being pushed back, so, you know --

3           THE COURT:  But he is not saying to push it back; he's

4   just saying if the trial period were to start on August the

5   15th, he just wants it moved to the following week, which is

6   August the 29th.

7           MR. WALSH:  We're fine with that.  But my objection --

8           THE COURT:  That's all he's asking.

9           MR. WALSH:  -- was that this particular expert

10  wouldn't tell us, he wouldn't tell me when I was asking him

11  these things.  This is a damage expert, Your Honor --

12          THE COURT:  Where is the conference?

13          MR. WALSH:  -- when it would start.

14          MR. DE VOOGD:  So he's testifying at trial at the

15  International Trade Commission in Washington, DC.

16          THE COURT:  Oh.

17          MR. DE VOOGD:  He's testifying on issues specific to

18  that forum related to domestic industry.  It's true that he

19  doesn't know precisely when during those trial dates he's going

20  to testify, but he was engaged in that case prior to --

21          THE COURT:  It doesn't matter.  We're not talking

22  about moving it back to October of 2027; we're just talking

23  about moving it back one week, one trial period, from

24  August 15th to August the 29th.

25          MR. WALSH:  I'm fine with moving it back.  My

1   understanding was they wanted to have it set back much longer

2   than that.

3           THE COURT:  No, he said the next trial period, so

4   that's August the 29th.  We'll enter an order requiring the

5   joint notice today and also pushing back the schedule to August

6   the 29th.

7           Anything else from the plaintiff?

8           MR. WALSH:  No, Your Honor.

9           THE COURT:  Anything else from the defense?

10          MR. DE VOOGD:  No, Your Honor.  Thank you very much.

11          THE COURT:  All right.

12          I just want to commend -- I always say to my law

13  clerks and to anyone who will listen, that you all in the IP

14  bar just a cut above, I think.  And you did a great job again

15  here in this case on the briefing and in the argument.  And I

16  really appreciate your time and you all coming down here.

17          Where'd you all come from?

18          MR. WALSH:  We're from St. Louis, Your Honor, our

19  base.

20          THE COURT:  St. Louis.

21          MR. DE VOOGD:  We're based in Boston, your Honor.

22          THE COURT:  In Boston.  Well, this might be welcomed.

23  What's the weather like in these places?

24          MR. DE VOOGD:  Don't get me started.

25          MR. WALSH:  Yes, right, a lot colder.

```
 1              THE COURT:  It's a lot colder.

 2              MR. WALSH:  It's a welcome relief, your Honor.

 3              MR. DE VOOGD:  It snowed earlier this week in Boston.

 4              THE COURT:  Amazing.

 5              MR. DE VOOGD:  Yeah.

 6              THE COURT:  All right.  Well, take care, folks.

 7              MR. HICKEY:  One housekeeping --

 8              THE COURT:  You're going to leave that for me, right?

 9    The bike?

10              MR. DE VOOGD:  Yeah.

11              MR. HICKEY:  We already had a request.

12              One clarification, is the trial going to be in Miami

13    or Fort Lauderdale?

14              THE COURT:  What do you prefer?

15              MR. WALSH:  I think Miami, Your Honor.

16              MR. DE VOOGD:  I think Miami, as well.

17              THE COURT:  I mean, I prefer Miami.  I don't know if

18    you've been to my Fort Lauderdale -- you've been, right, to my

19    Fort Lauderdale -- you haven't been.  We've done it by Zoom.

20              MR. DE VOOGD:  Yes.

21              THE COURT:  No, my Fort Lauderdale courtroom is like

22    one one-hundredth the size of this.  And it's just -- this is a

23    lot more comfortable.  So if you prefer it, I prefer it, too.

24              MR. WALSH:  That would be great.

25              Thank you, your Honor.
```

```
 1              MR. WALSH:  We need room for the props.

 2              THE COURT:  We need room -- I mean we need room for

 3       the product.

 4              MR. WALSH:  Happy to let you see this much closer.

 5       It's a very interesting bike.

 6              THE COURT:  I'd love to come down if you guys don't

 7       mind.

 8              MR. DE VOOGD:  Yeah.

 9              MR. WALSH:  Yeah.

10              THE COURT:  And maybe my law clerks can see it, too.

11              Fran, this can be off.

12              (Discussion had off the record)

13              (The Judge exited the courtroom)

14              (Proceedings concluded at 1:09 p.m.)

15                            -  -  -  -  -

16

17

18                   C E R T I F I C A T E

19        I certify that the foregoing is a correct transcript from

20         the record of proceedings in the above-entitled matter.

21

22
            /S/Francine C. Salopek                    4-21-22
23        Francine C. Salopek, RMR-CRR          Date
          Official Court Reporter
24

25
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305) 301-3276

COURTROOM SECURITY
OFFICER: [3]  3/12 3/17 3/19
MR. DE VOOGD: [76]
MR. GALICA: [30]
MR. HICKEY: [65]
MR. WALSH: [36]
ROOM CLERK: [4]  3/3 3/5 3/14 3/20
THE COURT REPORTER: [3]  20/8
30/4 70/21
THE COURT: [196]

$
$17,000 [1]  7/12
$200,000 [1]  53/13

'
'188 [23]
'75 [1]  15/11
'800 [28]
'peak' [1]  44/10

/
/S/Francine [1]  79/22

0
02111 [1]  2/8

1
1 percent [1]  12/23
10 [1]  21/6
102 [1]  58/20
11 [4]  21/3 39/25 44/4 45/24
112 [1]  66/21
11:08 [2]  1/9 3/1
1322 [1]  11/5
15th [6]  74/16 74/17 74/19 74/20
74/21 76/5
17 [3]  21/22 41/8 67/19
17B [1]  43/14
1818 [2]  6/24 7/2
1986 [1]  19/19
1991 [1]  19/19
1:09 p.m [1]  79/14

2
2 percent [1]  12/22
20 [3]  1/8 3/1 20/5
200 years [1]  7/3
2002 [1]  11/2
2004 [1]  15/11
2006 [1]  11/3
2011 [2]  19/16 19/21
2021 [1]  20/12
2022 [2]  1/8 3/1
2027 [1]  76/22
207 [1]  2/10
20th [1]  73/14
21-80581-CIV-RKA [1]  1/4
21-Civil-80581 [1]  3/20
22 [1]  79/22
23 [1]  41/6
25-page [1]  33/23
2500 [1]  2/4
26 [2]  59/1 59/21
27 [2]  59/2 59/21
27th [1]  73/14
28 [1]  12/7

29 [1]  59/3
299 [1]  2/10
29a [1]  60/17
29th [4]  76/6 76/24 77/4 77/6

3
3 percent [1]  12/23
301-3276 [1]  2/11
305 [1]  2/11
3276 [1]  2/11
35 [1]  66/21
358 F.3d 870 [1]  15/11
38 [2]  14/13 58/23

4
4,000 years [1]  6/22
4-21-22 [1]  79/22
40 [1]  12/8
41 [1]  60/7
42 [2]  63/17 69/14
442 F.3d 1322 [1]  11/5

5
52 [1]  12/8

6
6,000 years [1]  6/20
600 [1]  2/3
63101 [1]  2/4
6th or [1]  75/7

8
800 [1]  51/16
80581 [1]  3/20
870 [1]  15/11
874 [1]  15/11

A
a.m [2]  1/9 3/1
ability [1]  52/12
above [3]  36/17 77/14 79/20
above-entitled [1]  79/20
absolute [1]  40/4
absolutely [8]  11/20 34/14 34/19 58/8
62/7 62/7 62/14 63/14
absurd [1]  55/9
abutting [4]  24/23 25/19 25/22 25/23
accept [1]  34/24
acceptable [1]  34/16
accepts [1]  34/23
accessible [1]  60/25
accommodate [3]  75/11 75/20 75/21
accomplish [1]  33/1
according [1]  6/19
Accordingly [1]  60/18
accurately [1]  19/5 29/1
accused [4]  9/24 11/2 32/7 60/1
across [1]  50/19
add [11]  5/6 15/21 15/21 15/22 27/2
35/12 61/5 61/20 64/6 66/22 67/11
added [3]  23/7 26/21 27/5
addition [3]  35/12 54/3 63/9
address [2]  18/1 50/3
addresses [2]  19/7 64/18
adequately [2]  50/18 51/14
adjacent [7]  21/18 23/8 26/15 41/16
41/19 42/1 42/4

adjusting [1]  9/8
adopt [1]  33/18
adopting [1]  34/17
advanced [3]  31/5 32/25 33/17
advantage [3]  12/22 12/23 12/23
advisement [3]  34/17 35/19 46/19
aerodynamic [6]  7/14 8/3 8/19 12/8
12/14 13/18
affecting [1]  9/12
afraid [1]  26/18
agree [25]
agreement [10]  5/16 5/25 44/1 58/1
66/4 71/4 71/6 71/8 71/10 71/11
air [6]  7/17 7/18 8/4 8/13 11/23 60/2
Ajay [1]  3/10
align [1]  23/3
aligns [1]  15/24
allow [2]  37/12 65/18
allowed [2]  23/17 23/17
allows [1]  12/13
almost [4]  7/3 7/21 21/5 75/14
alone [1]  51/5
alternating [1]  49/24
although [6]  17/20 27/16 28/9 38/21
40/13 72/9
Altman [2]  1/15 3/6
aluminum [1]  22/17
Amazing [1]  78/4
ambient [1]  8/13
ambiguity [4]  30/18 32/4 33/3 55/20
ambiguous [2]  31/21 51/4
ambit [1]  34/10
ameliorates [1]  32/24
amended [1]  58/3
amendment [1]  30/24
Amgen [1]  26/24
analyzing [1]  42/8
Andrew [1]  2/5
annular [1]  59/16
answer [2]  10/23 51/3
anticipate [1]  71/14
antiquated [1]  55/14
anymore [1]  43/9
apex [6]  36/6 36/7 36/16 36/25 37/16
45/19
apogee [1]  36/8
apparatus [2]  51/8 51/12
appearances [3]  2/1 3/22 39/15
applicant [15]  16/10 18/21 19/4 23/6
23/11 26/21 30/21 50/17 70/8 70/11
70/13 70/14 70/18 70/23 72/1
application [2]  16/19 16/24
applied [1]  62/13
applies [1]  68/24
appreciate [6]  10/8 56/19 73/21 73/22
73/24 77/16
appropriately [2]  15/18 46/23
approve [1]  35/4
approved [1]  69/11
April [7]  1/8 3/1 73/14 74/15 74/16
74/17 74/20
April 15th [3]  74/16 74/17 74/20
APRIL 20 [1]  3/1
archeologists [2]  6/19 6/20
area [3]  22/18 41/24 42/8
areas [2]  23/2 49/12
aren't [4]  29/4 36/10 47/19 71/19
arena [1]  8/12

## A

arguing [1]  17/21
argument [8]  28/17 30/24 34/6 34/9
 35/10 40/17 59/24 77/15
arguments [6]  5/12 13/10 26/1 33/17
 33/25 41/12
arm [1]  7/23
arm's [1]  57/11
Armstrong [1]  17/12
art [28]
artful [1]  60/24
articulate [1]  41/3
articulated [1]  37/13
artificially [1]  64/20
ascent [3]  36/8 37/16 38/2
aspect [1]  72/17
aspects [4]  25/16 40/14 54/25 55/5
asserted [1]  15/14
asserting [1]  57/13
assignment [1]  57/24
assume [1]  64/25
assumed [1]  40/18
assuming [1]  43/20
assumption [1]  39/10
assures [1]  64/19
atomic [1]  25/22
attachment [1]  59/15
attempting [4]  30/18 32/16 41/13
 70/15
attributed [1]  15/8
August [9]  74/19 74/21 75/6 76/4 76/6
 76/24 76/24 77/4 77/5
August 15th [2]  74/19 74/21
August 15th to [1]  76/24
August 24th through [1]  75/6
Avenue [1]  2/3
average [1]  20/24
avoid [3]  9/9 14/6 18/18
aware [1]  13/9
axes [1]  43/21

## B

background [2]  4/17 12/10
backwards [1]  9/7
Bahamas [1]  3/11
bar [1]  77/14
base [1]  77/19
basic [1]  11/12
bearing [1]  9/25
becomes [2]  42/7 57/8
beforehand [1]  75/22
begin [5]  4/16 5/2 6/17 42/7 42/18
begins [1]  12/7
begun [1]  75/14
behind [3]  7/24 8/1 52/19
belaboring [1]  56/4
believe [12]  3/16 16/22 21/10 22/2
 22/24 30/22 33/16 41/9 44/17 51/14
 57/22 64/8
believes [1]  15/5 32/18
benefit [3]  12/16 12/18 17/18
benefits [2]  12/8 12/19
berth [1]  71/18
bicycle [6]  6/18 6/24 7/5 7/8 8/3 73/5
bicycles [2]  12/21 17/13
bicycling [1]  7/14
bike [6]  4/14 6/11 7/10 8/3 78/9 79/5
binding [1]  62/10

black [2]  9/22 50/16
black-letter [1]  9/22
bludgeoning [3]  5/24 6/8 33/11
blue [1]  59/2
Blvd [1]  2/10
boring [3]  59/1 59/21 60/17
Boston [4]  2/8 77/21 77/22 78/3
bottom [3]  32/8 40/5 43/4
Bradsby [1]  11/4
break [2]  11/21 11/22
breaks [1]  11/23
brief [8]  10/25 19/12 25/12 29/9 31/12
 31/15 34/1 40/17
briefed [2]  20/14 35/13
briefing [1]  77/15
briefs [2]  13/10 51/4
broaden [1]  32/16
Broward [1]  2/10
built [1]  61/24
bulging [5]  48/2 61/15 65/3 68/10
 72/23
bumps [3]  9/13 9/17 9/19
burden [1]  70/4
business [3]  57/11 57/23 59/11
busting [1]  73/5

## C

called [3]  9/13 22/15 58/17
Calling [2]  3/14 3/20
calls [1]  36/10
canned [1]  75/22
capture [2]  35/16 37/12
car [2]  9/1 9/2
CARBON [5]  1/10 3/21 4/8 38/25
 54/13
carries [1]  68/24
carry [3]  50/22 54/17 69/3
caveat [1]  37/4
center [11]  2/7 9/5 11/25 12/2 48/2
 48/4 53/6 61/15 65/4 68/10 72/23
certify [1]  79/19
cetera [3]  12/5 64/10 75/18
challenge [1]  19/3
child [5]  54/19 57/7 57/9 67/22 69/17
choice [1]  23/23
chuckled [1]  56/20
Cir [1]  15/11
circle [1]  25/6
circled [1]  59/2
circling [1]  7/25
Circuit [6]  9/22 11/3 39/14 50/17
 54/15 55/7
circular [2]  70/17 72/1
circumference [2]  25/5 25/5
circumstance [1]  22/9
circumvent [2]  28/20 35/23
cited [6]  5/23 10/25 15/18 22/8 26/23
 69/25
Cities [1]  53/17
CIV [1]  1/4
Civil [1]  3/20
claim [76]
Claim 1 [12]  21/15 66/17 66/19 66/23
 67/3 67/4 67/6 67/11 67/15 67/17
 69/21 73/15
Claim 11 [3]  39/25 44/4 45/24
claim 17 [1]  21/22
Claim 6 [5]  66/20 66/20 67/3 67/4

68/12
claimed [3]  51/9 59/9 67/6
claiming [1]  59/19
claims [44]
clarification [1]  78/12
clarifying [1]  63/25
clarity [3]  16/12 30/19 31/11
cleaner [2]  47/18 61/11
clear [24]
clerk [1]  36/6
clerks [3]  36/14 77/13 79/10
client [4]  6/4 46/18 57/14 65/18
client's [2]  9/24 10/16
close [1]  10/22
closer [4]  66/2 71/7 73/17 79/4
closing [3]  33/24 34/6 34/9
Cohn [1]  2/6
colder [2]  77/25 78/1
colleague [1]  65/18
collection [1]  39/3
colloquy [1]  66/23
column [1]  12/7
column one [1]  12/7
comfortable [2]  4/3 78/23
commend [1]  77/12
comments [2]  54/14 63/13
Commission [2]  74/25 76/15
common [8]  21/8 36/12 37/25 45/13
 45/17 47/16 55/16 70/16
commonly [1]  28/9
communications [1]  16/9
company [1]  58/17
complicated [2]  40/20 40/21
comprise [1]  67/9
computer [2]  1/25 30/10
concave [13]  23/20 36/22 47/11 48/5
 52/18 53/3 56/21 59/16 59/18 60/8
 60/18 63/19 72/17
concavity [1]  53/1
concept [2]  54/15 68/19
concepts [1]  47/19
conceptually [3]  33/7 33/15 35/16
concern [9]  31/10 32/6 32/15 33/16
 35/14 42/25 44/23 55/20 64/18
concerned [3]  33/3 34/5 55/19
concerns [2]  32/25 44/12
concluded [1]  79/14
conference [1]  76/12
configuration [8]  13/16 20/17 20/18
 40/3 40/7 46/2 59/5 67/7
configurations [1]  40/2
confirms [1]  19/14
conflict [1]  74/4
confused [3]  47/10 55/20 64/10
confusing [4]  27/13 27/15 32/2 64/3
consistent [3]  21/11 50/18 55/25
consistently [1]  46/15
constant [16]
constantly [14]  21/7 27/9 41/16 63/9
 63/21 64/5 64/7 64/11 64/17 64/21
 66/25 68/2 69/7 72/17
constitute [1]  31/23
construction [36]
constructions [4]  14/12 25/18 56/13
 61/5
construe [4]  20/13 45/2 50/11 54/18
construed [17]
construing [4]  17/9 40/22 52/4 55/10

## C

contention [2]  16/5 57/17
contentions [1]  33/17
context [14]  16/2 21/12 39/6 39/13
 39/14 39/22 43/25 44/9 45/20 46/13
 50/15 52/3 56/7 70/15
contexts [1]  39/16
continually [1]  26/13
continuation [1]  22/1
continuous [2]  62/14 67/21
continuously [55]
contours [1]  57/23
contract [1]  15/22
contrary [1]  53/15
contrast [1]  22/14
control [1]  18/16
convenience [1]  21/14
conversation [1]  47/1
convex [51]
convexity [1]  68/4
convince [1]  44/2
coordinate [1]  25/4
copies [2]  30/7 30/11
copy [1]  61/5
corollary [1]  22/15
Corp. [1]  15/10
counsel [3]  3/22 10/20 47/2
counts [1]  16/23
COURT [11]  1/1 2/9 2/9 2/10 3/5
 13/23 18/9 18/10 20/15 70/1 79/23
courtroom [4]  3/2 10/10 78/21 79/13
cover [1]  5/6
covered [1]  8/12
create [1]  19/5
created [3]  14/5 18/18 44/24
creates [2]  7/18 8/5
critical [1]  50/7
crosswind [5]  8/23 8/24 8/24 9/11
 12/15
crosswinds [2]  8/15 8/17
CRR [2]  2/9 79/23
curve [6]  20/18 40/1 40/3 40/5 67/7
 68/10
curved [4]  48/2 61/15 65/3 72/22
curves [1]  13/16
cut [1]  77/14
cycling [1]  8/11
cyclists [1]  22/25

## D

damage [1]  76/11
damages [2]  74/4 74/24
date [3]  74/24 75/17 79/23
dated [1]  23/25
dates [3]  74/5 75/4 76/19
daughter [3]  38/11 50/25 51/1
DC [1]  76/15
de [1]  7/9
Death [1]  36/19
December [1]  20/12
decided [1]  69/5
deck [1]  70/12
declaration [1]  14/14
defendant [4]  1/11 2/5 4/8 10/25
defense [2]  73/22 77/9
deficient [1]  51/25
defined [5]  10/6 14/2 24/13 24/16
 51/21

definition [17]
definitions [3]  17/25 18/13 18/15
deletion [1]  52/4
deny [2]  26/16 26/17
denying [4]  25/11 25/14 25/15 37/14
dependent [3]  15/16 66/22 68/12
depends [2]  51/7 52/18
depicted [1]  41/12
depicting [1]  41/24
deploy [1]  6/8
deposition [1]  75/13
descent [4]  36/20 37/17 38/6 55/18
describe [5]  4/21 21/3 22/13 52/12
 68/19
described [2]  21/6 58/17
describes [1]  41/15
describing [7]  13/15 42/24 43/16 46/8
 60/25 68/4 70/10
description [1]  15/25
design [1]  73/8
designed [3]  8/17 9/10 9/11
determine [4]  32/7 41/10 42/5 42/8
detriment [1]  64/4
device [2]  51/8 51/9
DeVoogd [4]  2/5 4/7 52/11 54/12
diagram [2]  58/23 63/17
dictionaries [4]  16/15 19/14 19/19
 20/1
difference [10]  17/6 17/13 17/17 33/14
 48/15 49/9 49/21 50/25 50/25 65/7
difficult [1]  50/13
difficulty [2]  19/3 56/20
digestible [1]  32/23
Dimitris [1]  57/10
direct [5]  19/20 31/17 56/24 69/13
 69/22
directly [2]  48/24 69/16
DirecTV [1]  15/10
disagree [6]  29/2 46/10 46/17 52/14
 71/15 73/16
disagreement [1]  71/17
discernible [2]  32/23 50/25
disclaimer [11]  16/13 16/13 26/20
 27/3 30/23 31/3 35/15 59/23 60/23
 68/21 69/15
disclaimers [1]  18/14
disclose [3]  58/19 59/5 60/11
disclosed [1]  58/22
discloses [2]  60/7 60/9
discuss [3]  4/22 6/13 65/17
discussed [2]  50/8 56/8
discussing [2]  5/2 61/6
discussion [12]  16/20 19/11 30/16
 31/1 31/13 32/6 33/10 38/23 46/21
 63/16 65/19 79/12
disks [1]  8/14
dispute [10]  6/25 13/6 13/20 14/8
 14/11 14/12 14/19 17/3 21/15 54/1
disputed [2]  5/24 14/9
disputes [1]  14/5
distance [22]
distances [2]  31/8 31/8
distinction [6]  31/2 40/19 49/15 53/10
 69/7 70/6
distinctions [3]  23/10 23/18 68/1
distinguish [9]  14/16 25/21 26/6 26/21
 27/6 29/13 51/19 67/24 70/24
distinguished [1]  35/17

distinguishing [2]  24/15 69/6
DISTRICT [5]  1/1 1/2 1/16 2/10 3/5
dive [1]  44/24
DIVISION [1]  1/3
docket [1]  35/3
document [1]  33/23
dome [1]  8/12
domestic [1]  76/18
drafted [1]  50/8
drafting [1]  44/24
drag [4]  7/18 7/18 7/24 11/24
draw [1]  23/10
drawing [1]  40/19
drawn [3]  41/18 41/24 68/1
Drew [2]  4/7 54/12
drop [1]  51/20
dropped [2]  51/24 69/11

## E

easier [2]  12/4 35/2
easiest [1]  42/10
eddies [1]  7/25
edge [16]
edified [1]  69/19
edition [1]  53/17
effectively [2]  32/7 32/12
eight [6]  4/19 17/10 17/11 17/11 18/6
 20/5
eight minutes [1]  4/19
eight months [1]  20/5
electron [1]  73/5
element [6]  58/21 62/15 62/18 63/11
 66/19 67/21
elements [2]  59/4 63/1
elevation [7]  39/3 42/6 42/6 42/17
 42/18 42/19 46/23
elevations [1]  37/5
ELMO [1]  30/8
embodied [1]  51/9
embodiment [2]  72/11 72/25
embodiments [1]  48/23
empty [1]  6/22
endeavor [1]  39/10
energy [4]  8/20 8/20 9/9 12/25
engaged [1]  76/20
English [17]
enhanced [1]  13/18
enter [2]  66/15 77/4
Enterprises, [1]  15/10
Enterprises, Inc [1]  15/10
entitled [1]  79/20
especially [1]  9/2
Esq [4]  2/2 2/2 2/5 2/6
essentially [6]  33/3 34/3 57/8 59/3
 63/18 68/18
estoppel [1]  60/23
et [3]  12/5 64/10 75/18
et cetera [2]  12/5 64/10
event [1]  58/6
everybody [4]  27/18 45/13 55/11
 64/17
everyday [4]  17/11 18/6 37/8 42/23
everyone [1]  75/12
everyone's [1]  75/11
evidence [6]  14/7 16/15 16/21 16/21
 19/17 53/15
examiner [10]  22/8 31/5 51/24 52/3
 58/15 58/19 60/12 60/16 70/11 70/14

**E**

excellent [2]  74/10 74/11
exclude [1]  72/3
exclusive [4]  31/2 59/8 60/13 62/11
Excuse [1]  35/11
exercise [1]  17/7
exhaust [1]  5/7
Exhibit [3]  14/13 21/3 21/6
Exhibit 10 [1]  21/6
Exhibit 11 [1]  21/3
Exhibit A [1]  14/13
existing [2]  58/16 59/4
exited [1]  79/13
expand [1]  70/5
expert [9]  14/9 16/15 17/22 17/23
 74/5 74/24 75/13 76/9 76/11
explain [5]  4/17 19/4 38/10 38/12 52/1
explaining [1]  40/22
express [1]  68/21
extension [2]  74/23 75/9
extent [6]  20/3 20/20 54/21 55/19
 66/18 68/18
exterior [22]
extra [1]  55/22
extreme [3]  5/17 5/18 36/2
extremely [3]  7/15 8/11 50/13
extrinsic [4]  16/14 16/20 16/21 19/17
eye [1]  17/9

**F**

F.3d [2]  11/5 15/11
face [1]  50/16
fact [10]  13/21 13/25 15/18 22/12 31/4
 35/15 52/9 68/17 72/16 72/25
falls [1]  30/19
family [4]  50/19 50/22 53/16 54/17
Fast [1]  7/3
faster [1]  8/20
faster/further [1]  8/20
feasible [1]  51/21
February [1]  20/15
Fed [3]  15/11 50/17 54/15
Federal [4]  9/22 11/2 39/14 55/7
feed [1]  63/1
Ferris [1]  2/6
field [2]  17/23 73/8
fighting [1]  71/20
figure [7]  41/14 48/20 48/20 48/23
 48/25 58/23 58/25
Figure 1 [1]  48/20
Figure 2 [1]  58/23
Figure 3 [2]  48/20 48/25
file [8]  19/13 26/17 26/19 35/3 57/8
 65/22 71/3 73/13
final [2]  16/11 71/25
Financial [1]  2/7
fine [23]
finger [2]  38/24 50/7
fins [2]  9/14 9/15
firm [1]  46/19
flat [1]  63/19
flies [1]  50/16
FLORIDA [3]  1/2 1/7 2/11
flowing [1]  8/4
flows [2]  50/20 56/9
focus [1]  13/13
folks [2]  4/1 78/6
foregoing [1]  79/19

form [6]  13/17 48/2 61/15 65/3 68/10
 72/23
Fort [5]  2/11 78/13 78/18 78/19 78/21
forum [1]  76/18
Fran [2]  30/3 79/11
France [2]  7/9 58/17
Francine [3]  2/9 79/22 79/23
free [1]  34/8
front [2]  26/15 31/6
funhouse [1]  56/22
funny [2]  38/9 53/24

**G**

Galica [4]  2/6 4/9 50/9 62/8
Game [1]  3/18
gather [2]  72/13 72/14
gears [1]  7/1
general [3]  6/18 8/18 73/2
geometric [1]  24/25
gets [3]  25/20 44/24 51/3
gives [1]  13/17
glad [1]  4/14
Glovsky [1]  2/7
God [1]  64/14
Goods [1]  11/4
Goods vs. Hillerich [1]  11/4
gotten [3]  71/5 71/7 75/17
govern [2]  71/9 71/10
grant [2]  25/2 59/8
granted [5]  31/7 35/18 60/22 61/3
 70/3
graphics [1]  74/10
great [3]  30/12 77/14 78/24
grew [1]  27/22
Grit [1]  21/4
ground [2]  5/19 28/24

**H**

H-E-R-T-I-N-G [1]  70/22
hammer [1]  55/21
hand [4]  10/16 40/6 41/14 58/23
handle [2]  4/15 49/25
hands [1]  74/12
hang [1]  74/9
Hanson [1]  14/13
happy [7]  29/3 47/1 49/23 50/3 53/22
 62/23 79/4
harder [2]  37/6 37/7
harmony [1]  62/4
haul [1]  12/24
hear [6]  28/18 30/1 38/19 53/22 54/7
 60/24
heard [2]  56/20 66/13
hearing [1]  1/14 4/13 35/8
heartland [1]  60/22
heavy [3]  8/9 8/10 15/7
help [6]  14/6 37/2 47/15 64/1 73/19
 73/23
helpful [6]  5/10 33/20 40/22 40/24
 56/1 63/14
helps [3]  20/20 37/4 52/1
here's [4]  27/11 66/1 66/4 71/2
Herting [3]  70/19 70/22 72/4
hey [2]  59/6 76/1
Hickey [10]  2/2 3/24 13/4 30/25 38/24
 50/16 50/24 51/6 58/16 67/13
Hickey's [1]  51/1
hierarchy [1]  15/13

highest [11]  41/18 41/19 41/21 41/22
 42/11 42/11 44/18 45/3 46/15 46/24
 46/25
highlight [2]  10/15 62/24
highlighted [3]  21/15 45/24 51/13
highway [1]  9/3
Hillerich [1]  11/4
history [15]  15/5 16/8 18/14 19/13
 22/5 26/17 26/19 30/22 57/8 57/9
 59/23 60/23 69/2 69/3 69/16
hits [1]  7/17
Hold [1]  11/6
homework [1]  37/19
Honor [68]
Honorable [3]  1/15 3/6 15/19
hope [1]  19/7
hopefully [8]  23/25 27/23 33/23 66/4
 71/4 71/6 73/16 73/17
hoping [1]  5/25
housekeeping [2]  73/25 78/7
hub [3]  9/6 12/3 12/4
huge [1]  28/17
human [2]  72/15
hundred [3]  12/22 62/5 69/25
hundred per [1]  62/5
hundredth [1]  78/22
hypothetical [4]  24/24 24/25 36/18
 40/21

**I**

I'd [3]  5/15 61/11 79/6
I'll [17]
I'm [51]
I've [4]  4/13 34/11 37/12 37/19 55/21
 59/2 65/23 66/13 71/8
idea [5]  12/11 12/13 24/22 48/6 49/11
identical [1]  21/5
identified [2]  22/11 23/7
identify [1]  25/5
identifying [1]  68/9
ignore [1]  55/8
images [1]  72/21
imperfection [2]  72/12 72/15
imperfections [2]  32/3 72/7
import [5]  16/3 55/8 57/6 62/10 64/15
importing [1]  34/3
imports [1]  29/4
impossible [3]  25/21 41/10 50/14
inappropriate [1]  64/20
INC [3]  1/10 3/21 15/10
include [9]  21/4 31/7 32/17 36/20
 43/14 44/2 61/20 64/12 69/21
included [3]  33/22 34/11 70/23
includes [2]  37/16 37/17
including [1]  11/13
inconsistent [2]  18/23 36/10
incorporates [1]  66/16
incredible [1]  72/21
indecipherable [1]  29/6
indefinite [6]  14/3 20/14 36/11 36/11
 39/17 50/13
indefiniteness [3]  44/23 56/8 56/9
independent [2]  21/22 41/8
indicating [2]  12/2 22/19
indulge [1]  74/2
industry [1]  76/18
infinitesimally [1]  25/20
infringement [3]  14/6 18/19 75/24

**I**

infringes [1]  72/25
initial [2]  53/21 54/14
initially [1]  45/9
inject [3]  30/18 47/13 47/19
injected [1]  72/16
injecting [1]  64/20
inner [2]  42/8 60/8
innovative [1]  58/18
inserted [1]  26/14
inserting [1]  40/20
insertion [1]  26/13
insolvably [1]  51/4
instances [1]  26/24
instruction [7]  35/6 43/14 44/2 62/6
 63/2 63/6 64/8
instruction's [1]  63/7
instructions [6]  34/11 34/13 37/22
 43/15 63/4 63/15
interchangeable [1]  49/4
interior [1]  13/17
International [2]  74/25 76/15
interpretation [2]  15/20 21/1
interpretations [1]  42/16
interpreting [2]  17/8 54/23
interrupt [2]  32/8 32/12
interrupted [1]  64/24
interruption [11]  21/10 24/21 27/9
 27/13 31/21 31/22 31/23 32/1 32/1
 33/5 34/4
interruptions [1]  32/2
interview [4]  70/13 70/13 70/15 72/1
invalid [2]  58/20 66/21
invalidity [1]  68/11
invent [1]  57/13
invented [1]  6/25
invention [13]  10/1 15/25 19/4 19/16
 19/18 59/9 59/19 60/14 62/12 62/12
 69/20 69/20 73/8
inventions [2]  50/18 53/16
inventor [3]  51/9 53/12 57/11
inventor's [1]  53/15
investigate [1]  73/6
IP [1]  77/13
IPRs [1]  13/22
isolation [2]  46/11 46/12
issue [16]
issued [2]  59/24 69/17
issues [2]  68/8 76/17
iterations [1]  53/16

**J**

jagged [2]  46/6 46/6
January [1]  20/15
job [2]  3/15 77/14
joint [5]  65/24 66/1 71/3 73/13 77/5
Jr [1]  2/2
Judge [3]  1/16 3/2 79/13
judging [1]  48/4
judgment [1]  68/12
jump [2]  6/10 56/12
jumping [1]  25/25
juror [1]  20/24
jurors [9]  32/23 33/24 37/2 37/4 40/25
 47/10 55/20 56/1 65/8
jury [24]
jury's [1]  18/25
Justice [1]  15/19

**J**

Justice Scalia [1]  15/19
justifiable [1]  64/18
justifiably [2]  64/8 64/10

**K**

Katsanis [8]  7/4 57/10 58/11 58/25
 59/5 60/4 60/21 69/19
keep [3]  9/8 29/18 29/19
keeping [1]  56/21
keeps [2]  8/4 11/24
kids [1]  38/10
knock [1]  27/19
knows [2]  55/12 64/14

**L**

lack [1]  16/12
Lance [1]  17/12
language [18]
larger [1]  9/2
latter [1]  61/16
Lauderdale [5]  2/11 78/13 78/18 78/19
 78/21
Laughter [3]  3/13 28/1 33/13
law [9]  9/22 11/3 13/11 13/11 36/14
 51/12 77/12 79/10
laws [1]  14/4
lay [1]  35/8
lazy [1]  24/3
leading [2]  7/19 8/7 52/20
leads [1]  44/22
leaning [1]  5/14
leave [2]  43/25 78/8
length [1]  57/11
letter [2]  9/22 50/16
levels [1]  8/7
Levin [2]  2/6 4/7
Lewis [1]  2/3
license [2]  58/1 58/2
light [2]  8/11 65/23
limit [1]  57/1
limitation [5]  45/1 66/20 66/22 66/24
 66/25
limitations [6]  16/3 24/11 29/4 60/1
 62/12 73/6
line 28 [1]  12/7
line 40 [1]  12/8
lines [1]  41/24
listen [1]  77/13
litigation [1]  70/5
LLC [5]  1/7 2/3 3/21 3/23 3/25
lost [2]  37/4 44/3
Louis [3]  2/4 77/18 77/20
love [1]  79/6
lowest [8]  42/1 42/1 42/12 42/12 44/5
 45/4 46/16 46/25

**M**

MA [1]  2/8
machine [1]  72/15
machined [2]  22/18 22/22
map [1]  51/11
margins [1]  5/15
marker [1]  69/6
marketing [4]  16/19 16/25 19/23 21/3
Markman [1]  1/14 4/12
mask [1]  4/2
matching [1]  67/15
materials [3]  16/19 16/25 19/23

matter [8]  31/4 44/3 51/10 52/9 73/25
 74/25 76/21 79/20
matters [4]  22/24 49/2 52/25 53/7
Matthew [2]  2/6 4/9
Mavic [2]  22/15 58/17
maximum [1]  40/2
mean [38]
meaning [27]
meaningless [1]  52/23
meanings [2]  19/14 54/25
means [19]
meant [5]  17/3 29/5 64/12 64/12
 70/10
measurable [1]  73/10
measurement [2]  25/21 40/21
mechanical [1]  1/24
mechanism [1]  51/19
median [1]  60/17
meet [1]  36/3
meets [1]  73/6
member [1]  18/12
Mercat [37]
metal [4]  22/17 22/20 22/22 22/24
MIAMI [8]  1/3 1/7 27/17 27/19 78/12
 78/15 78/16 78/17
Michael [3]  2/2 3/24 13/4
microscope [1]  73/5
microscopic [2]  72/20 73/10
middle [8]  5/19 6/5 6/22 28/24 36/3
 62/21 63/11 75/4
miles [1]  12/22
milled [1]  22/18
millimeter [1]  73/9
million [1]  39/14
mine [1]  59/14
minor [1]  73/25
Mintz [2]  2/6 4/7
minutes [1]  4/19
mirror [1]  56/22
misconstrued [1]  33/5
Missouri [1]  27/22
mistakenly [1]  40/18
mixing [1]  67/14
MO [1]  2/4
modest [6]  63/25 74/23
molecular [2]  72/14 72/14
momentarily [1]  57/1
moments [1]  25/13
month [1]  20/10
months [1]  20/5
morning [7]  3/7 3/8 3/9 4/1 4/7 4/10
 4/11
Mostly [1]  24/2
mountain [11]  36/17 37/1 38/3 43/24
 44/6 44/10 45/18 45/19 48/5 55/1
 55/23
mountains [1]  36/12
move [8]  6/4 6/6 7/22 10/23 12/2 12/4
 16/2 56/4
moved [1]  76/5
moves [1]  11/25
moving [3]  76/22 76/23 76/25
Mr. [19]
Mr. DeVoogd [1]  52/11
Mr. Galica [2]  50/9 62/8
Mr. Hickey [7]  30/25 38/24 50/16
 50/24 51/6 58/16 67/13
Mr. Hickey's [1]  51/1

**M**

Mr. Katsanis [3]  58/11 58/25 69/19
Mr. Katsanis told [1]  60/4
Mr. Katsanis used [1]  60/21
Mr. Patent [1]  60/12
Mr. Walsh [2]  13/14 22/23
multiple [7]  8/6 16/23 24/1 26/5 26/5
55/5 58/3

**N**

nadir [7]  36/20 36/21 37/1 37/17 38/4
40/4 55/17
namely [1]  70/24
narrowed [2]  70/4 72/3
narrower [1]  71/18
narrowing [1]  62/10
natural [1]  55/4
navigate [1]  42/4
near [2]  39/4 43/3
necessary [10]  16/16 17/5 21/9 24/14
29/4 29/10 31/2 43/17 54/3 56/13
necessity [1]  55/10
neck [1]  7/22
neglected [1]  69/14
negotiate [1]  43/20
negotiated [1]  30/20
negotiation [2]  16/11 16/11
neither [2]  11/9 60/18
NeoMagic [1]  11/1
nine [1]  20/14
nobody [2]  28/6 43/8
non [1]  59/22
nonconvex [1]  60/9
none [2]  33/25 58/15
normal [2]  9/6 39/22
normally [1]  37/8
Note [1]  20/5
noted [1]  16/10
notice [7]  35/3 65/22 65/24 66/1 71/3
73/13 77/5
notion [2]  66/16 68/18
number [2]  4/23 43/14
Number 17B [1]  43/14

**O**

object [3]  9/21 34/8 52/12
objecting [1]  16/18
objection [8]  5/4 10/11 10/12 10/20
28/10 31/25 75/9 76/7
objectionable [2]  34/7 34/10
objections [1]  52/6
obvious [2]  42/22 46/9
October [2]  20/11 76/22
October of [1]  76/22
offer [1]  31/19
offering [1]  17/1
offers [1]  28/25
Office [19]
Official [2]  2/9 79/23
Oh [6]  6/14 9/18 30/12 62/5 74/6
76/16
Omega [1]  26/24
one-hundredth [1]  78/22
ongoing [1]  16/10
open [2]  28/23 46/21
opening [1]  16/20
operating [1]  39/9
opine [1]  71/19

opportunity [1]  65/19
opposed [3]  8/6 23/20 46/23
opposing [1]  47/1
opposite [4]  17/21 53/3 59/18 59/19
order [7]  18/11 59/6 59/7 62/11 69/23
70/3 77/4
ordinary [9]  10/1 14/21 15/1 15/8
19/15 19/20 20/1 31/20 70/25
orthogonal [1]  48/25
outer [11]  48/1 48/8 48/12 48/12
48/16 48/24 53/2 53/25 60/10 61/10
65/5
outset [1]  30/17
owner [2]  30/21 62/10

**P**

P.C [1]  2/7
p.m [1]  79/14
page [9]  31/18 31/19 32/8 32/9 33/23
44/3 65/25 65/25 73/15
page 5 [2]  31/19 32/9
page 6 [2]  31/18 32/8
paragraph [3]  14/13 31/18 32/8
paragraph 38 [1]  14/13
parameters [1]  11/12
parent [2]  57/6 57/7
parents [1]  27/20
parlance [1]  36/12
part [11]  24/10 44/20 56/9 56/22 57/8
61/16 61/19 61/25 62/16 63/10 63/11
parties [4]  5/8 14/11 20/9 53/24
partner [2]  3/24 4/9
parts [3]  11/22 55/6 62/16
party [1]  39/8
passed [1]  74/20
patent [79]
patent's [1]  15/25
patentee [5]  31/6 31/6 35/17 57/1
69/23
patentees' [1]  68/21
patentholder [1]  26/25
patents [12]  26/18 36/4 43/23 50/19
50/21 54/16 54/16 57/12 57/13 57/13
59/9 59/24
path [1]  59/16
pattern [1]  63/5
PCW [2]  32/15 32/18
PCW's [3]  35/14 43/1 44/16
peak [54]
peak's [1]  44/6
peaks [38]
pellucid [1]  39/15
people [8]  3/15 7/9 17/11 18/6 42/23
47/11 47/15 73/7
percent [3]  12/22 12/23 12/23
percentages [1]  12/20
perfect [1]  27/24
perfectly [3]  39/19 55/3 55/24
performance [1]  13/18
performed [1]  9/23
perhaps [1]  60/25
period [4]  16/22 76/4 76/23 77/3
person [3]  9/25 14/21 19/19
personal [1]  48/19
persons [2]  15/9 59/17
perspective [12]  19/20 31/11 38/25
43/1 44/16 46/25 51/11 52/25 53/2
53/6 53/6 53/7

perspectives [1]  49/13
persuade [1]  59/7
phrase [2]  21/12 64/21
physical [1]  72/12
pick [2]  17/11 24/4
picked [1]  19/4
Pikes [11]  36/15 36/15 39/18 39/20
40/9 45/18 46/5 46/5 55/1 55/2 55/3
plain [28]
plaintiff [6]  1/8 2/2 10/21 65/19 73/19
77/7
play [2]  6/12 63/1
podium [1]  50/4
point [71]
pointed [1]  15/16
pointing [1]  40/17
points [19]
pool [1]  7/22
Popeo [1]  2/7
portion [9]  22/19 31/8 60/17 61/21
62/21 64/12 68/20 69/21 72/2
portions [4]  30/16 32/17 63/19 63/19
position [8]  18/10 18/18 18/20 29/23
41/3 41/5 50/11 56/9
positions [5]  18/9 33/18 33/21 36/1
73/17
postdate [1]  19/18
postdated [1]  16/21
potential [1]  32/4
practice [1]  60/13
precedent [2]  50/17 70/1
precise [5]  32/18 42/10 56/13 63/14
75/4
precisely [4]  53/3 60/3 61/7 76/19
precision [2]  28/25 30/19
predictions [1]  65/10
prefer [6]  43/7 65/6 78/14 78/17 78/23
78/23
preference [1]  40/15
preliminary [1]  13/9
premature [1]  71/14
present [1]  21/25
presenting [2]  13/5 32/6
presently [1]  74/5
presiding [1]  3/6
pressure [4]  8/25 9/5 11/25 12/2
presumed [1]  15/1
presumption [3]  15/7 55/4 69/2
PRINCETON [27]
Princeton's [6]  13/23 14/9 14/12 14/18
16/18 21/2
principle [2]  50/20 68/16
printed [1]  30/7
problem [13]  10/18 17/25 18/1 24/10
25/18 35/25 51/24 61/9 61/10 64/25
74/6 75/11 75/12
problems [1]  19/6
proceedings [3]  1/24 79/14 79/20
process [2]  14/25 72/16
produced [1]  1/25
product [4]  11/2 16/11 22/15 79/3
products [2]  9/24 32/7
profile [45]
profiles [9]  23/16 53/20 59/22 60/9
60/18 67/8 69/20 70/9 70/24
proper [2]  10/10 52/4
proposal [6]  21/9 34/15 34/23 34/24
60/25 63/23

**P**

propose [4] 39/10 50/12 71/2 71/2
proposed [14] 14/12 28/25 30/18
 31/20 35/16 35/19 39/8 42/17 43/6
 43/14 55/21 60/2 60/20 66/15
proposing [4] 32/11 32/12 42/19 42/20
proposition [4] 11/1 14/22 63/6 70/1
propositions [1] 14/17
props [1] 79/1
prosecution [25]
protrusion [3] 41/19 41/20 43/3
provide [1] 64/1
PTO [1] 76/1
public [2] 21/3 59/10
pull [5] 21/13 31/16 48/19 70/12 70/13
pulled [1] 69/15
pulling [2] 49/14 60/1
purported [2] 62/12 73/8
purposes [3] 21/1 43/17 58/7
push [2] 8/25 76/3
pushed [2] 9/3 76/2
pushing [4] 7/23 9/12 40/18 77/5

**Q**

qua [1] 59/22
question [17]
questions [1] 5/7
quick [1] 69/13
quoted [1] 44/20

**R**

races [2] 12/21 64/14
radial [24]
radially [2] 42/8 60/8
radius [2] 20/18 40/2
raise [2] 50/10 68/17
raised [1] 16/17
raising [3] 30/25 57/16 57/18
re [1] 69/19
re-edified [1] 69/19
reached [3] 39/18 39/20 66/5
read [10] 4/13 26/23 33/24 44/21
 61/25 62/4 62/24 62/25 63/23 64/9
reading [1] 50/14
reality [1] 17/10
realized [1] 51/23
realizes [1] 53/19
reasons [4] 6/3 24/1 24/5 24/7
recession [1] 42/20
recessions [1] 37/6
record [4] 3/22 10/19 79/12 79/20
recorded [1] 1/24
recounted [1] 70/11
red [1] 41/24
redefined [2] 18/15 18/21
redounds [2] 17/18 64/4
reduce [1] 22/25
reduced [1] 59/2
redundant [2] 53/18 63/9
reel [1] 7/1
refer [9] 25/3 37/9 38/1 38/1 38/2 38/4
 38/5 38/5 38/14
reference [17]
references [2] 22/5 25/16
referencing [3] 21/17 24/23 69/15
referring [4] 19/22 39/2 40/13 43/2
reflect [1] 19/5
reflects [2] 35/14 47/9

region [8] 43/3 45/1 45/15 56/17 59/2
 63/19 66/16 67/9
regions [3] 47/6 49/12 67/9
rejection [1] 60/6
relationship [2] 57/12 57/23
relevant [5] 16/22 22/8 30/15 58/6
 58/12
relied [1] 22/16
relief [1] 78/2
relying [1] 11/15
remain [1] 13/21
remainder [1] 68/19
remaining [1] 13/6
remembering [1] 15/12
Remind [1] 70/6
remotely [4] 72/3 75/18 75/19 75/20
remove [2] 27/1 27/6
removes [1] 32/3
render [1] 15/16
reply [3] 10/25 16/17 31/12
Reporter [3] 2/9 2/9 79/23
request [2] 20/13 78/11
required [3] 31/3 41/4 66/19
requirement [5] 24/9 42/3 68/2 68/3
 68/4
rescheduled [1] 75/12
resembling [1] 72/3
resetting [1] 76/1
resistance [1] 7/18
resolve [1] 11/6
respectfully [1] 46/10
respectively [1] 60/18
response [3] 31/14 34/9 60/6
responsive [1] 31/15
restate [1] 20/20
restated [1] 21/9
restatement [3] 18/11 21/9 31/20
restating [3] 19/3 24/20 35/13
restriction [1] 27/1
result [1] 72/16
reviewed [1] 71/8
Rice [1] 2/3
Richard [1] 2/2
Rick [1] 3/23
ridden [1] 12/21
ride [2] 7/9 12/5
rider [1] 9/8
right-hand [1] 58/23
rim [10] 8/21 13/17 22/17 22/17 22/19
 31/9 53/2 59/1 60/11 60/17
rim 1 [1] 60/17
rise [2] 3/3 13/17
rises [1] 36/17
risk [2] 56/4 62/9
RKA [1] 1/4
RMR [2] 2/9 79/23
RMR-CRR [1] 79/23
robin [1] 5/10
room [5] 2/10 5/15 79/1 79/2 79/2
roughness [1] 72/21
round [1] 5/10
round-robin [1] 5/10
rounded [9] 48/1 61/14 65/3 68/9
 70/17 72/1 72/6 72/8 72/22
rounds [1] 23/4
Roy [2] 1/15 3/6
rudimentary [1] 33/6
rule [1] 71/14

ruling [2] 35/5 71/12
rural [1] 27/22

**S**

salient [2] 13/13 29/6
Salopek [3] 2/9 79/22 79/23
satisfy [1] 44/11
save [1] 22/22
Scalia [1] 15/19
scary [1] 47/24
scenario [1] 42/24
schedule [1] 77/5
scheduled [1] 75/3
schedules [1] 75/11
scope [9] 26/20 30/20 32/16 35/17
 57/2 61/2 62/13 70/4 70/5
screen [1] 66/11
sea [2] 36/18 36/21
second [8] 22/23 23/11 37/4 42/23
 49/20 54/3 69/14 75/4
secret [1] 5/13
section [2] 23/5 25/12 31/13
seek [1] 30/19
semantic [1] 33/10
sense [14] 5/19 34/13 35/7 37/18
 37/20 37/20 41/1 53/7 54/7 56/15
 61/12 62/24 65/8 71/21
sentence [12] 37/22 37/24 39/19
 39/19 39/21 62/15 62/17 62/21 62/25
 63/2 63/10 63/12
series [2] 16/9 24/5
session [1] 3/6
seven [10] 5/25 34/22 35/1 35/2 35/3
 38/11 65/22 71/3 71/17 73/13
seven days [2] 34/22 35/1
seven-year-old [1] 38/11
shape [6] 25/1 48/5 48/6 70/17 72/1
 72/6
shapes [1] 72/17
shaved [1] 22/18
shaving [1] 22/24
shift [1] 48/19
short [2] 4/17 4/18
shorter [2] 47/18 53/18
shown [1] 10/21
sic [2] 5/23 60/10
side [21]
sides [2] 7/20 8/25
silly [1] 10/5
simple [1] 64/16
simplest [1] 35/24
sine [1] 59/22
single [16]
singular [4] 25/16 40/4 40/10 40/10
singularity [2] 25/13 36/25
situation [3] 6/2 37/9 51/18
size [2] 25/1 78/22
skill [5] 10/1 14/21 19/15 19/20 20/1
skilled [5] 15/9 50/14 51/1 59/17 73/4
skip [1] 30/15
slide [13] 21/13 21/20 21/23 41/6
 41/14 48/20 49/18 53/10 58/23 60/7
 63/17 69/14 70/12
slide 2 [1] 21/13
slide 3 [1] 21/20
slide 4 [1] 21/23
slides [5] 30/6 38/21 48/20 54/9 56/25
slightly [4] 39/16 39/21 40/14 49/1

**S**

sloping [1] 32/3
small [3] 12/20 12/20 32/17
snowed [1] 78/3
sole [1] 66/19
solid [3] 8/3 8/4 8/9
soon [1] 75/24
sooner [1] 35/2
sophisticated [1] 7/6
sound [2] 34/20 38/7
sounds [4] 6/9 28/3 44/12 65/2
SOUTHERN [1] 1/2
spans [1] 74/25
speaker [3] 33/6 39/22 40/12
special [5] 16/5 16/6 16/13 18/12
 18/15
specially [1] 18/21
specific [3] 41/7 75/16 76/17
specification [6] 16/2 16/3 16/7 19/13
 25/17 46/14
specifications [1] 12/6
specify [1] 44/9
spilling [1] 32/8
spills [1] 31/18
spins [1] 7/20
spoke [2] 22/20 59/15
spokes [3] 22/19 22/21 23/5
Sporting [1] 11/4
SRAM [14] 1/7 3/23 13/5 21/3 21/6
 31/19 32/16 33/17 34/23 41/11 41/14
 51/9 57/12 59/25
SRAM LLC [1] 3/23
SRAM's [4] 20/16 31/10 42/16 47/17
SRAM, [2] 3/21 3/25
SRAM, LLC [1] 3/25
SRAM, LLC vs. Princeton [1] 3/21
St [2] 2/4 77/20
St. [1] 77/18
St. Louis [1] 77/18
stability [3] 8/22 13/18 22/21
stable [1] 12/14
stand [4] 28/15 46/19 46/24 50/4
standard [2] 45/6 45/10
standing [2] 57/16 57/18
standpoint [5] 14/24 18/24 18/25
 19/11 22/16
starting [3] 14/22 31/18 74/16
starts [5] 8/24 8/25 9/6 19/12 53/7
state [1] 3/22
stated [2] 54/15 70/14
statement [1] 69/23
statements [2] 70/2 70/2
STATES [4] 1/1 1/16 2/10 3/5
status [1] 58/4
statute [2] 15/21 66/21
stays [1] 15/23
steer [1] 9/4
stenography [1] 1/24
step [1] 13/8
stipulated [1] 20/16
stop [2] 9/11 75/24
strange [1] 25/11
stray [1] 47/13
street [1] 18/6
strong [1] 12/1
strongly [1] 34/17
structure [2] 36/17 36/23
stuff [1] 29/16

subject [1] 42/16
submit [1] 42/10
submitted [2] 4/13 26/17
substitutions [1] 19/5
sufficient [4] 23/19 24/14 29/11 31/2
suggest [2] 55/21 65/1
suggested [1] 65/20
suggesting [1] 55/7
suggestion [1] 54/21
Suite [1] 2/4
summary [1] 68/12
summit [3] 36/16 45/19 55/2
sun [3] 48/4 48/5 48/6
superficial [1] 10/4
superfluous [3] 15/16 51/24 63/9
Superguide [1] 15/10
Superguide Corp. vs. DirecTV [1]
 15/10
support [1] 23/5
supports [1] 22/20
Supreme [1] 70/1
surface [1] 72/20
surprising [1] 13/19
sustained [1] 10/12
sweep [2] 32/25 33/2
switch [2] 30/9 54/9
synonym [2] 28/5 42/22
Systems [1] 5/23

**T**

take [28]
taken [1] 36/1
takes [2] 9/8 57/6
Tale [1] 53/17
talk [6] 23/12 25/4 25/5 26/2 36/12
 38/3
talked [1] 57/3
talking [23]
talks [3] 12/6 12/8 43/8
tastes [1] 47/20
taught [1] 59/15
teaches [2] 59/1 59/17
technical [1] 28/3
technically [1] 29/9
technology [3] 4/18 6/18 11/13
tell [12] 4/14 5/13 5/20 5/20 56/21
 61/1 65/23 66/3 71/6 71/12 76/10
 76/10
telling [5] 13/23 32/11 35/4 37/15 71/4
tend [1] 64/22
tends [1] 53/18
tenth [1] 73/9
term [17]
terminology [1] 70/23
terms [49]
testify [1] 76/20
testifying [3] 74/24 76/14 76/17
testimony [4] 16/15 19/14 19/19 20/1
text [1] 15/20
Thank [17]
Thanks [1] 30/12
theirs [1] 61/5
theme [1] 47/16
thicker [3] 8/18 8/19 8/21
thickness [6] 59/3 61/21 63/18 64/13
 69/22 72/2
thicknesses [2] 60/16 69/15
thin [1] 60/2

think [140]
thinking [2] 5/14 47/25
thinks [1] 23/24
thought [6] 23/1 45/5 45/9 45/22
 64/11 64/12
Thrones [1] 3/18
time [21]
times [10] 8/6 36/24 38/2 38/3 38/4
 39/14 44/8 57/4 58/4 75/14
tippity [4] 38/14 38/15 39/14 45/14
tippity-top [2] 38/14 38/15
tippy [1] 40/5
tippy-top [1] 40/5
today's [2] 43/17 73/14
tolerances [1] 73/9
top [9] 38/14 38/15 39/3 39/4 40/5
 40/10 43/3 45/14 45/15
totally [7] 18/15 18/23 28/11 34/19
 38/8 45/21 71/22
touched [1] 62/9
Tour [1] 7/9
toward [1] 12/4
towards [10] 6/5 17/9 31/12 45/15
 48/2 48/5 61/15 65/4 68/10 72/23
track [1] 12/17
Trade [2] 74/25 76/15
tradeoff [1] 8/22
trailing [3] 7/19 21/7 52/20
transcript [3] 1/14 1/24 79/19
trial [10] 63/7 74/5 74/6 74/14 76/4
 76/14 76/19 76/23 77/3 78/12
trial's [2] 75/3 76/2
tries [2] 27/1 33/1
trough [18]
troughs [25]
true [5] 15/24 36/19 39/24 67/18
 72/13 72/18 76/18
trump [1] 69/3
truth [1] 60/3
tubercle [3] 10/5 10/14 10/21
tubercles [2] 9/14 9/16
tutorial [1] 4/17
twice [1] 63/24

**U**

U.S.C. [1] 66/21
U.S.C. 112 [1] 66/21
unasserted [1] 15/15
unbounded [1] 45/1
unchanging [1] 32/17
unclear [2] 31/22 42/17
undefined [1] 43/3
underscore [1] 68/17
understand [28]
understandable [2] 18/12 19/1
understanding [6] 41/5 42/3 56/11
 58/13 72/24 77/1
understands [1] 62/3
understood [4] 14/10 32/14 34/14
 42/25
undulating [17]
unequivocal [2] 68/21 70/2
unique [1] 13/16
UNITED [4] 1/1 1/16 2/10 3/5
unless [1] 53/14
unlike [1] 33/4
unmistakable [4] 16/14 18/13 27/4
 30/23

**U**

unstable [1]  9/7
us [16]
usage [2]  21/11 55/4
useful [1]  5/6
users [1]  54/24

**V**

vague [1]  14/3
valid [3]  39/19 44/12 58/15
validity [2]  22/16 68/11
valley [17]
valleys [8]  36/20 37/10 37/21 42/14
 42/15 42/21 43/7 43/12
variation [1]  23/13
varied [1]  32/17
varies [27]
vary [1]  41/16
varying [5]  21/5 21/7 26/15 29/23
 31/13
Velodrome [1]  12/17
venture [1]  6/10
Venus [1]  5/22
Venus vs. Edge [1]  5/22
verbal [3]  5/24 6/7 33/11
verdict [1]  65/9
versus [2]  29/10 29/12
viable [1]  6/4
video [1]  6/12
view [40]
viewed [1]  49/13
viewing [1]  52/19
views [2]  48/22 52/12
violation [1]  66/21
visually [2]  41/12 41/15
vortices [2]  7/25 8/6
vs. [4]  3/21 5/22 11/4 15/10

**W**

Wake [2]  21/4 21/6
walk [1]  57/1
Walsh [4]  2/2 3/23 13/14 22/23
Washington [1]  2/3
Washington, [1]  76/15
Washington, DC [1]  76/15
water [2]  7/22 7/25
wave [2]  37/1 51/22
waves [1]  36/23
we'd [1]  4/16
weary [1]  35/13
weather [1]  77/23
WEDNESDAY [1]  2/13
week [6]  34/20 35/20 75/4 76/5 76/23
 78/3
weeks [3]  74/15 74/16 75/1
weight [2]  22/22 22/25
welcome [3]  6/7 74/10 78/2
welcomed [1]  77/22
whales [1]  9/14
whatsoever [1]  9/23
wheel [27]
wheel's [3]  48/2 48/4 61/15
wheels [15]  6/19 6/21 7/4 7/5 7/6 7/16
 9/13 9/19 10/17 21/4 21/6 22/14
 51/10 73/5 73/9
Where'd [1]  77/17
Where's [1]  3/10
wherein [2]  40/1 67/7

who's [1]  57/10
wife [1]  23/24
wiggle [1]  5/15
willing [2]  6/8 44/13
Wilson [1]  11/4
wind [4]  7/15 8/13 9/6 12/1
windy [1]  9/2
withdrew [1]  20/13
wondering [1]  36/2
word [29]
words [27]
wordy [1]  47/20
work [13]  37/23 37/24 43/13 47/2 51/8
 61/13 64/23 65/1 65/2 65/15 68/7
 75/14 75/15
working [1]  6/16
works [4]  1/10 4/8 51/13 54/13
Works' [1]  38/25
Works, [1]  3/21
Works, Inc [1]  3/21
world [2]  59/21 60/16
worlds [1]  9/11
worst [1]  24/2
worth [1]  10/9
writing [1]  43/14
written [1]  46/9
wrong [4]  16/23 29/8 53/11 65/10

**Y**

you'd [3]  4/15 65/18 74/9
yours [1]  10/6

**Z**

zenith [7]  36/5 36/7 36/16 38/2 43/23
 45/19 46/8
zero [2]  20/12
Zipp [1]  51/10
zone [1]  60/17
zones [4]  59/1 59/3 59/15 59/21
Zoom [1]  78/19