**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

SRAM, LLC,

                    Plaintiff,

v.

PRINCETON CARBON WORKS INC.,

                    Defendant.

Case No. 9:21-cv-80581 RKA

**JURY TRIAL DEMANDED**

## PRINCETON CARBON WORKS' RULE 50(a) MOTION FOR JUDGEMENT AS A MATTER OF LAW

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................................1

II.   LEGAL STANDARD.........................................................................................................1

III.  ARGUMENT .....................................................................................................................2

     A.    PCW Does Not Infringe the Asserted Patents. ......................................................2

         1.    PCW does not infringe the "continuously varies" claim elements in
             claims 1 and 17 of the '800 patent and claim 6 of the '188 patent. .............3

         2.    PCW does not infringe the "convex exterior profile"/"convex
             profile" elements of claim 1 of the '800 patent and claim 1 of the
             '188 patent. ..................................................................................................8

     B.    SRAM Is Not Entitled to Lost Profits....................................................................12

     C.    SRAM Failed to Show that PCW Willfully Infringed the Asserted Patents
         or Indirectly Infringed the '188 Patent..................................................................16

     D.    SRAM Itself Elicited Evidence Proving a Lack of Enablement............................18

IV.  CONCLUSION.................................................................................................................20

Pursuant to Fed. R. Civ. P. 50(a) and L.R. 7.1, Defendant Princeton Carbon Works Inc. ("PCW") respectfully moves this Court to enter Judgment as a Matter of Law ("JMOL") in its favor. In support, PCW provides this memorandum of law:

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Plaintiff SRAM, LLC ("SRAM") has now completed its infringement case-in-chief against PCW based on U.S. Patent Nos. 9,610,800 ("the '800 patent," Ex. P-1) and 10,611,188 ("the '188 patent," Ex. P-2) (collectively, the "Asserted Patents"). Further, PCW has begun its defense case. Defense counsel interpreted the Court's direction on Friday, February 17, 2023, to indicate that the Court wanted one Rule 50(a) motion made at the conclusion of the defense case—whether Tuesday, February 21 or Friday, February 24—depending on when the defense rested. Day 5 Rough T. at 1-2. The defense has not yet rested, but given the discussion of Rule 50(a) on Tuesday evening, PCW files this initial written Rule 50(a) motion based on the evidence admitted thus far (in both Plaintiff's case-in-chief and the defense case to this point). PCW further respectfully reserves the right to supplement and renew this motion at the close of all evidence.

Under Rule 50(a)'s "reasonable jury" standard, SRAM failed to prove required elements of certain of its claims. PCW is entitled to JMOL on at least five issues: **(1)** that PCW does not infringe the "convex profile"/"convex exterior profile" elements of independent claims 1 in the Asserted Patents, literally or under the doctrine of equivalents ("DOE"); **(2)** that PCW does not infringe the "continuously varying" elements of independent claims 1 and 17 of the '800 patent and dependent claim 6[1] of the '188 patent, literally or under the DOE; **(3)** that SRAM is not entitled to lost profits; **(4)** that PCW did not willfully infringe the Asserted Patents or indirectly infringe the '188 patent; and **(5)** that the Asserted Patents are invalid due to lack of enablement.

Consequently, this Court should grant JMOL in PCW's favor on all causes of action.

### II.    LEGAL STANDARD

"In [a] patent case, this Court applies the law of the Eleventh Circuit with respect to evidentiary issues and the standard applicable to a motion for [JMOL]." *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 661 (M.D. Fla. 2012), *aff'd*, 725 F.3d 1377 (Fed. Cir. 2013). JMOL is appropriate on a given aspect of the plaintiff's case-in-chief

---

[1] Claim 6 switches the wording, but retains the meaning of "continuously varies." *See* Ex. P-2 at 11:35-36 ("regions do not comprise a region of constant radial distance").

"[i]f a [plaintiff] has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [plaintiff] on that issue." Fed. R. Civ. P. 50(a)(1). The defendant may move for such judgment "at **any** time before the case is submitted to a jury,"[2] and the movant must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

The evidentiary standard for JMOL "is essentially the same as the one for summary judgment," with the record evidence viewed in the light most favorable to the non-movant. *Home Design Servs. v. Turner Heritage Homes, Inc.,* 101 F. Supp. 3d 1201 (N.D. Fla. 2015). The court must find that "under the governing law, there can be but one reasonable conclusion as to the" given issue. *Herzog v. Castle Rock Ent'mt,* 193 F.3d 1241, 1247 (11th Cir. 1999). For substantive patent-law issues, Federal Circuit precedent controls. *Ferox v. Conseal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1370 (S.D. Fla. 2016).

## III.   ARGUMENT

### A.   PCW Does Not Infringe the Asserted Patents.

To prove literal infringement, a plaintiff must submit substantial evidence that <u>every element</u> of the claimed invention is satisfied by the accused products. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("[JMOL] of no literal infringement is appropriate if no reasonable fact finder could determine that the accused devices meet every limitation of the properly construed claims."). As the plaintiff, SRAM bears the burden to prove infringement. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 193-94 (2014).

In addition to literal infringement, a patentee may show infringement through DOE. A patentee demonstrates equivalence by "showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Plastic Omnium Advanced Innovation & Research v. Donghee Am., Inc.*, 943 F.3d 929, 938 (Fed. Cir. 2019) (internal quotation omitted). "Patent infringement, whether literal or under [DOE], is a question of fact." *Jennewein Biotechnologie GMBH v. ITC*, Case No. 2020-2220, 2021 U.S. App. LEXIS 28200, *12 (Fed. Cir., Sept. 17, 2021).

---

[2] All emphasis is supplied unless otherwise noted.

"'Prosecution history estoppel applies as part of an infringement analysis to <u>prevent a patentee</u> from using [DOE] to <u>recapture subject matter surrendered from the literal scope of a claim during prosecution</u>.'" *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) (quoting *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013)). The Supreme Court has explained that the "patentee's <u>decision to narrow</u> his claims through amendment <u>may be presumed to be a general disclaimer</u> of the territory between the original claim and the amended claim." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002); *see also F & G Resch., Inc. v. Creative Tech. Ltd.*, No. 06-61748-CIV, 2008 U.S. Dist. LEXIS 8396, at *28 (S.D. Fla. Feb. 5, 2008) (Altonaga, C.J.).

"[JMOL] of no infringement under [DOE] is appropriate if no reasonable fact finder could determine that a claim limitation is met in the accused device by a substantial equivalent." *Elkay Mfg.*, 192 F.3d at 981. A demonstration of infringement under DOE must be shown on a limitation-by-limitation basis through particularized testimony and linking argument. *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1322-23 (Fed. Cir. 2003); *see also Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566-68 (Fed. Cir. 1996) (affirming JMOL of no infringement under DOE due to insufficient, conclusory evidence regarding the differences in claimed microchips and the allegedly infringing devices/products). Conclusory expert testimony does not qualify as substantial evidence. *See Iovate HealthScis., Inc. v. Vio-Engineered Supplements & Nutrition, Inc.,* 586 F.3d 1376, 1381-82 (Fed. Cir. 2009).

1. **PCW does not infringe the "continuously varies" claim elements in claims 1 and 17 of the '800 patent and claim 6 of the '188 patent.**

PCW is entitled to JMOL that its Wake, Grit, and Peak carbon-fiber wheels ("Accused Products") do not satisfy the "continuously varies" element of independent claims 1 and 17 of the '800 patent and claim 6 of the '188 patent, either literally or under DOE. As noted above, "[p]roof of infringement requires that <u>each element and limitation</u> of an asserted patent claim or claims be compared to an accused system." *CCC Grp., Inc. v. Martin Eng'g Co.*, Civ. No. 05-cv-86-RPM-MJW, 2008 U.S. Dist. LEXIS 70578, at *22 (D. Colo. Sep. 17, 2008).

PCW's witnesses (Mr. Werntz, Mr. Macris, and Dr. Hanson) presented extensive evidence that the Accused Products have measurable regions of constant radial distance—regions that they (a) measured using common tools available to, and used by, persons of ordinary skill in the art ("POSITA"), and/or (b) purposefully designed to be there. SRAM, on the other hand, **never measured** the Accused Products to determine if any regions of constant radial distance existed.

3

SRAM also entirely ignored the Accused Products' CAD files—literally their manufacturing instructions. <u>SRAM therefore presented **zero** quantitative, reliable evidence that a reasonable jury could use to find infringement</u>.

That failure in SRAM's proof does not present a jury issue; rather, SRAM and its expert failed to do the requisite work—*i.e.*, measuring radial distance, with tools commonly utilized in this industry by POSITA (it was never PCW's position that either party address this point from the extreme, non-industry perspective of molecular analysis using an electron microscope). *Cf., e.g.*, *Forest Grp., Inc. v. Bon Tool Co.*, No. H-05-4127, 2007 U.S. Dist. LEXIS 56792, at *9 (S.D. Tex. Aug. 3, 2007) (granting defense summary judgment of non-infringement where the plaintiff's expert "**took no measurements** <u>and had no written records of the alleged testing</u>," which he claimed demonstrated the shared characteristic of the patented apparatus and the accused device); *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1259 (Fed. Cir. 2010) (reversing denial of defense JMOL and reasoning, in relevant part: "Contrary to [the plaintiff's] assertions, the testimony of Garris, [plaintiff's] expert, is insufficient to support the jury's verdict…. Garris <u>produced no test evidence and **no measurements**</u> showing that the hinges contained stored energy or that they moved the guard even the smallest distance after unlatching.").

Rather, the lengths of constant radial distance in the Accused Products are visible <u>to **the naked eye**</u> when measured with industry-standard tools and recorded on the wheel. Dr. Hanson demonstrated the regions of constant radial distance in the Accused Products using a high-precision dial gauge, accurate to 0.001 millimeters—less than the thickness of human hair:



*See, e.g.*, Day 6 Tr. (Rough) at 216:7-219:9; D-370.44 (Demonstrative). Dr. Hanson also demonstrated that **Dr. Howle's own video analysis** <u>likewise clearly shows lengths of constant radial distance</u>, because when Dr. Hanson reviewed the video frame-by-frame, numerous

consecutive frames showed no laser movement. *Id.* at 226:12-231:20.

Dr. Hanson's industry-standard precision instruments and the precise tolerances demonstrate that, in this industry, tenths or (sometimes) hundredths of a millimeter matter. Indeed, even Mr. Katsanis recognized that such tiny differences can have meaningful real-world impacts. Day 3 Tr. (Rough) (Katsanis) at 45:10-18.  And, here, we are dealing with whole, multiple millimeters in the 24 peak-valley transitions in the Accused Products.

Mr. Werntz, for his part, testified that he knew the Accused Products have regions of constant radial distance, and are not a "perfect sine wave shape" (*i.e.*, not constantly varying), because he actually measured them. Day 5 Tr. (Rough) (Werntz) at 262:25-263:20. And Mr. Macris—the designer of the Accused Products—explained that his Wake SolidWorks files demonstrate (and require) lengths of constant radial distance of multiple millimeters between each peak and trough. *See* D-749 (Wake CAD file). Mr. Macris further testified that PCW requires its manufacturers to adhere to rigorous, precise tolerances in order to make a saleable wheel—*i.e.*, within 0.1mm of PCW's design specifications. Day 6 Tr. (Rough) at 81:13-82:5.

Thus, because the Accused Products have **industry-significant** measurable regions of constant radial distance, they cannot literally infringe the "continuously varies" limitations under the claims' plain language. *See, e.g.*, *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the [POSITA] in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning **in the field** …."); *Chung v. Vaporous Techs., LLC*, No. 2:16-cv-08586-RSWL-PLA, 2018 U.S. Dist. LEXIS 12429, at *12 (C.D. Cal. Jan. 25, 2018) (requiring a claim construction based on the understanding of those versed in **the particular industry**). SRAM's only affirmative evidence was Dr. Howle's "eyeball" test of the Accused Products using a carpenter laser. Day 4 Tr. (Rough) (Howle) at 185:5-11. This failure to measure is dispositive.

In addition, SRAM's own witnesses support PCW's showing of non-infringement through regions of measurable constant radial distance. During his testimony, Mr. Hall, one of SRAM's corporate representatives, testified that SRAM's products (based on the Katsanis '800 patent) "continuously vary" such that they have no areas of constant radial distance. Day 2 AM Tr. (Rough) (Hall) at 51:2-8. Mr. Hall further differentiated the '800 patent's continuously varying inner rim from prior art, which "has sections that, that are not continually varying." *Id.* at 92:1-4. In other words, Mr. Hall understood "continuously varying" to rule out sections of the inner rim

that had stretches with constant radial distance. Notably, in the Asserted Patents' prosecution history, the applicant unequivocally surrendered constant radial distance in order to obtain issuance over *Mercat* (a patented prior art reference in which measurements are defined in millimeters). *See* P-75 at 34, 36 (adding "continuously varies" to independent claims of '800 patent); *id.* at 39 (explaining reason for amendments because "As shown below in Mercat's FIGS. 2 and 4, Mercat discloses a radially inner edge that has a **continuous radial distance** except for intervals shown at 24, 26 and 25, 27 where boring zones exist."); *Festo*, 535 U.S. at 734.

As the Court acknowledged during the *Markman* hearing and during trial, the dispute over the scope of "continuously varies" is not over molecules, a constant radial distance measurable only with an electron microscope, or some small imperfection arising during manufacturing. [DE 90, *Markman* Tr. at 72:9-73:11]; *see also* Day 3 Tr. (Rough) at 37:8-13, 33:23-38:12. Rather, this Court's definition of "continuously varies" as "continuously changes" is interpreted from the perspective of **a POSITA**. *See, e.g.*, *Horizon Pharma, Inc. v. Reddy's Labs. Inc.*, 839 F. App'x 500, 504 (Fed. Cir. 2021) (applicable meaning is that which "the term would have to a [POSITA] in question at the time of the invention"); *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 972 (Fed. Cir. 2011); *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005); *QR Spex, Inc. v. Motorola Inc.*, 588 F. Supp. 2d 1240, 1246 (C.D. Cal. 2008).

Here, using that required standard, the Accused Products' respective lengths of constant radial distance are: (1) measurable using the tools and instruments common in the industry (Day 5 Tr. (Rough) (Werntz) at 263:6-264:10); (2) are not imperfections in a precision manufacturing process; and (3) were purposefully designed and are shown in the CAD drawings that define them.

This circumstance is similar to the bra-strap retainers at issue in *Mich & Mich TGR, Inc. v. Brazabra, Corp.*, 128 F. Supp. 3d 621, 645 (E.D.N.Y. 2015). In that case, because the shape and orientation of the accused products' bra-strap retaining prongs differed in appreciable ways from the independent claims asserted in the plaintiff's patents, the district court entered a defense summary judgment for lack of literal infringement:

> [N]o reasonable jury could find literal infringement because the accused product is lacking claim limitations from each of the independent claims. Specifically, the accused product lacks "prongs" that are "disposed essentially parallel," much less a "pair of prongs," and lacks an "elongate main portion" or "elongated member" as defined in the claim construction *supra*. The court need not reach the other disputed terms, because in order for a patent claim to be infringed, each and every limitation in the claim must be present in the accused product.

Similarly, during its case-in-chief here, SRAM failed to demonstrate that the Accused Products' inner rims have a <u>continuously</u> changing radial distance. That is because SRAM's expert, Dr. Howle, admitted that he **<u>never actually measured</u>** <u>the radial distance in the accused products to confirm a continuously varying radial distance</u>. Day 4 Tr. (Rough) (Howle) at 185:2-186:3 (*e.g.*, "A. I did not produce any quantitative measurements but it's just not required. This is not a complicated patent case."). Instead, Dr. Howle merely "eyeballed" the accused products to form his opinion. *Id.* at 185:5-11. SRAM, and SRAM alone, bore the burden to demonstrate no measurable portions of constant radial distance, yet their expert failed to take <u>any</u> measurements. *Medtronic*, 571 U.S. at 193-94. This omission renders Dr. Howle's testimony conclusory and unsupported, and therefore insufficient to survive JMOL for literal infringement. *Rembrandt Vision*, 282 F.R.D. at 666 (granting Rule 50 motion and rejecting the opinion testimony of the plaintiff's infringement expert as *ipse dixit*). That is not a jury issue—instead, it is a basic failure to do reliable work to support an ostensibly "expert" opinion. *Becton, Dickinson*, 616 F.3d at 1259; *Forest Grp.*, 2007 U.S. Dist. LEXIS 56792, at *9.

Dr. Howle's failure to conduct any quantifiable measurements is also fatal to SRAM's DOE theory. Indeed, because Dr. Howle never measured <u>anything</u> related to the length of constant radial distance in the accused products, it was impossible for Dr. Howle to produce anything but a conclusory "function, way, result analysis." Day 4 Tr. (Rough) (Howle) at 185:2-186:3. As a result, his DOE opinion was (by definition) speculative and conclusory. Such expert opinion on "function, way, result" is insufficient for SRAM's claims to survive JMOL. *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1322-23 (Fed. Cir. 2003) (rejecting conclusory expert testimony on function, way, result); *Nikken U.S. v. Robinsons-May, Inc.*, 51 F. App'x 874, 880 (Fed. Cir. 2002) ("Nikken makes only conclusory statements regarding equivalence and has failed to provide any evidence of how the accused fabric wraps are equivalent to the invention claimed in the '111 patent."); *Split Pivot, Inc. v. Trek Bicycle Corp.*, 987 F. Supp. 2d 838, 880 (W.D. Wis. 2013) (entering defense summary judgment and reasoning, in relevant part: "Given the dearth of evidence suggesting that the [bicycle] shock absorbers are not substantially different, the court finds that no reasonable jury could find equivalence on this record.").

Here, Dr. Howle did nothing more than conclude that 1-2mm is within the scope of equivalents. He offered no analysis as to <u>why</u>. Dr. Howle, for example, failed to offer any opinion on whether longer stretches—such as the 6.36 mm of constant radial distance between each peak

in the Grit products—fall within the scope of equivalents. Day 4 Tr. (Rough) (Howle) at 202:8-203:6. Importantly, Dr. Howle <u>never opined on the range of equivalents</u> that would otherwise define the scope of DOE without pulling in the prior art. *Id.* at 198:11-199:4; 203:7-13. Dr. Howle therefore failed to provide any reliable basis for the jury to consider alleged infringement under DOE. Indeed, his conclusory, unreliable approach attempts to read "continuously" out of the claims and ignores this Court's "<u>continuously</u> changes" construction. *See, e.g.*, *Mich & Mich TGR*, 128 F. Supp. 3d at 648 ("an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding <u>would entirely **vitiate the limitation**</u>"); *Olaf Soot Design, LLC v. Daktronics, Inc.*, 839 F. App'x 505, 511 (Fed. Cir. 2021) (same; reversing with directions to enter defense JMOL of non-infringement; collecting cases); *Wleklinski v. Targus, Inc.*, 258 F. App'x 325, 330 (Fed. Cir. 2007) (same; affirming defense summary judgment of non-infringement). Dr. Howle has no DOE parameter that gives meaning to "<u>continuously</u> varies/changes."

In any event, Dr. Hanson explained that the length of constant radial distance in each Accused Product falls squarely within the disclosure of *Mercat*, necessarily rendering such an amount beyond the scope of equivalents. Indeed, Dr. Hanson explained that the constant radial distance between peaks that the *Mercat* prior art disclosed was only <u>0.46mm</u>—far less than the Wake (2.0 mm), Peak (1.5 mm), and Grit (6.36 mm). As Chief Judge Altonaga concluded in *F & G Resch., Inc.*, 2008 U.S. Dist. LEXIS 8396, at *28, alleged equivalents that attempt to reclaim scope and/or would draw the asserted claim into the prior art and cannot satisfy DOE as a matter of law (as SRAM has done with *Mercat*). *See id.* (granting defense summary judgment of non-infringement and holding that prosecution-history estoppel applied in light of patentee's disclaimer that its patent avoided the prior art of a computer mouse with a scroll-wheel; "[P]rosecution history estoppel limits the broad application of the [DOE] by barring an equivalents argument for subject matter relinquished when a patent claim is narrowed during prosecution."). SRAM presented no evidence contrary to Dr. Hanson's opinion, which also entitles PCW to JMOL on DOE.

## 2. **PCW does not infringe the "convex exterior profile"/"convex profile" elements of claim 1 of the '800 patent and claim 1 of the '188 patent.**

PCW is also entitled to JMOL on this infringement issue because—even with the evidence viewed in the light most favorable to SRAM—PCW does not infringe the "convex profile" limitations in every asserted independent claim, either literally or under DOE.

As the Court construed these terms, "profile view having a rounded or curved form bulging

towards the wheel center" [DE 113 at 19:12-17], none of the Accused Products have convex profiles. Consistent with the Court's construction, the applicant of the Asserted Patents (Mr. Katsanis) clearly and unmistakably told the patent examiner and the world that his convex peaks "would have an <u>apex</u> that is radially further from the radially outer edge <u>than other **points** of the peak</u>." P-76 at 168 ('188 patent FH). Contrary to the requirements of the claims, and the prosecution history, the apex of each peak in the Accused Products is <u>concave,</u> not convex.

No reasonable jury could observe the concave profiles of the peaks' apexes on the Accused Products and determine that they are literally convex. The very top (<u>apex</u>) of the peaks in the Accused Products bulges toward <u>the outside of the rim</u> (*i.e.*, is concave)—not toward the wheel's center (convex). Indeed, the concave profile of the Accused Products is at least comparably concave to *Mercat*, which the applicant disclaimed to obtain issuance. In distinguishing *Mercat*, the applicant described *Mercat*'s zones with spoke holes as <u>concave</u>:

> The zones of spoke attachment taught by Mercat, which forms "peaks" of the "undulating configuration," are conventional sections of a wheel rim, <u>which follow an annular path and are concave in profile</u>. Mercat provides no teaching or motivation to alter the zones of spoke attachment, and thus a person skilled in the art is taught by Mercat to provide "peaks" having a <u>concave profile, which is the opposite to the convex profile</u> defined by amended independent claim 1.

P-75 at 75 ('800 patent FH). The applicant cannot reclaim or expand the scope of its claims after narrowing them during prosecution. *See, e.g.*, *Festo*, 535 U.S. at 734, 736-37.

The zones of spoke attachment in *Mercat* are actually <u>less concave</u> than the zones of spoke holes in the Accused Products, because the spoke holes in the Accused Products bulge towards outside of the rim and <u>away</u> from the hub, whereas the *Mercat* spoke holes appear constant:



P-109 (Wake 6560);[3] P-111 (Grit 4540); P-113 (Peak 4550); D-178 (*Mercat*) at Fig. 2. The

---

[3] The cited physical exhibits that correspond to these images are in evidence.

portions of concavity in the Accused Products are apparent to the naked eye.

If the simple comparison of the Accused Products to what the applicant disclaimed when discussing *Mercat* were not enough, Dr. Howle also admitted on cross-examination that the purported apexes of the "peaks" in the Accused Products are spoke holes. Day 4 Tr. (Rough) at 208:22-25 (Howle). Dr. Howle also admitted that digging a hole results in concavity, because a <u>hole cannot be convex</u>:

> Q. So, concavity would be like digging a whole, right?
> A. It could be like digging a hole.
> Q. So, when I a dig a hole, can it be convex?
> A. It cannot be convex.

Day 4 Tr. (Rough) at 209:15-18 (Howle). As Dr. Howle admitted, a hole must be <u>concave</u>. *Id.*

Dr. Howle's contradictions—and lack of measurements—show that his opinion is inaccurate, unsupported *ipse dixit*: Dr. Howle conducted no tests of the holes and made no hole measurements. Day 4 Tr. (Rough) at 217:13-220:6 (Howle) (*e.g.*, "Q. … Beyond observing it, did you perform any empirical tests to function [way] result analysis? A. <u>I made **no measurements**</u>. Q. <u>Did you perform **any other tests**</u>? A. **No**, <u>sir</u>."); *see also, e.g.*, *Rembrandt Vision*, 282 F.R.D. at 666 (rejecting the opinion testimony of plaintiff's infringement expert because it was "connected to existing data only by the *ipse dixit* of the expert") (citation omitted). The concave peaks on the Accused Products <u>are</u> clearly visible. Dr. Howle ignored this fact and did not do the requisite work.

Further, Dr. Howle admitted that if the peaks have constant radial distances and follow a concentric inner circle, then—necessarily—they are concave, not convex. Day 4 Tr. (Rough) at 216:9-16. Indeed, a portion of a circle is, by mathematical definition, concave in relation to the center of that circle. This admission from Dr. Howle, when compared to the SolidWorks file shown by Mr. Macris makes this point even more evident—the peaks of the Accused Products have discernible portions of constant radial distance shown in red boxes:



DDX5 (left: Howle Demonstrative); D749 (right).

Just as Dr. Howle admitted that the peak in the demonstrative is concave, so too are the peaks in the Accused Products. Note also that the peaks in Wake 6560 SolidWorks design resemble the peaks in *Mercat*, which the applicant expressly disclaimed as concave, <u>not</u> convex:



D-178 (*Mercat*) at Fig. 2 (left); D749 (right).

Finally, Dr. Howle asserted that there is infringement regardless of the concave profile because when spokes are inserted into the spoke holes the <u>spokes</u> make the profile convex. *See, e.g.*, Day 4 Tr. (Rough) at 210:1-6. If the claims required that the "<u>wheel</u>" have a "convex profile," Dr. Howle might have a point. But that is not the case; rather the claims require that the "<u>rim</u>" element (and only the rim element) have a "convex profile." *See* P-1 at 10:66-11:5 (claim 1); 12:14-26, (claim 17); P-2 at 11:8-18 (claim 1). The rim is a discrete, separately claimed component, not the entire wheel itself. As a result, the separately claimed, different component of the spokes cannot convert the rim's concave profile into a convex profile.

Knowing that literal infringement is untenable, SRAM and Dr. Howle again resort to DOE. SRAM's DOE argument for the terms "convex" and "concave" also fails as a matter of law for at least two reasons. **First**, as a straightforward application of prosecution-history estoppel, an applicant cannot regain claim scope that it previously forfeited to secure the patent. *See Festo*, 535 U.S. at 727, 734-37; *Pods, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1367 (Fed. Cir. 2007) (in holding that the district court should have determined non-infringement as a matter of law, stating: "We conclude that arguments made by PODS during prosecution bar it from asserting that Porta Stor's device infringed by equivalents.").

As noted above, Mr. Katsanis promised the Patent Office that his peaks' apexes are <u>convex</u>, expressly distinguishing and disclaiming <u>concave</u> peaks. P-76 at 168 ('188 patent FH); P-75 at 75

('800 patent FH). It would be error to allow SRAM to suggest to the jury that it can reclaim that abandoned territory for purposes of infringement. *See, e.g., Pods, Inc.*, 484 F.3d at 1365-69; *Medtronic Navigation*, 417 F. Supp. 2d at 1194-98 (applying argument-based and amendment-based prosecution-history estoppel and granting renewed Rule 50(b) JMOL motion).

**Second**, as a matter of law, opposites cannot be equivalents—and convex and concave are the antithesis of one another. *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006) ("This court has refused to apply [DOE] in other cases where the accused device contained the antithesis of the claimed structure."). The applicant acknowledged this in distinguishing *Mercat*. P-75 at 75 ('800 patent FH) (a POSITA "is taught by Mercat to provide 'peaks' having a concave profile, which is the opposite to the convex profile defined by amended independent claim 1."). Dr. Howle also acknowledged during cross-examination that convex and concave are opposites. Day 4 Tr. (Rough) at 208:6-13. That admission is fatal to SRAM's DOE theory because a jury cannot find DOE infringement when the alleged equivalent is the opposite (*i.e.*, "antithesis") of that which was claimed.

Just a few days ago, the Northern District of Indiana detailed why contrary directional terms—like convex and concave here—are incapable of operating as equivalents. *MercAsia USA Ltd. v. Jianqing Zhu*, No. 3:17-CV-718 JD JIANQING ZHU, 2023 U.S. Dist. LEXIS 24623, at *14 (N.D. Ind. Feb. 14, 2023) ("Where a patentee has narrowly construed his invention by including a limiting directional term, the Court cannot disregard this term by finding [a] contrary directional term to be its equivalent.") (citing *SeeSage Prod., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997) (affirming grant of summary judgment and finding "in" not equivalent to "on top of"); *Fin Control SytemsPty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1320-21 (Fed. Cir. 2001) (affirming refusal to read out "lateral" limitation via [DOE])). That is SRAM's approach here in reading concave as insubstantially different from its antithesis, convex, which is the subject claim limitation. In *MercAsia*, the issue related to the location of air-port holes in a wine-aeration device claimed to be above the device's spout. The court recognized that the insertion of the directional term "above" foreclosed alleged equivalents that were the opposite, such as air-port holes that were "below" the spout. *Id.* at *13-*14. That same reasoning applies here to foreclose SRAM's argument that concave can be convex.

### B.    SRAM Is Not Entitled to Lost Profits.

Damages in patent cases are at least a reasonable royalty. 35 U.S.C. § 284. In situations

where "a patentee proves it would have made additional sales but for a defendant's infringement, the patentee is entitled to be made whole for the profits it proves it lost." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017). The "<u>availability of lost profits is a</u> **question of law** <u>for the court</u>, not the jury." *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007). The *Panduit* test is the typical method of demonstrating entitlement to lost profits. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)). The *Panduit* factors are: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made. *Id.* The second factor, absence of acceptable non-infringing substitutes, is the most difficult to satisfy. *Mentor Graphics*, 851 F.3d at 1286.

Further, lost-profit "[d]amages under *Panduit* are <u>not</u> easy to prove." *Mentor Graphics*, 851 F.3d at 1284 (collecting cases). Indeed, "<u>the *Panduit* test is a **demanding one**</u>. A patentee cannot obtain lost profits unless it <u>and only it</u> could have made the sale—there are no non-infringing alternatives or, put differently, the customer would not have purchased the product without the infringing feature." *Id.* at 1289. Under the second factor, "if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale. For example, if the customer would have bought the infringing product without the patented feature or with a different, non-infringing alternative …, then the patentee cannot establish entitlement to lost profits for that particular sale." *Id.* at 1286.

The relevant market here includes wheels that are "similar in physical and functional characteristics to the patented invention." *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, Civ. No. 03-S-2875, 2006 U.S. Dist. LEXIS 55307, *24-*28 (N.D. Ala. July 28, 2006) (granting summary judgment of no two-player market where patentee had artificially narrowed the market) (citing *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003)). Determining the market "requires an analysis which excludes alternatives to the patented product with <u>disparately</u> different prices or <u>significantly</u> different characteristics." *Micro Chem.*, 318 F.3d at 1124. The "patentee often must adduce economic data supporting its theory of the relevant market in order to show 'but for' causation," which SRAM has not done here (and cannot do here) given that professional riders and enthusiast consumers readily choose between (and among) non-undulating and undulating carbon-fiber wheels. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA,

2018 U.S. Dist. LEXIS 167104, at *18 (D. Del. Sep. 28, 2018).

SRAM has not shown but for PCW's sale of carbon-fiber bike wheels, SRAM would have made sales because SRAM cannot satisfy the second *Panduit* factor. SRAM's contention of a two-player market based on the undulating nature of the rims is a manufactured litigation position. In reality, the relevant market is broader and encompasses all high-end, high-performance carbon wheels, including undulating and non-undulating rims.[4] Importantly, SRAM acknowledges, as it must, that if the relevant market is not a two-player market, then lost profits are inappropriate. Day 1 PM Tr. (Rough) at 49 ("Now if it's not a two player market you will get instructions to show that at a minimum you get a reasonable royalty…"). Consistent with this position, during trial, SRAM's expert, Dr. Perdue, only opined on the *Panduit* factors. Day 5 Tr. (Rough) at 112:13-16. Kevin Wesling, a SRAM corporate representative, also testified that SRAM markets its undulating and non-undulating wheels to generally the same customers. Day 6 Tr. (Rough) at 28:21-29:1.

By SRAM's own admission, there are numerous competitors in high-end bicycle wheels (the relevant market) and numerous non-infringing alternatives. For example, SRAM's witness Mr. Hall admitted that SRAM encompasses only around 14% of the carbon rim market. Day 2 AM Tr. (Rough) at 99:10-14. Mr. Hall also acknowledged that there are other competitors in the market for carbon rims, including Mavic and DT Swiss. *Id.* at 99:4-9. Mr. Fowler, one of SRAM's corporate representatives, testified <u>on direct</u> that PCW tested its wheels against "Zipp, [] <u>and other competitors</u>." Day 3 Tr. (Rough) at 148:19-24. Mr. Fowler further testified that while professional teams use both variable and constant-depth rims, <u>only one team</u> in the men's Tour de France rides Zipp undulating wheels and a handful in the women's tour. Day 3 Tr. (Rough) at 141:9-16. Mr. Fowler further confirmed that <u>professional teams use Zipp constant-radial depth rims</u>. Day 3 Tr. (Rough) at 174:16-25.

If variable and non-variable-depth high-end carbon wheels were separate markets, then the professional teams considering these wheels would not treat them as interchangeable options—

---

[4] Alternatively, SRAM could have potentially demonstrated lost profits if they showed that Zipp and PCW variable-depth wheels exist in a two-player price segment of the larger wheel market. *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1360-61 (Fed. Cir. 2001). However, SRAM never did this, only submitting evidence of the price of its wheels and PCW's wheels. Regardless, Zipp undulating wheels are <u>significantly</u> more expensive than PCW wheels, which are only marginally more expensive than Zipp's constant-depth rims. Day 5 Tr. (Rough) at 121:14-123:16 (identifying Zipp undulating wheels at $2,100/wheel, PCW's wheels at $1,700/wheel, and Zipp's constant wheels at $1,300/wheel). Nor did SRAM claim price erosion.

either of which is sufficient to compete **at the pinnacle of cycling**. As Mr. Fowler readily acknowledged, this market is "pro-proven"—*i.e.*, "professionally proven," such that enthusiasts will buy whatever wheels the professionals use. Day 3 Tr. (Rough) at 146:11-20. In other words, what the professionals choose to ride at the sport's pinnacle influences what enthusiasts will purchase for their own bikes. *Id.* ("… because when people that are considering buying a wheel s[ee] the top riders in the sport riding it, they want it, too."). Here, by readily moving between, and selecting from among, non-undulating and undulating carbon wheels, the relevant professionals have dictated that this is not a two-player market.

No reasonable jury could find otherwise because, in reality, professional teams are choosing between all carbon-rimmed wheels—as are the enthusiasts following the pros. Even Mr. Katsanis, the inventor of the Asserted Patents, admitted that only one or two of the men's professional world-tour teams use variable-depth wheels. *See* Day 3 Tr. (Rough) at 70:22-71:5. These constant-depth wheels were provided, at a minimum, by Shimano and Lightweight. Day 3 Tr. (Rough) (Katsanis) at 54:18-23 (Shimano); 55:11-15 (Lightweight); 55:20-23 (confirming constant diameter for Shimano and Lightweight). Mr. Fowler also admitted that Mavic makes rims that compete with SRAM. Day 3 Tr. (Rough) at 165:1-3 ("Q. Right, whether it's Shimano, whether Mavic for the rims, there are competitors that are nipping at your heels, right? A. Yes.").

There are numerous specific competing products. Mr. Crotty, PCW's CFO, provided several examples of these, specifically directed to each PCW wheel. For example, Mr. Crotty explained that PCW's Wake competes against "dozens" of other wheels, including the Shimano C60, Roval CLX64, Zipp 404, 454, and DT Swiss 1200 DICUT. Day 5 Tr. (Rough) at 184:17-19. Example competing products for the Grit are the constant-diameter Enve 3.4 and Zipp 303. *Id.* at 185:5-20. Finally, the Peak was created specifically to compete against the constant diameter Lightweight Meilenstein. *Id.* at 185:23-186:4. Mr. Daniels' testimony further supports that the list of competitors is long.

This is not a two-player market and, consistent with that point, SRAM's damages expert (Perdue) performed zero consumer surveys and had no explanation regarding why riders at the pinnacle of cycling treat undulating and non-undulating wheels as interchangeable. Day 5 Tr. (Rough) at 106:17-22. Rather, he visited a single bike shop in Tennessee and then parroted the position of SRAM's marketing department regarding the nature of the market and why SRAM believes it can charge more for undulating wheels. *Id.* at 107:11-18. That is not a reliable basis for

an expert opinion on the nature of this market.

Indeed, the court in *Hubbard/Downing, Inc. v. Kevin Heath Enters.*, No. 1:10-cv-1131-WSD, 2014 U.S. Dist. LEXIS 764, at *19 (N.D. Ga. Jan. 6, 2014), reached that same type of conclusion—holding that because there were <u>at least **eight** head-and-neck support systems **utilized in the relevant professional market**</u> (high-performance racing vehicles), the plaintiff and its expert could not artificially restrict that market to only those devices that had the same yoke-style device as the plaintiff's patented apparatus. "The test is not one of duplication of characteristics as Plaintiff suggests…. <u>[T]he market is **not limited** to only those that **duplicate** the characteristics of the patented device</u>. It also includes those that are '<u>similar</u> in physical and functional characteristics' such that they may be considered by purchasers as alternatives to the patented device." *Id.* at *20. That is the same incorrect analysis that Purdue used—*i.e.*, improperly equating duplication to similarity of function.

Finally, to the extent the Court is of the view that it can let the jury consider SRAM's lost-profits case and correct after the verdict, the Federal Circuit has explained that allowing the jury to consider improperly high damages figures presents a very real danger of skewing the jury's verdict by enlarging the damages horizon. For example, in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), the Federal Circuit explained that it was excluding an inappropriately high damages theory because

> [a]dmission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, <u>only serve to make a patentee's proffered damages amount appear modest by comparison</u>, and to artificially inflate the jury's damages calculation beyond that which is adequate to compensate for the infringement.

*Id.* at 68 (quotations omitted). Other cases have reached the same outcome where the jury considered inappropriate damages theories. *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319-20 (Fed. Cir. 2011) (affirming new trial on damages where plaintiff introduced, without objection, evidence related to the entire-market value, which "skew[ed] the damages horizon for the jury").

### C.    SRAM Failed to Show that PCW Willfully Infringed the Asserted Patents or Indirectly Infringed the '188 Patent.

SRAM has failed as a matter of law to show that PCW can be liable for willful or indirect infringement of the '188 patent. To prove willfulness, inducement, or contributory infringement, SRAM must prove knowledge both of the patent and of infringement of that patent. *Bayer*

*HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) (knowledge required to prove willfulness); *Commil USA, LLC v. Cisco Sys., Inc.,* 135 S. Ct. 1920, 1926 (2015) (knowledge required to prove indirect infringement).[5] Where an accused infringer learns of the patent post-suit, and then merely continues to manufacture infringing products, that would "simply be the kind of 'garden-variety' patent case that *Halo* affirms is ill-suited for a finding of willfulness." *M&C Innovations, LLC v. Igloo Prods. Corp.,* 2018 U.S. Dist. LEXIS 152075, at *14 (S.D. Tex. July 31, 2018) (dismissing willful-infringement claim where the "post-suit fact pattern characterizes every infringement action except for those in which an alleged infringer immediately ceases production following service of the complaint"); *Princeton Digital Image Corp. v. Ubisoft Entm't SA,* 2016 WL 6594076, at *11 (D. Del. Nov. 4, 2016) (dismissing willful-infringement claims in a third amended complaint, where that complaint "does not sufficiently articulate how [defendant's] actions during a short, three-month period of time amount to an 'egregious' case of infringement of the patent"); *CTP Innovations, LLC v. Solo Printing, Inc.*, Case No. 14-cv-21499, 2014 U.S. Dist. LEXIS 190232, *9 (S.D. Fla. July 15, 2014) (holding that "Plaintiff cannot sustain a claim for willful infringement because its sole allegation is that Defendant knew of the patents-in-suit of the date this Complaint was served."). Knowledge of a patent application is also insufficient. P*andora Jewelry, LLC v. Cappola Capital Corp.*, Case No. 06-cv-845, 2009 U.S. Dist. LEXIS 63382, *4-*5 (M.D. Fla. July 9, 2009) (rejecting claim of willfulness based on patent application, citing *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (knowledge of patent is required, patent application is no guarantee a patent will issue, and notices of pending application are insufficient)).

SRAM failed to present evidence that PCW had any knowledge of the '188 patent before the filing of the complaint. Indeed, the evidence presented at trial showed that PCW did not obtain knowledge of the patent until SRAM initiated this action. *See, e.g.*, Day 4 Tr. (Rough) at 233:23-234:2 (Macris). To the extent SRAM tries to rely on any knowledge held by former PCW employee Mr. Daniels, that knowledge is irrelevant and undated: The '188 patent did not issue until 2020, over a year after Mr. Daniels left PCW in 2019. *See* P-2.

---

[5] SRAM alleged, in passing, that PCW indirectly infringes the '188 Patent, either by contributing to infringement by others or by inducing others to infringe the patents. [DE 1, ¶46]. These scant allegations require evidence that PCW knew, <u>before</u> the complaint, (1) of the patent, and (2) of its infringement. SRAM has no evidence of either requisite fact.

SRAM's reliance on *Merrill Mfg. Co. v. Simmons Mfg. Co.*, 553 F. Supp. 3d 1297 (N.D. Ga.), is misplaced; that case actually supports granting judgment in favor of PCW. In *Merrill*, the court explicitly noted that "[o]bviously an allegation of willful infringement <u>in an initial complaint</u> cannot depend solely on post-suit conduct because the accused infringer does not have the requisite culpability or offending knowledge at the time of the filing." *Id.* at 1306 (internal quotations omitted). While the court acknowledged that post-filing actions could be tied to willfulness, a critical difference here is that, in *Merrill*, the plaintiff <u>filed an **amended** complaint</u> of willfulness based on conduct that occurred after the initial complaint was filed. SRAM did not file any amended complaint, foreclosing willfulness as to the '188 patent. *M&C Innovations*, 2018 U.S. Dist. LEXIS 152075, at \*14; *Princeton Digital*, 2016 WL 6594076, at \*11; *CTP Innovations*, 2014 U.S. Dist. LEXIS 190232, \*9.

With respect to the '800 patent, SRAM's allegation of willfulness also fails. Mr. Werntz explained that he measured the lengths of constant radial distance in PCW's products, and therefore believed that the wheels did not have a continually varying radial distance. Day 5 Tr. (Rough) (Werntz) at 262:25-263:20. Mr. Macris, for his part, explained and demonstrated that his SolidWorks design files show measurable lengths of constant radial distance, and satisfied himself that the Accused Products do not have continuously varying radial distances, as required by each independent claim of the '800 patent. *See, e.g.*, D749 (Wake CAD drawing). PCW also independently developed a bike wheel with a variable-depth rim, as show from early-2014 design materials. *See, e.g.*, Ex. D146 (Macris sketch); D168 (Werntz sketch); D169 (Werntz sketch). PCW's good-faith basis to believe it did not infringe is sufficient to overcome willfulness, regardless of the animosity between SRAM and PCW that later developed.

SRAM's aggressive claims of infringement, its bullying of a small player in the high-end bike-wheel market, and its demands that PCW exit that market cannot unilaterally create a willfulness claim. Willfulness must be based on the actions of the alleged infringer, not a licensee's subjective feelings. *Halo*, 579 U.S. at 105-06. SRAM has not proffered sufficient evidence to permit its willfulness, inducement, or contributory-infringement claims to go to the jury.

### D.    SRAM Itself Elicited Evidence Proving a Lack of Enablement.

Patent claims must be "enabled" to avoid invalidity. *See* 35 U.S.C. § 112(a) ("The specification <u>shall contain</u> a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms <u>as to enable</u> any person skilled in

the art to which it pertains … to make and use the same….”). A claim is not enabled when, “<u>at the effective filing date of the patent</u>, one of ordinary skill in the art could not practice their full scope <u>without undue experimentation</u>.” *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). Whether a claim is enabled is a question of law. *Trs. of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1361 (Fed. Cir. 2018).

During trial, SRAM elicited clear and convincing testimony, <u>from its own witnesses,</u> that the claims of the Asserted Patents are not enabled. Mr. Hall testified in great detail <u>on direct</u> how Mr. Katsanis provided SRAM merely the “nugget of an idea” (Day 2 AM Tr. (Rough) at 25:9-10) or “the seed of a concept” (Day 2 AM Tr. (Rough) at 20:17-18). Based on this nugget/seed, SRAM witnesses testified that SRAM worked for many <u>years</u>, utilizing countless (but unquantified) resources building and testing prototypes before successfully implementing Katsanis’ idea. *See, e.g.*, *id.* at 20:23-21:3 (“there was a lot of things that went into making this rim, but we made, you know, we made 30-something prototypes just particular those are different shapes we would test in the wind tunnel <u>but we had hundreds</u> ever prototypes how to make it and the like. <u>It’s quite an involved process to make one of these rims</u>.”); Fowler, Day 3 (Rough) at 117:6-13, 118:19-119:4.

Even Mr. Katsanis, the inventor, agreed that actually manufacturing a wheel that practiced his invention was a challenging obstacle. Day 3 Tr. (Rough) (Katsanis) at 56:9-57:18. Mr. Katsanis further confirmed that his patent does not teach how to make the wheel he claimed to invent. *Id.* at 58:2-9; *see also* P-99.12 (Katsanis Pitch). This alone is enough to show a lack of enablement.

SRAM further admitted that the patented concept was so undeveloped that <u>SRAM did not even know how to drill spoke holes in the rim</u>—a glaring problem for a bike wheel that requires spokes, and furthermore a requirement in every asserted claim. Day 2 AM Tr. (Rough) (Hall) at 23:18-25. Even with its teams of persons skilled in the art of bike wheels, the extensive time and effort required by SRAM to make a practicing wheel demonstrates “undue experimentation,” which renders the claims invalid for lack of enablement. *See Intel Corp. v. Tela Innovations, Inc.*, 2020 U.S. Dist. LEXIS 241022, *26-40 (N.D. Cal. Dec. 22, 2020) (finding lack of enablement for patent claims covering transistors because <u>two years</u> of development was undue experimentation in the context of making smaller semiconductors than was available at the time of the patent).

SRAM’s strategy here is evident. Free of any allegations of invalidity under 35 U.S.C. § 112 due to a pretrial, interlocutory summary-judgment ruling, SRAM hoped to inflate its damages by presenting evidence tending to show (in SRAM’s view) that it made considerable investments

and spent numerous resources making wheels that could practice the invention. The issue here is that a patentee is only entitled to royalty damages based on the <u>value of the patented invention</u>, not something else (like an improved carbon-fiber manufacturing process) not covered by the Asserted Patents. *See, e.g.*, Day 3 Tr. (Rough) at 57:23-58:1 (Katsanis confirming his patents do not claim "the specific way of manufacturing the carbon fiber product."); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 561 Fed. Appx. 909, 912 (Fed. Cir. 2014) ("the aim of the reasonable-royalty calculation is to measure the <u>market value of **the invention** itself</u>…."). Thus, in the event that liability is found against PCW, PCW owes no damages on any innovations that SRAM may have made on technology not claimed in the Asserted Patents.

Beyond this, SRAM's damages overreach walks into an enablement problem. On one hand, if Mr. Katsanis enabled the invention such that one could practice it without undue experimentation, then the evidence that SRAM submitted related to SRAM's struggles to manufacture a practicing wheel is irrelevant because it has nothing to do with practicing the invention. On the other hand, if all of the effort SRAM emphasized was necessary for professionals working in the bike-wheel industry to make a wheel that could practice Mr. Katsanis' invention assisted by the disclosure, then the claims were **not enabled** at the time of filing, and the patents are invalid under § 112. *Wyeth*, 720 F.3d at 1384. SRAM cannot have it both ways.

Because SRAM decided to present evidence in its affirmative case in the hope of inflating its damages—but thereby proved a lack of enablement—the Court should revisit its interlocutory order on summary judgment foreclosing PCW's § 112 defenses, rescind that order, and find that— based on SRAM's own testimony and documents—the Asserted Patents are invalid for lack of enablement. Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims … <u>may be revised **at any time** before the entry of a judgment</u> …."); *see also, e.g.*, *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 227 (5th Cir. 2020) ("Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."); *Gemstone Foods, LLC v. AAA Foods Enters.*, No. 5:15-cv-02207-MHH, 2022 U.S. Dist. LEXIS 82407, at *6 (N.D. Ala. May 6, 2022) (same; collecting cases).

## IV.   CONCLUSION

For all of these reasons, the Court should grant JMOL in Defendant Princeton Carbon Works Inc.'s favor.

Dated: February 22, 2023

Respectfully submitted,

*/s/ David L. Luck*
Todd R. Ehrenreich
FBN 945900
David L. Luck
FBN 041379
Todd.Ehrenreich@lewisbrisbois.com
David.Luck@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
2 Alhambra Plaza, Suite 1110
Coral Gables, FL 33134
Tel.: (786) 353-0210
Fax: (786) 513-2249


James M. Wodarski (admitted *pro hac vice*)
Andrew H. DeVoogd (admitted *pro hac vice*)
Matthew S. Galica (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, PC
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
Fax: (617) 542-2241
JWodarski@mintz.com
AHDeVoogd@mintz.com
MSGalica@mintz.com

*Counsel for Defendant Princeton Carbon Works Inc.*


## CERTIFICATE OF SERVICE

I CERTIFY that on February 22, 2023, a true and correct copy of the foregoing was e-filed using the court's CM/ECF system, which will serve notifications on all counsel of record.

By: */s/ David L. Luck*
David L. Luck
FBN 041379