**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

SRAM, LLC,

                    Plaintiff,

v.

PRINCETON CARBON WORKS INC.,

                    Defendant.

Case No. 9:21-cv-80581 RKA

**THE COURT'S FINAL JURY INSTRUCTIONS AT THE CLOSE OF THE CASE**

Members of the jury:

It's my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, sometimes called deliberations.

The parties have agreed that certain facts are true. This agreement is called a stipulation. You must treat these facts as proved for this case. The stipulated facts are:

The '800 Patent issued on April 4, 2017. The '188 Patent issued on April 7, 2020. The Patents-in-Suit are part of a family of patents that claim priority to a British patent application filed January 27, 2011. The inventor of the Patents-in-Suit is Dimitrios Katsanis. Dimitrios Katsanis' company, Metron IP Limited, is the owner of the Patents-in-Suit. SRAM is the exclusive licensee of the Patents-in-Suit. SRAM's exclusive license to the Patents-in-Suit states that SRAM has the exclusive right, but not the obligation, to commence, prosecute and resolve lawsuits against third parties arising from alleged infringement of the Patents-in-Suit.

Each of the accused products (the WAKE 6560, GRIT 4540, and PEAK 4550 bicycle wheels) have been and continue to be sold by PCW in the United States. The rim depth and width dimensions of the GRIT 4540 bicycle wheels have not changed since their first sale in the United States in 2019. The rim depth and width dimensions of the PEAK 4550 bicycle wheels have not changed since their first sale in the United States in 2021.

The following references were patented or described in a printed publication in the United States or a foreign country more than one year prior to January 27, 2011 and constitute "prior art":

- U.S. Patent No. 6,402,256: Filing date of Sept. 5, 2000; Assignee is Mavic S.A.; Inventor is Jean-Pierre Mercat (referred to as "Mercat"); and

- U.S. Patent No. 6,425,641: Filing date of Feb. 13, 2001; Assignee is Jas. D. Easton, Inc.; Inventor is Eric Herting (referred to as "Herting").

The Mercat and Herting references were cited during the prosecution of the '800 and '188 patents.

SRAM gave PCW actual notice of the '800 Patent on May 29, 2018, when SRAM sent a

letter from its litigation counsel. SRAM gave PCW actual notice of the '188 Patent on March 23, 2021, when SRAM served its complaint in this lawsuit.

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

1) Did the witness impress you as one who was telling the truth?

2) Did the witness have any particular reason not to tell the truth?

3) Did the witness have a personal interest in the outcome of the case?

4) Did the witness seem to have a good memory?

5) Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6) Did the witness appear to understand the questions clearly and answer them directly?

7) Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

As I did at the start of the case, I will first give you a summary of each side's contentions in this case. I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I previously told you, SRAM seeks money damages from PCW for allegedly infringing the '800 patent and '188 patent by making, using, selling, or offering for sale in the United States, or importing into the United States, products that SRAM argues are covered by claims 1-6, 9, 12, 14-19, and 21-22 of the '800 patent and claims 1-8 and 10-13 of the '188 patent. These are the asserted claims of the '800 patent and the '188 patent.

PCW denies that it has infringed the asserted claims of the '800 patent or the '188 patent and argues, in addition, that the asserted claims are invalid.

Your job is to decide whether PCW has infringed the asserted claims of the '800 patent or the '188 patent, and whether any of the asserted claims of the '800 patent or '188 patent are invalid. If you decide that any claim of the '800 patent or '188 patent has been infringed and is not invalid, you will then need to decide any money damages to be awarded to SRAM to compensate it for the infringement. You will also need to make a finding as to whether the infringement was willful. If you decide that any infringement was willful, that decision should not affect any damages award you make. I will take willfulness into account later.

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

To know what a claim covers, a claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. The requirements of a claim are often referred to as "claim elements" or "claim limitations." The coverage of a patent is assessed claim-by-claim. When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid. The first step is to understand the meaning of the words used in the patent claim.

The law says that it is my role to define the terms of the claims and it is your role to apply my definitions of the terms I have construed to the issues that you are asked to decide in this case. Therefore, as I explained to you at the start of the case, I have determined the meaning of certain claim terms and I have provided to you my definitions of certain claim terms. You must accept my definitions of these words in the claims as being correct. It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity.

The beginning portion, also known as the preamble, of a claim often uses the word "comprising." The word "comprising," when used in the preamble, means "including but not limited to" or "containing but not limited to." When "comprising" is used in the preamble, if you decide that an accused product includes all of the requirements of that claim, the claim is infringed. This is true even if the accused product contains additional elements.

For any words in the claim for which I have not provided you with a definition, you should apply the ordinary meaning of those terms in the field of the patent. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

It is my job as judge to provide to you the meaning of any claim language that must be interpreted. You must accept the meanings I give you and use them when you decide whether any claim has been infringed and whether any claim is invalid. I will now tell you the meanings of the following words and groups of words from the patent claims.

I have already determined the meaning of the claims of the '800 and '188 patents. You have been given a document reflecting those meanings, which I repeat now, as well as a glossary of general patent terms that may be used during the course of this trial:

1) "Continuously varies" means "continuously changes."

2) "Convex exterior profile" and "convex profile" mean "profile view having a rounded or curved form bulging towards the wheel center."

3) "Convex region" means "areas having a rounded or curved form bulging towards the wheel's center."

4) "Peaks" as used in the asserted claims of the '800 and '188 patents means "peaks." "Peak" sometimes refers to the single highest point on an ascending curve, and other times refers to the entire ascent. "Troughs" as used in the asserted claims of the '800 and '188 patents means "valleys." "Trough" sometimes refers to the single lowest point on a descending curve, and other times refers to the entire descent. I will now identify where these meanings occur for the claims of the '800 and '188 patents.

- Claim 1 of the '800 patent recites, in relevant part: "wherein the rim has a radially inner edge, and wherein at least part of the radially inner edge has an undulating configuration and a radial distance that continuously varies between adjacent *peaks* and *troughs* of the undulating configuration, each *peak* of the undulating configuration having a convex exterior profile in a plane of the wheel." The first

instance of "peaks" refers to the single highest point on an ascending curve. The second instance of "peak" refers to the entire ascent. "Troughs" refers to the single lowest point on a descending curve.

- Claim 9 of the '800 patent recites: "A wheel as claimed in claim 1, wherein at least twenty-four pairs of *peaks* and *troughs* are provided along the radially inner edge of the rim." Here, "peaks" means the entire ascent, and "troughs" means the entire descent.

- Claim 17 of the '800 patent recites, in relevant part: "wherein at least part of the radially inner edge has an undulating configuration and a radial distance that continuously varies between adjacent *peaks* and *troughs* of the undulating configuration…." Here, "peaks" refers to the single highest point on an ascending curve, and "troughs" refers to the single lowest point on a descending curve.

- Claim 18 of the '800 patent recites: "A wheel as claimed in claim 17, wherein a radial distance that varies between *peaks* and *troughs* of the undulating configuration and the difference in radial height between the *peaks* and *troughs* of the undulations is at least 5 mm." Both instances of "peaks" refer to the single highest point on an ascending curve, and both instances of "troughs" refer to the single lowest point on a descending curve.

- Claim 22 of the '800 patent recites: "A wheel as claimed in claim 17, wherein at least twenty-four pairs of *peaks* and *troughs* are provided along the radially inner edge of the rim." Here, "peaks" means the entire ascent and "troughs" means the entire descent.

- Claim 1 of the '188 patent recites, in relevant part: "wherein at least part of a radially inner edge of the rim has an undulating curve configuration, the undulating curve configuration having *peaks* and *troughs*, and wherein the radially inner edge has convex profiles in convex regions of the rim, the convex regions including the *peaks*." Here, the first instance of "peaks" refers to the entire ascent. The

second instance of "peaks" refers to the single highest point on an ascending curve. "Troughs" refers to the entire descent.

- Claim 3 of the '188 patent recites: "The wheel as claimed in claim 1, wherein the *peaks* and the *troughs* of the undulating curve configuration are arranged at regular intervals." Here, "peaks" refers to the entire ascent, while "troughs" refers to the entire descent.

- Claim 5 of the '188 patent recites: "The wheel as claimed in claim 1, wherein the undulating curve configuration has the convex profiles in a plan of the wheel, such that the *peaks* do not comprise an angular apex." Here, "peaks" refers to the entire ascent.

- Claim 8 of the '188 patent recites: "The wheel as claimed in claim 1, wherein a difference in radial height between the *peaks* and the *troughs* is at least 5 mm, at least 10 mm, or at least 20 mm." Here, "peaks" refers to the single highest point on an ascending curve, and "troughs" refers to the single lowest point on a descending curve.

- Claim 10 of the '188 patent recites: "The wheel as claimed in claim 1, wherein the undulating curve configuration has a radius that varies between the *peaks* and the *troughs* of the undulating curve configuration, and wherein at least a subset of the *peaks* of the undulating curve configuration are points of minimum radius of the undulating curve configuration." Here, both instances of "peaks" refer to the single highest point on an ascending curve, and "troughs" refers to the single lowest point on a descending curve.

- Claim 11 of the '188 patent recites, in relevant part: "The wheel as claimed in claim 1, wherein the undulating curve configuration has a radius that varies between the *peaks* and the *troughs* of the undulating curve configuration, and wherein the *troughs* of the undulating curve configuration are points of maximum radius of the undulating curve configuration." Here, "peaks" refers to the single highest point on an ascending curve, and both instances of "troughs" refer to the single lowest point on a descending curve.

5)   "A radius" means "a straight line drawn between a circle's center and any point on its circumference."

6)   "Radial distance" means "distance from a point on the radially inner edge of the rim to the center of the wheel."

7)   "Undulating configuration" means "wavelike configuration."

8)   "Undulating curve configuration" means "rounded wavelike configuration."

For a claim term for which I have not provided you with a definition, you should apply the ordinary meaning of that term in the field of the patent. You are to apply my definitions of the terms I have construed throughout this case. However, my interpretation of the language of the claims should not be taken as an indication that I have a view regarding issues such as infringement and invalidity. Those issues are yours to decide.

This case involves two types of patent claims: independent claims and dependent claims.

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, claims 1 and 17 of the '800 patent and claim 1 of the '188 patent are independent claims.

The remainder of the claims in the '800 patent and '188 patent are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim to which it refers. A product that meets all of the requirements of both the dependent claim and the claim to which it refers is covered by that dependent claim.

I will now instruct you how to decide whether or not SRAM has proven that PCW has infringed the '800 patent and the '188 patent. Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another.

In this case, there are three possible ways that a claim may be infringed. The three types of infringement are called: (1) direct infringement; (2) active inducement; and (3) contributory infringement. Active inducement and contributory infringement are referred to as indirect infringement. There cannot be indirect infringement without someone else engaging in direct infringement. In this case, SRAM has alleged that PCW directly infringes the '800 and '188 patents. In addition, SRAM has alleged that companies and individuals selling or using the PCW bicycle wheels (including when sold or used as part of a bicycle) directly infringe the '800 and '188 patents and PCW is liable for actively inducing or contributing to that direct infringement by such companies and individuals.

In order to prove infringement, SRAM must prove that the requirements for one or more of these types of infringement are met by a preponderance of the evidence, that is, that it is more likely than not that all of the requirements of one or more of each of these types of infringement have been proved.

I will now explain each of these types of infringement in more detail.

In this case, SRAM asserts that PCW has directly infringed the '800 and '188 patents. PCW is liable for directly infringing the '800 and '188 patents if you find that SRAM has proven that it is more likely than not that PCW made, used, imported, offered to sell, or sold the invention defined in at least one claim of the '800 or '188 patents.

A party can directly infringe a patent without knowing of the patent or without knowing that what the party is doing is patent infringement.

To determine literal infringement, you must compare PCW's products with each patent claim that SRAM asserts is infringed, using my instructions as to the meaning of the terms the patent claims use.

A patent claim is literally infringed only if PCW's product includes each and every element recited in that patent claim. If PCW's product does not contain one or more elements recited in a claim, PCW does not literally infringe that claim.

You must determine literal infringement with respect to each patent claim individually.

The accused product should be compared to the invention described in each patent claim it is alleged to infringe. The same element of the accused product may satisfy more than one element of a patent claim.

There are two different types of claims in the patent. One type is called an independent claim. The other is called a dependent claim.

An independent claim does not refer to any other claim of the patent. For example, claim 1 of the '800 patent is an independent claim. An independent claim must be read separately from the other claims to determine the scope of the claim.

A dependent claim refers to at least one other claim in the patent. For example, claim 2 of the '800 patent is a dependent claim that refers to claim 1 of the '800 patent. A dependent claim includes all elements recited in the dependent claim, as well as all elements of the independent claim to which it refers.

To establish literal infringement of a dependent claim, SRAM must show that it is more likely than not that PCW's product includes each and every element of the independent claim and the dependent claim.

If you find that the independent claim from which the dependent claim depends is not literally infringed, then you must find that the dependent claim is also not literally infringed.

If you decide that PCW's product does not literally infringe an asserted patent claim, you must then decide whether it is more probable than not that PCW's product infringes the asserted claim under what is called the "doctrine of equivalents." Under the doctrine of equivalents, the product can infringe an asserted patent claim if it includes components that are equivalent to those elements of the claim that are not literally present in the product. If the product is missing an equivalent component to even one component of the asserted patent claim, the product cannot infringe the claim under the doctrine of equivalents. Thus, in making your decision under the doctrine of equivalents, you must look at each individual element of the asserted patent claim and decide whether the product has an equivalent component to each individual claim element that is not literally present in the product.

One way of showing that a component is an equivalent of a claimed element is to show that it performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally present in the accused product. Another way of showing that a component is an equivalent of a claimed element is to show that it is insubstantially different from the claimed element.

In deciding whether a claim element and the component are equivalents, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the component with the claimed element. However, known interchangeability between the claim element and the component of the product is not necessary to find infringement under the doctrine of equivalents.

Further, the same component of the accused product may satisfy more than one element of a claim.

SRAM alleges that PCW is liable for infringement by actively inducing other companies and individuals to directly infringe the '800 and '188 patents literally or under the doctrine of equivalents. As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

PCW is liable for active inducement of a claim only if SRAM proves by a preponderance of the evidence:

(1)      that the acts are actually carried out by companies and individuals selling or using the PCW wheels that directly infringe that claim;

(2)      that PCW took action during the time the '800 or '188 patents were in force that was intended to cause and led to the infringing acts by companies and individuals selling or using the PCW wheels; and

(3)      that PCW was aware of the '800 or '188 patents and knew that the acts, if taken, would constitute infringement of those patents, or that PCW believed there was a high probability that the acts by companies and individuals selling or using the PCW wheels infringed the '800 or '188 patents and took deliberate steps to avoid learning of that infringement.

If you find that PCW was aware of the patent, but believed that the acts it encouraged did not infringe that patent, PCW cannot be liable for inducement.

In order to establish active inducement of infringement, it is not sufficient that companies and individuals selling or using the PCW wheels themselves directly infringe the claim. Nor is it sufficient that PCW was aware of the act(s) by companies and individuals selling or using the accused wheels that allegedly constitute the direct infringement. Rather, in order to find active inducement of infringement, you must find either that PCW specifically intended companies and individuals selling or using the PCW wheels to infringe the '800 or '188 patents or that PCW

believed there was a high probability that companies and individuals selling or using the PCW wheels would infringe the '800 or '188 patents, but deliberately avoided learning the infringing nature of the acts of companies and individuals selling or using the PCW wheels. The mere fact, if true, that PCW knew or should have known that there was a substantial risk that the acts of companies and individuals selling or using the PCW wheels would infringe the '800 or '188 patents would not be sufficient to support a finding of active inducement of infringement.

SRAM argues that PCW is liable for contributory infringement by contributing to the direct infringement of the '800 and '188 patents by companies and individuals selling or using the PCW wheels. As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

PCW is liable for contributory infringement of a claim if SRAM proves by a preponderance of the evidence:

(1)       PCW sells, offers to sell, or imports within the United States a component of a product, material, or apparatus for use in a process, during the time the '800 or '188 patents are in force;

(2)       the component, material, or apparatus is not a staple article or commodity of commerce suitable for substantial non-infringing use;

(3)       the component, material, or apparatus constitutes a material part of the invention;

(4)       PCW is aware of the '800 or '188 patents and knows that the component, material, or apparatus is especially made or adapted for use as an infringement of the claim; and

(5)       companies and individuals selling or using the PCW wheels use the component, material, or apparatus to directly infringe a claim.

In this case, SRAM argues that PCW willfully infringed the '800 patent both before and after SRAM filed this lawsuit.  In addition SRAM argues that PCW willfully infringed the '188 patent after PCW learned of the '188 patent through SRAM's provision of a copy of its complaint in this lawsuit to PCW on March 23, 2021. If you have decided that PCW has infringed, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine whether SRAM proved that it is more likely than not PCW knew of the '800 patent or the '188 patent and that the infringement by PCW was intentional. You may not determine that the infringement was willful just because PCW was aware of the '800 patent or the '188 patent and infringed one or both of them. Instead, you must also find that PCW deliberately infringed the '800 or the '188 patent.

To determine whether PCW acted willfully, consider all facts and assess PCW's knowledge at the time of the challenged conduct. Facts that may be considered include, but are not limited, to:

1)      Whether or not PCW acted consistently with the standards of behavior for its industry;

2)      Whether or not PCW intentionally copied a product that is covered by the '800 or the '188 patent;

3)      Whether or not PCW reasonably believed it did not infringe or that the patent was invalid;

4)      Whether or not PCW made a good-faith effort to avoid infringing the '800 patent or the '188 patent, for example, whether PCW attempted to design around the '800 patent or the '188 patent;

5)      Whether or not PCW tried to cover up its infringement; and

6)      Whether PCW's behavior was malicious, wanton, deliberate, or consciously

wrongful, flagrant, or in bad faith.

I will now instruct you on the rules you must follow in deciding whether or not PCW has proven that claims 1-6, 9, 12, 14-19, and 21-22 of the '800 patent and claims 1-8 and 10-13 of the '188 patent are invalid.

Each of the claims of the '800 and '188 patents is presumed to be valid. For that reason, to prove that any claim of a patent is invalid, PCW must persuade you by clear and convincing evidence, that is, you must be left with a clear conviction that the claim is invalid.

In order for someone to be entitled to a patent, the invention must actually be "new" and not obvious over what came before, which is referred to as the prior art. Prior art is considered in determining whether claims 1-6, 9, 12, 14-19, and 21-22 of the '800 patent and claims 1-8 and 10-13 of the '188 patent are anticipated or obvious.

Prior art includes any of the following items received into evidence during trial:

1)  any product that was publicly known or used by others in the United States before the claimed invention was invented;

2)  any product that was in public use or on sale in the United States before January 27, 2011;

3)  any patents that issued before January 27, 2011;

4)  any publications having dates of public accessibility before January 27, 2011; and

5)  any product that was made by anyone in the United States before the date of invention where the claimed invention was not later abandoned, suppressed, or concealed.

PCW contends that the following is prior art to the '800 and '188 patents:

- U.S. Patent No. 6,402,256 (referred to as "Mercat"); and

The parties agree that the Mercat reference qualifies as prior art based on their issuance and/or publication dates.

Regardless of whether particular prior art references were considered by the Patent Examiner during the prosecution of the applications that matured into the '800 and '188 patents, PCW must prove by clear and convincing evidence that the challenged claims are invalid. This burden of proof on PCW never changes regardless of whether the Patent Examiner considered the reference.

As I told you previously, there are two different types of claims in the patent. One type is called an "independent claim." The other is called a "dependent claim."

An independent claim does not refer to any other claim of the patent. For example, claim 1 of the '800 patent is an independent claim. An independent claim must be read separately from the other claims to determine the scope of the claim.

A dependent claim refers to at least one other claim in the patent. For example, claim 2 of the '800 patent is a dependent claim that refers to claim 1 of the '800 patent. A dependent claim includes all of the elements recited in the dependent claim, as well as all of the elements of the claim to which it refers.

You must evaluate the invalidity of each asserted claim separately. Even if an independent claim is invalid, this does not mean that the dependent claims that depend from it are automatically invalid. You must decide this issue of validity on a claim-by-claim basis. However, if you find that a dependent claim is invalid, then you must find that the independent claim from which it depends is also invalid.

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the claimed invention as of the effective filing date. Thus, prior art must be evaluated from the perspective of one of ordinary skill in the field of the invention as of the effective filing date.

In this case, PCW contends that claims 1-6, 9, 12, 14-19, and 21-22 of the '800 patent and claims 1-8 and 10-13 of the '188 patent are invalid.

PCW must convince you of this by clear and convincing evidence that the claims are invalid. Specifically, PCW contends that the following piece of prior art anticipates claims 1-6, 9, 12, 14-19, and 21-22 of the '800 patent and claims 1-8 and 10-13 of the '188 patent:

- U.S. Patent No. 6,402,256 (referred to as "Mercat").

To anticipate a claim, each element in the claim must be present in a single item of prior art and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation. In determining whether every one of the elements of the claimed invention is found in the prior art, you should consider what a person of ordinary skill in the art would have understood from his or her review of the particular prior art.

PCW contends that claims 1-6, 9, 12, 14-19, and 21-22 of the '800 patent and claims 1-8 and 10-13 of the '188 patent are invalid because the claimed inventions are "obvious."

A claimed invention is invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art of the claimed invention as of January 27, 2011. Unlike anticipation, which allows consideration of only one item of prior art, obviousness may be shown by considering one or more than one item of prior art.

In deciding obviousness, you must avoid using hindsight (or looking back in time); that is, you should not consider what is known today or what was learned from the teachings of the patent. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art as of January 27, 2011.

The following factors must be evaluated to determine whether PCW has established that the claimed invention is obvious:

1)    the scope and content of the prior art relied upon by PCW;

2)    the differences, if any, between each claimed invention of the '800 and '188 patents that PCW contends is obvious and the prior art;

3)    the level of ordinary skill in the art as of January 27, 2011; and

4)    additional considerations, if any, that indicate that the invention was obvious or not obvious.

Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform a separate analysis for each of the claims.

PCW must prove by clear and convincing evidence that the invention would have been obvious. Again, you must undertake this analysis separately for each claim that PCW contends is obvious.

I will now explain each of the four factors in more detail.

In deciding obviousness, the prior art includes the following item received into evidence during the trial:

U.S. Patent No. 6,402,256 (referred to as "Mercat").

You should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art as of January 27, 2011. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the claimed invention as a whole, and not merely some portion of it.

In analyzing the relevance of the differences between the claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention. You may consider the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention. For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claim was obvious. On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

Importantly, a claim is not proven obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long-known, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the teachings in the way the claimed invention does. The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of any problem or need to be addressed, market demand, or common sense. If you find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed invention, and there

would have been a reasonable expectation of success for doing so, this evidence would make it more likely that the claimed invention was obvious. Similarly, you may consider the possibility that a reference teaches away from the claimed invention. A reference teaches away from the invention when it would have discouraged a person of ordinary skill in the art as of January 27, 2011, from practicing the claimed invention, or when such a person would be led in a different direction than practicing the claimed invention.

You must undertake this analysis separately for each claim that PCW contends is obvious.

To determine the obviousness of the invention, you must determine the level of ordinary skill in the field of the invention at the time of January 27, 2011. Regardless of whether you are asked to articulate in your verdict what you believe was the level of ordinary skill in the field of the invention, you must consider and assess this factor before reaching your conclusion in this case.

The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant. The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems. The Parties agree that the level of ordinary skill in the art is such that a person of ordinary skill in the art in January 2011 would have at least (1) a bachelor's degree in mechanical engineering or an equivalent degree in the aerodynamics or fluid dynamics fields plus one or more years of experience in the design work related to aerodynamics or fluid dynamics or bicycle component design relating to aerodynamics; (2) a Master's or Ph.D. degree in mechanical engineering or in the fields of aerodynamics or fluid dynamics plus a strong understanding of mechanical design principles; or (3) the equivalent work experience in the fields of aerodynamics or fluid dynamics or bicycle component design relating to aerodynamics.

Before deciding the issue of obviousness for each claimed invention, you must also consider certain factors, which may help to determine whether the invention would have been obvious. No factor alone is dispositive, and you must consider the obviousness or nonobviousness of the invention as a whole. Certain of these factors include:

1) Were products covered by the claim commercially successful due to the merits of the claimed invention rather than due to advertising, promotion, salesmanship, or features of the product other than those found in the claim?

2) Was there long-felt need for a solution to the problem facing the inventors, which was satisfied by the claimed invention?

3) Did others try, but fail, to solve the problem solved by the claimed invention?

4) Did others copy the claimed invention?

5) Did the claimed invention achieve unexpectedly superior results over the closest prior art?

6) Did others in the field or PCW praise the claimed invention or express surprise at the making of the claimed invention?

7) Did others accept licenses under '800 and '188 patents because of the merits of the claimed invention?

Answering all, or some, of these questions "yes" may suggest that the claim was not obvious. These factors are relevant only if there is a connection, or nexus, between the factor and the invention covered by the patent claim. Even if you conclude that some of the above factors have been established, those factors should be considered along with all the other evidence in the case in determining whether PCW has proven that the claimed invention would have been obvious.

If you find that PCW infringed any valid claim of the '800 patent or the '188 patent, you must then consider what amount of damages to award to SRAM. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, on any issue. If you find that PCW has not infringed any valid claim of the patent, then SRAM is not entitled to any damages.

The damages you award must be adequate to compensate SRAM for the infringement. They are not meant to punish an infringer. Your damages award, if you reach this issue, should put SRAM in approximately the same financial position that it would have been in had the infringement not occurred.

SRAM has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that SRAM establishes that it more likely than not has suffered. While SRAM is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

There are different types of damages that SRAM may be entitled to recover. In this case, SRAM seeks lost profits or a reasonable royalty. Lost profits consist of any actual reduction in business profits SRAM suffered as a result of PCW's infringement. A reasonable royalty is defined as the money amount SRAM and PCW would have agreed upon as a fee for use of the invention at the time just prior to when infringement began. But, regardless of the type of damages you may choose to award, you must be careful to ensure that award is no more and no less than the value of the patented invention.

I will give more detailed instructions regarding damages shortly. Note, however, that SRAM is entitled to recover no less than a reasonable royalty for each infringing sale.

SRAM is seeking lost profits damages in this case. To prove lost profits, SRAM must show that, but for PCW's infringement, SRAM would have made additional profits through the sale of all or a portion of the sales of the bicycle wheels made by PCW. SRAM must prove this by a preponderance of the evidence, more likely than not.  Part of your job is to determine what the parties who purchased the allegedly infringing product from PCW would have done if the alleged infringement had not occurred. It is important to remember that the profits I have been referring to are the profits allegedly lost by SRAM, not the profits, if any, made by PCW on the allegedly infringing sales.

SRAM has proven its lost profits if you find that SRAM has proven each of the following factors by the more likely than not standard:

1)   a demand for the patented product in the relevant market;

2)   the absence of acceptable non-infringing substitutes;

3)   that SRAM had the manufacturing and marketing ability to make all or a part of the infringing sales actually made by PCW; and

4)   the amount of profit that SRAM would have made if it were not for PCW's infringement.

I will now explain each of these factors.

The first factor asks whether there was demand for the patented product in the relevant market. SRAM can prove demand for the patented product by showing significant sales of SRAM's own patented product that are covered by one or more of the asserted claims of the patent-in-suit. SRAM also can prove sales of PCW's products that are covered by one or more of the asserted claims of the patent-in-suit. To use sales of SRAM's or PCW's products as proof of this demand,

however, SRAM's and PCW's product must be sufficiently similar to compete against each other in the same market or market segment.

The second factor asks whether non-infringing, acceptable substitutes for SRAM's product competed with PCW's infringing product in the marketplace and the impact of such substitutes on the marketplace absent the sale of PCW's product. If the realities of the marketplace are that competitors other than SRAM would likely have captured some or all of the sales made by PCW, even despite a difference in the products, then SRAM is not entitled to lost profits on those sales.

To be an acceptable substitute, the product must have had one or more of the advantages of the patented invention that were important to the actual buyers of the infringing products, not the public in general. The acceptable substitute also must not infringe the patent, either because they were licensed under the patent or they did not include all the features required by the patents. The acceptable substitute may be a product that involved a modification of the infringing product to avoid infringement or the removal of at least one feature of the invention from the product. The acceptable substitute, in addition to being either licensed or non-infringing, must have been available during the damages period. The acceptable substitute need not have actually been sold at that time. But, if the acceptable substitute was not sold during the damages period, then PCW must show by a preponderance of the evidence that, during the damages period, a competitor or PCW had all the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable substitute. If you determine that some of PCW's customers would just as likely have purchased an acceptable non-infringing substitute, then SRAM has not shown it lost those sales but for PCW's infringing sales.

Even if you find that SRAM's and PCW's products were the only ones with the advantages of the patented invention, SRAM is nonetheless required to prove to you that SRAM, in fact, would have made PCW's infringing sales.

The third factor asks whether SRAM had the manufacturing and marketing ability to actually make the sales it allegedly lost due to PCW's infringement. SRAM must prove that it could have supplied the additional products needed to make the sales SRAM said it lost, or that someone working with SRAM could have supplied the additional products. SRAM also must prove that it more likely than not had the ability to market and sell these additional products.

On the fourth factor, SRAM may calculate the amount of its lost profits by calculating its lost sales and subtracting from that amount any additional costs or expenses that SRAM would have had to pay to make the lost sales. The amount of lost profits cannot be speculative, but it need not be proven with unerring certainty.

If you find that SRAM has not proven its claim for lost profits, then you must consider the issue of a reasonable royalty, or if you find that SRAM has proven its claim for lost profits for only a portion of the infringing sales, then you must consider the issue of a reasonable royalty.

The amount of damages that PCW pays SRAM for infringing SRAM's patent must be enough to compensate for the infringement, but may not be less than a reasonable royalty for the use of SRAM's invention.

You must award SRAM a reasonable royalty in the amount that SRAM has proven it could have earned on any infringing sales for which you have not already awarded lost-profit damages.  A royalty is a payment made to a patent owner by someone else in exchange for the rights to make, use, sell, or import a patented product.

The reasonable royalty award must be based on the incremental value that the patented invention adds to the end product. When the infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by the patented features. Your reasonable royalty award—whether through the royalty base, the royalty rate, or a combination of both the royalty base and rate—must reflect the value attributable to the infringing features of the product, and no more.

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between SRAM and PCW. Of course, we know that they did not agree to a license and royalty payment. But, to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license just before the infringement began. You should also presume that the parties had full

knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors, in addition to any other evidence presented by the parties on the economic value of the patent:

1.    Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2.    The rates paid by PCW to license other patents comparable to the '800 and '188 patents.

3.    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4.    The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5.    The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6.    The effect of selling the patented product in promoting other sales of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

7.    The duration of the '800 and '188 patents and the term of the license.

8.   The established profitability of the product made under the '800 and '188 patents; its commercial success; and its popularity.

9.   The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10.   The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by or for the licensor; and the benefits to those who have used the invention.

11.   The extent to which PCW has made use of the invention; and any evidence that shows the value of that use.

12.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.   The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14.   The opinion testimony of qualified experts.

15.   The amount that a licensor and a licensee would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet

be able to make a reasonable profit and which amount would have been
acceptable by a patentee who was willing to grant a license.

16.   Any other economic factor that a normally prudent business person
would, under similar circumstances, take into consideration in
negotiating the hypothetical license.

The amount you find as damages must be based on the value attributable to the patented
technology, as distinct from other, unpatented features of the accused product, or other factors such
as marketing or advertising, or PCW's size or market position. In determining the appropriate
royalty base and the appropriate royalty rate, your ultimate combination of both the royalty rate and
the royalty base must reflect the value attributable to the patented technology. In other words, the
royalty base must be closely tied to the invention. It is not sufficient to use a royalty base that is too
high and then adjust the damages downward by applying a lower royalty rate. Similarly, it is not
appropriate to select a royalty base that is too low and then adjust it upward by applying a higher
royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base
that, in combination, reflect the value attributable to the patented invention alone.

A multi-component product may have both infringing and non-infringing components. In
such products, royalties should be based not on the entire product, but instead on the "smallest
salable unit" that practices the patent and has close relation to the claimed invention. If the smallest
salable unit is a multi-component product containing one or more non-infringing features with no
relation to the patented feature(s), damages must only be based on the portion of the value of that
product attributable to the patented technology. This may involve estimating the value of a feature
that may not have ever been individually sold.

The entire market value rule is a narrow exception to this general rule. In order to recover damages as a percentage of revenues or profits attributable to the entire product, SRAM must establish that it is more likely than not that the patented feature is the sole driver of customer demand for an entire multi-component product such that it creates the basis for customer demand or substantially creates the value of the product.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies. A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between SRAM and PCW in order for you to consider it. However, if you choose to rely upon evidence from any license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between SRAM and PCW, in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon. Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

In determining the amount of damages, you must determine when the damages began. Damages commence on the date that PCW has both infringed and been notified of the alleged infringement. For the '800 patent, SRAM and PCW agree that date was at least as early as May 29, 2018. For the '188 patent, SRAM and PCW agree that date was at least as early as March 23, 2021.

Any doubts that you may have on the issue of damages due to PCW's failure to keep proper records should be decided in favor of SRAM. Any confusion or difficulties caused by PCW's records also should be held against PCW, not SRAM.

Of course, the fact that I have given you instructions concerning the issue of SRAM's damages should not be interpreted in any way as an indication that I believe that SRAM should, or should not, prevail in this case.

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

The form breaks down your verdict into a series of separate questions, first on Plaintiff's claims of infringement, then the issue of willfulness, following by the Defendant's claims of invalidity, and finally damages.

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.