# EXHIBIT 2 to HICKEY DECLARATION

*UNITED STATES DISTRICT COURT*

*SOUTHERN DISTRICT OF FLORIDA*

*MIAMI DIVISION*

*CASE NO. 21-80581-CIV-RKA*

*SRAM, LLC,*                          . *Miami, Florida*
                                      . *February 14, 2023*
        *Plaintiff,*        . *10:24 A.M.*
                                      .
        *v.*               .
                                      .
*PRINCETON CARBON WORKS, INC.,* .
                                      .
        *Defendant.*        .
. . . . . . . . . . . . . . ..

- - - - -

*Transcript of Testimony of Michael Lee Hall had*

*before the Honorable Roy K. Altman,*

*United States District Judge, and a Jury.*

- - - - -

*Proceedings recorded by mechanical stenography, transcript
produced by computer.*

HALL – DIRECT/WALSH

| | |
|---|---|
| 1 | we'll come back? |
| 2 | MR. WALSH:  Thank you, Your Honor. |
| 3 | MR. WODARSKI:  Thank you, Your Honor. |
| 4 | *(The Judge exited the courtroom)* |
| 5 | *(Recess taken at 11:40 a.m.)* |
| 6 | *(The Judge entered the courtroom)* |
| 7 | THE COURT:  All right.  Please be seated. |
| 8 | All right. |
| 9 | MR. EHRENREICH:  I'm going to actually allow |
| 10 | Mr. Wodarski to argue this.  It has to do with going into, we |
| 11 | believe, expert testimony. |
| 12 | THE COURT:  Okay. |
| 13 | MR. WODARSKI:  Thank you, Your Honor. |
| 14 | Just to address it, what Mr. Walsh was just trying to |
| 15 | do was take Mr. Hall and have him take the claims of the patent |
| 16 | element by element, compare it to the accused product.  That is |
| 17 | the sole province of an expert who's properly qualified, be one |
| 18 | of skill in the art. |
| 19 | THE COURT:  That's what Dr. Howle is going to testify |
| 20 | to. |
| 21 | MR. WODARSKI:  Exactly, Your Honor.  And it gets a |
| 22 | little more egregious here.  Because we're concerned about this |
| 23 | issue here, we raised it with respect to the hypothetical of |
| 24 | Mr. Wesling doing it.  You said, I grant that MIL, he's not |
| 25 | allowed to do it.  And flouting that, they're now having |

HALL - DIRECT/WALSH

1    Mr. Hall do it.

2            THE COURT:  All right.  Let me hear from you,

3    Mr. Walsh.

4            MR. WALSH:  I think it's the exact opposite, Your

5    Honor.  Your ruling with respect to Mr. Wesling -- and I'm

6    quoting from page 34, line 19 of your ruling on it -- was that

7    Mr. -- you said:  As a lay witness, Mr. Wesling may only

8    provide lay witness testimony within the meaning of Rule 701.

9    To the extent Mr. Wesling's factual testimony is based on his

10   personal knowledge, including based on his study of the accused

11   products, that testimony will be permitted under Rule 701,

12   subject to any objection the defense may raise.

13           Mr. Wesling -- so, for example, Mr. Wesling could

14   testify that he has seen and examined the accused wheel, and

15   that the wheel had a convex exterior profile.  That's different

16   from a lay witness --

17           THE COURT:  Aha.  So what he's saying is, so you could

18   say -- what I was saying is -- and I have it pulled up as

19   well -- you could have him look at the Princeton wheel, and he

20   can say that has a convex exterior profile.  That's observable

21   by all.  You don't need an expert for that.

22           MR. WALSH:  Right.

23           THE COURT:  What he thinks you're going to do is, he

24   thinks you're then going to go claim by claim with the patent,

25   have him compare the wheel that Princeton makes to the patent

HALL – DIRECT/WALSH

1   claim and say, Yeah, this infringe -- this is what the claims

2   mean, this is what the embodiment in the Princeton wheel

3   manifests, and there's therefore infringement.  And that is

4   what -- I mean first of all --

5           MR. WALSH:  I'm doing that --

6           THE COURT:  You're not doing that.

7           MR. WALSH:  No.  I'm not going to ask him if it

8   infringes, et cetera.  I'm just going to --

9           THE COURT:  So why do you think he's doing that?

10          MR. WODARSKI:  Your Honor, that's exactly what he's

11  doing.  What he just said admits it.  And the last sentence he

12  just said to you means he's not going to ask the ultimate

13  issue, but that's not the point, Your Honor.  The error that's

14  going to result here --

15          THE COURT:  I just don't want -- hold on.

16          MR. WODARSKI:  Yeah.

17          THE COURT:  I don't want to get into this, because

18  we've got an expert who's going to go through this already.  We

19  don't need this guy to talk about this.

20          MR. WODARSKI:  And --

21          THE COURT:  Hold on.  What I want us to do is, if you

22  want him to, you can have him say that he's looked at this

23  wheel and that it has a convex exterior profile, if you want,

24  an undulating rim.  I mean these are observable things.

25          MR. WALSH:  Right.

HALL – DIRECT/WALSH

1              THE COURT:  Any of us could see that.  The jurors can
2    see that.
3              MR. WALSH:  Right.
4              THE COURT:  I don't want you to get any farther into
5    the weeds.
6              MR. WALSH:  I'm not going to.
7              THE COURT:  Because we're just duplicating effort.  We
8    have an expert who's going to say all that.
9              MR. WALSH:  I'm not going to, Your Honor.  But part of
10   our position, Your Honor, is that this is a very easy thing.
11   You don't need an expert to define what RDNA is.  And, you
12   know, I'm not going to get to the infringement, but, you know,
13   that it has --
14             THE COURT:  You may not need an expert to define what
15   R -- what did you say, RDNA?
16             MR. WALSH:  RDNA.
17             THE COURT:  Okay.  I don't know that that's
18   necessarily true, but even if it were, you certainly would need
19   an expert to explain, like, how an MRNA vaccine is made.  Okay?
20             MR. WALSH:  Absolutely.
21             THE COURT:  And so like in these areas where -- and
22   this is where I'm drawing the line, so let's just be clear
23   about it, and where I drew the line before.  He can testify, as
24   a lay witness, and in particular a lay witness with specialized
25   training and experience, to what he observes about this wheel.

HALL - DIRECT/WALSH

1    It's got a convex profile.  Of course he can testify to that.

2    He observes it.

3              MR. WALSH:  Sure.

4              THE COURT:  Any of us can observe it.  That's not

5    expert testimony.

6              MR. WALSH:  Right.

7              THE COURT:  When you start comparing it to the claims

8    and saying, Hey, this is what the claim means, this is what

9    this wheel does, there's therefore a Venn diagram here where

10   there's infringement, you're going way beyond --

11             MR. WALSH:  And I'm not doing that.

12             THE COURT:  -- what a lay witness should be testifying

13   to.

14             MR. WALSH:  I got it.

15             THE COURT:  Does that satisfy you?

16             MR. WODARSKI:  Your Honor, it causes some concern, so

17   may I have just a moment to explain my concern?

18             Your Honor, I don't think that's what's happening.

19   And I understand your point about observable, but this is

20   actually a really critical point in patent infringement

21   litigation and jurisprudence.  When you observe something,

22   that's okay as fact witness.  It's a historical observation

23   which you can recount on the stand.

24             But when you start observing by using claim term

25   language, we have a problem, Your Honor, because you referred

HALL – DIRECT/WALSH

```
 1    to Federal Rule of Evidence 701.  That says you cannot testify
 2    with the use of special knowledge, Your Honor.  And that's what
 3    they're really trying to get him to do.  I would say here it's
 4    so egregious that he was literally going to go element by
 5    element of the claim and compare it to the accused product.
 6              THE COURT:  Well, he's saying he wasn't going to do
 7    that.
 8              MR. WODARSKI:  It was exactly what he was doing, Your
 9    Honor.  And I will say this.  Even if he just does what you
10    suggest and uses claim terms in what he says he observed, he is
11    doing what the Federal Circuit says you can't do.  He is
12    bolstering their expert.  He has not gone through the regimen
13    required, as you noted in your ruling on the MIL, to do it.
14              THE COURT:  Give me a Federal Circuit case that says
15    you can't do that.
16              MR. WODARSKI:  The Federal Circuit that he can't
17    provide expert testimony?
18              THE COURT:  No.  Of course, he can -- you don't need
19    the Federal Circuit to tell us that he can't provide expert
20    testimony.  The question is, can he look at that wheel and use
21    an English word that we all know what it means and say it's
22    convex in the profile?  Why can't he do that?
23              MR. WODARSKI:  That's right, Your Honor.  And the 401,
24    403 underpinnings of that then is because --
25              THE COURT:  No, no, no.  You said there's a Federal
```

HALL – DIRECT/WALSH

1    Circuit case.  The only one you all cited in the motion

2    in limine was *Global-Tech*.  *Global-Tech* actually has nothing to

3    do with this, as I pointed out.

4            MR. WODARSKI:  That's a separate issue.

5            THE COURT:  Separate issue.

6            So you just said there's a Federal Circuit case that

7    says this witness is not able to do in this litigation what any

8    lay witness would be able to do in any other case.  For

9    example:  Witness:  What color is the gun?  Black.  Okay,

10   great.  That's a witness observing an object in court and

11   describing it with an English word.  Convex, although it's a

12   fancy word, is an English word, and we all know what it means.

13   I'm going to describe it to the jurors who don't know what it

14   means to the extent that they don't understand it.

15           So you're telling me there's a Federal Circuit case

16   that in this particular situation, he cannot do what any

17   witness, who's lay, in any other case can do.  And I'm asking

18   you to show me that case.

19           MR. WODARSKI:  Yes, and, Your Honor, I can try and

20   find one, but just to preserve my objection right now --

21           THE COURT:  No, no, no.  We're not going to bring the

22   jurors in because you're saying it's reversible error based on

23   mystery case, so we've got to look at mystery case.

24           MR. WODARSKI:  No, Your Honor, I don't want to digress

25   into a mystery.  Let me just talk about the substance of it.

HALL – DIRECT/WALSH

1    Your illustrations actually prove my point.  In those

2    circumstances that are in your hypothetical, that may be okay.

3    But here in a patent --

4            THE COURT:  It's not "may be okay."  Of course it's

5    okay.

6            MR. WODARSKI:  In a patent infringement case, it's

7    different, Your Honor, precisely for the reason why you did a

8    claim construction hearing, because here words matter.  Certain

9    words have import where only one of ordinary skill in the art

10   can communicate to the jury what they mean.  And when you use

11   words like "continuously varying," "convex profile," you have

12   construed those terms, the jury is supposed to follow your

13   instruction and then only hear from an expert about what they

14   mean by way of comparing them to the accused product.

15           What they are trying to do is take Mr. Hall, who's

16   already spent some time this morning saying that he spent

17   decades acquiring specialized knowledge as an engineer, then

18   when you're asking him, What do you see in this wheel, he's

19   saying, I see something that continuously varies.  And when you

20   put those two things together, Your Honor, they are

21   accomplishing -- trying to accomplish through him exactly what

22   they tried to accomplish through Mr. Wesling, and exactly what

23   they should not have -- should be able to do (sic).

24           If he wants to say that that tire is black, to use

25   your hypothetical, go ahead, I don't care.  But if he says

HALL – DIRECT/WALSH

1    "convex profile," if he says "continuously varying," now we've

2    got a problem, because he's intentionally using a claim term so

3    that he can bolster the expert.  And so from their side of the

4    case, they have two people with specialized knowledge telling

5    them the same thing and that's a problem.

6         THE COURT:  Mr. Walsh?

7         MR. WALSH:  Your Honor, I can't stop the fact that

8    this witness is someone who is skilled in the art.  He's a lay

9    witness —

10        THE COURT:  You can't do that.  Here's what I'm going

11   to do.  Here's what I'm going to do.  I'm not going to let you

12   get into it with him now.  You all will show me cases for your

13   respective propositions, because what he just said makes sense

14   to me.  If you have a case that says I'm allowed, and you have

15   a case that says I'm not allowed, I'll let you recall

16   Mr. Walsh — Mr. Hall.  Okay?

17        MR. WODARSKI:  Thank you very much, Your Honor.

18        MR. WALSH:  One other point I think we have to raise,

19   Your Honor, and that is, with respect to anticipated

20   cross-examination yesterday, you said to us about — I

21   complained about what was going on in the opening with respect

22   to trying to rewrite the claim constructions?

23        THE COURT:  Yes.

24        MR. WALSH:  And so I got the information here.  And

25   the point is, I didn't object to it in opening because I felt

KATSANIS – DIRECT/HICKEY

1  screen, you know, the picture on the screen, and you move it

2  around, you take several snapshots of that, and then you make a

3  decision which ones to use.

4       So the three on the left, they went on the drawing --

5  sorry -- the three on the right went on the drawing.

6       The one on the left didn't make the drawing.

7       And I'm pretty sure I had even more versions of this.

8  Q.  And you previously mentioned CFD analysis.

9       What kind of CFD analysis did you do for your

10  undulating wheel designs?

11  A.  So the initial work, it was concentrating on what is the

12  drag, meaning what is the force that is trying to hold you from

13  going faster.

14       So when we established that there was a potential

15  benefit there, then I thought, is there a benefit perhaps on

16  the stability?

17       You remember earlier on I tried to demonstrate on the

18  bike that -- how you actually measure the stability.

19       So I thought, okay, we need to see are there any other

20  benefits on this one.  And one of the benefits that we came up

21  with, it was these kind of wheels, they appear to be

22  significantly more stable.

23       One byproduct, if I can call it, of these aerodynamic

24  wheels in -- between 2000 and 2010, the depth of varying went

25  deeper and deeper, which means it made them more and more

KATSANIS - DIRECT/HICKEY

1   sensitive to crosswinds.

2          And there were several people that you could hear that

3   they were riding the bike, they coming on to a gust of side

4   wind and made them unstable and so on.

5          So at some point, I thought, does this configuration

6   have a benefit on that potentially?

7          And what I found pretty much immediately, it was

8   actually moving the center of pressure further back towards the

9   neutral axis that I demonstrated earlier, which it was an

10  unexpected design, to be fair.

11         I didn't know at the time that this will be the case,

12  and that's why it's called research and development at the end

13  of the day.

14         You look of where you may have a benefit.  The way

15  that I work with these ideas is you try to approach it from

16  many different aspects, and you see if there is a benefit.  And

17  in this case, there was a small -- there was a benefit on the

18  aerodynamic drag, and there was an even bigger benefit on

19  stability.

20  Q.  So at the time, how many years had you been working in the

21  design of bicycle frames, components, et cetera?

22  A.  Around 2010, it was already about 20 years.

23  Q.  So after working for 20 years in designing bicycle

24  components, why do you say that the result was unexpected?

25  A.  It was a new -- it was a totally new concept at the time.

KATSANIS – DIRECT/HICKEY

1          The vast majority, if not everybody at the time, was

2     actually working towards how you can make the bike faster on a

3     straight line.  It was relatively unknown on how you try to

4     make it more stable.

5          And actually, it was around that time, maybe a year or

6     two before that, that Zipp/SRAM, they actually came up with a

7     version of the wheel, but it departed from what it was the

8     common practice at the time.  The common practice at the time,

9     it was that the inner edge of the wheel was very sharp, and

10    Zipp came up with the inner edge of the wheel to be quite

11    rounded.

12         And it was the first time -- the first time I know, at

13    least -- that somebody seriously looked on to that stability

14    matter and can we do something about it.  So to a significant

15    extent, the reason why I looked into stability, it was because

16    of the work that Zipp/SRAM they did before that.

17         So I tried to find out, is this going in the same

18    direction or is it better?  And as it turn out to be, it was

19    adding -- it was an added benefit, it was getting even better.

20    Q.  And after you did these multiple different types of designs

21    of your undulating wheel designs and done these drawings, what

22    did you do next in the process?

23    A.  So at the time, uhm, I was actually working -- my business

24    at the time, it was just a design consultant.  So my whole,

25    uhm, office, if I can say, was about the size of this desk.  So

KATSANIS – DIRECT/HICKEY

1   Q.  What is it that you were trying to communicate to the

2   world, as you said, in 2012 it publishes, what is it that you

3   were trying to communicate to the world about your invention?

4   A.  So I was trying to explain where the potential benefits are

5   coming from.  So what -- to get a patent for something, you

6   have to demonstrate that there is some applicable benefit.

7   It's not that I came up with an idea only, but it should

8   actually give you some benefit somewhere.

9           So in this particular case over here, I was trying to

10  explain what is the benefit.  And one of the benefits is also

11  like that you having like extra stability because of the

12  reduction on the side force.

13  Q.  And if we look at Figure 15?

14  A.  Yep.

15  Q.  Okay.  We previously talked about 12 -- Figures 12(a) and

16  12(c).

17  A.  Yeah.

18  Q.  There's an A here and a C there.

19  A.  Yeah.

20  Q.  Is that what that's referring to?

21  A.  Yeah, the original of that one was actually in color, but

22  unfortunately the Patent Office is still on black and white.

23  So it's a little bit more difficult to make sense out of it.

24          But A, which is the line which is slightly above the

25  other one, it is actually the standard version of the wheel, if

KATSANIS – DIRECT/HICKEY

1    I can call it.

2            And C, it was the one that it has this undulating

3    inner edge.

4            So you can see that in pretty much all cases, except

5    perhaps on the point on ten degrees and 20, so pretty much

6    everywhere else in between, there is a benefit having the

7    undulating inner edge.

8            And again, remember, these –– when you come up with a

9    new idea, if it's straightaway, it gives you a benefit

10   somewhere, it pretty much tells you there is more to come.

11   Q.  And so this says "drag comparison."  And on one axis, the

12   Y axis, you have drag, and then on the X axis, you have yaw

13   angle.  What do those refer to?

14   A.  Okay.  I'll try to –– okay.

15           The yaw angle –– the yaw angle you have to think about

16   it this way.  It's the angle between where the wheel is

17   travelling and where the wind is coming from the

18   side *(indicating)*.

19           So zero means that the wheel is travelling at exactly

20   the same direction as the wind, which it can be on a day that

21   has absolutely no wind or in an indoor velodrome or something

22   like this.

23           But then in the real world, you always have a bit of

24   wind blowing and always comes from some direction.  So in this

25   particular case, we taking it up about to 20 degrees, so in

KATSANIS – DIRECT/HICKEY

1    effect it's from head on to maybe up to about here

2    somewhere *(indicating)*.

3            Which these, by the way, are derived from real world

4    measurements, and we know, as a bicycle racer, the range that

5    you encounter as you're going on the road is somewhere between

6    zero and 20.  That's why we stopped at 20 in this particular

7    case.  So this is the angle of yaw.

8            The drag that says "Newtons" over there, Newtons is a

9    scientific way of measuring the drag.  You may say Newton

10   one -- a Newton is about -- let's call it hundred grams, to --

11   it's not exactly, but let's call hundred grams, 100 grams is

12   about, which was that, one-fifth of a pound.  I don't know how

13   many ounces that is.

14           So this is actually trying to show that when you

15   changing the angle as the wind is encountering the wheel, you

16   have the actual drag changing.  That's very common.  It's the

17   retarding force, the force that stops you from going faster.

18   Q.  And if we could look at column 10 of the '800 patent, the

19   description of Figure 15 in column 10.

20   A.  Yeah.

21   Q.  What was the conclusion that you drew from that data shown

22   in Figure 15?

23   A.  The conclusion at the time it was that the CFD, the

24   computer simulation for aerodynamics, it shows that it has --

25   it gives you less drag comparing to a nonundulating rim.

KATSANIS – DIRECT/HICKEY

1          So the invention, it appears that it has a benefit.

2          MR. HICKEY:  And if we can quickly look at Figure 16?

3    A.  Yeah.

4    Q.  What does Figure 16 show to the world?

5    A.  This is actually, uhm, the first approximation that I did

6    with regards on to where is the center of pressure.

7          You remember the demonstrations that I've done earlier

8    on, of the more it comes towards the back of the wheel -- the

9    front of the wheel, the better the performance of the wheel it

10   will be in terms of stability.  So that was the first

11   approximation on how this is working.

12         And you can see over there that A was the original

13   version of the wheel, and C was the modified one.  And it moved

14   more towards the center of the wheel, which is where we want it

15   to be, in effect.

16         MR. HICKEY:  And so if we could look at column 10 of

17   the '800 patent?

18   A.  Say that again?

19   Q.  Column 10 of the '800 patent.

20   A.  Column 10.

21   Q.  And looking at the description of Figure 16, what is it

22   that you were trying to communicate to the world about

23   Figure 16?

24   A.  Yeah, I was trying to communicate that there is a benefit

25   to when the -- you have the undulating inner edge, that the

KATSANIS – DIRECT/HICKEY

1    results that we had at the time, it was showing that there is a

2    benefit, there is a favorable result.  It makes a more stable

3    bike, in effect.

4            MR. HICKEY:  Your Honor, it's 3:45.

5            Can we take a break?

6            THE COURT:  Folks, let's take a ten-minute break.

7            Please don't discuss the case with anyone or allow it

8    to be discussed with you.

9            Please don't conduct any research on the case, the

10   lawyers, or the parties, or communicate via social media or

11   otherwise about the case.

12           We'll see you in ten minutes.

13           COURTROOM SECURITY OFFICER:  All rise for the jury.

14           *(The jury exited the courtroom)*

15           THE COURT:  So you think you've got about, what, 30 --

16   sir, thank you very much.

17           Why don't you wait for us for ten or 15 minutes?

18           THE WITNESS:  No problem.

19           THE COURT:  Use the restroom.

20           Don't talk to the attorneys about your testimony.

21           THE WITNESS:  Okay.

22           THE COURT:  Go ahead, sir.

23           THE WITNESS:  Thank you.

24           *(The witness exited the courtroom)*

25           THE COURT:  All right.