# EXHIBIT 6 to HICKEY DECLARATION

*UNITED STATES DISTRICT COURT*

*SOUTHERN DISTRICT OF FLORIDA*

*MIAMI DIVISION*

*CASE NO. 21—80581—CIV—RKA*

*SRAM, LLC,*                           . *Miami, Florida*
                                       . *February 21, 2023*
        *Plaintiff,*                   . *10:11 A.M.*
                                       .
            *v.*                       .
                                       .
*PRINCETON CARBON WORKS, INC.,* .
                                       .
        *Defendant.*                   .
*. . . . . . . . . . . . . . ..*


— — — — —

*Transcript of Trial Proceedings had*

*before the Honorable Roy K. Altman,*

*United States District Judge, and a Jury.*

— — — — —

*DAY 6*

— — — — —


*Proceedings recorded by mechanical stenography, transcript
produced by computer.*

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301—3276

WERNTZ – CROSS/HICKEY

1  your wheel design in Plaintiff's Exhibit 55 either, correct?

2  A.  Uhm, it's not -- I do not know whether it's used to

3  describe it or not in this document.

4  Q.  Okay.  So let's jump to page 53, which is Figure 4 of this

5  second Princeton patent application.  The wheel shown here is a

6  physical model of your bicycle wheel design, correct?

7  A.  It's -- yeah, I mean, it's a bicycle wheel.

8  Q.  But it's a physical model of your design, correct?

9  A.  Yeah, yes.  I mean, it's a working bicycle wheel, so I

10 don't know if I'd use "model."  I'd just call it -- it's a

11 prototype.

12 Q.  It's a prototype of your wheel design.

13 A.  Yes.

14 Q.  Okay.  And your view is that this type of design gave

15 specific aerodynamic and stability and performance benefits to

16 the bicycle rider, correct?

17 A.  Correct.

18 Q.  And it had a different and better feel and performance than

19 other wheels you had ridden before, ones that had a constant

20 diameter rim, correct?

21 A.  Correct.

22 Q.  Okay.  Now, let's take a step back.  Before you gave sworn

23 testimony in a deposition in this case on January 17th, 2022,

24 you met with Mr. Macris, correct?

25 A.  Yes.

MACRIS – DIRECT/WODARSKI

1    the shape of the rim all the way around has to be consistent.

2    You can't have things be off center.

3         So these sections were defined by circles, but then I

4    had to join them.  So this area here *(indicating)* is what I

5    refer to sort of as a transition zone, and that's what allows

6    you to join the maximum depth section and the minimum depth

7    section.  And I used the spline to create a transition between

8    the two.

9    Q.  And what impact did your decision to use a spline in

10   forming your transition zones have on the design features of

11   your wheel?

12   A.  So in SOLIDWORKS, you can use these things called

13   relations, where you can tell the sketch, I want this part to

14   do a certain thing.  So using those splines, I was able to take

15   the spline handle and say, make that spline -- where it reaches

16   this little section, make it tangent, which means make it

17   perfectly in line with that section.  So the two lines were

18   perfectly connected.  So I added those relations in software.

19   And by making those splines tangent to the concentric circles,

20   you basically had a smooth transition zone, but also you

21   inherently had sections of constant radial distance.

22   Q.  And what do you mean by "you inherently had regions *(sic)*

23   of constant radial distance"?

24   A.  It's inherent to the model.  It's there by definition, by

25   numerical definition.  There are sections where the radius is

MACRIS – DIRECT/WODARSKI

1    constant.

2    Q.   There has to be constant radial distance.

3    A.   That's correct.

4         MR. WODARSKI:   So could we go to the next slide,

5    Mr. Doyle?

6    BY MR. WODARSKI:

7    Q.   All right.   What do we see here?

8    A.   So we've zoomed in even further.   So this would be the

9    shallowest section of the wheel, up here would be the outer

10   edge of the rim, and down here would be the center of the

11   wheel (indicating).   So we've zoomed in much more closely.   And

12   this shows -- this is actually -- this line here is actually a

13   portion of a circle (indicating) that's drawn on the center

14   point of the whole sketch.   And we're just showing that the

15   radius from the center point, along that section of line, the

16   radius is the same at all three points -- here, here, and

17   here (indicating).

18        And then this shows -- this dimension just defines the

19   spline handle length, and then this shows the spline handle

20   being perfectly tangent to that section of circle.

21   Q.   So you said the radial distant (sic) measurement was the

22   same for each of the three.   Does that mean it was constant

23   radial distance?

24   A.   Yeah, that just shows a numeric section of constant radial

25   distance.

MACRIS - DIRECT/WODARSKI

1    than what Mr. Katsanis is claiming.

2           So you always get a little bit of a shock when someone

3    says, Hey, that's not yours, like, no, no, and you kind of get

4    put on the back foot.  But when you think about it, and you can

5    be rational, I realized -- I was like, No, these are two

6    inherently different things.  So, you know, it was my good

7    faith belief that we didn't infringe.

8    Q.  So after that March 2017 back and forth with Mr. Katsanis,

9    at some later date did Mr. Katsanis' patents come up again in

10   conversation with anyone?

11   A.  Uhm, yeah, I'd say things progressed quickly through 2017.

12   We offered our product for sale in October or November of that

13   year.  Uhm, and then shortly thereafter, in 2018, we received a

14   letter from Rick Walsh, cease-and-desist letter, in May of

15   2018.

16   Q.  What was your reaction to that cease-and-desist letter?

17   A.  Also unsettling, never nice to get a stern demand letter,

18   essentially, from a law firm.  So it, again, puts you on the

19   back foot, and you kind of -- it kind of wakes you up.  And

20   then, again, sort of cooler heads prevailed, and I said, Wait a

21   minute, wait a minute, wait a minute, like, we're way off base

22   here.  Like, there's no proof included in this letter.  This is

23   an opinion from Rick Walsh representing a massive player in the

24   global cycling industry.  So of course it's in their best

25   interest that we get out of the way.

MACRIS – DIRECT/WODARSKI

 1   think we need to get into it a third time.  What's the

 2   purpose --

 3           MR. WODARSKI:  It does go to willfulness, Your Honor.

 4   I just wanted -- and it's him talking about the state of mind

 5   he had in the moment, not giving an opinion.  And so that when

 6   he had the conversation with Mr. Katsanis, he had a state of

 7   mind, and when he had the conversation with SRAM in Chicago, he

 8   had a state of mind.  It goes exclusively to willfulness.  All

 9   I want is the answer as to what his state of mind was in

10   June 2018 as opposed to March 2017.

11           THE COURT:  Okay.  So you just want to say, At that

12   day, on the day of the meeting, was your -- did you have a

13   different state of mind than you did before?

14           MR. WODARSKI:  Yeah.  What was your state of mind at

15   that meeting?

16           THE COURT:  Okay.  I'll allow it.  Objection's

17   overruled.

18           *(The foregoing proceedings were had at sidebar out of*

19   *the hearing of the jury)*

20   BY MR. WODARSKI:

21   Q.  Mr. Macris, when you were at the June 2018 introductory

22   meeting with SRAM, what was your belief as to whether or not

23   you infringed the Katsanis patent?

24   A.  It was and is my continued belief that our product was --

25           THE COURT:  The question is:  What was your belief on

MACRIS – DIRECT/WODARSKI

1  that day?

2  A.  My belief was we did not infringe.

3  Q.  Thank you.

4        And so was any resolution concluded as a result of

5  that meeting?

6  A.  There was no resolution.

7  Q.  Okay.  And did you and Mr. Daniels have an opportunity to

8  meet with them again?

9  A.  Yeah, there was a follow-up meeting probably a month later,

10  sometime in July.

11  Q.  And where did that take place?

12  A.  Also in Chicago.

13  Q.  And who were the representatives present for SRAM?

14  A.  I believe Brian was not in attendance at that meeting.  I

15  think it was Kevin Wesling and someone else.  And I apologize,

16  I don't remember who.

17        But I was actually a little put off, because I was,

18  like, they took the guy out of the meeting, the guy I was

19  talking to.  Brian is supposed to be handling this, he didn't

20  even bother to show up.  So I was a little put off by that.  I

21  was like, Huh, well, that shows they don't really -- you know,

22  they just want us out of here.

23  Q.  Did you ever receive at any time a licensing proposal from

24  SRAM?

25  A.  Yes.

MACRIS - DIRECT/WODARSKI

1    me -- those are Apex, another company called XYZ, and another

2    company called Stren.

3    Q.   And with respect to those manufacturers, what types of

4    documentation and information do you give them so they can

5    manufacture the rims?

6    A.   I typically will send them a solid model.  So I'll take the

7    SOLIDWORKS file, and I'll export it as a model that has all the

8    dimensions inherent to the model.  So I'll send them the solid

9    model, and then there's always a little bit of back and forth

10   as far as drilling angles for things like the spokes and the

11   nipples, so what we have to do we have to drill the hole for

12   the spoke.  But if you look at that, those spokes are all at

13   different angles, because they come out this way and they come

14   out that way.  So it's this sort of thing where you have to

15   tell them, you know, we plan on using these hubs, and it has an

16   average angle of X.  So we send them the solid model, and then

17   we send them our specifications as far as weight targets,

18   impact targets, spoke drilling angles, et cetera.

19   Q.   Do those specifications include manufacturing tolerances?

20   A.   Yeah, we have a pretty strict tolerance that we require

21   from all of our manufacturers.

22   Q.   And what is a "manufacturing tolerance"?

23   A.   Manufacturing tolerance, the way I understand it, is the

24   variance between the resulting physical product that you get

25   and the drawn dimensions.  So if I say this is ten inches, and

MACRIS - CROSS/WALSH

1  bleeds out into the spline.

2  Q.  Um-hum.  If -- and didn't you also testify if the

3  dimensional difference is too large, the wheel cannot be

4  manufactured nor would it be very well-performing, right?

5  A.  Correct.

6  Q.  So you think that -- and you believe that your wheels have

7  aerodynamic and stability and performance characteristics?

8  A.  All products have those characteristics, whether they're

9  good or bad.  I think our characteristics are good, but any

10  product would have a characteristic.

11  Q.  Good point.  I asked you an inartful question, right?

12       I'm not talking about any product.  I'm talking about

13  the wheels that you designed.  Do you agree that you at least

14  represent to the public that they have superior, exceptional

15  aerodynamic and stability characteristics?

16  A.  Sorry, I must have misheard.  I didn't hear the phrase

17  "superior" or "exceptional" in your original question.  I

18  apologize.

19  Q.  Can you answer the question?  Do you agree that that's how

20  you represented those characteristics to the public?

21  A.  Yeah, we did.

22  Q.  Okay.  And that two-millimeter point that you put in there,

23  the result of putting that in there, of being a constant radial

24  thing, did it still have the same result of achieving that

25  stability and aerodynamic quality that you were looking for?

MACRIS - CROSS/WALSH

1  A.  I can't say what the direct result of any discrete singular

2  dimension is, but holistically the performance of the wheels

3  over time has been very good and has improved.  And we do know

4  that as a precision shape, very small changes do have very

5  large effects on the final performance.

6  Q.  How does that two-millimeter point that you talked about in

7  a CAD drawing -- how does it affect the way that it operates?

8  A.  Again, I go back to the -- my answer is, no singular

9  discrete dimension can affect the operation.  But when I first

10 drew these products, I used those two sections to set the shape

11 of the airfoil and then joined them with that transition zone.

12      So when you have an aerodynamic product that performs

13 well, you typically only make very minute, small, precise

14 changes.  So it's more evolutionary once you get the shape.

15      So, yeah, I'd say we make very small changes, but no

16 singular dimension has a singular purpose.  It's a holistic

17 thing, where the entire wheel has to perform well.

18 Q.  You weren't making it so that it performed differently than

19 if those two -- I think you called them splines met at the

20 exact center, right?  So it was a constantly varying wheel.

21 A.  We had to make it so that those sections were perfectly

22 concentric to the outer diameter.  So it's difficult to get the

23 shape to work just right.  So we've gone through numbers of

24 iterations where the shape that spit out is unusable.

25      So, yeah, I can't say that that singular dimension has

MACRIS – CROSS/WALSH

1   any one direct performance characteristic.  But, again,

2   holistically, on the whole, the wheel performs well.  And when

3   we reached that level of performance, we wanted to continue

4   evolving from a precise level.

5   Q.  So the demonstrative exhibit that you walked through with

6   Mr. Wodarski, that parts of this CAD drawing on SOLIDWORKS --

7   do you recall that?

8   A.  Yes.

9   Q.  Okay.  And you said it's an extremely complicated software

10  program, right?

11  A.  The software is, yes.

12  Q.  Okay.  And, you know, I won't walk through all the

13  specifics of that since, as you said, it's extremely complex.

14  But I just want it clear.  Is it your sworn testimony to the

15  jury that -- under oath, that that's how you made the Wake 6560

16  wheels?

17  A.  That is the current iteration of the 6560, that's correct.

18  Q.  All right.  And that if we went back into 2028 *(sic)*, '29,

19  2020, '21, they're made the same way.

20  A.  For the most part, yeah.  We have explored doing different

21  shapes for the 6560.  Some of those shapes don't work, some of

22  those shapes do work.

23  Q.  So, you know, I notice that -- well, hold on.  Okay.

24          You used certain terms in your direct.  Like you

25  described your wheels as "splines between two concentric

MACRIS – CROSS/WALSH

1   Q.  Um-hum.  I want to --

2           MR. WALSH:  Can you pull up Exhibit P4 -- I'm sorry --

3   Exhibit P643.  This is a sound file, so there's no video, just

4   for you to listen to.  Is this a conversation between you and

5   Dan?  It's short.  This is just the introduction.

6           (Exhibit P4 was played)

7           "MR. CAVALLARI:  Hello, VeloNews listeners.  This

8        is Dan Cavallari, tech editor at VeloNews, coming at

9         you with another VeloNews tech podcast.

10          "And we are deep of the throes of the final week

11       of the Tour de France.  So on the phone today all the

12       way from my homeland of Connecticut is Harrison

13       Macris, the CEO and cofounder of Princeton

14       CarbonWorks.

15          "Harrison, how's it going?

16          "MR. MACRIS:  Hi, Dan.  Thank you for having me."

17          (End of audio clip)

18   BY MR. WALSH:

19   Q.  Is that your voice?

20   A.  Yes.

21   Q.  Okay.  And the -- you -- with respect to your statements

22   previously about not using the word "sinusoidal," I'd like you

23   to listen to this and tell me if you'd like to change your

24   testimony on that.

25          MR. WALSH:  Can you play clip 2, please?

MACRIS – CROSS/WALSH

1   on your website?

2   A.  That's correct.

3   Q.  And it says -- at the top, it says "by Harrison."  Is that

4   something that Mr. Daniels again posted?

5   A.  No, sir.

6   Q.  That's something you posted.

7   A.  Yes, sir.

8   Q.  Okay.  Now, if I can go back and ask you to -- you also

9   testified that -- in your deposition that "continuously

10  varying" is not an accurate way to describe Princeton

11  CarbonWorks wheels, correct?

12  A.  It's not precise, that's correct.

13  Q.  Well, you said it's not accurate, right?

14  A.  Accurate or precise.  There's more precision language that

15  could be used.

16  Q.  Okay.  Are you aware that the Court has construed the term

17  "continuously varies" to mean "continuously changes"?

18  A.  I believe so.

19  Q.  All right.

20          MR. WALSH:  Could you play --

21  BY MR. WALSH:

22  Q.  I'm going to ask you a question about this.

23          MR. WALSH:  Could you play clip 3, please.

24          (Clip 3 of Exhibit P4 was played)

25          "MR. CAVALLARI:  So the sinusoidal rim shape --

MACRIS - CROSS/WALSH

1          those lumps, essentially, in the rim -- are basically

2          to reduce drag, which is created by the airflow --

3               "MR. MACRIS:  The result --

4               "MR. CAVALLARI:  Yeah.

5               "MR. MACRIS:  The result is a reduced drag.

6               "MR. CAVALLARI:  Uh-huh.

7               "MR. MACRIS:  That's the resulting part of it.

8          But what they're doing is you're not allowing

9          basically trends to form.  Because the trailing edge

10         of the body is always changing, the flow can never

11         create these sort of trends.  So you never have the

12         opportunity for the flow to even start that

13         oscillatory sort of harmonic or vibration --

14              "MR. CAVALLARI:  Um-hum.

15              "MR. MACRIS:  -- or pressure differentials or

16         vortices slopping back and forth.  We're preventing

17         that from even becoming an issue.

18              "MR. CAVALLARI:  Gotcha.  Gotcha.

19              "MR. MACRIS:  By having the trailing edge of the

20         body continuously changing."

21              *(End of audio clip)*

22    BY MR. WALSH:

23    Q.  So you were telling this technical editor that your wheel

24    had a trailing edge of the body that continuously changes,

25    right?

MACRIS - CROSS/WALSH

1    A.   In that -- in that interview, yes.

2    Q.   Okay.  And you also testified in your deposition that you

3    would never use the term "convex," among others, to describe

4    the Princeton work *(sic)* wheels, right?

5    A.   I think I said, when it comes to engineering, I probably

6    wouldn't.  That if I was going over it with an engineer, we

7    would just look at the drawing.

8    Q.   Okay.

9          MR. WALSH:  Could you play clip 4, please.

10         THE COURT:  One second.  Of this call?

11         MR. WALSH:  Yes.

12         THE COURT:  Okay.

13         *(Clip 4 of Exhibit P4 was played)*

14         "MR. MACRIS:  And if you look at a regular wheel,

15     regular wheel has a concave surface where the spoke

16     attaches to the rim.

17         "MR. CAVALLARI:  Um-hum, um-hum.

18         "MR. MACRIS:  It's a concavity.  If you look at a

19     PCW wheel, we actually have a convex point.  We only

20     attach spokes at the convex or the max depth."

21         *(End of audio clip)*

22   BY MR. WALSH:

23   Q.   So you're telling this editor and his listeners that

24   Princeton CarbonWorks' wheels actually have a convex point

25   where the spokes are attached, right?

HANSON - DIRECT/WODARSKI

1   green kind of circled area here shows a portion within the

2   trough.  And that portion within the trough shows a region with

3   basically a constant radial distance.  So there's these kind of

4   gray lines going up from the bottom.  Those are where I

5   measured from the center of the wheel out to the radial inner

6   edge.  And we see that these three locations, we get the exact

7   same radius measurement.  And that happens over a span of

8   two millimeters for the Wake 6550.

9   Q.  All right.  And just to help us orient, would the center of

10  the wheel be underneath this demonstrative or above it?

11  A.  Oh, yeah, the center of the wheel is underneath, yeah.

12  Q.  Okay.  So the area where we see the two, that you just said

13  represents two millimeters, that's in one of the shallower

14  portions of a valley rather than a peak, right?

15  A.  Yeah, it's a valley, but it's as if it's at the top of the

16  wheel, yeah.

17  Q.  Right, right.

18       And just so that the jury is clear here, the R256.500

19  that appears three times, what does that represent?

20  A.  This is a distance in millimeters.

21  Q.  And what's the significance of each of those values being

22  the same?

23  A.  It means that we have a constant radial distance.  It's not

24  changing.

25  Q.  And so this specification -- this CAD specification we're

HANSON – DIRECT/WODARSKI

1   looking at --

2           MR. WODARSKI:  You can zoom out, Jim.

3   BY MR. WODARSKI:

4   Q.  -- this is in reference to what product?

5   A.  The Wake 6560.

6   Q.  Okay.

7           MR. WODARSKI:  If we could go to the next slide, 39.

8   BY MR. WODARSKI:

9   Q.  Did you also perform a similar analysis with the accused

10  Grit wheel?

11  A.  I did.  I basically did the exact same thing.

12  Q.  And what did you find?

13  A.  Well, the Grit has a slightly different shape.  And I'll

14  just kind of skip forward to what's over here, but the Grit

15  shows a region of 6.36 millimeters.  The way that I show the

16  measurement here is just 3.1 millimeters to the left of center,

17  3.18 millimeters to the right -- sorry -- 3.18 for both to the

18  left and right, so that's 6.36 millimeters.  And, again, it

19  occurs at both the trough and the region -- and the peak.

20  Q.  So it's 6.36 millimeters of what?

21  A.  Constant radial -- span of constant radial distance.

22  Q.  Thank you.

23          MR. WODARSKI:  And going to the next slide, 40.

24  BY MR. WODARSKI:

25  Q.  Did you do the same review with respect to the accused PCW

HANSON - DIRECT/WODARSKI

1    Peak?

2    A.  I did.

3    Q.  And what did you find?

4    A.  Again, this is -- I did the exact same analysis.  These

5    wheels have a different design.  And in this case, the span is

6    0.75 millimeters to the left and right of center, so the total

7    span is 1.5 millimeters at the location of the valleys or

8    troughs and the location of the peaks.

9    Q.  And so just -- before we move on to your next step, did you

10   find from your examination of the CAD specification drawings

11   that each of the accused PCW wheels have regions of constant

12   radial distance?

13   A.  That's correct.

14   Q.  And in the Wake, what was the measurement of that

15   constant -- those regions of constant radial distance?

16   A.  In the Wake, it was two millimeters.

17   Q.  And in the Grit PCW wheel, what was the measurement of

18   constant radial distance?

19   A.  6.36 millimeters.

20   Q.  And with the Peak wheel from PCW, what did you find was the

21   measurement of the areas of constant radial distance?

22   A.  The span is 1.5 millimeters.

23   Q.  Okay.  Dr. Hanson --

24        MR. WODARSKI:  If we could go to slide 42.

25

HANSON – DIRECT/WODARSKI

1  Q.  So the portions colored in black within the blue box

2  represent what?

3  A.  They represent the -- effectively, the radial inner edge of

4  the rim.

5  Q.  And it says two millimeters from drawings, and it has a

6  span identified by a purple arrow.  What does that show us?

7  A.  That's just shows the span that I determined from the CAD

8  drawing.  So that two-millimeter kind of puts some scale to

9  this, but this is the span taken out of the CAD that I

10 determined previously.

11 Q.  So it's the two-millimeter span of constant radial distance

12 from the CAD drawings?

13 A.  Yes.

14 Q.  Okay.

15      MR. WODARSKI:  And if we could go to the next slide,

16 45.

17 BY MR. WODARSKI:

18 Q.  What's shown here?

19 A.  Well, this I kind of added in just so you could sort of see

20 it for yourself a little bit better, but I've zoomed in here on

21 the actual dial.  And I guess what I want to draw your

22 attention to is -- well, there's four of the needles that you

23 can see on the dial gauge at four locations in the middle, and

24 the needle doesn't move.  But if you look at the needles on the

25 far left or the needle on the far right, I think it will be

HANSON – DIRECT/WODARSKI

1  apparent to you that it did nudge a little bit.

2         So there's a region in this -- kind of in the middle

3  region where I show that to -- where I show that there's a

4  region of constant radial distance where the dial gauge just

5  doesn't move.  But if you go outside of this span, then the

6  radial distance starts to change, and that's what I would

7  expect it to do.

8  Q.  So with respect to the Wake and the use of your dial gauge,

9  what conclusions were you able to make, if any, with respect to

10 areas of constant radial distance on the Wake rim?

11 A.  Well, this confirms that the Wake rim has a region of

12 constant radial distance.

13 Q.  And --

14        MR. WODARSKI:  If we could go to the next slide, 46.

15 BY MR. WODARSKI:

16 Q.  Did you perform the same dial gauge analysis with respect

17 to the Grit wheel?

18 A.  I did the same thing for the Grit wheel.

19 Q.  And if we look at slide 48, can you please tell us what

20 conclusions, if any, you were able to draw as to areas of

21 constant radial distance on the Grit wheel?

22 A.  Again, I came to the same conclusion, that I determined

23 there were clear regions of constant radial distance on the

24 Grit wheel.  And this, again, agreed with all my other

25 analysis, so -- so it seemed to -- it made sense.

HANSON – DIRECT/WODARSKI

1  Q.  And, again, just so we're clear, on slide 48, what was the

2  area of constant radial distance you were looking for in the

3  Grit wheel?

4  A.  From the CAD in the Grit wheel, this showed me that the

5  region of constant radial distance should be 6.36 millimeters.

6  Practically, because of the size of the dial gauge and the

7  location of the spokes, I couldn't actually scan it over that

8  entire region, so I just scanned it over as far as I could

9  until the dial gauge hit a spoke, effectively.

10  Q.  And looking at slide 49, were you able to perform your dial

11  gauge analysis on the accused PCW Peak wheel?

12  A.  Yes, I was.

13  Q.  And looking at slide 51, what conclusions, if any, were you

14  able to draw with respect to portions of constant radial

15  distance on the Peak wheel?

16  A.  Again, I came to the same conclusions, that my measurement

17  shows that there's regions of -- or I should say I measured

18  that there's a region of constant radial distance on the Peak

19  wheel.

20  Q.  And from the CAD drawings, what was the region of constant

21  radial distance?

22  A.  The CAD drawings show that the region of constant radial

23  distance was designed as 1.5 millimeters.

24  Q.  And, sir, the next thing you said in your process of

25  forming your opinion was to do a graphic image analysis, right?

236

HANSON – DIRECT/WODARSKI

1   A.  It was.

2   Q.  All right.  So let's go back to focusing on the Wake and

3   look -- the Wake wheel.

4           MR. WODARSKI:  And look at slide 53.

5           Well, actually, you can go back, Jim.  Yeah.

6   BY MR. WODARSKI:

7   Q.  Could you explain to us just first, what is a graphic image

8   analysis?

9   A.  Yeah.  I think, uhm, it's actually just something -- to me,

10  it's actually something fairly straightforward.  What I did was

11  I took images of the PCW wheels, I took them directly off their

12  website, and this was just a way for me to look at the shape of

13  the wheels using another method.

14          So at this point, I've already looked at the CAD, I

15  performed measurements on the surface, I'm confident of the --

16  I'm confident that there's regions of constant radial distance,

17  but I realize I have some other kind of tools at my disposal.

18  So I went through, and I looked at the images on the PCW

19  website, and I designed some little pieces of code so I could

20  go through and I could analyze some of the shapes.

21          MR. WODARSKI:  So could we look at slide 54,

22  Mr. Doyle?

23  BY MR. WODARSKI:

24  Q.  Is this slide related to your graphic image analysis?

25  A.  Yes, it is.

HANSON – DIRECT/WODARSKI

1   Q.  All right.  And can you show us -- walk us through what's

2   shown here and what the different colors mean?

3   A.  Yeah.

4         So on the figure on the left, inside that kind of

5   green square that says "Wake," the black portion represents the

6   rim.  The lines coming kind of, hum, not quite perpendicular

7   out of it, but these lines coming out of it all colored in

8   green, these represent the locations of the spokes.  The purple

9   circle, this defines the outer edge of the rim.

10        And then I've also included two different circles on

11  there.  The red circle that I've plotted on that image, the red

12  circle is centered at the wheel's center, and it passes through

13  the location of the valleys.  The blue circle again plotted at

14  the wheel's center, and the wheel center in the blue circle

15  passes through the location of the peaks.

16        Now, the -- basically, the green part that's added on

17  there, if you look really closely, those are actually a lot of

18  little plus symbols all placed really closely.  So then I

19  designed a script or a small piece of code that would go

20  through and automatically detect where the image was changing,

21  effectively, from black to white, so where the gradients of

22  change were.  And then I allowed the computer, effectively, to

23  calculate those positions and then plot that on here as well.

24  Q.  What's on the right side of the document?

25  A.  The figure on the right is just basically a zoom-in or a

HANSON - DIRECT/WODARSKI

1    closer up view to what was on the left, and it just shows that

2    there's regions where these -- effectively, these green plusses

3    are overlapping with the circles that I've drawn.

4    Q.  And from that, what were you able to determine with respect

5    to areas of constant radial distance?

6    A.  Yeah.  Well, kind of going -- well, I determined there's

7    regions of constant radial distance.  What supports this, I

8    guess, is that -- keeping in mind I'm drawing a circle, and a

9    circle has a constant radial distance.  So if the green plus

10   symbols are overlapping with the circle, this suggests constant

11   radial distance.

12   Q.  And can you just show us precisely where you're talking

13   about overlap that shows a constant radial distance?

14   A.  Yeah, you know, one area I've highlighted there on the

15   right where I've kind of put a little blue marker there.

16   Q.  And that's a shallower area of the peaks and valleys, a

17   valley?

18   A.  Yeah, this is in the valley.

19   Q.  And --

20        MR. WODARSKI:  Your Honor, may I ask Dr. Hanson to

21   come -- grab a microphone and come look at --

22        THE COURT:  Sure.  Just grab one of those microphones,

23   sir.

24        THE COURT REPORTER:  Just keep it close to you.

25        THE WITNESS:  Okay.  Yes?

HANSON – DIRECT/WODARSKI

1  BY MR. WODARSKI:

2  Q.  Okay.  Thank you, Dr. Hanson.

3       So, Dr. Hanson, while you're speaking up there, if we

4  could come to the wheel right here, which I believe is P9 for

5  the record?

6  A.  Yes.

7  Q.  On that Wake 6560 wheel, in reference to your slide 54,

8  could you tell us on the actual wheel where the red line

9  concentric circle would be on the -- red line concentric circle

10 would be?

11 A.  Yeah, the red line concentric circle intersects each one of

12 the valleys.  So it's a circle drawn with the center at the

13 center of the wheel, and the circle's intersecting each one of

14 the valleys here.

15 Q.  And the blue concentric circle line that you have on

16 slide 54, where would that be on the wheel?

17 A.  Exactly.  So the blue line has a center that's about the

18 center of the wheel.  And it's intersecting at each -- at

19 the -- basically it intersects at the radial inner edge

20 associated with where the peak is here (indicating), so going

21 along here (indicating).

22 Q.  And just to make sure we're all on the same page, before I

23 let you go sit back down, just explain for us what are

24 "concentric circles."  What does that mean?

25 A.  "Concentric circles" are just circles of different radius

HANSON – DIRECT/WODARSKI

1   but all plotted from the same center point.

2   Q.  Thank you.

3   A.  And, by the way, this was -- the purple line was the

4   outside (indicating).

5   Q.  So what conclusions were you able to draw from your graphic

6   image analysis as to portions of constant radial distance on

7   the Wake wheel?

8   A.  Well, this -- this confirmed my other measurements.

9   Q.  And confirmed what?

10  A.  Well, I would use this as supporting evidence that, again,

11  the Wake has regions of constant radial distance of

12  two millimeters, the Grit has constant radial distance of

13  6.36 millimeters, and as well the Peak has constant radial

14  distance of 1.5 millimeters at both -- at both the valleys and

15  the peaks.

16  Q.  All right.  Great.

17          MR. WODARSKI:  And let's just look quickly then at

18  slide 55.

19  BY MR. WODARSKI:

20  Q.  And so you said that you did the same analysis with the

21  Grit wheel as you just said?

22  A.  That's right.

23  Q.  And looking at slide 56, you did the same analysis with the

24  Peak wheel?

25  A.  That's right.

HANSON – DIRECT/WODARSKI

1    it in its present form.

2    Q.  But ultimately, at the end, after the additional analysis

3    you performed, do you think that Dr. Howle's laser light test

4    refutes or confirms your opinion that regions of constant

5    radial distance exist on the accused wheels?

6    A.  If you would use the laser light position to draw a

7    conclusion of the radial distance, then you would look at it

8    and say the radial distance is not changing over very specific

9    portions.  So it would confirm my analysis.

10   Q.  Did you do anything else to support your opinion that

11   there's no -- that the PCW wheels do not literally infringe any

12   of the claims of the asserted '800 patent?

13   A.  Yeah, on these four different, uhm... outside of the scope

14   of what I presented today?

15   Q.  I think you told us those were the four things, right?

16   A.  Yes.

17   Q.  And that's what supports your opinion?

18   A.  Yes.

19   Q.  So did you also consider as part of your review in this

20   case whether or not any of the PCW wheels infringe the asserted

21   claims of the '800 patent under what's known as a "doctrine of

22   equivalents" theory of infringement?

23   A.  I'm sorry, could you restate that?

24   Q.  Sure.

25         Do you have an opinion for us today as to whether or

HANSON – DIRECT/WODARSKI

1   not any of the PCW wheels, accused wheels, the Wake, the Peak,

2   and the Grit, whether any of those infringe the asserted claims

3   of the '800 patent under the doctrine of equivalents?

4   A.  I do.

5   Q.  What is that opinion?

6   A.  That they don't infringe.

7   Q.  And in coming to that opinion, did you try and figure out

8   what the range of -- something called the range of equivalents

9   is?

10  A.  I did.

11  Q.  All right.

12          MR. WODARSKI:  And so let's look at slide 63.

13  BY MR. WODARSKI:

14  Q.  Using slide 63, can you help explain to the jury what

15  analysis you did concerning a range of equivalents for the '800

16  patent?

17  A.  Yeah.  I'd first like to explain, though -- well, I haven't

18  been in this room really outside of the little moment early

19  last week -- the doctrine of equivalents is applied here

20  because it said to me that as -- well, Dr. Howle said that even

21  if the wheels don't literally infringe, they could still

22  infringe under this concept of doctrine of equivalents.  And

23  that's why I'm looking at it here.  But it's an important

24  concept.  And what I've set up here is a little bit of a

25  schematic, where I've put this dividing line on the page, and

251

HANSON – DIRECT/WODARSKI

1    on the left of the page, we have Mr. Katsanis' '800 patent.  On

2    the right, I'm noting here Mr. Mercat's 1999 patent.

3            And in my analysis, what I'm looking to do is

4    determine what is that dividing line.  So how do I determine

5    what it is?

6    Q.   And the dividing line is a dividing line between what?

7    A.   Effectively, Mr. Katsanis has patented a certain type of

8    undulating wheel that has a radial inner edge that must

9    continuously vary or continuously changes.  And Mr. Mercat has

10   another undulating wheel with constant radial distance.  So the

11   idea is –– under the doctrine of equivalents is, well, how much

12   constant radial distance would be insubstantial?  So is there

13   some bit of constant radial distance that would be

14   insubstantial that could be –– that Mr. Katsanis could have

15   that wouldn't claim what Mr. Mercat already owns?

16   Q.   And why do you draw the line at what Mr. Mercat already

17   owns?

18   A.   Well, because Mr. Mercat can't claim –– or Mr. Mercat's

19   patent –– or Dr. Howle can't use Mr. Mercat's *(sic)* patent in a

20   way to claim what Mr. Mercat already owns.

21   Q.   And I think you said Mercat twice.

22           MR. HICKEY:  Objection, Your Honor.  Could we have a

23   sidebar?

24           THE COURT:  Sure.

25           *(The following proceedings were had at sidebar out of*

HANSON – DIRECT/WODARSKI

1   the hearing of the jury)

2          MR. HICKEY:  He's getting into, you know, a legal

3   conclusion as to what --

4          THE COURT:  The only thing he said so far was that

5   Dr. Howle -- the last comment was, Dr. Howle cannot use

6   Mr. Katsanis' patent to claim something that Mr. Mercat already

7   owns.  That's a factual -- that's a true statement, right?

8          MR. HICKEY:  True.

9          THE COURT:  So what is the objection to that?  Not to

10  that, you're saying.  You're predicting something that's

11  coming.

12         MR. HICKEY:  Yes, exactly.

13         THE COURT:  Okay.  So what is it that --

14         MR. HICKEY:  I think he's going to be going over the

15  line in terms of saying what is the legal scope of the claim

16  compared to Mr. Mercat.

17         THE COURT:  Okay.

18         MR. WODARSKI:  I don't fully understand that, Your

19  Honor, but in this case, as in your orders -- we went over this

20  a little before -- you've expressly left it for the jury to

21  find what the range of equivalents is.  They have to be guided

22  in that determination that they have to make by one of ordinary

23  skill in the art.

24         THE COURT:  And he's just going to say that --

25         MR. WODARSKI:  What amount of constant radial distance

HANSON – DIRECT/WODARSKI

1  is permitted when you're still within something that is

2  Mr. Katsanis' claim --

3          THE COURT:  Versus Mr. Mercat's.

4          MR. WODARSKI:  And the reason why, as Dr. Howle

5  testified in this trial, Your Honor, you cannot draw the

6  doctrine of equivalents --

7          THE COURT:  Well, he didn't say -- there was a very

8  strange portion of what happened.

9          MR. WODARSKI:  No, no, I'm saying doctor.

10          THE COURT:  Okay.  Because he --

11          MR. WODARSKI:  It was strange.

12          THE COURT:  That was a very strange thing that just

13  happened.

14          MR. WODARSKI:  I think it was a little nervousness,

15  Your Honor.  I agree with that.  But I'm saying Dr. Howle this

16  week testified when I cross-examined him appropriately that the

17  DOE expands the literal scope of the claim, but you can never

18  expand it into what someone else has already invented.

19          THE COURT:  Well, that's -- everybody agrees with

20  that.

21          MR. WODARSKI:  And that's all he's saying, Your Honor,

22  that's --

23          THE COURT:  That's all he has said thus far.

24          MR. WODARSKI:  Yeah.

25          THE COURT:  So in terms of literal infringement, of

HANSON – DIRECT/WODARSKI

1    course that's true.  We're talking now on doctrine of

2    equivalents.

3              MR. WODARSKI:  Correct.

4              THE COURT:  And he's going to say that -- so far is

5    okay and no more.

6              MR. HICKEY:  And that's fine.  I just want to make

7    sure -- he's been going into a number of narrative answers.  I

8    don't know what he's going to say next, and I just want --

9              THE COURT:  All right.  Well, let's just keep it to

10   where we are now, and I don't take you to make any objection

11   yet, but we'll see how it goes.

12             MR. HICKEY:  Okay.

13             THE COURT:  But I think everything you've just said is

14   permissible.

15             MR. WODARSKI:  Thank you, Your Honor.

16             THE COURT:  All right.

17             *(The foregoing proceedings were had at sidebar out of*

18   *the hearing of the jury)*

19             THE COURT:  Actually, come back for a second.

20             Well, you know what, I'll just ask you.  How much

21   longer do you have?

22             MR. WODARSKI:  I probably have another 45 minutes,

23   Your Honor.

24             THE COURT:  All right.

25             Folks, how do you feel about going till six o'clock?

HANSON – DIRECT/WODARSKI

1    You want to take a break right now?

2                JUROR NO. 1:  *(Witness shaking head negatively)*

3                THE COURT:  I'm seeing a lot of ambivalence from these

4    jurors.  You want to go to six o'clock?  Anybody want to take a

5    break?

6                Okay.  Go ahead, sir.

7                MR. WODARSKI:  All right.  Thank you, Your Honor.

8    BY MR. WODARSKI:

9    Q.  So looking at slide 63, explain for the jury, what is the

10   range of equivalents that we're speaking about, and how does it

11   relate to your analysis for the doctrine of equivalents?

12   A.  What I'm trying to determine with respect to the range of

13   equivalents is, how far could we broaden out the scope of the

14   claim without -- how far we could broaden out the scope of the

15   claim without actually claiming the regions of constant radial

16   distance disclosed by Mercat as the example here.

17   Q.  And the range of equivalents that you found from your

18   review of the Mercat reference, how much constant radial

19   distance can be present in a wheel like the accused products

20   and still be equivalent to Mr. Katsanis' invention?

21   A.  Yeah, so this is something I determined in the analysis

22   that I do in the next slide.  Uhm, I guess I can explain where

23   I got to with that now, but I set the line at one millimeter.

24   Q.  Okay.  And so just to make sure the jury understands that,

25   you set the line at one millimeter, so anything less than

HANSON – DIRECT/WODARSKI

1  one millimeter of constant radial distance could be equivalent

2  to Mr. Katsanis' claimed patent?

3  A.  Yep, that's what I say.

4  Q.  And anything greater than one millimeter of constant radial

5  distance would be something not equivalent to Mr. Katsanis'

6  claimed '800 invention, right?

7  A.  That's correct.

8  Q.  And that's because that would be something Mr. Mercat

9  already invented and shared with the world?

10  A.  That's what I determined from analysis of Mercat.

11  Q.  Okay.  Thank you.

12       MR. WODARSKI:  Could we go to the next slide.

13  BY MR. WODARSKI:

14  Q.  And you said this is where you explain your analysis, but

15  first, did you have some understanding of how Dr. Howle went

16  about the range of equivalents analysis?

17  A.  Yes.

18  Q.  And could you explain, with the slide 64, what that

19  understanding is?

20  A.  Yeah.  So in slide 64, to the left figure here, what I'm

21  showing is one of the -- one of the versions of the wheel that

22  Mr. Mercat has explained in his patent.  In the figure on the

23  left, Mr. Mercat had disclosed -- had disclosed some dimensions

24  in his patent.  And Dr. Howle used those dimensions to tell us

25  that Mr. Mercat has disclosed regions of constant radial

HANSON - DIRECT/WODARSKI

1   distance of at least 32 millimeters.  So this was something

2   that -- that he provided as the lower range.

3        Now --

4   Q.  Let me just ask you a few things about that.

5        So you were talking about the -- what says the

6   20-spoke embodiment on the left side?

7   A.  That's right.

8   Q.  And so, just so we all orient in the same way, an

9   "embodiment" is what?

10  A.  An "embodiment" is just a version of the wheel.

11  Q.  A version of what wheel?

12  A.  A version of the wheel that he's claimed as his invention.

13  Q.  And that's Mr. Mercat?

14  A.  Yes, it is.

15  Q.  Okay.  So Dr. Howle's analysis addressed the 20-spoke

16  version of Mr. Mercat's claimed wheel, right?

17  A.  That's right.

18  Q.  Did Dr. Howle's analysis, to your understanding, address a

19  36-spoke embodiment or version of Mr. Mercat's wheel?

20  A.  No.

21  Q.  And if you do look at a wheel with 36 spokes instead of 20,

22  what impact does that have on the areas of constant radial

23  distance?

24  A.  Well, it makes them much smaller.

25  Q.  And so did you endeavor, as part of your analysis, to look

HANSON - DIRECT/WODARSKI

1   at Mr. Mercat's 36-spoke embodiment?

2   A.   Yes, this is a version of his wheel.  This is a version of

3   his wheel, yeah.

4   Q.   And were you able to determine in the 36-spoke embodiment

5   of what Mr. Mercat invented and shared with the world, what is

6   the smallest amount of constant radial distance that he

7   disclosed to the world?

8   A.   Yeah, I analyzed -- I analyzed what that dimension must be,

9   and I calculated it.

10  Q.   What was it?

11  A.   A determinative value of at least 0.46 millimeters.  It's

12  about half a millimeter.

13  Q.   So Mr. Mercat before Mr. Katsanis disclosed to the world

14  regions of constant radial distance of what you calculated to

15  be half a millimeter and greater, right?

16  A.   That's right.

17  Q.   But for the purposes of your DOE analysis, did you use that

18  half millimeter or something else?

19  A.   I used something a bit bigger.

20  Q.   Why?

21  A.   Because I don't really want to argue over fractions of a

22  millimeter.  Just to simplify everything here, I'm going to say

23  that I'm not going to argue over fractions of a millimeter.

24  And I'm going to say I'm going to choose a number slightly

25  larger, so that I'm a hundred percent confident with the

HANSON - DIRECT/WODARSKI

1  dimension.  So instead of arguing over was it 0.46, was it

2  0.47, or 0.52, we'll just round it up to the nearest whole

3  millimeter, which is exactly how Mr. Mercat spoke about the

4  span of his boring zones, as example.  He spoke about them to

5  the nearest whole millimeter.

6  Q.  And so with that understanding then, I just want to go back

7  to slide 66, but we've seen it before, but just to be clear and

8  orient ourselves, what were the portions -- the measurement for

9  the portions of constant radial distance you found in each of

10 the accused PCW wheels?

11 A.  Yeah.  The smallest portion was on the Peak of

12 1.5 millimeters.  And the largest portion was on the Grit of

13 6.36 millimeters.  And the Wake was in between at

14 two millimeters.

15 Q.  And, by the way, is the millimeter the standard unit of

16 measure for features that are -- appear on bicycle wheel

17 specifications?

18 A.  Yeah, often.  Often sometimes smaller.

19 Q.  And why are millimeter and smaller units of measure used to

20 measure features on a wheel?

21 A.  It's a typical expectation for the range of sizes that

22 would be important, say, perhaps down to .1 millimeter is what

23 I would see on other patent applications.

24 Q.  And so now that we have those measurements for regions of

25 constant radial distance from the wheels --

HANSON - DIRECT/WODARSKI

1            MR. WODARSKI:  Could we go to slide 67.

2    BY MR. WODARSKI:

3    Q.  -- and can you tell us how you actually came to your

4    doctrine of equivalents noninfringement opinion?

5    A.  Sure.

6            So to the left of the dividing line is Mr. Katsanis'

7    '800 patent.  Mr. Katsanis' '800 patent, you know, in the claim

8    language says he has regions of constant change in terms of the

9    radial distance.

10           However, perhaps a small or a sub -- insubstantial

11   size would be less than -- would be less than one millimeter,

12   because it wouldn't... it wouldn't broaden out so far as to

13   encompass what I've shown is the smallest size that Mr. Mercat

14   has shown in his embodiment or his versions of the wheel, which

15   was down to, say -- well, down to, say, perhaps

16   0.46 millimeters or rounded up to one millimeter as a whole

17   number.

18           Because Mr. Mercat has a patent, just like because

19   Mr. Katsanis has a patent, it's substantial.  So Mr. Mercat's

20   dimensions that Mr. Mercat has for these wheels are substantial

21   designs.  And, therefore, it can't be equivalent.  So it can't

22   be equivalent to expanding out the scope of the Katsanis patent

23   in the analysis.

24           So the dimensions that we're seeing here for

25   1.5 millimeters, two millimeters, and 6.36 millimeters, these

HANSON – DIRECT/WODARSKI

1  are firmly on the right-hand side of the line.  These

2  dimensions are things that Mr. Mercat has invented already.

3  And of interest as well is Mr. Mercat's invention was from

4  1999, and this is public knowledge, and this can be used in

5  other designs.

6  Q.  And it's public knowledge because Mr. Mercat's patent has

7  expired?

8  A.  That's right.

9  Q.  Okay.  And so this dividing line then is, if it's something

10  Mr. Mercat has invented, it cannot be insignificantly different

11  or equivalent to Mr. Katsanis' invention, right?

12  A.  That's right.

13  Q.  Okay.  And you found here that the actual areas of constant

14  radial distance in each of the three PCW wheels is something

15  that Mr. Mercat had already claimed and shared with the world,

16  right?

17  A.  That's right.

18  Q.  So it cannot be equivalent to Mr. Katsanis' claim, right?

19  A.  That's correct.

20  Q.  Thank you.

21          So if we look at slide 68 then, can you just summarize

22  your doctrine of equivalents opinion with respect to the '800

23  claims?

24  A.  Yeah, this gives my opinion here.  So the PCW wheels are

25  substantially different from the '800 claimed invention, uhm,

HANSON - DIRECT/WODARSKI

1   because they are what -- in terms of these radial distance --

2   are what Mercat has already claimed as prior art.

3           MR. WODARSKI:  Your Honor, if this would be a good

4   time to break, I would next transition to the '188 patent.

5           THE COURT:  I think we've got 17 minutes, so --

6           MR. WODARSKI:  Okay.

7           THE COURT:  -- you can probably do it.

8   BY MR. WODARSKI:

9   Q.  Dr. Hanson, it looks like we'll spend the last 15 minutes

10  going back into a prosecution history, so I beg everyone's

11  attention and patience.

12          So let's -- did you review the prosecution -- well,

13  first let me ask you -- we'll start there -- did you review the

14  prosecution history for the '188 patent?

15  A.  Yes, I did.

16  Q.  Okay.  And for what reason did you review the prosecution

17  history of the '800 patent *(sic)*?

18  A.  Sorry, for the --

19  Q.  Or the '188 patent.

20  A.  For the same reason as the '800 patent.  It helps me better

21  understand exactly what is the scope of what Mr. Katsanis has

22  claimed.

23  Q.  And your review of that was related to a noninfringement

24  opinion as to literal and doctrine of equivalents infringement

25  of the '188?