# EXHIBIT 7 to HICKEY DECLARATION

*UNITED STATES DISTRICT COURT*

*SOUTHERN DISTRICT OF FLORIDA*

*MIAMI DIVISION*

*CASE NO. 21-80581-CIV-RKA*

*SRAM, LLC,*                              . *Miami, Florida*
                                          . *February 22, 2023*
            *Plaintiff,*                  . *10:47 A.M.*
                                          .
              *v.*                        .
                                          .
*PRINCETON CARBON WORKS, INC.,*  .
                                          .
            *Defendant.*                  .
. . . . . . . . . . . . . . ..


– – – – –

*Transcript of Trial Proceedings had*

*before the Honorable Roy K. Altman,*

*United States District Judge, and a Jury.*

– – – – –

*DAY 7*

– – – – –

*Proceedings recorded by mechanical stenography, transcript produced by computer.*

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

HANSON – DIRECT/WODARSKI

1   Q.  And the concave profile, is that something that's practiced

2   by the prior art before Mr. Katsanis' invention?

3   A.  Exactly.  This is what's practiced by Mr. Mercat.

4   Q.  Okay.  And so what was the second --

5          MR. WODARSKI:  If we can go to the next slide,

6   Mr. Doyle.

7   BY MR. WODARSKI:

8   Q.  What was the next step in your analysis?

9   A.  Well, the next step in my analysis is, I also went back

10  through and I examined the drawings that we had previously

11  looked at together as well yesterday.

12  Q.  And what were you looking for in the drawings?

13  A.  Specifically, in the drawings, I was looking for regions of

14  constant radial distance at the peaks.

15  Q.  Did you find, again, constant radial distance regions in

16  the Wake?

17  A.  Yes, I did.

18  Q.  And did you do the same analysis --

19          MR. WODARSKI:  Go to slide 92.

20  BY MR. WODARSKI:

21  Q.  -- with respect to the Grit?

22  A.  Yes.

23  Q.  Did you find regions of constant radial distance in the

24  Grit?

25  A.  Yes, I did.

HANSON – DIRECT/WODARSKI

1   Q.  Did you do the same analysis with respect to the PCW Peak

2   wheel?

3   A.  Yes, I did.

4          MR. WODARSKI:  And if we look at slide 93.

5   BY MR. WODARSKI:

6   Q.  What did you find there?  Were there regions of constant

7   radial distance?

8   A.  Yeah, absolutely, yes.

9   Q.  And why was it important for you to look for areas of

10  constant radial distance in the accused wheels?

11  A.  Because areas of constant radial distance are concave.

12  Q.  So let's explore that a little.

13         MR. WODARSKI:  I'd like to bring up next slide 94.

14  BY MR. WODARSKI:

15  Q.  And this is a drawing I made that I shared with Dr. Howle

16  and now I'll share with you.  So I'm going to pose a

17  hypothetical off of this demonstrative.

18         Will you understand that the point in the middle is

19  the center of the wheel?

20  A.  Yes, I do.

21  Q.  Okay.  Like the hub on the accused wheels, right?

22  A.  Exactly.

23  Q.  Okay.  And then that gray line on the far outside, that's

24  the tire that you pump up with air.  Got it?

25  A.  Got it.

HANSON – DIRECT/WODARSKI

1   Q.  All right.  And that red line would be the innermost

2   diameter of the shallow portions of the rim, right?

3   A.  Yes.

4   Q.  Okay.  And then that blue circle, concentric circle would

5   be where the peaks or the tallest parts would be, correct?

6   A.  Yep, that makes sense, yeah.

7   Q.  Okay.  So you understand me so far?

8   A.  Absolutely.

9   Q.  All right.  So what I've drawn in black here is basically a

10  region that bulges towards the center of the rim.  Do you see

11  that?

12  A.  Yes.

13  Q.  Okay.  And at some point, the peak or the top of that thing

14  bulging to the center of the rim hits that blue concentric

15  circle.  Do you see that?

16  A.  Yes.

17  Q.  Okay.  Where that peak of that protrusion hits the blue

18  line, are you able to tell me what the profile of that peak is?

19  A.  Yeah, it follows the circle.

20  Q.  And so if it follows the circle, what kind of a peak is it?

21  A.  It's absolutely concave.

22  Q.  And can you tell us why you're confident in that?

23  A.  Because this is just a basic geometric rule.

24  Q.  All right.

25          MR. WODARSKI:  And if we can go to the next slide,

HANSON — DIRECT/WODARSKI

1   please.

2   BY MR. WODARSKI:

3   Q.   Have you seen this demonstrative before?

4   A.   Yeah, this is what I made.

5   Q.   Okay.  And with the demonstrative you made, can you just

6   tell us what you mean by a simple geometric rule?

7   A.   Well, in this one that I've made here, it's -- what I'm

8   showing is, again, these concentric circles.  The -- it looks

9   like a dark green line, but I'm defining these areas that bulge

10  towards the wheel center.  And these areas have peaks, and the

11  peaks follow the blue circle, and the blue circle is a concave

12  profile.  So the peaks are concave.

13  Q.   And looking at slide 96, how does the drawing you just made

14  compare to your review of the actual PCW wheels?

15  A.   Well, I made this drawing so that you could kind of

16  understand a little bit more about that previous graphical

17  image analysis that I've done.  And the blue line in my drawing

18  on the left, that's the same as the blue line that I put on my

19  graphical image analysis that passes through the peaks.  The

20  red line that you see from my graphical image analysis is the

21  same one that passes through the valleys.

22       Uhm, effectively, those sort of green plots or green

23  symbols that I plotted in my graphical image analysis, you can

24  see those as well that I've drawn in that little demonstrative

25  figure to the left.

HANSON – DIRECT/WODARSKI

1          So this aligns with my understanding of the Princeton

2    CarbonWorks wheels' geometry.

3    Q.  And so from that analysis you just described --

4          MR. WODARSKI:  Mr. Doyle, if he could go back to

5    slide 86, just briefly.

6    BY MR. WODARSKI:

7    Q.  Can you just refresh the jury, what is your opinion as to

8    literal infringement of the '188 patent?

9    A.  My opinion is that none of the accused wheels are --

10   infringe.

11         MR. WODARSKI:  And if we could go back to slide 97?

12   BY MR. WODARSKI:

13   Q.  Dr. Hanson, did you also, with respect to the '188 patent,

14   come to an opinion as to whether or not the PCW wheels infringe

15   under a doctrine of equivalents?

16   A.  Yes.

17         MR. WODARSKI:  And going to the next slide.

18   BY MR. WODARSKI:

19   Q.  Can you first tell us what that opinion is?

20   A.  Well, my opinion is that they don't infringe.  Uhm, Mercat,

21   we know, has concave profiles, is what Mercat defined.  I

22   understand that the peaks associated with the Princeton

23   CarbonWorks wheels are concave.  And that this is substantially

24   different than what is claimed by Mr. Katsanis' patent.

25   Q.  And what is the opposite of concave?

HANSON – DIRECT/WODARSKI

1  A.  It's convex.

2  Q.  And looking here in this demonstrative you've created,

3  there's some red arrows and some text that says "not convex."

4  What is the figure we're looking at right here?

5  A.  Yeah, this is just Figure 4 from Mercat.  It shows one of

6  the versions of his wheels.

7         Uhm, the arrows are pointing to the location of the

8  peaks.  And the peaks are not convex, because they are concave.

9  Q.  And why are Mr. Mercat's peaks in this drawing concave?

10  A.  Because they follow the path defined by a circle.  Again,

11  the same geometric rule I explained before.

12  Q.  And those arrows point to areas of constant radial

13  distance?

14  A.  Yes, they do.

15         MR. WODARSKI:  All right.  Could we go to the next

16  slide.

17  BY MR. WODARSKI:

18  Q.  So please describe for the jury, then, what analysis you

19  did to figure out the range of equivalents with respect to

20  Mr. Katsanis' claimed invention and what earlier inventors had

21  shared with the world.

22  A.  Yeah.  So, again, I've kind of made a schematic here where

23  I've set up a dividing line.  And you'll notice on the bottom,

24  what I've said is what someone else has invented is a

25  substantial difference, and, therefore, it can't be equivalent.

HANSON – DIRECT/WODARSKI

1          Mr. Mercat invented wheels that are -- have concave

2    profiles at the peak.  So in their concave regions, they have

3    peaks, and these peaks have -- have -- are concave.

4          Mr. Herting also built -- or designed wheels of peaks,

5    and Mr. Herting's peaks look pointy.

6          Princeton CarbonWorks wheels look just like

7    Mr. Mercat's wheels in that sense, or their rim, with the peaks

8    that are still, again, concave.  On the other hand,

9    Mr. Katsanis' peaks are effectively opposite than concave

10   because they're convex, and they're a curved profile as well.

11   And we know that from the claim 1, that they're curved and they

12   can't be pointy.

13         So this is -- my basic understanding is that the peaks

14   of the Princeton CarbonWorks' wheels are just not equivalent to

15   the peaks of the '188 -- defined in the '188 patent.

16   Q.  Great.

17         MR. WODARSKI:  And so if we could go to slide 100?

18   BY MR. WODARSKI:

19   Q.  Would you just summarize your doctrine of equivalents

20   argument for the record, Dr. Hanson?

21   A.  Yeah, just to summarize, the Princeton CarbonWorks wheels

22   are substantially different from the '188 claimed invention,

23   because they're effectively Mr. Mercat's prior art.

24   Q.  And as part of your work in this case, did you also analyze

25   the validity of any claims related to this case?

HANSON – CROSS/HICKEY

1    procedure back and forth, that we talked back and forth about

2    this in arriving at my final report.

3    Q.  Okay.  And in your validity -- in your report on patent

4    invalidity, it stated that the asserted patents were the '594

5    and '881 patents, correct?

6    A.  We're talking about the '188 patent and the '800 patent.

7    Q.  That wasn't my question.  I said, in your report on

8    invalidity, it said that the asserted patents were the '594 and

9    the'881 patents, correct?

10   A.  Yeah, perhaps it was a typo on that, sure.

11        MR. HICKEY:  Okay.  Let's pull up the appendix page, I

12   believe it's page number 4, of Dr. Hanson's report on

13   invalidity.

14        THE COURT:  Is this document in evidence?

15        MR. HICKEY:  It is not.  So just show -- only show it

16   to the witness.

17        THE COURT:  Do not show it to the jurors yet.

18        MR. HICKEY:  Yeah.

19        THE COURT:  Let's show it to defense counsel.  And if

20   you want to....

21        (Discussion had off the record between counsel)

22   BY MR. HICKEY:

23   Q.  We can come back to that one, Dr. Hanson.

24        Let's talk about what you did not do for your reports.

25        You didn't talk to anyone at Princeton to form the

HANSON – CROSS/HICKEY

1   bases of your opinions, is that right?

2   A.  That's correct.

3   Q.  Okay.  You didn't talk to Princeton's prior manufacturer in

4   Taiwan Carbotec, correct?

5   A.  I didn't speak to them.

6   Q.  You didn't talk to Princeton's manufacturers in the

7   People's Republic of China, is that right?

8   A.  That's right.

9   Q.  Okay.  And that would include the company Apex?  You didn't

10   talk to anyone at Apex?

11   A.  Not to -- not to any (sic) best of my knowledge, no.

12   Q.  Okay.  You didn't talk to anyone at a company called XYZ in

13   Mainland China, did you?

14   A.  As I sit here today, I have no recollection of that.

15   Q.  Okay.  Did you talk to anyone at a company called Stren in

16   Mainland China?

17   A.  Not that I know of, unless I've randomly spoken to someone

18   who happens to work there (laughing), is the only caveat.

19   Q.  Okay.  But specific to the manufacturing of Princeton

20   wheels, you didn't talk to anybody at any of those companies,

21   including Princeton itself, about how Princeton wheels are

22   manufactured, is that right?

23   A.  I didn't speak to anyone at Princeton CarbonWorks about how

24   they manufacture.  Yeah, that's correct.  Yeah, that's correct.

25   Q.  I'm sorry, I couldn't hear that.

HANSON – CROSS/HICKEY

```
 1              THE COURT:  I couldn't hear you either, sir.
 2              THE WITNESS:  Sorry.
 3   A.  That's right.
 4   Q.  Okay.  You didn't speak to anyone at Princeton or any of
 5   Princeton's manufacturers about the manufacture of these
 6   accused products, correct?
 7   A.  I had spoken to Harrison on a Zoom call concerning the
 8   drawings, like the actual drawing files.
 9   Q.  But you didn't talk to anyone at Princeton to form the
10   bases of your opinions, is that right?
11   A.  That's correct.
12   Q.  Okay.  You didn't review Princeton's patent applications
13   for its bicycle wheels, did you?
14   A.  That's correct.
15   Q.  Okay.  You didn't ask to see Princeton's applications --
16   patent applications for its bicycle wheels, did you?
17   A.  That's correct.
18   Q.  Okay.  You weren't aware that Princeton's patent
19   applications that describe the Wake 6560 call its wheels as
20   having an undulating shape, correct?
21   A.  That's correct.
22   Q.  Okay.  You weren't aware that Princeton's patent
23   applications describe its wheels as having sinusoidal
24   undulations, correct?
25   A.  That's correct.
```

HANSON – CROSS/HICKEY

1  Q.  And that was the radial distance that was constant across

2  those three points for the CAD drawing for the Wake 6560, is

3  that right?

4  A.  That's correct.

5  Q.  And the 2 that is designated above that, that's the

6  two-millimeter constant radial distance that you said is shown

7  in the CAD drawing for the Wake 6560, correct?

8  A.  That's right.  That's correct.

9  Q.  Okay.  And so if we pull out of this and go to the feature

10  properties on this, this says it was created May 9, 2014, and

11  it was last modified November 24th, 2021, at 11:07:21 a.m.  Do

12  you see that?

13  A.  I see that.

14  Q.  Okay.

15       MR. HICKEY:  I'd like to pull up Plaintiff's

16  Exhibit P667, which has been admitted into evidence.

17  BY MR. HICKEY:

18  Q.  And can you see that this is an email that was sent to

19  myself, Mr. Walsh, from the Mintz law firm, and it indicates:

20  "Dear Counsel, Princeton CarbonWorks' document production

21  bearing Bates Numbers PCW_0006309 through PCW_0006311 has been

22  posted to Mintz' secured FTP site in a file titled

23  'PCW_006.zip.'"  Do you see that?

24  A.  I do.

25  Q.  Okay.  And the time that that was sent was Wednesday,

HANSON – CROSS/HICKEY

1   November 24th, 2021, at 3:02 p.m.  Do you see that?

2   A.  I see that.

3   Q.  Okay.  So this file was sent to our law firm at 3:02 on

4   November 24th, 2021.

5        MR. HICKEY:  And if we can go back to 662.

6   BY MR. HICKEY:

7   Q.  It indicates that it was last modified that same day at

8   11 o'clock in the morning.  Do you see that?

9   A.  Oh, I see that, yes.

10  Q.  Okay.

11  A.  And just to be clear, that could just mean that someone

12  added in the little line that shows you the actual dimension,

13  that would indicate a modification, which is a very simple

14  thing.

15  Q.  Okay.  Did you make that modification, Dr. Hanson?

16  A.  I didn't -- I don't --

17  Q.  Did you modify this file?

18  A.  I don't believe I modified this file, no.

19  Q.  You didn't.  Okay.

20       And you don't know who modified the file, do you?

21  A.  Presumably, it could be done by adding a dimension on to

22  show it for this.

23  Q.  I'm asking you, Dr. Hanson, do you know who modified the

24  file?

25  A.  I don't know.

HANSON – CROSS/HICKEY

1    Q.  You don't know what modifications were made or what the

2    file looked like before it was modified, do you?

3    A.  I can only comment on --

4    Q.  I'm not asking --

5    A.  -- the opinions that I've expressed from what I've looked

6    at in the files that I've examined.

7    Q.  Okay.  I'm not asking for your comment.  I'm asking for

8    your answer.

9    A.  Okay.

10   Q.  Do you know what modifications were made to this file at

11   11:07 a.m. before they were sent to us four hours later?  Do

12   you know what those modifications were?

13   A.  I don't.  And it's irrelevant to my opinions.

14   Q.  Excuse me?

15   A.  I said I do not, and it's irrelevant to my opinion.

16   Q.  It's irrelevant to your opinion that there were

17   modifications made to the file four hours before it was sent to

18   us, and you don't know what those modifications are.  That's

19   irrelevant to your position -- your opinions, correct?

20   A.  Only -- I've only looked at a file that showed me what

21   Princeton CarbonWorks sent to me, and I went and checked the

22   dimensions on it.

23          THE COURT:  I couldn't hear you.  Say that again.

24          THE WITNESS:  Sorry.

25   A.  I only looked at the file that was sent to me, and from

HANSON – CROSS/HICKEY

1    that file, I made measurements of distances on.  And that was

2    it.

3    Q.  Okay.  And so you don't know what the file looked like

4    before these modifications, correct?

5    A.  I guess, yes, I guess.

6    Q.  Okay.  And you weren't told what modifications were made to

7    the file just before it was produced, correct?

8    A.  I don't know that there are any relevant modifications

9    made.

10   Q.  There -- it -- the file was modified, you admit that,

11   Dr. Hanson.

12   A.  *(No response)*

13   Q.  It says "last modified November 24th, 2021, at 11:07 a.m.,"

14   correct?

15   A.  Yes, it absolutely says that, yes.

16   Q.  Okay.  So there was a modification to the file.  You don't

17   know what modification was made or who made it, correct?

18   A.  That's correct.

19   Q.  Okay.  Would it surprise you, Dr. Hanson, that the relevant

20   sketch feature in the SOLIDWORKS file and the CAD drawing for

21   the Grit 4540 was also modified on November 24th, 2021, just

22   before it was produced to us?

23   A.  Again, it could just be adding the dimension on to show it.

24   So I'm not surprised, I guess.

25   Q.  You're not surprised.

HANSON – CROSS/HICKEY

1   A.  I mean --

2   Q.  You don't think that's a surprising modification.  And you

3   don't know what the modification is, right?

4   A.  No, I don't know what it is.

5   Q.  Okay.  Well, why don't we take a look at Plaintiff's

6   Exhibit P666.

7           Do you recognize this as the SOLIDWORKS file

8   PCW_0006311.SLDRP -- SLDPRT?

9   A.  Yes.

10  Q.  Okay.  And do you recognize that as being the file that you

11  reviewed with respect to the Grit 4540?

12  A.  I believe so.

13  Q.  Okay.

14          MR. HICKEY:  And if we can turn to the next page.

15  BY MR. HICKEY:

16  Q.  And it's similar as what we looked at for the Wake 6560.

17  There's a view, and then on the side, there are different

18  features that are listed, including different planes.

19          MR. HICKEY:  So why don't we turn to the next page.

20  BY MR. HICKEY:

21  Q.  So we see this is for sketch2.  Okay?  That was modified on

22  7-6-2018.

23          MR. HICKEY:  Let's go to the next one.

24  BY MR. HICKEY:

25  Q.  Sketch3, modified on the same date, correct?

HANSON – CROSS/HICKEY

1   A.  Correct.

2   Q.  Plane1, modified on the same date, correct?

3   A.  Correct.

4   Q.  Okay.

5        MR. HICKEY:  Why don't we go down to -- keep going,

6   keep going to -- let's go down to sketch6.

7   BY MR. HICKEY:

8   Q.  Okay.  Sketch6, we're going to go into this.  This says it

9   was modified November 24th, 2021, at 11:11:14 a.m.  Do you see

10  that?

11  A.  I see that.

12  Q.  Okay.

13        MR. HICKEY:  Let pull up Plaintiff's Exhibit 663 that

14  was admitted into evidence.

15  BY MR. HICKEY:

16  Q.  Do you recognize this as the CAD file that you reviewed for

17  the Grit 4540?

18  A.  Yes.

19  Q.  Okay.  And that shows a radius of 276.50.  You previously

20  said those were millimeters, correct?

21  A.  Yes.

22  Q.  And then there's a designation of 3.18.  Do you see that?

23  A.  I do.

24  Q.  And that's for half of the side, so that the total constant

25  radial distance that is shown in this CAD drawing is

HANSON – CROSS/HICKEY

1   6.36 millimeters, correct?

2   A.  That's right.

3   Q.  Okay.  And if we go over to the feature properties for

4   sketch6, this was -- this says that it was last modified

5   November 24th, 2021, at 11:11:00 a.m.  Do you see that?

6   A.  I do.

7   Q.  And just to remind you, Plaintiff 667, the time that that

8   file was sent to us, 63111, was November 24th at 3:02 p.m.

9   on -- in the year 2021.  Do you see that?

10  A.  I do.

11  Q.  Okay.  And you don't know what modifications were made to

12  this sketch for the Grit 4540, do you?

13  A.  No.  And it could have been as simple as adding a

14  dimension.

15  Q.  Yep, but you don't know what those modifications are,

16  correct?

17  A.  That's correct.

18  Q.  You don't know who made those modifications, correct?

19  A.  That's correct.

20  Q.  You didn't make those modifications, did you?

21  A.  I don't believe so.

22  Q.  Okay.

23          MR. HICKEY:  Let's turn to Plaintiff's

24  Demonstrative 661.

25          Sorry.  Let's actually turn to the demonstrative --

HOWLE – DIRECT/HICKEY

1  doesn't mean he's telling the truth.  You're to determine his

2  credibility just like you do for any other witness.  Okay?

3         Please proceed, sir.

4         MR. HICKEY:  Thank you, Your Honor.

5         And if we can pull up the demonstrative for Dr. Howle

6  with respect to validity.  This is Plaintiff's Exhibit P660.

7  It's not being admitted into evidence.

8         THE COURT:  So then give us a second, please.

9         Fran, we got to just do it for the witness only.

10        Is there no objection to showing it to the jury at

11  this time?

12        MR. HICKEY:  We were just going to show it as a

13  demonstrative.

14        THE COURT:  I'm just asking –– oh, Mr. DeVoogd.

15        MR. DE VOOGD:  No, Mr. Hickey shared this with us

16  already.  As long as it's for demonstrative purposes only, we

17  have no objection.

18        THE COURT:  Okay.  Go ahead and show it to the jury,

19  Fran.

20        Can you all see that?  All right.

21  BY MR. HICKEY:

22  Q.  Okay.  So if we move to the validity of the '800 patent,

23  what are your opinions with respect to whether or not the

24  Mercat reference invalidates any of the claims –– asserted

25  claims of the '800 patent?

HOWLE - DIRECT/HICKEY

1  A.  Well, at a very high level, my opinion is that the Katsanis

2  patents, '800 in this case, do not read onto the Mercat

3  invention.  So it does not invalidate the Mercat patent.

4  Q.  Okay.  And here is a chart.  How would you describe this

5  chart, Dr. Howle?

6  A.  This combines some of the similar claim element types from

7  the patents and tries to group them together to streamline

8  things a bit.  And in this first line, we have the two

9  independent claims, 1 and 17 of the '800 patent, and most of

10  the lines below that deal with the dependent claims that depend

11  from one of those independent claims.

12  Q.  And so with respect to the features of the radially inner

13  edge having an undulating configuration and a radial distance

14  that continuously varies between adjacent peaks and troughs --

15  sorry, I went too fast.

16        With respect to the features in the independent claims

17  of the '800 patent, claims 1 and 17, and specifically the

18  feature that the radially inner edge has an undulating

19  configuration and a radial distance that continuously varies

20  between adjacent peaks and troughs, what is your view about

21  whether those patent features are found in Mercat?

22  A.  Those are not found in Mercat.

23  Q.  And why is that?

24  A.  Uhm, you can see there that they don't have this undulating

25  configuration or this radial distance that continuously varies.

HOWLE – DIRECT/HICKEY

1              Mercat itself is directed to a lightweight bicycle

2    wheel.  And it has regions where there are spoke attachments,

3    those are the thicker regions, and then boring zone regions

4    where they remove material through a standard subtractive

5    manufacturing process to achieve the lightweight goal of this

6    invention.

7    Q.  And the Mercat reference was considered during the

8    prosecution of the '800 patent, is that correct?

9    A.  Yes, sir, it was.

10   Q.  And did the '800 patent claims issue over the Mercat

11   reference?

12   A.  Yes, it did.

13   Q.  Okay.  And moving to the next feature, that each peak has a

14   convex exterior profile in the plane of the wheel found in

15   claim 1, what's your opinion with respect to whether the Mercat

16   reference discloses that feature?

17   A.  My opinion is that that feature is not present on the

18   Mercat reference.

19   Q.  And why is that?

20   A.  You can see in the spoke attachment regions, these are

21   constant radius, so they do not have a convex exterior profile

22   in the plane of the wheel.

23   Q.  And with respect to the features that are found in

24   claims 2, 3, or 6, that the radially inner edge is continually

25   undulating or has undulations along the full extent of the

HOWLE - DIRECT/HICKEY

1    wheel, what is your opinion with respect to the Mercat

2    reference in those features?

3    A.  Those features are also missing from the Mercat reference.

4    Q.  Okay.  With respect to the feature that the radially inner

5    edge has a series of alternating concave and convex regions

6    immediately adjacent to each other in dependent claim 4, what

7    is your opinion with respect to the Mercat reference?

8    A.  That element is also missing from Mercat.

9    Q.  With respect to the feature found in claims -- dependent

10   claims 5 and 16, that the radially inner edge is rounded or

11   defined by rounded inner portions of the side surfaces, what is

12   your opinion with respect to the Mercat reference?

13   A.  That feature is also missing from Mercat.

14   Q.  Okay.  And what about with respect to the feature of -- the

15   dependent claim feature in 9 and 22 of 24 pairs of peaks and

16   troughs?

17   A.  Well, this dependent claim first has to get past the claim

18   from which it depends.  So nine depends upon 1, 17 -- I'm

19   sorry -- 22 depends from 17, so we haven't even been able to

20   reach there, because those are not found on the Mercat

21   reference.  So the 24 pairs of peaks and troughs, likewise, are

22   not found on this Mercat reference.

23   Q.  Okay.  And do you understand that Dr. Hanson created a

24   figure showing a depiction where Mercat, I believe, had 36

25   spokes?  Do you recall that?

HOWLE – DIRECT/HICKEY

1    A.   Yes, sir, I remember seeing that.

2    Q.   What is your opinion about that figure created by

3    Dr. Hanson and whether or not Mercat -- well, just what is your

4    opinion about that figure created by Dr. Hanson?

5    A.   That particular figure freezes the spoke attachment

6    regions, and it tries to get -- actually depart from the main

7    purpose of the Mercat reference.  The Mercat is specifically

8    purposed to provide a lightweight wheel, so they remove

9    material.  So in my opinion, a reasonable person of skill would

10   understand that you want to shorten up the transition regions

11   between the boring zones and the spoke attachment regions so

12   that you would have this expansive region of constant radius

13   and what Mercat calls the boring zone regions.

14         So I don't think that figure accurately predicts or

15   represents what a person of skill would interpret this claim

16   to -- to impart -- or to practice.

17   Q.   And with respect to the feature requirement in claims 12

18   and 19 that the rim is made of a composite material, what is

19   your opinion with respect to the Mercat reference?

20   A.   Well, the Mercat reference teaches that their rim is made

21   from aluminum, so there's no mention of composite material, so

22   that's not present.

23   Q.   And when you mentioned before about taking away material

24   from the aluminum rim of Mercat, what's the purpose of removing

25   that material?

HOWLE – DIRECT/HICKEY

1   A.   Uhm, you want to leave the material where the spokes are

2   because the stress is there, and they might tear loose from the

3   rim.  But that extra material is not needed in between the

4   spoke attachment.  So it's removed to minimize the weight of

5   the rim.

6   Q.   And in a 36-spoke model would that change the tensions that

7   are associated with the rim?

8   A.   It would actually reduce the tensions, because you're

9   spreading the load out over more spokes, so --

10  Q.   And -- go ahead.

11  A.   So you could actually reduce the thickness of the spoke

12  attachments, or you can actually double them up, you don't have

13  to place them at uniform increments around the circumference.

14  Q.   And so your conclusion with respect to Mercat is that it

15  does not disclose this feature of the rim being made of a

16  composite material, is that correct?

17  A.   That's correct, yes, sir.

18  Q.   With respect to the feature in dependent claims 14, 15, and

19  21, and independent claim 17, what is your opinion with respect

20  to Mercat and the exterior cross-sectional profile having a

21  radius of at least five or ten millimeters?

22  A.   That feature is missing from Mercat.

23  Q.   And why is that?

24  A.   Uhm, the inner surface there in the boring zones is almost

25  flat.

HOWLE - DIRECT/HICKEY

1   Q.   Okay.  And with respect to the radial height between the

2   peaks and troughs being at least five millimeters in dependent

3   claim 18, what is your opinion with respect to the Mercat

4   reference?

5   A.   Likewise, with the similar one, that's -- well, I'm

6   sorry -- this one is also missing from the Mercat reference.

7   Q.   Okay.  So overall, your opinion with respect to the

8   validity of the asserted patent claims of the '800 patent in

9   view of Mercat, what is that, Dr. Howle?

10  A.   My view is that the '800 patent is valid over Mercat.

11  Q.   Okay.  And if we move to the validity of the '188 patent,

12  here we see the '188 -- we see another chart, and could you

13  explain this chart, Dr. Howle?

14  A.   Yes, sir.

15       So this chart deals with the '188 patent rather than

16  the '800 patent, and this '188 patent only has a single

17  independent claim.  So that first line covers the independent

18  claim, and all of the ones below depend from that independent

19  claim.

20  Q.   And if we look at the '188 patent features for claim 1, it

21  recites that the radially inner edge has an undulating curve

22  configuration as well as convex profiles and convex regions,

23  which convex regions include the peaks.  Do you see that,

24  Dr. Howle?

25  A.   Yes, sir, I do.

HOWLE – DIRECT/HICKEY

1   Q.  And what is your opinion with respect to those features

2   compared to the Mercat reference?

3   A.  My opinion is that those are missing from the Mercat

4   reference.

5   Q.  Okay.  And with respect to the features, the requirements

6   of claims 2 and 3, that the rim is continually undulating, or

7   that the peaks and troughs of the undulating curve

8   configuration are at regular intervals, what is your opinion

9   with respect to those features compared to the Mercat

10  reference?

11  A.  My opinion is that those features are not present in the

12  Mercat reference.

13  Q.  Okay.  And to be clear, the Mercat reference, that was also

14  considered by the United States Patent Office during the

15  prosecution of the '188 patent?

16  A.  Yes, during this patent also, yes, sir.

17  Q.  And what was the conclusion of the Patent Office with

18  respect to the '188 patent and Mercat?

19  A.  It is valid over Mercat, so it was issued, the patent was

20  issued.

21  Q.  Okay.  If we look at the next feature, that the rim has

22  alternating concave and convex regions immediately adjacent to

23  each other, I think you mentioned that before -- this is for

24  dependent claim 4 of the '188 patent -- what is your opinion

25  with respect to whether that feature is found in Mercat?

HOWLE – DIRECT/HICKEY

1   A.   That feature is not found in Mercat.

2   Q.   Okay.  Then, if we look at features that are found in 5,

3   6 -- dependent claims 5, 6, and 13 of the '188 patent, namely

4   that the peaks do not have an angular apex, or that the convex

5   regions do not have a constant radial distance, or that the

6   peaks of the undulating configuration are of the same size and

7   shape, what is your opinion with respect to the Mercat

8   reference in those features?

9   A.   My opinion is that those features are not present in the

10  Mercat preference.

11  Q.   Okay.  With respect to the -- I think we hit this before --

12  claim 7, dependent claim 7, the exterior cross-sectional

13  profile has a radius of at least five millimeters, what is your

14  opinion with respect to whether the Mercat reference discloses

15  that feature?

16  A.   That feature is missing from Mercat.

17  Q.   I think we hit this before with respect to the '800 patent

18  as well, that the radial height between the peaks and troughs

19  is at least five millimeters.  That's found in dependent

20  claim 8.  What is your opinion with respect to the Mercat

21  reference in this feature?

22  A.   That feature is also missing from the Mercat reference.

23  Q.   If we look to dependent claims 10 and 11, those

24  alternatively require that the peaks are points of minimum

25  radius and the troughs are points of maximum radius, how does

HOWLE – DIRECT/HICKEY

1    that compare to Mercat in view of independent claim 1 and

2    dependent claims 10 and 11?

3    A.   That feature is missing from the Mercat reference.

4    Q.   Okay.  And finally, with respect to dependent claim 12, it

5    requires a bicycle with the wheel of claim 1.  What is your

6    opinion with respect to Mercat and that claim?

7    A.   Well, since 12 depends upon 1, and 1 is not practiced, my

8    opinion is that that feature is missing from Mercat.

9    Q.   And you previously talked about the '800 and '188 patents

10   and talked about kind of from a general standpoint why you

11   thought that the invention disclosed and claimed in the '800

12   and '188 patents were distinct from the prior art.  Could you

13   explain to the jury again what your opinions are in that

14   regard?

15   A.   Yes, sir, be happy to.

16         So as I previously explained, uhm, this is the first

17   time where I've ever seen this type of aerodynamic feature,

18   namely a tubercle, used in a way that it both operates in

19   trailing edge flow and leading edge flow and then transitions

20   between the two.  So we have one set of this feature that does

21   all of those things at alternate points in the rotation.  So it

22   operates in cross-flow when it transitions.

23         And the result of this is an aerodynamic improvement

24   that reduces the drag of the wheel, but it also moves the

25   center of pressure closer to the hub, and in doing so, it makes

HOWLE – DIRECT/HICKEY

1    the bike less I guess susceptible to crosswinds.

2    Q.  And you had also kind of described that in a figure that

3    you had annotated.  You had used Figure 1, and then you had

4    some depictions.  Could you explain that again for the jury?

5    A.  Certainly.

6          So if we start over on the right there where I show

7    the relative airflow, now let's suppose this bike rider is

8    riding from left to right, so the wind that that rider sees

9    would be as shown in the arrow.

10         So the peaks and troughs at the trailing edge, or

11   what's depicted over on the left side, so there it's operating

12   in trailing edge flow.  Then as it rotates, if you go over to

13   the left side, then you'll see where it operates in leading

14   edge flow.  And then up at the top, you'll see where it

15   transitions between the leading edge flow on the back to the

16   trailing edge flow on the front.  And this is the first time

17   that I've ever seen a device use tubercules in this manner.

18   Q.  And it was so different that you actually reached out to us

19   to participate in this case, isn't that right?

20   A.  Yes, sir.  I first found the patents and was fascinated,

21   and then I reached out to Lewis Rice.

22         MR. HICKEY:  And if we can go to the last slide.

23   BY MR. HICKEY:

24   Q.  What does this depict, Dr. Howle?

25   A.  So my understanding is that this is some of Princeton's

HOWLE - CROSS/WODARSKI

1  varying element is part of a limitation in the independent

2  claims, right?

3  A.  Yes, sir, that's correct.

4  Q.  So any claim that depends off of them also requires the

5  continuously varying element, right?

6  A.  That's my understanding of how patent law works, yes, sir.

7  Q.  Thank you.  I appreciate that.

8          Now if we could just go... all right.  So this is the

9  Mercat patent that you reviewed and we've been talking about?

10  A.  Yes, sir.

11  Q.  Okay.  And you reviewed that figure on the front, right?

12  A.  Yes, sir, I did.

13  Q.  Right.

14          And do you recall that that was a 20 -- this figure is

15  taught in the specification as the 20-spoke version or

16  embodiment?

17  A.  Yes, sir.

18  Q.  And you did some calculations from that 20-spoke version

19  where Section 29A here could be a portion of constant radial

20  distance of between 16 and 32 millimeters, correct?

21  A.  You're saying that I did that calculation?

22  Q.  A calculation is possible from it.

23  A.  A calculation is possible from that.

24  Q.  And from -- in your report, you told us that it could be

25  from 16 to 32 millimeters, right?

HOWLE – CROSS/WODARSKI

1  A.  I believe that's the case.  I would need to refer to my

2  report.

3  Q.  And as I –– you –– I provided your expert report to you,

4  and that's what led to your opinion that one to two inches of

5  constant radial distance would be well within what's permitted

6  before you get to Mercat, right?

7  A.  Please restate that.

8  Q.  Actually, I'm okay with that.  I don't want to get us to

9  too far in the weeds.  But you'll agree that you told us in

10 your report that Mercat discloses constant radial distance of

11 between 16 and 32 millimeters.

12 A.  Between 16 and 32 millimeters, I believe I did, yes, sir.

13 Q.  And that's referring to this 20-spoke embodiment, right?

14 A.  Yes, sir.

15 Q.  Okay.  But you know from your review of the patent, do you

16 not, Dr. Howle, that Mr. Mercat's patent also teaches a

17 36-spoke embodiment or version?

18 A.  Yes, sir, it does.

19 Q.  Okay.  And you also understand that when you add spokes to

20 a wheel, the portions of constant radial distance will get

21 smaller, right?

22 A.  Not necessarily, no, sir.

23 Q.  Okay.

24 A.  I think a person of skill in the art in doing this would,

25 for example, the figure you have there, make R2 (sic) smaller.

HOWLE − CROSS/WODARSKI

1    Q.  Okay.

2    A.  And, therefore, you could keep those constant radial

3    distance portions large.

4    Q.  Okay.  And so it's your testimony, though, as I add more

5    spokes to a wheel, the portions of constant radial distance can

6    get larger?

7    A.  That is a possibility up to a limit.

8    Q.  Okay.  And so you knew that there was a 36−spoke embodiment

9    taught by Mr. Mercat disclosed to the world in his patent,

10   correct?

11   A.  Yes, sir.

12   Q.  But you never tried to figure out what portions of constant

13   radial distance would exist in that 36−spoke wheel, right?

14   A.  I did not do that calculation.

15   Q.  But you know Dr. Hanson did, right?

16   A.  Yes, sir.

17   Q.  One last thing.  You know that Mr. Katsanis, while he was

18   trying to get his '188 patent, that the issue of Mercat came up

19   again, right?

20   A.  Yes, sir.

21   Q.  Okay.  And the distinction that Mr. Mercat expressly said

22   to the examiner at that time to get his patent was, "Mercat's

23   peaks are concave in profile," right?

24   A.  Yes, sir.

25   Q.  And he said, "I'm the exact opposite.  I'm not concave in

HOWLE - REDIRECT/HICKEY

1  profile," right?

2  A.  I believe his words were something to that effect, but as I

3  said, 10,000 pages, it's hard to remember every quote.

4  Q.  Okay.  So if a concave profile is added to Mr. Katsanis'

5  actual claimed invention, the combination of those two things

6  would be an invalid patent claim, right?

7  A.  Sir, you would have to look at all of the other elements of

8  the claims also.

9  Q.  So can Mr. Katsanis' claim -- independent claim in the '188

10  patent claim both a convex and a concave peak to the convex

11  region?

12  A.  I don't believe he has tried to do so, no, sir.

13  Q.  Okay.  But if someone else tried to do that, that would be

14  an invalid claim, wouldn't it?

15  A.  I see where you're trying to go with this, but --

16  Q.  I think we all do.  What's the answer to my question?

17  A.  The answer is, as you've put forward this convex and

18  concave regions, that does not invalidate this patent.

19       MR. WODARSKI:  Your Honor, I thank you.  I have

20  nothing further.

21       THE COURT:  All right.  Thank you, sir.

22       Redirect?

23                    **REDIRECT EXAMINATION**

24  BY MR. HICKEY:

25  Q.  When you were talking about the area of constant radial

1    distance in Mercat potentially getting larger with 36 spokes,

2    it's because you could go from having 20 peaks to a fewer

3    number of peaks if you doubled up the spokes, is that right?

4    A.  That's just one of the ways, but, yes, sir, that could do

5    it.

6    Q.  Okay.  And with respect to Mercat, you're aware of the fact

7    that on November 3rd, 2016, Mr. Mercat reached out to

8    Mr. Katsanis and sought a license to Mr. Katsanis' patented

9    undulating wheel technology?

10   A.  I do recall reading the document with that, yes, sir.

11   Q.  And you also recall that Mr. Katsanis told Mr. Mercat that

12   it wasn't available because it had already been licensed to

13   SRAM, Zipp, correct?

14   A.  That's my recollection, yes, sir.

15   Q.  Okay.

16        MR. HICKEY:  I have nothing more, Your Honor.

17        THE COURT:  All right.  Dr. Howle, thank you.  You may

18   be excused.  I think for the last time.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  All right.

21        (Witness excused)

22        THE COURT:  Will the lawyers just very quickly come

23   sidebar with me for a moment?

24        (The following proceedings were had at sidebar out of

25   the hearing of the jury)