**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-cv-80581-ALTMAN/Reinhart**

**SRAM, LLC**,

      *Plaintiff*,

*v.*

**PRINCETON CARBON WORKS INC.**,

      *Defendant*.

_____/

## ORDER

This is a patent-infringement case between two bicycle-wheel manufacturers. We held a jury

trial in February 2023, and the jury returned a verdict of "no infringement" as to both counts (one for

each patent in question). A few weeks after the verdict, our Plaintiff—SRAM—filed an Amended

Motion for New Trial and to Alter or Amend the Final Judgment (the "New Trial Motion") [ECF

No. 281]. SRAM argues that we should "grant a new trial" because:

1. the verdict was based on Princeton's improper 'ensnarement' argument to the jury
   and there is no alternative basis upon which to uphold a verdict of non-
   infringement by equivalents;

2. the Court erred in excluding SRAM's lay witness testimony describing Princeton's
   wheels;

3. the jury's finding of non-infringement [as to the '800 Patent] is contrary to the
   overwhelming weight of the evidence, either literally or under the doctrine of
   equivalents; and

4. the jury's finding of non-infringement [as to the '188 Patent] is contrary to the
   overwhelming weight of the evidence, either literally or under the doctrine of
   equivalents.

New Trial Motion at 1–2 (cleaned up). Of these, the ensnarement argument is the most extensively

briefed. For reasons we'll discuss below, we find that Princeton *did not* present an ensnarement defense

to the jury. That aspect, then, of SRAM's New Trial Motion fails.

SRAM's lay-witness and weight-of-the-evidence arguments are likewise unavailing. Starting with the lay-witness argument, we acted within our discretion in determining *which* lay-witness testimony was (and wasn't) admissible. And, as for the weight-of-the-evidence arguments, the jury's conclusions were reasonable and based on evidence the parties presented during the trial.

We therefore **DENY** SRAM's Motion for New Trial and to Alter or Amend the Final Judgment [ECF No. 281].

**FACTUAL AND PROCEDURAL HISTORY**

SRAM asserted two counts of patent infringement against Princeton. *See* Complaint [ECF No. 1] ¶¶ 2, 39–50. In Count I, SRAM alleged that Princeton infringed SRAM's U.S. Patent No. 9,610,800 B2 Patent (the '800 Patent)[1] "by making, using, selling, and/or offering for sale within the Unites States or importing into the United States bicycle wheels that embody one or more of the claims of the '800 Patent, including at least claim 1 of the '800 Patent, and/or by contributing to infringement, inducing others to infringe the '800 Patent, and/or carrying acts constituting infringement under 35 U.S.C. § 271(f)." *Id.* ¶ 40. SRAM further alleged that Princeton "knew of the '800 Patent's patented technology long before the initiation of the present action and therefore [Princeton's] actions have been both willful and deliberate." *Id.* ¶ 41. Specifically, SRAM asserted that Princeton "had knowledge of the '800 Patent since at least on or about May 29, 2018, when SRAM sent a letter to [Princeton] describing infringement of the '800 Patent." *Id.* ¶ 42. Count II replicates Count I, except that it pertains to Princeton's alleged infringement of SRAM's U.S. Patent No. 10,611,188 B2 Patent (the '188 Patent).[2] *See id.* ¶¶ 45–50. The accused wheels are Princeton's Wake, Grit, and Peak models. *See id.* ¶ 8.[3] Princeton answered that it didn't infringe the '800 and '188

---

[1] The '800 Patent can be found on the docket at [ECF No. 1-1].

[2] The '188 Patent can be found on the docket at [ECF No. 1-2].

[3] Only the Wake and Grit wheels are mentioned in the Complaint. *See* Complaint ¶¶ 8–11. SRAM accused the Peak wheel later in the litigation—which is why the first reference to it appears in SRAM's

patents and countered that both patents were invalid. *See* Princeton's Answer and Affirmative Defenses [ECF No. 16] ¶¶ 22–53 (raising non-infringement and invalidity counterclaims for each of the two patents).

Naturally, the parties disputed the meaning of various claims in both patents. After the parties agreed to narrow their dispute, *see* Joint Stipulation Regarding Claim Construction Terms No Longer in Dispute [ECF No. 85], we held a *Markman* claim-construction hearing. *See* Markman Hearing Transcript [ECF No. 90]. As relevant here, here's how we came out on the following terms (and their constructions):

1. "undulating configuration" ('800 Patent—claims 1–2, 7–8, and 17–18) = "wavelike configuration," Joint Stipulation Regarding Claim Construction Terms No Longer in Dispute ¶ 2;

2. "undulating curve configuration" ('188 Patent—claims 1–3, 5–6, and 10–11) = "rounded wavelike configuration," *ibid.*;

3. "continuously varies" ('800 Patent—claims 1 and 17) = "continuously changes," Trial Transcript at 157:6–7;

4. "peaks" ('800 Patent—claims 1, 9–11, 17–18, and 22; '188 Patent—claims 1, 3, 5, 8, and 10–11) = "peaks," *id.* at 157:13–14;

5. "troughs" ('800 Patent—claims 1, 9–11, 17–18, and 22; '188 Patent—claims 1, 3, 5, 8, and 10–11) = "valleys," *id.* at 157:17–18;

6. "convex exterior profile" ('800 Patent—claim 1) = "profile view having a rounded or curved form bulging to towards the wheel center," *id.* at 2334:12–14;

7. "convex profile" ('188 Patent—claims 1, 5–6, and 13–15) = "profile view having a rounded or curved form bulging to towards the wheel center," *ibid.*;

8. "convex regions" ('800 Patent—claim 4; '188 Patent—claims 1, 4, 6, and 15) = "areas having a rounded or curved form bulging to towards the wheel center," *id.* at 2334:15–16.

---

Preliminary Infringement Contentions: Infringement Claim Charts for [Princeton's] PEAK 4550 Wheels [ECF No. 40-3]; *see also* SRAM's Supplemental Answer to Princeton's Interrogatory Nos. 2, 3, 5, 10, and 14 [ECF No. 45-4] at 3 ("SRAM further identifies documents relating or referring to these facts as including [Princeton's] copycat Peak 4550 bicycle wheels and publicly available articles about [Princeton's] copycat Peak 4550 bicycle wheels.").

On May 11, 2022, the parties filed cross-motions for summary judgment. SRAM focused on Princeton's defenses and counterclaims, arguing that "Princeton cannot prove invalidity of any claims of the patents-in-suit by clear and convincing evidence" under 35 U.S.C. §§ 102, 103, or 112. *See* SRAM's Motion for Partial Summary Judgment [ECF No. 101-1] at 5, 17. We denied SRAM's MSJ as to its §§ 102–03 argument because we thought "a reasonable jury could side with Princeton . . . that SRAM's patents are invalid because they were anticipated or rendered obvious by some prior art." Order Adjudicating the Cross-MSJs [ECF No. 174] at 6. But we granted summary judgment on Princeton's § 112 defenses because we found that Princeton had effectively "abandoned" them. *Id.* at 5.

Princeton, in its MSJ, argued that "Summary Judgement [sic] of no literal infringement in defendant's favor is warranted as to all asserted patent claims" because "[i]ndependent claim 1 of each of the Asserted Patent[s] requires a rim that has peaks with a 'convex' profile," and "[i]ndependent claims 1 and 17 of the '800 patent requires a rim with a 'radial distance' that 'continuously varies'"— and none of the accused wheels had either of those. Princeton's Renewed Motion for Summary Judgment [ECF No. 106-1] at 7–11. Princeton also asserted that it was "similarly entitled to summary judgment that SRAM is legally barred from arguing infringement of any of the asserted patent claims under the doctrine of equivalents" because "SRAM impermissibly seeks to present an infringement theory based on the doctrine of equivalents that attempts to recapture precisely the claim scope that the patentee clearly and unequivocally disclaimed during prosecution to secure issuance of the Asserted Patents." *Id.* at 7, 11–20.[4] We denied summary judgment as to both these arguments. As to the first—which is *particularly* relevant here—we found as follows:

> Whether Princeton's wheels reveal a concave profile or a continuously
> varying radial distance—either literally or [ ]closely enough[ ] to be

---

[4] Put a pin in this argument, because it foreshadows the dispute over Princeton's alleged ensnarement defense.

> equivalent—are material facts at the heart of SRAM's infringement
> claim. Since "there are . . . genuine issues of material fact," we "must
> deny summary judgment and proceed to trial."

Order Adjudicating the Cross-MSJs at 16 (quoting *Torres v. Wal-Mart Stores East, L.P.*, 555 F. Supp. 3d 1276, 1282 (S.D. Fla. 2021) (Altman, J.)). We also noted that "SRAM disputes each of [Princeton's MSJ] assertions with competent evidence—much of it from its expert, Dr. Howle, whose expertise in the field of mechanical engineering is hard to quibble with." *Id.* at 13–14. In concluding our order, we observed that "[t]his case presents us with a proverbial battle of experts. And, as we've said in a slightly different context, 'we think it beyond cavil that the task of resolving [factual] disputes rests squarely with a jury of laymen, not a panel of (unelected judges).'" *Id.* at 16 (quoting *Torres*, 555 F. Supp. 3d at 1288).

The jury trial began on February 13, 2023. *See* Paperless Minute Entry [ECF No. 218]. Over the course of two weeks, ten jurors[5] heard in-person fact and expert testimony from eleven witnesses and watched several additional deposition videos. *See generally* Trial Transcript [ECF Nos. 270–78].[6] These jurors also reviewed many documents, photos, and videos. *See generally ibid.* The parties spent much of the trial focusing on the "continuously varies" limitation of the '800 Patent and the "convex peaks" limitation of the '188 Patent. According to Dr. Hanson (Princeton's expert), the "continuously varies" limitation "was critical. It was substantial. . . . This additional language is the difference between [Katsanis[7]] not getting a patent [because of the *Mercat* prior art] and getting a patent." Transcript at 1773:6–8. Likewise, the "convex peaks" limitation of the '188 Patent was supposedly the

---

[5] Only nine would deliberate; the tenth—an alternate—was dismissed.

[6] The trial transcript spans nine docket entries, and the pagination of one entry picks up where the prior entry left off. To keep things simple, we'll cite to a single "Transcript" and the cumulative page/line number. But when we quote from transcripts of *non-trial* proceedings, we *will* identify the hearing in the citation.

[7] Dr. Katsanis is the patent holder of both the '800 and '188 Patents. SRAM is the sole licensee of these patents.

difference between Katsanis getting the '188 Patent and not getting it (also because of the *Mercat* prior art). *See id.* at 1822:3–12 (**Princeton's Counsel:** "So what did Mr. Katsanis do to explain to the examiner that his '188 claim was not what Mr. Mercat had invented?" **Dr. Hanson:** "Yeah, so Mr. Katsanis has explained that the peaks of Mercat have a very particular shape. And he says the peaks of Mercat are concave in profile. . . . [This] is opposite to the convex profile [newly] defined in the amended [and soon-to-be '188] claim."). The lawyers delivered their closing arguments on February 23, 2023, *see id.* at 2378:3–2461:2, and the jury rendered its verdict the next day, *see id.* at 2505:25–2506:4. Instead of filling out the verdict form, the jury simply found as follows: "One, no infringement on Patent '800; two, no infringement on Patent '188; three, no damages due to no infringement." *Ibid.*

On April 7, 2023, SRAM filed its New Trial Motion, which we adjudicate now. Again, SRAM advances the following four arguments:

1. we should "grant a new trial on Counts I and II of [its] Complaint for infringement of the '800 and '188 Patents under the doctrine of equivalents because the verdict was based on Princeton's improper 'ensnarement' argument to the jury, and there is no alternative basis upon which to uphold a verdict of non-infringement by equivalents";

2. we should "grant a new trial on Counts I and II . . . because [we] erred in excluding SRAM's lay witness testimony describing Princeton's wheels, which substantially prejudiced SRAM";

3. we should "grant a new trial on Count I . . . regarding infringement of the '800 Patent for the additional reason that the jury's finding of non-infringement is contrary to the overwhelming weight of the evidence, either literally or under the doctrine of equivalents;" and

4. we should "grant a new trial on Count II . . . regarding infringement of the '188 Patent because the overwhelming weight of the evidence is contrary to the jury's finding of non-infringement, either literally or under the doctrine of equivalents."

New Trial Motion at 3, 17, 21, 23 (cleaned up). Princeton disputes these four contentions. As to ensnarement, it says that it didn't make any such argument but merely "rebutted SRAM's attempt to establish a range of equivalents." Princeton's Opposition to SRAM's Motion for New Trial and to

Alter or Amend the Final Judgment (the "New Trial Response") [ECF No. 283] at 14. Even if it *had* made such an argument, Princeton continues, the "jury could have reached its non-infringement verdict for multiple [other] reasons." *Id.* at 7. Princeton also asserts that our lay-witness rulings were correct because SRAM had impermissibly "attempted to bolster and duplicate its expert's infringement opinion through lay-witness opinion testimony," whereas Princeton was entitled to present its own "state-of-mind testimony" since SRAM had asserted "willful infringement." *Id.* at 20, 23. As for the two weight-of-the-evidence arguments, Princeton counters that SRAM is impermissibly asking us to "re-weigh the evidence (in a on[e]-sided, baseless manner), and thereby substitute [our] judgment, conclusions, and credibility assessment for the jury's." *Id.* at 16.[8] These, then, are the four issues we must address in this Order.

## THE LAW

Under Rule 59(a), we "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(A)." "Generally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). "Although a comprehensive list of the grounds for granting a new trial is elusive," *Hurtado v. Raly Dev., Inc.*, 2013 WL 1786524, at *2 (S.D. Fla. Feb. 1, 2013) (Altonaga, J.), we may grant a new trial when (1) "evidentiary error" has "caused substantial prejudice to the affected party," *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004); (2) "the verdict is against the great—not merely the greater—weight of the evidence," *Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 923 (11th Cir. 1991); or (3) the verdict "will result in a miscarriage of justice," *Jenkins v. Anton*, 922 F.3d 1257, 1264 (11th

---

[8] SRAM filed its Reply in Support of its Motion for New Trial and to Alter or Amend the Final Judgment (the "New Trial Reply") [ECF No. 289] on April 18, 2023. The New Trial Motion is therefore ripe for review.

Cir. 2019). "[I]n a motion for a new trial the judge is free to weigh the evidence," *McGinnis v. Am. Home Mort. Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Rabun v. Kimberly–Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir. 1982)), and "when independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well," *id.* at 1255 (quoting *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982)). "New trials granted because (1) a jury verdict is against the weight of the evidence [are] sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence." *Hurtado*, 2013 WL 1786524, at *2 (quoting *O'Neil v. W.R. Grace & Co.*, 410 F.2d 908, 914 (5th Cir. 1969)).[9] "[I]t is critical that a judge does not merely substitute his judgment for that of the jury" when deciding whether to grant a "new trial[ ] . . . on evidentiary grounds[.]" *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948–49 (11th Cir. 2018) (cleaned up). "[W]hen the trial involves simple issues, highly disputed facts, and there is an absence of 'pernicious occurrences,' trial courts should be considerably less inclined to disturb a jury verdict." *Williams*, 689 F.2d at 974. "Accordingly, review of motions that have been granted in such cases will be more rigorous." *Ibid.* "On the other hand, in cases involving complex issues, facts not highly disputed, and events arguably marred by error, trial courts have more freedom to evaluate independently the verdict." *Ibid.*

Under Rule 59(e), we may "alter or amend a judgment," *only* "where there is newly discovered evidence or *manifest errors of law or fact.*" *Samara v. Taylor*, 38 F.4th 141, 149 (11th Cir. 2022) (cleaned up & emphasis added). "A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

present evidence that could have been raised prior to the entry of judgment." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007).

The law of the Federal Circuit applies "for questions impacting substantive patent questions." *In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1290 (Fed. Cir. 2016). Likewise, "a procedural issue that is not itself a substantive patent law issue is nonetheless governed by Federal Circuit law if the issue pertains to patent law, if it bears an essential relationship to matters committed to [the Federal Circuit's] exclusive control by statute, or if it implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction." *Ibid.* (cleaned up). But for "procedural issue[s] which [are] not unique to patent law, we must apply the law of [our] regional circuit[.]" *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 984 n.2 (Fed. Cir. 1999).

## ANALYSIS

We begin our analysis with some trepidation. As Princeton correctly observes, "[o]nly the nine final members of the jury know why they rejected SRAM's infringement claims. No one else knows precisely how and why they reached their verdict." New Trial Response at 1. That's especially true because our jurors neglected to fill out the special verdict form, leaving us only the following clues as to their thinking: "One, no infringement on Patent '800; two, no infringement on Patent '188; three, no damages due to no infringement." Transcript at 2505:25–2506:4. And, when we asked SRAM's lawyer if he "want[ed] the verdict form filled out, or is that sufficient for you," he responded: "That's sufficient[.]" *Id.* at 2506:6–8.

### I.    Princeton didn't argue ensnarement but instead asserted what it believed to be a proper range of equivalents.

According to SRAM, Princeton "repeatedly argued to the jury issues of law that it previously acknowledged were for the Court, not the jury, to decide." New Trial Motion at 1. Specifically, SRAM says, Princeton relied on the "ensnarement defense—which is a legal defense to infringement under the doctrine of equivalents based on prior art[.]" *Ibid.*; *see also* New Trial Motion Reply at 3 ("When

9

the accused infringer argues that prior art precludes assertion of a claim's equivalent, that is the definition of ensnarement."). "To avoid reversible error," SRAM continues, "the Court should . . . amend its Final Judgment to enter judgment for SRAM on Princeton's ensnarement defense and order a new trial on infringement by equivalents." *Id.* at 16.[10] Princeton counters that it "did not raise an ensnarement defense" but only "rebutted SRAM's belated attempt to show a range of equivalence." New Trial Response at 7. "[T]he range of equivalents," Princeton adds, "was a fact issue left for the jury to determine, and both sides were entitled to address it." *Id.* at 14.

We consider, then, what the ensnarement defense is and whether Princeton deployed it improperly.

### a. Ensnarement is a legal defense to doctrine-of-equivalents patent-infringement claims for a court—and not a jury—to adjudicate.

Ensnarement is a defense to a claim of patent infringement that's predicated on the doctrine of equivalents. Under this doctrine, "a product or process that does not literally infringe[11] upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 609 (1950)). "A finding of infringement under the doctrine of

---

[10] SRAM seems to seek a slightly different form of relief in its New Motion Reply, where it says: "Since ensnarement is a question of law, it will be reviewed *de novo* on appeal. . . . The Court can and should correct this legal error and resulting miscarriage of justice now, by amending the Final Judgment to enter judgment against Princeton on that defense. Further, since there was no other basis [other than ensnarement] on which a reasonable jury could find non-infringement under the DOE, *the Court must also reverse the jury's verdict.*" New Trial Reply at 2 (cleaned up & emphasis added). Since we're denying SRAM's New Trial Motion, the relief SRAM is seeking is irrelevant.

[11] "Literal infringement exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the accused device." *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1366 (Fed. Cir. 2002). While SRAM invokes literal infringement in conjunction with its weight-of-the-evidence arguments, *see* New Trial Motion at 21–23, we don't need to delve into *that* theory just yet because whether Princeton asserted an ensnarement defense is only relevant in the context of SRAM's claims of infringement under the doctrine of equivalents.

equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). To prove infringement under the doctrine of equivalents, "[a] patentee must establish 'equivalency on a limitation-by-limitation basis' by 'particularized testimony and linking argument' as to the insubstantiality of the differences between the claimed invention and the accused device or process." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016) (cleaned up). The Federal Circuit has emphasized that, under the doctrine of equivalents, "[t]he claims—i.e., the scope of patent protection *as defined by* the claims—remain the same and application of the doctrine *expands the right to exclude* to 'equivalents' of what is claimed." *Wilson Sporting Goods, Co. v. David Geoffrey & Assoc's*, 904 F.2d 677, 684 (Fed. Cir. 1990). As for those equivalents, a jury *can* establish their range. Indeed, the Federal Circuit has noted the following:

> In applying the doctrine of equivalents, the *fact finder* must determine the *range of equivalents* to which the claimed invention is entitled, in light of the prosecution history, the pioneer-non-pioneer status of the invention, and the *prior art*. It must then be determined whether the entirety of the accused device or process is so "substantially the same thing, used in substantially the same way, to achieve substantially the same result" as to fall within that range.

*Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 842 (Fed. Cir. 1991) (quoting D.*M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed. Cir. 1985) (emphasis added)); *see also Jackson v. Casio Phonemate, Inc.*, 105 F. Supp. 2d 858, 864 (N.D. Ill. 2000) (same).[12]

---

[12] *Intel* and *D.M.I.* both centered on 35 U.S.C. § 112 invalidity defenses on patent-indefiniteness grounds. The Federal Circuit in those two cases said what we quoted above as a way of differentiating the word "equivalent" as it relates to a § 112 defense from *the doctrine* of equivalents. *See Intel*, 946 F.2d at 842; *D.M.I.*, 755 F.2d at 1575. *Jackson*, however, involves the doctrine of equivalents *in addition to* § 112. *See generally Jackson*, 105 F. Supp. 2d 858.

Federal Circuit law "establishes that there are limitations to the doctrine of equivalents. Whether the result of the All Limitations Rule, prosecution history estoppel, or the inherent narrowness of the claim language, many limitations warrant little, if any, range of equivalents." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1319–20 (Fed. Cir. 2015) (cleaned up). One such limitation to the doctrine of equivalents is prior art; "[a] doctrine of equivalents theory cannot be asserted if it will encompass or ensnare the prior art." *Jang. v. Boston Sci. Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017) (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009)); *see also Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1363 (Fed. Cir. 2016) ("A patentee may not assert a scope of equivalency that would encompass, or ensnare, the prior art." (quoting *DePuy*, 567 F.3d at 1322)). The ensnarement defense is grounded in the concept that "a patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the [Patent and Trademark Office (the "PTO")] by literal claims." *Wilson Sporting Goods*, 904 F.2d at 684. "The doctrine of equivalents exists to prevent a fraud on a patent, *not* to give a patentee something which he could not lawfully have obtained from the PTO had he tried." *Ibid.* "This limitation is imposed even if a jury has found equivalence as to each claim element." *Jang*, 872 F.3d at 1285 (quoting *DePuy*, 567 F.3d at 1323); *see also Intendis GMBH*, 822 F.3d at 1363 ("Even if an accused element meets the function-way-result test, no equivalent will be found if the scope of an equivalency would capture the prior art.").

Generally, a defendant raises an ensnarement defense to a claim of doctrine-of-equivalents infringement *before* trial. It informs the court (and the plaintiff) of its intent to raise the defense, and the court then reserves that defense for a post-trial evidentiary hearing (or even a separate bench trial). *See, e.g.*, *EveryScape, Inc. v. Adobe Sys., Inc.*, 31 F. Supp. 3d 322, 328 (D. Mass. 2014) ("*If* the jury returns a verdict that [the defendant] infringes the Asserted Claims under the doctrine of equivalents, the court will decide, as a matter of law, whether such an application of those claims ensnares prior art."

(emphasis added)); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 2014 WL 12480498, at *3 (M.D. Pa. May 27, 2014) ("*If and only if* the jury returns a verdict of infringement under the doctrine of equivalents, the court will thereafter resolve Defendants' ensnarement defense on a post-verdict motion for judgment as a matter of law. At that time, the court will consider all necessary and proper evidence and arguments from the parties. Therefore, resolving the ensnarement defense does not justify disclosing to the jury [certain evidence] that we have previously concluded should not be admitted into evidence at trial." (emphasis added)); *Almirall LLC v. Pharm. Indus. LTD*, 2019 WL 316742, at *6 (D. Del. Jan. 24, 2019) (ruling—on a motion *in limine*—that a defendant may "reassert[ ]" its ensnarement defense in a "properly supported motion at the close of evidence, at the end of trial, or in a posttrial motion"); *ICU Med., Inc. v. RyMed Techs., Inc.*, 752 F. Supp. 2d 486, 488 (D. Del. 2010) (scheduling a "jury trial on the issues of infringement, validity, and willfulness," to be followed by a "bench trial" on "all issues to be tried before the Court," including "ensnarement").

To "determine whether an equivalent would impermissibly ensnare prior art [identified by the defendant]," the parties and the court engage in a "hypothetical claim analysis." *Jang*, 872 F.3d at 1285 (quoting *Intendis*, 822 F.3d at 1363–64). A hypothetical claim analysis involves a two-step process. *First*, the plaintiff "construct[s] a hypothetical claim that literally covers the accused device." *Ibid.* (quoting *Intendis*, 822 F.3d 1363); *see also UCB, Inc. v. Watson Labs., Inc.*, 927 F.3d 1272, 1283 (Fed. Cir. 2019) ("A helpful first step in an ensnarement analysis is to construct a hypothetical claim that literally covers the accused device." (quoting *DePuy*, 567 F.3d at 1324)). *Second*, "the prior art introduced by the accused infringer is assessed to determine whether the patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art." *Jang*, 872 F.3d at 1285 (quoting *Intendi*, 822 F.3d at 1363). "In short, the court asks if a hypothetical claim can be crafted, which contains both the literal scope and the accused device, without ensnaring the prior art." *Ibid.* (quoting *Intendi*, 822 F.3d at 1363). "The burden of producing evidence of prior art to challenge a hypothetical

claim rests with an accused infringer, but the burden of proving patentability of the hypothetical claim rests with the patentee." *Ibid.* (quoting *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001)).

In other words, *if* the jury returns a verdict of infringement under the doctrine of equivalents, the defendant will have the opportunity—and the burden—of identifying prior art that (it believes) would be ensnared by any hypothetical claim. The plaintiff then bears the burden of creating a hypothetical claim that (1) would be literally infringed by the accused product but (2) would be patentable in light of the identified prior art. If the plaintiff can't come up with such a hypothetical claim, the court vacates the jury's finding of infringement. *See, e.g.*, *Kahr v. Cole*, 221 F. Supp. 3d 1065, 1071–72 (E.D. Wis. 2016) (explaining this process in the context of an order adjudicating a post-trial motion); *Siemens Mobility, Inc. v. Westinghouse Air Brake Tech. Corp.*, 2019 WL 1040539, at *1 (D. Del. Mar. 5, 2019) (scheduling—in a post-trial order—ensnarement-related briefing, as well as an evidentiary hearing).

SRAM is correct, then, that "ensnarement is a question of law for the Court, not the jury, to decide." New Trial Motion at 11–12; *see also Tyco Healthcare Grp. LP v. E-Z-EM, Inc.*, 2010 WL 8545507, at *1 (E.D. Tex. June 8, 2010) (ruling, on a pretrial motion to strike an expert report, that the defendants were "forbidden from introducing evidence or argument relating to the ensnarement defense in front of the jury"); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 4129193, at *3 (N.D. Cal. July 8, 2015) (granting a plaintiff's motion *in limine* such that "any argument concerning prosecution history estoppel and ensnarement" be "exclude[d] from the jury's consideration" since "[t]hese issues are questions of law reserved for the Court"). Indeed, in *DePuy*, the Federal Circuit found that "ensnarement, like prosecution history estoppel, is 'to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of evidence and after the jury verdict.'" *DePuy*, 567 F.3d at 1324 (quoting *Warner Jenkinson*, 520 U.S. at 39

n.8). Several years later, the Federal Circuit clarified that "*DePuy* is most fairly understood as holding that ensnarement is a legal question for the district court to decide and that the district court *could*, but did not have to, decide that question through particular types of motions." *Jang*, 872 F.3d at 1288. It's therefore appropriate for a district court to "conduct[ ] a separate ensnarement proceeding after a jury verdict of infringement under the doctrine of equivalents[.]" *Ibid.*

### b. SRAM alleged infringement under the doctrine of equivalents.

For an ensnarement defense to be relevant to this case, SRAM needs to have made a doctrine-of-equivalents argument. It did. According to SRAM, "[t]he test for determining equivalency is whether the feature of the accused product performs substantially the same function in substantially the same way with substantially the same result as the claim limitation, or is otherwise insubstantially different from the claim limitation." New Trial Motion at 4–5. Indeed, SRAM tried to show that "[t]he Princeton wheels' purportedly millimeter-length segments of constant radial distance and peaks with concave spoke-connection points are equivalent both to the claimed undulating configuration of the '800 Patent with a continuously varying radial distance, and to the claimed undulating configuration of the '188 Patent with convex profiles." *Id.* at 5 (cleaned up).

We won't discuss every occasion on which SRAM's expert, Dr. Howle, mentioned the doctrine of equivalents, but a few are worth mentioning. First, he introduced the concept by saying:

> I believe [the Princeton wheels] literally infringe the claims that we've cited. But an alternate way to look at this or an alternate method for infringement could be under the doctrine of equivalents. So in this case, if a particular claim requirement is not literally present on an accused device, then its equivalent—if that's still found on the product, then it can be accused of infringing under the doctrine of equivalents.
>
> And one of the ways you can do that analysis is by the so-called "function-way-result test[.]"

Transcript at 1046:20–1047:4. And, applying this opinion to the "continuously varies" limitation of the '800 Patent, Dr. Howle elaborated that:

> if we want to give [Princeton] the benefit of the doubt, and we say that [its rims] have constant radial distances, then I find that they still would perform substantially the same function and substantially the same result in substantially the same way to produce substantially the same result. . . . So they would infringe in that case under the doctrine of equivalents. . . . [T]he radial distance of the troughs in Princeton's wheels is insubstantially different from the claimed requirement—or the claim requirements from the patent.

*Id.* at 1049:22–1050:12. As for the "convex profile" limitation of the '188 Patent, Dr. Howle testified that "my finding is that the Princeton's wheels still perform substantially the same function even if the unmeasured spoke hole concavity was readily visible, which it's not." *Id.* at 1054:2–4.

The parties disagree over the extent to which the jury may have been persuaded by Dr. Howle's function-way-result testimony. In SRAM's view, "no reasonable jury could conclude that the function-way-result test was not substantiated. There was overwhelming, if not uncontested, evidence that Princeton's wheels satisfy the function-way-result test." New Trial Reply at 6. Specifically, according to SRAM, Dr. Howle showed that "the supposedly millimeter-length segments of constant radial distance and holes for spoke-connection points in disassembled wheels do not substantially distinguish Princeton's wheels from the '800 and '188 Patent inventions in function, structure, or result." New Trial Motion at 6. Princeton obviously disagrees. As to the '800 Patent, "Dr. Howle never explained how the accused products were insubstantially different from the claimed requirement—he just said they were (mere *ipse dixit*)." New Trial Response at 10 (citing Transcript at 1050:7–12). And, "[w]ith respect to the '188 Patent, Dr. Howle acknowledged that the term 'convex does not mean concave.'" *Ibid.* (citing Transcript at 1118:3–6). "He also conceded that he conducted no empirical testing to support his function-way-result conclusion regarding infringement, and claimed that no such testing was necessary because all he needed to do was 'observe' the purported

convex peaks of the accused wheels within the meaning of the claim term." *Id.* at 10–11 (citing Transcript 1129:17–1130:25; 1132:13–17).

As we'll explain a bit later on, *infra* §§ III–IV, the jury seems to have rejected Dr. Howle's testimony wholesale in favor of Princeton's account and expert. That it did so rather strongly indicates that there was a standalone basis for the verdict—unrelated to the purported ensnarement defense. For the following analysis, though, we'll accept for the sake of argument that Dr. Howle *did* present a doctrine-of-equivalents theory, which Princeton *could* have countered with an ensnarement defense to the Court (though not to the jury).

### c. Princeton offered its own range of equivalents and *didn't* present an ensnarement defense.

As we'll explain, Princeton *didn't* present an ensnarement defense in its opening statements, in its case-in-chief, through Dr. Hanson's extensive expert testimony, or in its closing argument. Instead, Princeton asserted what it believed to be the proper range of equivalents in light of the prior art.[13]

### i. SRAM Opened the Door to Any Error.

Before we address what Princeton did, however, we'll dispose of one ancillary matter: The parties accuse each other of "opening the door" to the presentation of the ensnarement defense. According to Princeton, "[t]o the extent the jury ever considered whether Dr. Howle's undisclosed range of equivalents to the asserted patent claims 'read on' the prior art, *it was because SRAM and its expert injected the issue into the proceedings during SRAM's affirmative case*." New Trial Response at 14. "SRAM made the tactical decision during its own affirmative case to have its expert opine on the patents *in view of the prior art in a belated attempt to establish the range of equivalents*." *Ibid.* Now, "after opening the

---

[13] Sometimes, as we'll see, Princeton's counsel (or its expert, Dr. Hanson) would assert what they believed to be the proper range of equivalents in the same breath as they attacked the *validity* of SRAM's patents (ostensibly as relevant to literal infringement). That it's difficult—even in retrospect—to disentangle these two defenses strongly suggests that Princeton was principally attacking validity.

door," Princeton argues, SRAM unfairly "complains that it was 'grievous error' for Princeton to explore that concept on cross-examination with Dr. Howle, and to rebut it with Dr. Hanson." *Ibid.*

SRAM disagrees, of course: "Princeton, not SRAM, opened the door. SRAM simply responded to Princeton's ensnarement defense." New Trial Reply at 6. At trial, SRAM explains, "Princeton asserted the [ensnarement] defense . . . in its opening statement by arguing that Mercat invalidates not the patent itself, but rather the equivalents of the asserted claims. . . . SRAM thus responded by showing that the asserted equivalents were not invalid over the prior art Princeton raised, which SRAM did through Dr. Howle[.]" *Id.* at 5–6.

We doubt that it matters much *exactly* who "opened the door," because we don't think "opening the door" would ever create the circumstances in which it'd be *justified* for either party to *invite* the jury to resolve ensnarement. But Princeton's account is more accurate than SRAM's. It's not lost on us that "the words 'ensnare' or 'ensnarement' were *never used* in the jury's presence—*other than when Dr. Howle*"—SRAM's expert—"*introduced the term*, unprompted and unsolicited, in one answer on cross-examination." New Trial Response at 12. Dr. Howle gratuitously raised "ensnarement" as he tried to wriggle his way out of answering a straightforward line of questioning about the doctrine of equivalents:

> **Princeton's Counsel:** And when you look at the doctrine of equivalents, it's a way of expanding out that fence [i.e. the scope of a claim] to say, well, [the allegedly infringing product is] not within my literal yard, but it's so close, either by its function, way, or result, or it's so close because it's an insubstantial difference, that I can expand out my claim a little bit to capture it . . . . It expands the claim out a little bit, expands the fence out a little bit, so that it can capture something that's not substantially different, right? Is that fair?
>
> **Dr. Howle:** Well, I would not use those words. I've clearly stated what my understanding of the doctrine of equivalents is. And what I think you're trying to get to is—I heard you use the term "broadening of the scopes" or "broadening of the claims." I disagree with that, because

what I think you're trying to get to is broadening to the point where they would *ensnare* previous or prior art.

**Princeton's Counsel:** Well, I think—I'm not going to use those words, but I think I am going there[.] You and your counsel . . . talked about reading on the prior art. Do you remember talking to [SRAM's counsel] about reading on the prior art?

**Dr. Howle:** Yes, sir.

**Princeton's Counsel:** And when he was talking to you, you had no problem telling him whether something in your opinion read on the prior art or didn't, right?

**Dr. Howle:** Yes, sir.

**Princeton's Counsel:** Okay. And he only had to ask once, right?

**Dr. Howle:** Yes, sir.

**Princeton's Counsel:** Okay. And so I'm basically asking the same thing. You understand that if something doesn't literally infringe under that fence, when you look at it under equivalents, you are expanding or broadening the claim to see if something's insubstantially different so that it should still infringe, correct?

**Dr. Howle:** Sir, the terms that [SRAM's counsel] and I agreed with are the terms that, you know, I understand. You're using different language, so I'm not quite sure that I agree with the language you're using.

Transcript at 1101:21–1103:13 (emphasis added).

Inasmuch as SRAM "opened the door" to ensnarement, it appears to have invited the error it now complains of. "[S]omeone who invites a court down the primrose path to error should not be heard to complain that the court"—or another party—"accepted its invitation and went down that path." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011). Because we conclude that Princeton ultimately *didn't* present an ensnarement defense to the jury, though, *see infra* § I(c)(ii), we won't reach the consequences SRAM should face to the extent it invited error.

### ii.    There's No Error Because Princeton Didn't Present Ensnarement.

As we've suggested, it seems clear to us that Princeton asserted a proper range of equivalents, not an ensnarement defense. We'll start with Princeton's opening statement. According to SRAM, "Princeton clearly relied on ensnarement in its opening and closing statements, when its counsel argued that *Mercat*, as prior art, would preclude the asserted equivalents." New Trial Reply at 3. But here's what Princeton's counsel actually said:

> I'm going to come back to you at the end of all this evidence you're going to hear over the next week or two, and I'm going to ask you to enter a verdict in our favor, that we are not liable because we didn't infringe their patents. And at that time, I'm going to tell you the reason why is because SRAM in this case has an unsolvable problem.
>
> [ . . . ]
>
> What is the problem they can't solve? . . . They can either try and convince you that the . . . actual claim Mr. Katsanis had and is entitled to is at issue. But as I just explained, if that's the case, we don't infringe it. So what they're going to try and do with their expert, Dr. Howle, is they're going to try and say, Wait, well, my understanding of Mr. Katsanis's claim is a little broader, a little bit more expansive than that. And to do that, they're going to go grab things from Mr. Mercat and what he already invented and say, Hmm, they're really part of what Mr. Katsanis invented. And that violates the golden rule, right? That would mean that we're allowing Mr. Katsanis to claim as his invention what someone else had already invented. And what's the result of that, as Judge Altman's instruction told you? *You end up with an invalid claim*.
>
> So the unsolvable problem is, they can either stick with the claim that Mr. Katsanis actually got, and then we don't infringe, and we'll show you that. Or they can try and create a new claim that's not exactly what Mr. Katsanis got, but include some things that other people had already invented, in which case, *they invalidate the claim*. So when I come back, I'm going to say that the evidence has shown you there's only two outcomes that are possible, ladies and gentlemen. We either don't infringe the claim Mr. Katsanis actually got *or we potentially infringe a claim that is no longer valid*. But either way, ladies and gentlemen, the verdict should be in our favor. And that's what I'm going to ask you to do.

Transcript at 219:2–220:13 (emphasis added).

We don't construe this as an ensnarement defense. Here, Princeton's discussion of prior art was part of its (ultimately abandoned) effort to invalidate the '800 and '188 Patents *themselves*. Indeed, as evidenced by the italicized language above, Princeton's lawyer mentioned *invalidity* three times. And invalidity and ensnarement are *different* defenses to *different* theories of infringement—literal and the doctrine of equivalents, respectively. *See Jang*, 872 F.3d at 1288 ("We have explained that 'the ensnarement inquiry has no bearing on the validity of the actual claims' asserted in the case. And that is because ensnarement concerns patentability with respect to a hypothetical patent claim as opposed to the validity of an actual patent claim." (quoting *DePuy*, 567 F.3d at 1323) (cleaned up)). Princeton's assertion of the invalidity defense was consistent with the strategy it had employed throughout the pretrial litigation. *See, e.g.*, Answer and Affirmative Defenses [ECF No. 16] at 9 ("Third Affirmative Defense: Invalidity – One or more claims of the Asserted Patents are invalid for failure to satisfy one or more of the requirements of the Patent Act . . . . [O]ne or more of the Asserted Patents are invalid and/or obvious in view of prior art[.]"); *id.* ¶¶ 36–53 (asserting Counterclaims III and IV for "declaratory judgment[s] of invalidity" as to the '800 and '188 Patents, respectively); Princeton's Opposition to Plaintiff's Motion for Partial Summary Judgment [ECF No. 120] at 22 ("SRAM's motion for partial summary judgment does not individually address any of [Princeton's] anticipation *invalidity* theories beyond providing conclusory statements and bulk citations to its expert's report regarding the elements it believes are missing from prior art references."). Indeed, not only does SRAM not question the propriety of this invalidity argument, but it also recognizes the distinction between the invalidity and the ensnarement defenses. *See* New Trial Reply at 1 ("[Princeton] started this trial alleging that about a dozen different prior art references purportedly invalidated the asserted '800 and '188 Patent claims, subsequently abandoned all but one over the course of the trial (Mercat), then about-faced and admitted in closing that the patents were valid, but nevertheless contended to

the jury that all of the asserted patent claims would be ensnared by Mercat under the doctrine of equivalents[.]").

Let's move, then, to Princeton's case-in-chief. There, SRAM argues that "Dr. Hanson testified that, in his opinion, there is no infringement of either the '800 Patent or the '188 Patent under the doctrine of equivalents because Princeton's wheels have areas of constant radial distance and 'concave' peaks purportedly like those in *Mercat*, and, in Dr. Hanson's view, prior art features cannot be equivalents of claimed features." New Trial Motion at 8. We largely agree with this assessment. But we disagree with SRAM's conclusion that Princeton therefore "unquestionably asserted ensnarement." New Trial Reply at 3. Let's consult the transcript, then, to see what *exactly* Dr. Hanson had to say about the '800 Patent's "continuously varies" limitation:

> **Dr. Hanson:** Dr. Howle said that even if the wheels don't literally infringe, they could still infringe under this concept of doctrine of equivalents. . . . And what I've set up here is a little bit of a schematic, where I've put this dividing line on the page, and on the left of the page, we have [the] '800 patent. On the right, I'm noting here Mr. Mercat's 1999 patent. . . . [W]hat I'm looking to do is determine what is that dividing line.
>
> [ . . . ]
>
> **Princeton's Counsel:** And the dividing line is a dividing line between what?
>
> **Dr. Hanson:** Effectively, Mr. Katsanis has patented a certain type of undulating wheel that has a radial inner edge that must continuously vary or continuously changes. And Mr. Mercat has another undulating wheel with constant radial distance. So the idea is—under the doctrine of equivalents is, well, how much constant radial distance would be insubstantial? So is there some bit of constant radial distance that would be insubstantial that could be—that Mr. Katsanis could have that wouldn't claim what Mr. Mercat already owns?
>
> **Princeton's Counsel:** And why do you draw the line at what Mr. Mercat already owns?

> **Dr. Hanson:** Well, because . . . Dr. Howle can't use [Katsanis's] patent in a way to claim what Mr. Mercat already owns.

Transcript at 1804:20–1805:20.[14] At this point, SRAM's counsel *attempted* to object, and the following exchange occurred at sidebar:

> **SRAM's Counsel:** He's getting into . . . a legal conclusion as to what—
>
> **The Court:** The only thing he said so far was that . . . Dr. Howle cannot use Mr. Katsanis' patent to claim something that Mr. Mercat already owns. . . . [T]hat's a true statement, right?
>
> **SRAM's Counsel:** True.
>
> **The Court:** So what is the objection to that? Not to that, you're saying. You're predicting something that's coming.
>
> **SRAM's Counsel:** Yes, exactly. . . . I think he's going to be going over the line in terms of saying what is the legal scope of the claim compared to Mr. Mercat.
>
> **The Court:** Okay.
>
> **Princeton's Counsel:** I don't fully understand that, Your Honor . . . . [Y]ou've expressly left it for the jury to find what the range of equivalents is.[15] They have to be guided in that determination that they have to make by one of ordinary skill in the art.
>
> **The Court:** And he's just going to say that—
>
> **Princeton's Counsel:** What amount of constant radial distance is permitted when you're still within something that is Mr. Katsanis's claim—
>
> **The Court:** Versus Mr. Mercat's.

---

[14] Dr. Hanson appears to have misspoken here as he actually said: "Dr. Howle can't use Mr. Mercat's patent in a way to claim what Mr. Mercat already owns." *Id.* at 1805:18–20. We think this because: (1) what Dr. Howle said doesn't make any sense; (2) the court reporter inserted a "(sic)" after that first "Mr. Mercat"; and (3) Princeton's counsel immediately noted, "[a]nd I think you said Mercat twice." *Id.* at 1805:21.

[15] We're fairly sure this refers to our (previously mentioned, *see ante* at 5) adjudication of the MSJs, in which we said that, because "[w]hether Princeton's wheels reveal a concave profile or a continuously varying radial distance—either literally or [ ]closely enough[ ] to be equivalent—are material facts at the heart of SRAM's infringement claim . . . we 'must deny summary judgment and proceed to trial.'" Order Adjudicating the Cross-MSJs at 16 (quoting *Torres*, 555 F. Supp. 3d at 1282).

[ . . . ]

> **Princeton's Counsel:** Dr. Howle this week testified when I cross-examined him appropriately that the DOE expands the literal scope of the claim, but you can never expand it into what someone else has already invented.
>
> **The Court:** Well, . . . everybody agrees with that. . . . In terms of literal infringement, of course that's true. We're talking now on doctrine of equivalents.
>
> **Princeton's Counsel:** Correct.
>
> **The Court:** And he's going to say that—so far is okay and no more.
>
> **SRAM's Counsel:** *And that's fine.* . . . I don't know what he's going to say next, and I just want—
>
> **The Court:** All right. Well, let's just keep it to where we are now, and I don't take you to make any objection yet, but we'll see how it goes.
>
> **SRAM's Counsel:** Okay.
>
> **The Court:** But I think everything you've just said is permissible.
>
> **Princeton's Counsel:** Thank you[.]

Transcript at 1806:2–1808:15 (emphasis added). The direct exam of Dr. Hanson resumed, and it

continued in this vein for some time:

> **Princeton's Counsel:** And the range of equivalents that you found from your review of the Mercat reference, how much constant radial distance can be present in a wheel like the accused products and still be equivalent to Mr. Katsanis's invention?
>
> **Dr. Hanson:** . . . I set the line at one millimeter.
>
> **Princeton's Counsel:** . . . [S]o anything less than one millimeter of constant radial distance could be equivalent to Mr. Katsanis's claimed patent?
>
> **Dr. Hanson:** Yep, that's what I say.
>
> **Princeton's Counsel:** And anything greater than one millimeter of constant radial distance would be something not equivalent to Mr. Katsanis's claimed '800 invention, right?
>
> **Dr. Hanson:** That's correct.

> **Princeton's Counsel:** And that's because that would be something Mr. Mercat already invented and shared with the world?
>
> **Dr. Hanson:** That's what I determined from analysis of Mercat.

*Id.* at 1809:17–1810:17.

Based on this framework, Dr. Hanson ultimately determined that Princeton's wheels didn't infringe on the '800 Patent's "continuously varies" limitation because he found that the Peak, Wake, and Grit had portions of constant radial distance of 1.5, 2, and 6.36 millimeters, respectively. *Id.* at 1813:9–14; *see also id.* at 1815:13–1815:19 (**Princeton's Counsel:** "And you found here that the actual areas of constant radial distance in each of the three [Princeton] wheels is something that Mr. Mercat had already claimed and shared with the world, right?" **Dr. Hanson:** "That's right." **Princeton's Counsel:** "So it cannot be equivalent to Mr. Katsanis's claim, right?" **Dr. Hanson:** "That's correct.").

Dr. Hanson took the same approach with SRAM's '188 Patent and its "convex peaks" limitation.[16]

> **Princeton's Counsel:** [D]id you also, with respect to the '188 patent, come to an opinion as to whether or not the [Princeton] wheels infringe under a doctrine of equivalents?
>
> **Dr. Hanson:** Yes. . . . [M]y opinion is that they don't infringe. Uhm, Mercat, as we know, has concave profiles, is what Mercat defined. I understand that the peaks associated with the [Princeton] wheels are concave. And that is substantially different than what is claimed by Mr. Katsanis's patent.

*Id.* at 1897:13–24.

Finally, in its closing argument, Princeton drove home Dr. Hanson's testimony. According to SRAM, this "further illustrates Princeton's use of singular features of *Mercat* to make its improper ensnarement argument to the jury." New Trial Motion at 10. Here's what Princeton's counsel said in

---

[16] This limitation, we note, is categorical as opposed to numeric. In other words, the wheels have *either* convex peaks *or* concave peaks. This is slightly different than the issue of constant radial distance, where all the wheels had *some length* of constant radial distance, but the question was *how long*.

closing about the '800 Patent: "And the experts seem to agree, that the furthest you could go before you run into trouble is, you can't extend beyond where someone else has already invented something and shared it with the world, right? What's the closest prior art? And that closest prior art here is Mr. Mercat." Transcript at 2422:7–13. "Dr. Hanson," Princeton's lawyer continued, "properly understood that the most expansive scope of the claim was Mr. Katsanis could have something that is a continuously varying rim or a continuously varying rim that does have portions of constant radial distance but of nothing more than one millimeter in length. And so still, even under that expanded doctrine of equivalents, we're [*i.e.*, Princeton's rims] still over in Mr. Mercat's property, right?" *Id.* at 2446:5–11. And here's what Princeton's counsel said about the '188 Patent: "[Katsanis] kept trying to get too much [during the patent prosecution]. And [the Patent Office] said, No, you can't have the concave peak of the Mercat patent, and you can't have the pointy circus top peak of Mr. Herting. . . . [A]t that peak, is it convex, which is all [Katsanis] was allowed to claim." *Id.* at 2411:6–14. To find infringement, Princeton's counsel added, "[w]e also have to find a convex region with a convex profile at its peak. And you're not going to find that . . . . And that's all that matters. Because if you don't find [that], we don't infringe." *Id.* at 2412:11–15. "With respect to both patents," Princeton's lawyer concluded, "they either have a valid claim that we don't infringe or you do what Dr. Howle did and you create a combined claim to try and get infringement, but that combined claim is invalid. Either of those two outcomes requires you to . . . find in our favor on noninfringement[.]" *Id.* at 2448:8–13.

Looking at this testimony and argument, we can't say that Princeton argued ensnarement either in opening or in its case-in-chief or during its closing. Instead, Princeton asserted what it believed to be the proper range of equivalents for the "continuously varies" limitation of the '800

Patent and the "convex profile" limitation of the '188 Patent *in light of* the prior art. This was proper. Again, let's consider what the Federal Circuit has said on this issue:

> In applying the doctrine of equivalents, the *fact finder* must determine the *range of equivalents* to which the claimed invention is entitled, in light of the prosecution history . . . and the *prior art*. It must then be determined whether the entirety of the accused device or process is so substantially the same thing, used in substantially the same way, to achieve substantially the same result as to fall into that range.

*Intel*, 946 F.2d at 842 (quoting *D.M.I.*, 755 F.2d at 1575) (emphasis added); *see also Martin v. Barber*, 755 F.2d 1564, 1568 (Fed. Cir. 1985) ("The range of equivalents to which the . . . patent is entitled also presents material fact issues relating to the nature and closeness of the prior art. . . . . With regard to the types of proof relevant to a finding on equivalence, . . . 'proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of prior art.' The task of carefully weighing the evidence rests with the trier of fact." (quoting *Graver Tank*, 339 U.S. at 609) (cleaned up))). That is, "when the patent holder relies on the doctrine of equivalents, as opposed to literal infringement, the difficulties and complexities of the doctrine require that evidence be presented *to the jury or other fact-finder* through the particularized testimony of a person of ordinary skill in the art[.]" *AquaTex*, 479 F.3d at 1329 (emphasis added)). And that comports with what we said when we denied *Princeton's* MSJ argument that "SRAM is legally barred from arguing infringement of any of the asserted patent claims under the doctrine of equivalents" because "SRAM impermissibly seeks to present an infringement theory based on the doctrine of equivalents that attempts to recapture precisely the claim scope that the patentee clearly and unequivocally disclaimed during prosecution to secure issuance of the Asserted Patents." Princeton MSJ at 12. And, in our summary-judgment order, we clarified that this was a question for the jury:

> Whether Princeton's wheels reveal a concave profile or a continuously varying radial distance—either literally or [ ]closely enough[ ] to be

> equivalent—are material facts at the heart of SRAM's infringement claim. Since "there are . . . genuine issues of material fact," we "must deny summary judgment and proceed to trial."

Order Adjudicating the Cross-MSJs at 16 (quoting *Torres*, 555 F. Supp. 3d at 1282).

We recognize that Princeton's strategy of emphasizing what it believed to be the proper range of equivalents in light of the prior art shares much in common with the ensnarement defense. *See e.g.,* *Streamfeeder,* 175 F.3d 974, 981 (Fed. Cir. 1999) (noting—in a case involving the ensnarement defense—that "[d]etermining whether the scope of equivalents accorded to a particular claim would encompass the prior art is an issue of law which we review *de novo*"); *DePuy*, 567 F.3d at 1322 ("Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art.'" (quoting *Wilson Sporting Goods*, 904 F.2d at 683)); *Jang*, 872 F.3d at 1285 ("A doctrine of equivalents theory cannot be asserted if it will encompass or 'ensnare' the prior art." (quoting *DePuy*, 567 F.3d at 1322)). But Princeton's approach and ensnarement *can be* distinguished, if barely. And the caselaw SRAM relies on hasn't convinced us otherwise.

SRAM hasn't cited a *single* case in which a district court (or the Federal Circuit for that matter) granted a motion for new trial filed by a patentee on the grounds that an accused infringer—who *prevailed* at trial—had improperly asserted an ensnarement defense. *See generally* New Trial Motion; New Trial Reply. Most of SRAM's cases are Federal Circuit decisions involving alleged infringers who *prevailed* on an ensnarement defense (before a court, not a jury, of course). *See Wilson Sporting Goods*, 904 F.2d at 686–87 ("We conclude that the magistrate erred in denying [the alleged infringer's] motion for JNOV on infringement, because, as a matter of law, a range of equivalents broad enough to cover [the accused product] would also have encompassed the prior art."); *Streamfeeder*, 175 F.3d at 985 ("The district court erred in adopting the jury's finding of infringement of claim 1, since the hypothetical claim proposed by [the patentee] encompassing the accused device would not have been patentable over [the prior art]."); *Jang*, 872 F.3d at 1290 ("The district court properly vacated the jury's finding of

infringement under the doctrine of equivalents because it correctly concluded that [the patentee] did not meet his burden of proving that his doctrine of equivalents theory did not ensnare the prior art as he failed to draft a hypothetical claim."). Others—cited by SRAM for the purpose of shedding light on the ensnarement defense generally—are just different procedurally from our case. *See generally DePuy*, 567 F.3d 1314 (on appeal from the district court's denial of the *alleged infringer's* motion for new trial and judgment as a matter of law); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570 (Fed. Cir. 1994) (on appeal from the district court's decision granting summary judgment for the alleged infringer).

This makes sense because courts *almost always* deal with the merits of an ensnarement defense on summary judgment or in post-trial motions *after* a jury has returned a verdict of infringement under the doctrine of equivalents. *See Agrofresh, Inc. v Essentiv LLC*, 2020 WL 7024867, at *17 (D. Del. Nov. 30, 2020) (finding—*after* a jury found that the defendant had infringed under the doctrine of equivalents—that the plaintiff "failed to prove that its asserted range of equivalents does not ensnare . . . prior art"); *Interactive Pictures*, 274 F.3d at 1381 (coming to the opposite conclusion in the same procedural posture). SRAM, in short, has done little more than tell us *what* the ensnarement defense is and *when* it can (and cannot) be advanced. But SRAM *hasn't* convinced us that an alleged infringer *cannot* assert its conception of the proper range of equivalents in light of the prior art in the way Princeton did at our trial. Nor has SRAM shown that the Federal Circuit's observations in *D.M.I.*, 755 F.2d at 1575, and *Intel*, 946 F.2d at 842—*i.e.*, that, "[i]n applying the doctrine of equivalents, the fact finder must determine the range of equivalents . . . in light of . . . the prior art"—are wrong.[17]

In researching for (and thinking about) this Order, we've found *only* one procedurally apposite Federal Circuit decision—and it tends to confirm what we're saying here. In *01 Communique Laboratory*

---

[17] Other district courts have made the same observation. *See Ind. Mills & Mfg., Inc. v. Dorel Indus. Inc.*, 458 F. Supp. 2d 890, 925 (S.D. Ind. 2006); *TV/Com Int'l, Inc. v. Mediaone of Greater Fla., Inc.*, 2001 WL 36169709, at *8 (M.D. Fla. Aug. 3, 2001) (Nimmons, J.); *Jackson*, 105 F. Supp. 2d at 864; *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 815 F. Supp. 1488, 1504 (D. Del. 1993).

*v. Citrix Systems*, 889 F.3d 735 (Fed. Cir. 2018), Communique, the patentee for a particular kind of computer system, sued Citrix for literal infringement of one independent claim and one dependent claim associated with its patent. After years of litigation (as well as parallel review by the U.S. Patent and Trademark Office), the case finally went to a jury trial, and Citrix prevailed. *Id.* at 738–39. Communique moved for judgment as a matter of law and a new trial on the grounds that "Citrix resorted to a well-known-defendant's trick, known as the 'practicing the prior art defense.'" *Id.* at 741. Specifically, Communique argued that "the jury verdict of non-infringement must be set aside because the trial court improperly permitted Citrix to by-pass the required comparison between the asserted claims and the accused products and instead focus on the similarities between Citrix's current . . . product and its prior art . . . product." *Ibid.*

The Federal Circuit rejected the patentee's argument for two reasons. *First*, the court found that Citrix didn't "eschew[ ] the requisite limitation by limitation comparison between the asserted claims and the accused product." *Ibid.* Instead, Citrix merely argued—as an "alternative invalidity defense"—that "if Communique attempted to expand the scope of its claims to include systems in [certain ways], then the claims would be invalid in light of the prior art," and there "was nothing improper about this." *Id.* at 741–42. As the Federal Circuit noted, a problem *would* have arisen had the "accused infringer forsake[n] any comparison between the asserted claims and the accused product, *relying instead* upon purported similarities between the accused product and the prior art." *Id.* at 742. But "[t]his does not . . . preclude a litigant from arguing that if a claim term must be broadly interpreted to read on an accused device, then this same broad construction will read on the prior art." *Ibid.* Indeed, "an infringement plaintiff must 'beware of what [it] asks for' since a broad claim construction for infringement purposes may ultimately result in a determination of patent invalidity[.]" *Ibid.* (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007)). "[W]hen an

accused product and the prior art are closely aligned," after all, "it takes exceptional linguistic dexterity to simultaneously establish infringement and evade invalidity." *Id.* at 742–43 (cleaned up).

*Second*, the Federal Circuit noted that, while "we have never suggested that any comparison between the accused product and the prior art mandates a new trial, . . . 'when [any] such prejudice is cured by instructions of the court, the motion for a new trial should be denied.'" *Id.* at 743 (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1046–47 (6th Cir. 1996)). And the trial court in *Communique* issued "careful jury instructions [that] were more than adequate to remedy any alleged prejudice or confusion resulting from comparisons between [the accused product] and [prior art]." *Id.* at 743–44. Specifically, the *Communique* Court told the jurors that "[t]he determination of literal infringement depends on the presence of the claim elements in the accused product, *not on similarities between the accused product and the prior art.*" *Ibid.*

While we recognize that *Communique* only involved claims of literal infringement—while our case involves *both* literal infringement *and* infringement under the doctrine of equivalents—we find the Federal Circuit's analysis persuasive. Here, Princeton, like Citrix, asserted an invalidity defense to the literal infringement claims that involved comparisons between the SRAM wheels, the Princeton wheels, and the prior art. And Princeton, like Citrix, advanced the logical argument that SRAM *couldn't* have it both ways. That is, either SRAM could remain faithful to the claim construction it rightfully had (in which case Princeton wouldn't infringe), or SRAM could present an overbroad claim construction (on which Princeton infringed) that impermissibly read on the prior art. That this invalidity-in-light-of-prior-art strategy may have bled into Princeton's defense against infringement under the doctrine of equivalents doesn't invalidate Princeton's defense or the jury's verdict. Indeed, like Citrix, Princeton's defense involved *more* than just a prior-art strategy. And our jury instructions—

we think—mitigated any possible confusion. With respect to *literal* infringement, after all, we instructed the jury as follows:

> To determine literal infringement, you must compare [Princeton's] products with each patented claim that SRAM asserts is infringed, using my instructions as to the meaning of the terms the patent claims.
>
> A patent claim is literally infringed only if [Princeton's] product includes each and every element recited in that patent claim. If [Princeton's] product does not contain one or more elements recited in the claim, [Princeton] does not literally infringe that claim. You must determine literal infringement with respect to each patent claim individually.
>
> The accused product should be compared to the invention described in each patent claim it is alleged to infringe. The same element of the accused product may satisfy more than one element of a patent claim.
>
> [ . . . ]
>
> To establish literal infringement of a dependent claim, SRAM must show that it's more likely than not that [Princeton's] product includes each and every element of the independent claim.
>
> If you find that the independent claim from which the dependent claim depends is not literally infringed, then you must find that the dependent claim is also not literally infringed.

Transcript at 2341:8–2342:19. We then moved on to the doctrine of equivalents:

> If you decide that [Princeton's] product does not literally infringe an asserted patent claim, you must then decide whether it is more probable than not that [Princeton's] product infringes the asserted claim under what's called the "doctrine of equivalents." Under the doctrine of equivalents, the product can infringe an asserted patent claim if it includes components that are equivalent to those elements of the claim that are not literally present in the product. If the product is missing an equivalent component to even one component of the asserted patent claim, the product cannot infringe the claim under the doctrine of equivalents. Thus, in making your decision under the doctrine of equivalents, you must look at each individual element of the asserted patent claim and decide whether the product has an equivalent component to each individual claim element that is not literally present in the product.

One way of showing that a component is an equivalent of a claimed element is to show that it performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally present in the accused product. Another way of showing that a component is an equivalent of a claimed element is to show that it is insubstantially different from the claimed element.

In deciding whether a claim element and the component are equivalents, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the component with the claimed element. However, known interchangeability between the claim element and the component of the product is not necessary to find infringement under the doctrine of equivalents.

*Id.* at 2342:20–2343:25. SRAM (notably) *didn't* object to these jury instructions.

Based on our examination of the ensnarement-related caselaw, therefore, we think the ensnarement defense is essentially a backstop to prevent accused infringers from *wrongfully* having been found *liable*. As one district court summed up the relevant cases in its adjudication of a motion for summary judgment:

The Court need not rule on the merits of these defenses [including ensnarement] at this time, however. If the jury finds literal infringement, then the jury will not be asked to determine whether [the accused device] infringes under the doctrine of equivalents, and the Court will not have to rule on [the infringement defendant's] defenses to that doctrine. Likewise, if the jury finds no literal infringement and no infringement under the doctrine of equivalents, the Court will not have to rule on [the infringement defendant's] defense. *Only if* the jury finds that the [accused device] does not literally infringe but does infringe under the doctrine of equivalents will the Court be required to rule on [the infringement defendant's ensnarement] defenses. . . . In that event, [the infringement defendant] may raise its defenses "on a motion for judgment as a matter of law at the close the evidence and after the jury verdict."[18]

---

[18] *QXMédical, LLC* arose on an unusual posture. Generally, the plaintiff in a patent action is the *patentee*, suing a defendant for infringing a patent. In *QXMédical, LLC*, however, the "plaintiff" was the alleged infringer and initiated the case by seeking declaratory judgments of noninfringement and invalidity.

*QXMédical, LLC v. Vascular Sol., LLC*, 408 F. Supp. 3d 996, 1009 (D. Minn. 2019) (quoting *Warner-Jenkinson*, 520 U.S. at 39 n.8) (emphasis added)); *see also Kewazinga Corp. v. Microsoft Corp.*, 558 F. Supp. 3d 90, 112 (S.D.N.Y. 2021) ("Although 'the ensnarement inquiry is separate and distinct from the jury's element-by-element equivalence analysis,' ensnarement is a defense asserted to *limit the reach of the doctrine of equivalents doctrine*. Because the Court has determined that [the plaintiff's] doctrine of equivalents theory is untenable, it need not discuss the viability of [the defendant's] ensnarement defense, as the issue is moot." (quoting *DePuy*, 567 F.3d at 1323) (emphasis added)).

Let's make something clear, though: The conclusion we reach here doesn't give accused infringers *carte blanche* to assert the ensnarement defense before juries. It simply means that we won't throw out a jury's verdict based on bits of testimony scattered throughout a lengthy and complicated trial transcript that *could* be viewed as approximating an improper ensnarement defense. And, as we'll explain later, we're especially reluctant to start again when the patentee *failed to object* to the accused infringer's defenses when those defenses were presented at trial.

Finally, SRAM notes that Princeton's alleged ensnarement defense wasn't even a proper ensnarement defense. According to SRAM, "[e]ven though ensnarement is a legal question for the Court to decide, Princeton argued an improper application of ensnarement to the jury. . . . The jury improperly compared singular features of the Princeton wheels and the *Mercat* prior art, instead of a holistic consideration of the claimed inventions of the '800 and '188 Patents compared to the accused products and the sole prior art of Mercat." New Trial Motion at 4 (cleaned up). "[T]he jury's finding of no infringement under the doctrine of equivalents," SRAM adds, "is wrong as a matter of law because it applied a test for ensnarement that the Federal Circuit rejected as 'improper.' While prior

---

The defendant—the patentee—then asserted patent infringement as a *counterclaim*. After appeal, the case was remanded by the Federal Circuit in view of another decision involving one of the same parties, *see QXMedical, LLC v. Vascular Sols. LLC*, 2024 WL 5054846, at *1 (Fed. Cir. Dec. 10, 2024)— but the remand was unrelated to the proposition we discuss here.

art, like *Mercat*, may limit the scope of equivalents in certain circumstances, the test for determining whether, and to what extent, it does so is not a 'simple plotting exercise'[19] (as Princeton argued at trial) comparing whether a single element of the accused product is also present in prior art. The test is whether the prior art anticipates, or renders obvious, the claimed invention *in each claim considered as a whole*, together with the equivalent of the challenged claim element." *Id.* at 12 (cleaned up). In other words, SRAM says, "Princeton's ensnarement defense fails as a matter of law, because Princeton relied on single features ('continuously varies' and 'convex') in *Mercat* to purportedly invalidate the equivalents of the asserted patent claims[.]" New Trial Reply at 1.[20]

---

[19] The "simple plotting exercise"—as asserted by Princeton in its closing argument—was that the jurors merely needed to compare the lengths of the portions of constant radial distance found in Princeton's rims to the one-millimeter "dividing line between . . . what's permissible under the doctrine of equivalents and what is not," *i.e.*, the dividing line Dr. Hanson established based on his analysis of Mercat. Transcript at 2424:12–20.

[20]     To make this point, SRAM relies on *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570 (Fed. Cir. 1994), a case involving the air bladders of basketball sneakers. *See* New Trial Motion at 16–19. There, the Federal Circuit reversed entry of summary judgment for the defendant on infringement under the doctrine of equivalents because the district court—"rather than perform a hypothetical claim analysis" after the defendant raised the ensnarement defense—"directly compared the prior art with a *single element* [*i.e.*, under-sole tabs that connected the two sides of the bladder] . . . of the accused device in an attempt to determine the extent to which prior art limits the application of the doctrine of equivalents." *Conroy*, 14 F.3d at 1576 (emphasis added). In other words, the district court improperly "concluded that the mere existence of a [a single] element in the prior art automatically preclude[d] the [plaintiff] from asserting a scope of equivalency sufficient to encompass the corresponding element in the accused device." *Id.* at 1577. Instead, the district court should have applied the Federal Circuit's "jurisprudence regarding anticipation and obviousness." *Ibid.* And "the obviousness inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention *as a whole* for which patentability is claimed." *Ibid.* (quoting *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1987) (cleaned up & emphasis added)).

According to SRAM, then, "[j]ust as it was improper for the district court in *Conroy* to rule that the 'tabs' in Reebok's PUMP shoe could not be equivalent to the 'linking member' of the Conroy patent simply because those 'tabs' appeared in an earlier patent, the jury here cannot find that the undulating configurations and peaks of Princeton's wheels lack equivalence to the undulating configurations and peaks of the '800 and '188 Patents simply because those singular features in Princeton's wheels purportedly appear in Mercat." New Trial Motion at 14. "Rather," SRAM goes on, "under *Conroy*, the Court must instead determine whether Mercat anticipates, or renders obvious, the '800 Patent and the '188 Patent claims, each considered *as a whole* with the asserted equivalent of the 'continuously varies' and 'convex' elements." *Ibid.* (emphasis added).

For two reasons, we don't need to determine whether Princeton's ensnarement defense was a *proper* ensnarement defense. *One*, *any* ensnarement defense *made to a jury* is improper. *See ante* § I(a) (explaining that the ensnarement defense is a legal question for the court). And *two*, Princeton *didn't assert* an ensnarement defense.

### d. SRAM didn't object to Princeton's defense on the grounds that it was an ensnarement defense.

Another problem for SRAM is that it didn't timely object to Princeton's alleged use of the ensnarement defense. According to Princeton, "to the extent SRAM now contends that any portion of [Princeton's] opening statement or closing argument was improper, no timely objection was made to any aspect of either presentation. As a result, all of SRAM's arguments are waived." New Trial Response at 7. The closest SRAM came to objecting to Dr. Hanson's testimony was during the sidebar conversation we reproduced above. *See ante* at 23–24. In that sidebar, however, we concluded that we didn't "take [SRAM's attorney] to make any objection yet, but we'll see how it goes." Transcript at 1808:10–11. And, "[a]s to the jury instructions," Princeton observes, "SRAM's counsel *explicitly stated* that there was *no objection to any of them* as given to the jury." New Trial Response at 9 (emphasis added).

SRAM concedes that it didn't object to Princeton's allegedly improper ensnarement defense testimony or argument (either in opening or closing). *See generally* New Trial Reply. It nevertheless insists that "there was no waiver because a legal question . . . cannot be transformed by a party into a question of fact." *Id.* at 5. Plus, it says, there's "no authority that [a party] must object to ensnarement

---

Princeton disagrees "given the important distinctions" between *Conroy* and our case. New Trial Response at 12. According to Princeton, "the lower court in *Conroy* granted *summary judgment* of non-infringement on the papers, making the case irrelevant on procedural grounds alone as not involving any jury fact-finding or decision-making. In deciding the case on the papers, the district court improperly made findings of fact at the summary-judgment stage, and concluded that the presence of just one of the elements of the accused device in the prior art limited the range of equivalents available to the plaintiff. The Federal Circuit concluded that it was error to find facts and to short-circuit the doctrine-of-equivalents analysis, and reversed." *Id.* at 12–13.

We needn't delve into *Conroy* because we haven't found that Princeton has asserted *any* ensnarement defense—proper or improper.

evidence at trial for the district court to decide this legal question later." *Ibid.* SRAM is wrong on both counts.

"Our general rule is that a timely objection is necessary to bring to the trial court's attention alleged errors in the conduct of trial." *Woods v. Burlington Northern. R.R. Co.*, 768 F.2d 1287, 1292 (11th Cir. 1985), *rev'd on other grounds*, 480 U.S. 1 (1987).[21] Indeed,

> [t]he rule is applied to argument of counsel [and] is grounded on sound policy. First, the requirement fosters judicial economy. By bringing an error to the judge's attention, the court has a chance to correct it on the spot. Requiring timely objection prohibits counsel from 'sandbagging' the court by remaining silent and then, if the result is unsatisfactory, claiming error. Second, there are a number of good reasons why skilled trial counsel may make a tactical decision not to object to improper argument.

*Ibid.* (cleaned up).

When a party has appealed an alleged error to which it had not objected, the Eleventh Circuit will "retain the authority to review for plain error." *Ibid.*; *see also Bratt v. Genovese*, 2018 WL 5111910, at *4 (M.D. Fla. Oct. 19, 2018) (Honeywell, J.) ("When no objections are raised, the standard for a new trial is plain error[.]"). "Under plain-error review, a party must show (1) an error occurred; (2) the error was plain; (3) the error affected substantial rights; and (4) failure to correct the error 'would seriously affect the fairness of the judicial proceedings.'" *Vista Marketing, LLC v. Burkett*, 812 F.3d 954, 975 (11th Cir. 2016) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999)). "[A] finding of plain error 'is seldom justified in reviewing argument of counsel in a civil case.'" *Bratt*, 2018 WL 5111910, at *4 (quoting *Woods*, 768 F.2d at 1292)); *accord Berman v. Kafka*, 661 F. App'x 621, 626 (11th Cir. 2016) (affirming denial of new trial where defense counsel made "improper comments

---

[21] As we explained above, when the Federal Circuit "handl[es] appeals from a district court, [it] review[s] matters not unique to patent law according to the law of the regional circuit." *Egenera, Inc. v. Cisco Sys., Inc.*, 141 F.4th 1350, 1358 (Fed. Cir. 2025). We therefore look to our own Circuit's case law in resolving SRAM's motion for a new trial. *See, e.g., ibid.* (applying First Circuit law to a Massachusetts court's denial of a new-trial motion).

during opening and closing argument" but plaintiff's counsel failed to object); *Egenera*, 141 F.4th at 1366 (affirming denial of new trial where defense counsel "traveled close to the lines the district court set" but did not "directly" violate them, and where plaintiff's counsel failed to object). "[R]eversal for plain error . . . will occur only in exceptional cases where the error is so fundamental as to result in a miscarriage of justice." *Vista Marketing*, 812 F.3d at 975 (quoting *Farley*, 197 F.3d at 1329).

There was no error here—plain or otherwise. Again, Princeton *didn't* assert an ensnarement defense. It simply advanced an *invalidity* defense and countered SRAM's asserted range of equivalents with its own. But it's especially telling that SRAM's lawyers *didn't object* to Princeton's alleged ensnarement defense, especially during counsel argument. SRAM's lawyers, after all, are experienced, savvy patent attorneys—and no strangers to federal court. In our estimation, they did an admirable job at trial—despite the jury's finding of no infringement. Had Princeton *really* committed the mortal sin of *both* arguing ensnarement *and* grounding its *entire defense* on an impermissible legal argument— as SRAM would now have us believe—it would have bordered on malpractice for SRAM's attorneys not to have objected. That they didn't object is not, we think, because SRAM's attorneys are inept. It's more likely that SRAM's skilled trial attorneys recognized Princeton's defense for what it was: a back-and-forth over patent invalidity and a tug-of-war over the range of equivalents. SRAM's ado about ensnarement is just a last-ditch effort to salvage the jury's across-the-board verdict of no infringement. As we've explained, this effort fails.

\*      \*      \*

Because Princeton didn't assert the ensnarement defense, we **DENY** this first part of SRAM's Motion for New Trial and to Alter or Amend the Final Judgment.

## II.    We didn't err with respect to the lay-witness testimony.

We move on now to the second issue SRAM has raised in its New Trial Motion: lay-witness testimony. Specifically, SRAM argues that "[t]he Court's exclusion of highly probative testimony from

SRAM lay witnesses describing Princeton's wheels was an improper application of FED. R. EVID. 403[22] and requires a new trial." New Trial Motion at 17. This exclusion, SRAM says, was doubly prejudicial because "Princeton was allowed to bolster the testimony of its experts with lay witness testimony." New Trial Reply at 8. SRAM is wrong on both points.

### a. We properly excluded SRAM's lay-witness testimony.

According to SRAM, we "acknowledged [before trial] the admissibility under FED. R. EVID. 701[23] of lay witness testimony describing the appearance and shape of Princeton wheels, including by using terms that may appear in the claims of the '800 and '188 Patents." New Trial Motion at 17. But we "nevertheless excluded that testimony at trial under FED. R. EVID. 403 on the basis that it would confuse the jury," which SRAM alleges prevented it "from introducing such lay witness testimony from . . . Michael Hall, Jason Fowler, Dimitris Katsanis, and Kevin Wesling." *Ibid.* (cleaned up). According to SRAM, we erred in that Rule 402 analysis.

As to probative value, SRAM says that "lay witness testimony describing the features of Princeton's wheels has substantial weight" and would have been "highly persuasive." *Id.* at 18. In other words, "[l]ay witnesses with knowledge of and experience with bicycle wheels, like Michael Hall, Jason Fowler, Dimitris Katsanis, and Kevin Wesling, testifying about the appearance, features, and shape of the Princeton wheels based on their own perceptions of them, is directly relevant to infringement." *Ibid.* And, as for the dangers Rule 403 guards against, SRAM argues that there was no risk "that such testimony w[ould] confuse the jury, much less a danger that substantially outweighs the testimony's heavy probative value." *Id.* at 20. "The claim terms at issue, as construed by the Court, are not technical

---

[22] According to FED. R. EVID. 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[23] And, under FED. R. EVID. 701, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

ones . . . but instead plain and ordinary words used and understood in everyday language, including words like 'convex,' 'peaks' and 'valleys,' and 'continuously changing.'" *Ibid.* This "misapplication of FED. R. EVID. 403," SRAM concludes, caused "material[ ] prejudice." *Id.* at 17.

Princeton disagrees. In its view, we "merely precluded lay witnesses from using *disputed claim terms* to describe [Princeton's] wheels under FED. R. OF EVID. 403, and decided, in its measured discretion, 'to leave comparison of claim terms and the products to the experts.'" New Trial Response at 21 (quoting Transcript at 627:12–15). To have "permit[ed] SRAM's lay witnesses to offer expert infringement opinions by comparing the claim language to the accused products," Princeton continues, "would have violated black-letter Federal Circuit law." *Id.* at 2. Indeed, Princeton adds, "[t]he Federal Circuit consistently admonishes trial courts for doing what SRAM now demands." *Id.* at 20. Considering the testimony in question from a Rule 403 perspective, Princeton maintains that any such testimony would've had "minimal, if any, probative value, especially because the jury heard expert opinion comparing claim terms to the accused wheels from SRAM's expert . . . . The fact testimony SRAM complains about was thus *per se* duplicative." *Id.* at 22. As for the other side of the equation, Princeton contends that "a lay witness using claim terms to describe the accused wheels is confusing[.]" *Ibid.*

While it's a stretch to say that we "reversed course" on this issue, New Trial Motion at 19, our approach to how several of SRAM's lay witnesses would be permitted to testify did evolve. When ruling on one of SRAM's motions *in limine* at the Calendar Call, we said the following:

> As a lay witness, Mr. Wesling may only provide lay witness testimony within the meaning of Rule 701. To the extent that Mr. Wesling's factual testimony is based on his personal knowledge, including based on his personal study of the accused products, that testimony will be permitted under Rule 701, subject to any objections the defense may raise.
>
> So, for example, Mr. Wesling could testify that he has seen and examined the accused wheel, and the wheel had a convex exterior

profile. That's different from a lay witness impermissibly testifying about legal conclusions as, for example, "Princeton's wheels infringe the '800 and '188 patents."

For a discussion of this difference, compare *Composite Resolution, Inc. vs. Recon Medical LLC*, 2021 WL 5501104, at page 4, District of Nevada, 2021. "The Court should not exclude him as a lay witness because he has inspected the defendant's accused products and therefore has personal knowledge of whether they must have been made using the process he's described in the patent in suit." Compare that with *HVLPO2 LLC v. Oxygen Frog, LLC*, 949 F.3d 684, at 689, a Fed. Circuit case from 2020. "Testimony directed to the conclusion of obviousness and its underlying technical questions is the province of qualified experts and not lay witnesses."

So, I'll grant the motion, because a lay witness cannot be permitted to offer expert testimony, and *I will go play by play on defining the exact contours of that limitation during Mr. Wesling's testimony.*

Calendar Call Transcript [ECF No. 212] at 33:19–34:20 (emphasis added). During the trial, the following back-and-forth occurred at sidebar:

> **The Court:** I want to leave comparison of claim terms and the products to the experts. Okay? I just think that's cleaner and safer, and I don't want us to stray from that. Am I clear about that for both sides.
>
> [ . . . ]
>
> **SRAM's Counsel:** Well, we provided three cases in our response to the [motion *in limine*] where we believe you can do that as a lay witness. It really goes into 701(c). Because it's what you perceive, et cetera, especially with someone like Mr. Hall and Mr. Fowler.
>
> **The Court:** I get it, but I just think that when we perceive things, and we use the words that are in the claim terms, I agree with you that to some extent, it's 701. I just think it's so confusing that under 403, I want to draw the line. Because . . . I know what we're all doing, and I just don't want the jurors to get confused by those claim terms being used by a lay witness. That's the issue I'm having.
>
> **SRAM's Counsel:** I understand. I assume that applies for both sides.
>
> **The Court:** Of course it applies to both sides.
>
> **Princeton's Counsel:** Agreed.

Transcript at 627:12–628:12. In other words, consistent with what we said at the Calendar Call about going "play-by-play," we decided at trial *not* to allow lay witnesses to use claim terms because of our concern that their opinion testimony would violate the careful balancing act Rule 403 deploys.

According to SRAM, "federal courts adjudicating patent infringement actions like this one regularly admit testimony of lay witnesses describing accused products under FED. R. EVID. 701, even when the lay witnesses use terms found in the patent claims or in the court's constructions." *Id.* at 19. SRAM—in its motion-*in-limine* briefing—cited three district-court, patent-infringement cases to support its position. In *Composite Resources, Inc. v. Recon Medical, LLC*, the court denied the defendant's motion *in limine*, which had urged the judge to "exclude" the testimony of a lay witness under Rules 602 and 701 because the witness "ha[d] no personal knowledge of [the defendant's] manufacturing methods." 2021 WL 5501104, at *4 (D. Nev. Nov. 22, 2021). According to the court, the lay witness *could* "testify to facts perceived from his own senses." *Ibid.*

In *Maxell, Ltd. v. Apple, Inc.*, the plaintiff moved *in limine* to "exclude any lay witness references, evidence, testimony or argument regarding infringement and invalidity opinions" and submitted that "lay witnesses should not be permitted to testify as to why specific claim language in the asserted patents is not met by the accused products or use claim language while describing the features of prior art products, as these opinions would constitute expert testimony." 2021 WL 3021253, at *3 (E.D. Tex. Feb 26, 2021). The court granted in part and denied in part the motion: "[The defendant's] lay witnesses . . . may not compare the accused . . . products to [the plaintiff's] infringement contentions, nor provide any noninfringement analysis that would require an expert report . . . . [The Defendant's] lay witnesses may provide facts within their personal knowledge about the structure, function, or operation of the accused products." *Ibid.*

Finally, in *Steyr Arms, Inc. v. Beretta USA, Corp.*, the plaintiff argued that a lay defense witness's declaration constituted "inadmissible expert testimony." 2020 WL 2767359, at *5 (N.D. Ala. May 28,

2020). In that testimony, the witness "explained his understanding of the structures required by the Court's Claim Construction order," "described the relevant component parts of the [accused pistol] and explained [how it functioned]," and "identified structures in the Claim Construction Order that are not present in the [accused pistol]." *Ibid.* The court found that the declaration was "admissible lay witness testimony." *Id.* at *6. According to the court, the lay witness "has extensive personal knowledge of and experience with the [accused pistol] and other [defendant] products. . . . He compared his knowledge of the [accused pistol] with his understanding of the [allegedly infringed patent] and Court's Claim Construction order, reaching factual opinions as to components missing from the [accused pistol]. He did not offer opinions about infringement or the legal implications of the Court's Claim Construction Order." *Ibid.* As in these cases, SRAM says, "[a] SRAM [lay] witness describing the appearance and features of bicycle wheels would be testifying based on the witness's own perceptions and using everyday reasoning, not specialized processes or methodologies." New Trial Reply at 8.

Princeton counters SRAM's caselaw with a single Federal Circuit decision. In *HVLPO2, LLC v. Oxygen Frog, LLC*, the patent owner of an oxygen-generating system sued a competitor for infringement. 949 F.3d 685, 686–87 (Fed. Cir. 2020). The district court allowed the plaintiff to present deposition testimony of one of its lay witnesses, in which the witness had opined on the issue of obviousness. *Id.* at 687 ("Question: 'Did you think that modifying the Cornette system to support two circuits to be obvious?' Answer: 'Yes, I did.'"). The defendant had previously objected, but the district court overruled the objection and instead gave a limiting instruction to the effect that "such testimony is 'not the ultimate question' of obviousness and that it was up to the jury to decide obviousness." *Id.* at 688. After the jury ruled for the plaintiff, the defendant filed a motion for new trial, which the district court denied on the grounds. *See ibid.* But the Federal Circuit reversed. According to the Federal Circuit, "[a]dmission of [the lay] testimony opining that it would be 'obvious' to modify a prior art

system in a particular way that would match the claimed invention was improper" under Rule 702. *Ibid.* "Issues of infringement and validity," the court said, "'are analyzed in great part from the perspective of a person of ordinary skill in the art,' such that a witness who is 'not qualified as an expert by knowledge, skill, experience, training, or education in the pertinent art . . . cannot assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Ibid.* (quoting *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361–62 (Fed. Cir. 2008) (cleaned up)). "The prohibition of unqualified witness testimony," the court continued, "extends to the ultimate conclusions of infringement and validity as well as to the underlying technical questions. '[A] witness not qualified in the pertinent art [may not] testify as an expert on obviousness, or any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of the prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention.'" *Id.* at 689 (quoting *Sundance*, 550 F.3d at 1364 (cleaned up)). Applying this framework to the lay-witness opinion testimony in question, the Federal Circuit found the testimony "inadmissible" because it "was directed to the central legal and technical question at trial: whether [the plaintiff's asserted] patent claims were invalid for obviousness." *Ibid.*

It seems to us that SRAM's three district-court cases and Princeton's Federal Circuit decision stand for different—and not mutually exclusive—propositions. In SRAM's district-court decisions, the courts found that a lay witness *could* "testify to facts perceived from his own senses," *Composite Resources*, 2021 WL 5501104, at *4; "provide facts within their personal knowledge about the structure, function, or operation of the accused products," *Maxell*, 2021 WL 3021253, at *3; and "compare[ ] his knowledge of the [accused product] with his understanding of the [allegedly infringed patent] and Court's Claim Construction order," *Steyr*, 2020 WL 2767359, at *6. These holdings *don't* conflict with the Federal Circuit's *HVLPO2* prohibition on lay-witness testimony that "extend[s] to *the ultimate*

*conclusions* of infringement and validity as well as to the *underlying technical questions*." *HVLPO2*, 949 F.3d at 689 (quoting *Sundance*, 550 F.3d at 1364 (cleaned up)). In other words, it's one thing for a lay witness to describe a product—but it's something entirely different for that same witness to make "ultimate conclusions" or speculate as to "underlying technical questions." *Ibid.* None of the cases cited by either party are thus dispositive as to the question we face here—namely, whether a court can exclude lay-witness testimony offered by the plaintiff in a patent-infringement case in which that lay witness *describes* a product using *claim terms*.

Because the Eleventh Circuit "affords district court judges 'the broadest discretion in determining whether evidence should be excluded under Rule 403,'" *Ermini v. Scott*, 937 F.3d 1329, 1343 (11th Cir. 2019) (quoting *United States v. Costa*, 947 F.2d 919, 924 (11th Cir. 1991)), we don't think we erred in preventing SRAM's lay witnesses from describing the products using claim terms, *see Borden, Inc. v. Fla. E. Coast Ry. Co.*, 772 F.2d 750, 756 (11th Cir. 1985) ("The trial judge is accorded broad discretion in determining whether evidence should be excluded under Rule 403 and we will only reverse where there has been a clear abuse of discretion."); *Hopkins v. Britton*, 742 F.2d 1308, 1311 (11th Cir. 1984) ("Under FED. R. EVID. 403 the trial judge has broad discretion to exclude evidence in order to prevent the needless presentation of cumulative evidence.").

We also can't see how this decision of ours *prejudiced* SRAM in any meaningful way, since (as Princeton rightly points out) "SRAM's expert, Dr. Howle, provided exactly the testimony SRAM sought to elicit from its biased lay witnesses, who would have offered cumulative testimony in any event. . . . Nothing prevented SRAM from asking questions [to Dr. Howle] to elicit descriptions and observations of the accused wheels without using disputed claim terms. Thus, even assuming the exclusion of lay-witness testimony using claim terms was somehow an abuse of discretion (and it was not), it was harmless, as SRAM suffered no prejudice." New Trial Response at 23. SRAM (tellingly) doesn't explain how the lay-witness testimony it hoped to introduce would've been anything but

cumulative, given that those lay witnesses would've parroted Dr. Howle—a far more knowledgeable witness by all accounts. *See, e.g.*, Transcript at 992:3–6 (**Dr. Howle:** "My understanding is that [Princeton] make[s] use of the undulating configuration on the inside of the [Peak] rim to achieve the aerodynamic benefits and also to be impervious to the crosswinds[.]"); *id.* at 1017:1–8 (**SRAM's Counsel:** "And if we look at the Wake 6560, what is your opinion with respect to infringement of the Wake 6560 for claim 2 and 3 of the '800 patent?" **Dr. Howle:** "So for the Wake 6560, . . . I find that it has a continually undulating configuration, and that it's arranged along that circumference, around the circle, of the radially inner edge, such that that radially inner edge is either intermittently or continually undulating."); *id.* at 1018:18–24 (**SRAM's Counsel:** "[W]hat is your opinion with respect to infringement of claim 4 for the Grit 4540?" **Dr. Howle:** "So there you'll see the same concave regions adjacent to the convex regions. . . . [T]he Grit 4540 also infringes this claim 4.").

We therefore didn't abuse our discretion in preventing SRAM from producing this cumulative—and only mildly probative—lay-witness testimony.

**b.  We rightly allowed Princeton's lay witnesses to testify as they did.**

According to SRAM, "[t]he prejudice [it suffered was] significantly heightened by the fact that Princeton witnesses were permitted to testify repeatedly that they did not believe their wheels infringed the patents and lacked particular features." New Trial Motion at 20. "Princeton was," SRAM insists, "permitted to introduce both expert and lay witness testimony of non-infringement, effectively using multiple lay witnesses to bolster or augment the testimony of its expert[.]" *Id.* at 21. But that's an apples-to-oranges comparison, Princeton says, because "*SRAM itself* placed [Princeton's] state of mind directly in controversy by alleging *willful* infringement[.]" New Trial Response at 21. Princeton was thus "permitted to rebut these allegations with testimony regarding its good-faith belief of no infringement." *Ibid.* Indeed, as Princeton rightly observes, "[a] defendant's subjective belief that it did not infringe the asserted patents is *highly relevant* to willful infringement—indeed, it is usually the entire

crux of the matter[.]" *Id.* at 23. Even so, as Princeton clarifies, *none* of Princeton's "fact witnesses were permitted to testify using disputed claim terms," either. *Id.* at 22.

SRAM specifically takes issue with Princeton CEO Harrison Macris's lay-witness testimony that—after being notified of the potential infringement by SRAM representatives—Macris "realized" that the products were "two inherently different things. So, you know, it was my good faith belief that we didn't infringe." Transcript at 1617:5–7. Later in his testimony, Macris reiterated that "[m]y belief was that we did not infringe." *Id.* at 1624:2. And he later asserted that "[t]here are sections [of the Princeton wheel] where the radius is constant." *Id.* at 1601:25–1602:1.

SRAM also objects to the testimony of Bradley Wentz, one of Princeton's designers (and lay witnesses), who said that, based on his own measurements, "none of [Princeton's wheels] have a perfect sine wave shape[.]" *Id.* at 1497:10–1498:5. In SRAM's view, our admission of these statements (in conjunction with the exclusion of SRAM lay-witness testimony) so "unfairly stacked the deck in Princeton's favor" that a "new trial is warranted." New Trial Motion at 21. For this proposition, SRAM cites just one case: *Higgs v. Costa Crociere S.p.A.*, 720 F. App'x 518 (11th Cir. 2017), an unreported Eleventh Circuit decision concerning Rule 403 in the context of a slip-and-fall aboard a cruise ship.

We think Princeton has the better side of this argument, and the caselaw bears this out. Take *Exmark Manufacturing Co. Inc. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332 (Fed. Cir. 2018), for example. There, the plaintiff prevailed before a jury on its claim that the defendant had *willfully* violated its patent. *Id.* at 1338. On appeal, however, the Federal Circuit found that the district court erred by excluding "any evidence regarding the validity [of one of the allegedly infringed claims] or how closely the prior art tracks [that claim]." *Id.* at 1354. According to the Federal Circuit, "the district court erred to the extent it excluded this evidence without also determining whether it was relevant to [the defendant's] state of mind at the time of the accused infringement." *Id.* at 1353. After all, continued the Federal Circuit, "willfulness is an issue for the jury, not the district court." *Ibid.*

Likewise, in *Omega Patents, LLC v. CalAmp Corp.*, the Federal Circuit held that the district court abused its discretion through its "exclusion of [a lay defense witness's] testimony relating to CalAmp's state of mind prior to the alleged acts of infringement." 920 F.3d 1337, 1352 (Fed. Cir. 2019). This witness's "testimony on this issue was clearly relevant," the court wrote, "as the evidence shows he was the 'main person' tasked with investigating the patent landscape 'before CalAmp decided to release' the accused products and he was central to CalAmp's decision to launch the accused products." *Ibid.* In short, the lay witness "should have been allowed to present a limited summary of his conclusion [about the patent landscape and where CalAmp's product fit into it] from [his] investigation and the basis for it." *Ibid.*

The four lines of testimony SRAM takes issue with here were perfectly admissible. Starting with Macris's two statements about his "belief" that Princeton didn't infringe, those are plainly within the ambit of the state-of-mind testimony the court discussed in *ExMark Manufacturing* and *Omega Patents*. And Macris's point that there are "sections [of the Princeton wheel] where the radius is constant" likewise bolsters his lay-witness *belief*—as opposed to an expert *conclusion*—that Princeton's products didn't infringe. Finally, Wentz's view that none of Princeton's wheels have a "perfect sine wave shape" is just a fancier way of stating his subjective belief that Princeton's wheels do have portions—regardless of the length—of constant radial distance.

Since SRAM had asserted that Princeton *willfully* infringed its patents, Princeton was entitled to rebut this claim with evidence that its CEO (and one of its principal designers) *didn't* believe they had infringed at all. We, in short, properly admitted this testimony.

### III. The jury's finding of non-infringement as to the '800 patent was not contrary to the overwhelming weight of the evidence, either literally or under the doctrine of equivalents.

According to SRAM, "[e]ven if Princeton's theory that Mercat's conjectured 1 millimeter of constant radial distance limits the range of equivalents is correct, the jury's finding that Princeton's

wheels do not infringe the '800 Patent is against the great weight of the evidence, and a new trial is required on this issue." New Trial Motion at 23. Specifically, SRAM says:

> Dr. Hanson did not testify about performing any quantitative measurements of Princeton's wheels to support a finding that their supposed segments of constant radial distance exceeded Mercat's purported 1 millimeter. For his dial-gauge experiment, Dr. Hanson did not provide any quantitative measurements of the lengths of the segments he claims have constant radial distances. His graphical-image analysis likewise generated no such measurements. The only quantitative measurements of purported constant radial distance he presented—*i.e.*, 2 millimeters for the WAKE 6560, 6.36 millimeters for the GRIT 4540, and 1.5 millimeters for the PEAK 4550—were derived from computer-generated CAD drawings, *not Princeton's actual wheels.* The CAD drawings themselves cannot support a finding of no infringement of all Princeton wheels, literally or under the doctrine of equivalents, for the obvious reason that it is *Princeton's wheels* that the jury must evaluate for infringement, not computer drawings. Further, there is no evidence to support a finding that the CAD drawings Dr. Hanson evaluated are identical to, or materially accurate representations of, Princeton's wheels. Dr. Hanson did not confirm that to be the case as part of his analysis. Moreover, Harrison Macris . . . testified to creating and editing [the] CAD files, did not testify that the SolidWorks file he sent to Princeton's manufacturer is the same file Dr. Hanson reviewed, and, in addition, the CAD drawings Dr. Hanson reviewed were modified just hours before they were produced in the case, a fact of which Dr. Hanson was unaware. Left with that, Princeton's non-infringement argument amounts to the mere presence of 'any region of constant radial distance,' a position that this Court already rejected in claim construction.

*Id.* at 21–22 (cleaned up). In Princeton's view, SRAM's "suggestion that the no-infringement finding on each patent is against the weight of the evidence ignores all the reasons (known and unknown) on which the jury may have based its non-infringement decision." New Trial Response at 7. We agree with Princeton.

Again, "[b]ecause it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is

against the great—not merely the greater—weight of the evidence." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (cleaned up); *see also Palm Beach Atl. Coll. v. First United Fund, Ltd.*, 928 F.2d 1538, 1542–43 (11th Cir. 1991) ("We note at the outset that when reviewing the sufficiency of the evidence supporting a general jury verdict, we are not free to substitute our judgment for that of the jury." (cleaned up)). "Indeed, our inquiry is limited to determining whether or not reasonable jurors could have concluded as this jury did based upon the evidence presented," and "we are obliged to examine all the evidence and draw reasonable inferences in favor of the party prevailing in the district court." *Id.* at 1543 (cleaned up).

The Eleventh Circuit's "review of a district court's grant of a new trial is 'extremely stringent' when the district court discards the verdict on the ground it is against the great weight of the evidence." *Auto-Owners Ins. Co. v. S.E. Floating Docks, Inc.*, 571 F.3d 1143, 1145 (11th Cir. 2009) (quoting *Redd v. City of Phenix City*, 934 F.2d 1211, 1215 (11th Cir. 1991)). The Eleventh Circuit's "application of this more rigorous standard of review ensures the district court does not simply substitute its own credibility choices and inferences for the reasonable choices and inferences made by the jury." *Ibid.* (quoting *Redd*, 934 F.2d at 1214–15). In other words, "[i]f the jury's verdict is supported by the evidence, then it is immaterial that we or the district judge would have arrived at the same verdict because it is not our place to substitute our judgment for that of the jury." *Ibid.*

Let's start with Dr. Hanson's quantitative measurements. While SRAM accurately describes what Dr. Hanson did and didn't do, it's worth discussing his process a bit more carefully. He initially used a dial gauge to determine whether Princeton's *actual wheels* exhibited portions of constant radial distance. *See* Transcript at 1784:8–1785:1 (**Princeton's Counsel:** "Can you explain for us what is the dial gauge analysis that you did?" **Dr. Hanson:** "I guess I call it an analysis, but this is a measurement. . . . I've taken the wheel, and I've mounted the wheel, and I put a very sensitive instrument that can make measurements down to 0.001 millimeters [on it] . . . . I position the sensitive

region of the dial gauge . . . on to the inner edge of the wheel. . . . I've set up a computer-controlled system to rotate the wheel very slowly while I record whether or not the radial inner edge is changing as measured by the reading on the dial gauge."). While this process in isolation revealed the presence of portions of constant radial distance, it didn't reveal the *lengths* of those portions. *See id.* at 1960:15–18 (**Dr. Hanson:** "I used a dial gauge, which is basically an extremely, extremely precise ruler, to determine whether or not there were any changes in radial distance, and I found changes of zero[.]"). So, Dr. Hanson arrived at his measurements of constant radial distance by evaluating the CAD ("computer-aided design") drawings. *Id.* at 1780:7. According to Dr. Hanson, a CAD drawing is a "drawing made by [Princeton] . . . [a]nd it's the drawings that define the shapes of the wheels. Now, these would be the same drawings that would be sent to the manufacturer, and the manufacturer would produce the product to the shape specified by the drawings." *Id.* at 1780:8–13; *see also id.* at 1641:23–1642:4 (**Macris:** "Manufacturing tolerance, the way I understand it, is the variance between the resulting physical product that you get and the [CAD drawing] dimensions. . . . So in our case, I request a 0.1-millimeter tolerance on dimensions."). And those portions of constant radial distance— as measured on the CAD drawings by Dr. Hanson—equaled 2, 6.36, and 1.5 millimeters for Princeton's Wake, Grit, and Peak wheels, respectively. *See id.* at 1783:9–22. This is a reasonable analysis the jury was free to either accept or reject.

SRAM also takes issue with the usefulness and reliability of the CAD drawings, arguing that "there is no evidence that those CAD drawings are accurate representations of Princeton's wheels, and Princeton does not identify any evidence to the contrary." New Trial Reply at 9. SRAM also claims that "the CAD drawings Dr. Hanson reviewed were modified just before they were produced to SRAM, without any explanation as to what the modifications were, or any attempt to confirm that the segments Dr. Hanson claims to have measured from the CAD drawings were not the objects of these modifications." *Ibid.* But these are just regurgitations of points SRAM already made during the trial—

points the jury apparently rejected. For example, SRAM's counsel asked Dr. Hanson on cross-examination whether, "just to be clear, SRAM's not accusing CAD drawings [*i.e.*, as opposed to actual bicycle wheels] of infringing the '800 or the '188 patent, correct?" Transcript at 1979:24–25. And SRAM's counsel drilled down on the issue of possible CAD-drawing modifications a few moments later:

> **SRAM's Counsel:** It's irrelevant to your opinion that there were modifications made to the file four hours before it was sent to us, and you don't know what those modifications are.
>
> [ . . . ]
>
> **Dr. Hanson:** I don't know that there are any relevant modifications made.
>
> [ . . . ]
>
> **SRAM's Counsel:** So there was a modification to the file. You don't know what modification was made or who made it?
>
> **Dr. Hanson:** That's correct.

*Id.* at 1987:16–1988:18. In its closing argument, SRAM came back to this point:

> And then the most amazing thing is this diagram, these CAD drawings, right, that [Princeton] produced . . . . [Y]ou saw from the other piece of evidence that we put in, [the CAD drawing was modified] a few hours before they produced it to us. No one got on the stand and said, What was that modification? What happened here? . . . [T]hey didn't put anyone on to say, No, this is what that change was, I didn't change anything related to this area [of supposed constant radial distance].

*Id.* at 2403:11–2404:3. So, while SRAM raised legitimate questions about the validity and reliability of the CAD drawings at trial, none of the testimony it elicited from the expert witnesses (or the arguments it made in its closing) were conclusive proof that the CAD drawings were *inaccurate* representations of Princeton's wheels. How much weight to give the CAD drawings, then, was ultimately a factual question for the jury—and one the jury apparently answered in Princeton's favor.

Still, to make a weight-of-the-evidence determination here, we can't just consider Dr. Hanson's testimony, which we've found to be persuasive. We must *also* consider Dr. Howle's testimony. Because Dr. Howle found that *none* of Princeton's wheels had "regions of constant radial distance," he could not (and did not) provide *any* measurements of any such non-existent regions. Transcript at 1089:8–19 (**Princeton's counsel:** "So when you found that [Princeton's wheels] didn't have any non-varying portions, it means that you found that they had no constant regions of radial distance, right?" **Dr. Howle:** "No regions of constant radial distance. . . . " **Princeton's Counsel:** "And so in your opinion, though, you didn't take any measurements of constant radial distance to determine whether or not that was the case, did you?" **Dr. Howle:** "When I did my analysis with these products, I measured everything that had a measurement associated with it in both the '800 and '188 patents.").

Dr. Howle reached his no-constant-radial-distance conclusion by conducting the following analysis:

> [T]he way I set this up was I used a common carpenter's laser level. So it has a cross hair that floats, and so you can set this up, and it will give you a straight line either horizontally or vertically . . . . And so what I did was project this on to this radially inner edge, and then what I'm going to do in this video is rotate this at a constant speed throughout the 360 degrees.
>
> And the important part to look at is, on the background, there's a short laser line . . . and what you want to do is observe the top portion of that. And that is the light . . . that projects past the radially inner edge. And what you're going to see is the top portion is going to move up and down as the wheel passes by just to show you the wavelike characteristic of this undulating configuration.

*Id.* at 1012:20–1013:13. As with Dr. Hanson's analysis, Dr. Howle's approach seems persuasive.

We find, in sum, that a reasonable juror could have been swayed by *either* expert on both the literal infringement and doctrine-of-equivalents claims—and so, we disagree with SRAM that "the finding of non-infringement [was] against the great weight of the evidence." New Trial Reply at 9. As

Princeton observes, "Dr. Hanson provided *empirical evidence* showing that all of the accused products include constant-radial-distance portions, meaning that they could not literally infringe the '800 patent claims. [And] [i]n the context of the doctrine of equivalents, Dr. Hanson provided a detailed rebuttal to Dr. Howle's range-of-equivalents argument. . . . He also explained that the portions of constant radial distance, of which there are 24 in each accused wheel, can have a substantial impact on performance. . . . For these additional reasons, the jury reasonably could have found non-infringement." New Trial Response at 17–18. We agree.

Perhaps even more importantly, however, "SRAM cannot know why the jury found non-infringement of the '800 patent, let alone solely because of the 'continuously varies' limitation. Yet this is the only element in the '800 patent that the 'great weight' argument addresses. . . . [SRAM's] motion merely asks this Court to re-weigh the evidence (in a one-sided, baseless manner), and thereby substitute its judgment, conclusions, and credibility assessment for the jury's." *Id.* at 16. As Princeton notes: "SRAM's entire motion focuses on the 'continuously varies' limitation of the '800 patent, and disregards the possibility that the jury very well could have found that SRAM failed to prove other claim limitations." *Id.* at 18. Again, we agree. SRAM's weight-of-the-evidence argument fails both (1) as to the continuously-varies limitation because Princeton provided sufficient evidence for its view that certain portions of constant radial distance existed, and (2) as to the literal and doctrine-of-equivalents infringement claims more generally because the jurors' conclusion was reasonable, and we have no way of knowing *how* or *why* they reached it.[24]

---

[24] According to Princeton, "Dr. Howle only 'eye-ball[ed]' and 'trace[d] [his] finger' along the accused product but never measured them, *failed to identify a range of equivalents*, and *simply concluded*—but did support with any evidence regarding function-way-result—*that the products were 'insubstantially different* than the claimed requirement.' The jury could have reasonably determined that this collection of conclusory, unsupported arguments failed to meet SRAM's affirmative burden of proving infringement both literally and under the doctrine of equivalents." New Trial Response at 17 (cleaned up). We aren't convinced that this is a fair assessment of the evidence SRAM presented. But we don't need to re-evaluate all the evidence both sides presented in this case and then substitute our own

IV.   **The jury's finding of non-infringement as to the '188 patent wasn't contrary to the overwhelming weight of the evidence, either literally or under the doctrine of equivalents.**

SRAM offers a similar argument for the convex limitation of the '188 Patent. According to SRAM, "[t]he jury's finding that Princeton's wheels do not infringe the 'convex' limitation of the '188 Patent—the only basis on which Princeton defended against infringement on this patent—is against the great weight of the evidence. SRAM introduced substantial evidence that Princeton's wheels have convex profiles, as claimed in the '188 Patent." New Trial Motion at 23. Princeton, SRAM continues, "relied on only two sources of evidence in support of its contention that its wheels do not have 'convex' profiles as claimed in the '188 Patent: (i) spoke holes in Princeton's disassembled wheels; and (ii) Dr. Hanson's 'CAD schematics' analysis. Neither supports the jury's finding." *Id.* at 24. "*First*, the fact that the peaks of Princeton's disassembled wheels have spoke holes cannot support a finding that they are not convex, because the '188 Patent expressly discloses and claims wheels with convex regions with spokes attached to them, not a disassembled wheel part. . . . The '188 Patent calls out that these [spoke] holes are present in the convex peaks or support elevations[.]" *Ibid.* "*Second*, Dr. Hanson's 'CAD schematics' analysis also fails to support a finding of no infringement, because it is based on computer drawings, not Princeton's wheels. Dr. Hanson summarily concludes that the peaks of Princeton's wheels are concave, rather than convex, because, according to the CAD schematics Dr. Hanson reviewed, the peaks of Princeton's disassembled wheels have portions of constant radial distance which, when plotted on a concentric circle inside the rim, are concave to the hub. . . . Those drawings cannot support a finding of non-infringement because the jury must evaluate *Princeton's wheels*, not computer drawings, to determine infringement, and there is no evidence to support a finding that the CAD drawings Dr. Hanson evaluated are materially accurate representations of Princeton's actual

judgment for the jury's. Instead, we must decide *only* whether Princeton adduced sufficient evidence for us to conclude that the jury's determination was reasonable—*i.e.*, that the verdict wasn't against the *great weight* of the evidence. And that's what we've done.

wheels[.]" *Id.* at 25.[25] Finally, "even if the jury accepted that spoke holes at the peaks of Princeton's wheels made them 'concave,' the evidence overwhelmingly shows that the peaks satisfied the function-way-result test." New Trial Reply at 7.

Princeton disagrees with SRAM's characterization of Dr. Hanson's testimony and counters that SRAM's "request for a new trial on the 'convex' limitation rests entirely on Dr. Howle's testimony that the accused products have 'convex' profiles because he says so." New Trial Response at 19. Here, again, we side with Princeton. On direct examination, Dr. Hanson testified that "[t]he key element [of the '188 Patent] that I focused in on here was the convex profiles in convex regions of the rim. I focused in on this limitation because it's in every one of the asserted claims. None of the accused [Princeton] wheels practiced that limitation. And, therefore, none of the accused [Princeton] wheels infringes any of the asserted claims." Transcript at 1890:13–18. To arrive at this conclusion, he first reviewed "images" of the accused Princeton wheels and found that "it [was] obvious that the peaks . . . bulge[d] away from the center" and were thus "concave." *Id.* at 1892:16–25. Next, he "went back through and . . . examined the [CAD] drawings" to "look[ ] for regions of constant radial distance at the peaks." *Id.* at 1893:9–14. Dr. Hanson found such regions, which he considered important "because areas of constant radial distance are concave." *Id.* at 1894:9–11. So, yes, SRAM is right that Dr. Hanson relied on the Princeton wheels' spoke holes for his conclusion that the peaks of those rims were concave and not convex. But it doesn't necessarily follow that "[s]poke holes in the peaks of an undulating wheel rim configuration do not make those peaks concave, as the '188 Patent discloses and claims convex regions including peaks with both spoke holes and spokes. . . . The clear

---

[25] We needn't delve into this CAD-drawing dispute again because we've already addressed it. Again, SRAM was free to make these points during trial—which it did—and the jury was free to reject them, which it apparently did.

and necessary point is that spoke holes do not transform convex profiles into concave shapes." New Trial Reply at 10.

To be clear, SRAM's assertion is certainly reasonable, but it's equally (or more) reasonable to conclude that (1) the '188 Patent exhibits convex peaks, but (2) the Princeton wheels don't have convex peaks because of the spoke holes. *See* New Trial Response at 20 ("[T]he fact that another, separately claimed element (a spoke) engages with the convex portions of the rim does not and cannot alter the plain language of the claim. . . . [T]he spoke does not convert a concave element into a convex element. . . . The shape of the *rim* standing in isolation is the only thing relevant to whether the 'convex' limitations are infringed, and the shape of the rim, standing alone, does not change whether a spoke is inserted or removed."). And the jury could have reasonably concluded that Princeton's approach was more convincing. Alternatively, as Princeton rightly points out, "even if the evidence was a toss-up on this point, a reasonable jury could have simply found that Dr. Hanson was more credible [than Dr. Howle]," New Trial Response at 19, or "the jury may have found non-infringement of another claim limitation. . . . [For example, a] reasonable jury could have found that SRAM failed to demonstrate that the 'peak' limitation was infringed." *Id.* at 20.[26] Because all these possibilities are reasonable, we reject this part of SRAM's Motion.

---

[26] SRAM contests this assertion: "The 'peak' element of the '188 Patent does not provide an alternative basis to support the verdict. . . . Dr. Howle testified the undulating configuration on Princeton's wheels has those peaks and, alternatively, a feature equivalent to them, even if the rims are considered in isolation. . . . Dr. Hanson did not testify Princeton's wheels lack peaks as part of his DOE opinion. . . . Dr. Hanson's testimony that the spoke holes result in two highest points, rather than one, cannot support a finding that Princeton's wheels lack peaks, because the '188 Patent describes peaks with spoke holes." New Trial Reply at 10 (cleaned up). But, again, this just brings us back to the same fundamental dispute about the significance—if any—of spoke holes. The parties made their best cases to the jury on this point—both reasonable—and the jurors were free to choose one side or the other.

### V.      Because of the general jury verdict, there are alternative (and unknowable) explanations for why the jury found non-infringement.

In conclusion—and as an overarching point—Princeton is correct that "SRAM's new-trial motion is based on an unsupported assumption about what the jury was thinking . . . . The jury could have based its non-infringement finding on the resolution of multiple factual questions, but SRAM has no idea why the jurors decided what they decided." New Trial Response at 7. As Princeton observes: "The jury's verdict was general, rejecting SRAM's infringement claims across the board—at a high level and without any further granularity. This is important because, absent a special verdict, 'it is *impossible* to ascertain with any reasonable degree of certainty' specific details of the jury's rationale, 'except to say that the jury found in favor of' [Princeton] on the ultimate issue of non-infringement." *Id.* at 8 (quoting *Graham v. R.J. Reynolds Tobacco, Co.*, 857 F.3d 1169, 1240 n.136 (11th Cir. 2017)).[27] We therefore agree that "[t]his alone is sufficient to deny SRAM's motion," *ibid.*, because "[t]he jury was entitled to assess the relative credibility of each expert, weigh their differing expertise, and credit the more persuasive expert. Second-guessing these conclusions, as SRAM urges, is improper." *Id.* at 13. In the end, Princeton's right: "SRAM *never objected* to the general form of the verdict; it never asked for special interrogatories; and it never requested the ability to interview jurors following the verdict." *Ibid.*

In support of its view, Princeton points us to *Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 375 F.3d 1328, 1334 (Fed. Cir. 2004). In the portion of *Novartis* that's relevant to our case, the Federal Circuit noted that "the jury determined that [the plaintiff] failed to prove by a preponderance of evidence that [the defendant] infringed [one of the patents at issue] under the doctrine of equivalents. The verdict form on which the jury indicated its decision did not require the jury to specify the one

---

[27] "A general verdict is a verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions; it is a verdict by which 'the jury pronounce[s] generally on all or any of the issues, either in favor of the plaintiff or in favor of the defendant." *Mason v. Ford Motor Co., Inc.*, 307 F.3d 1271, 1274 (11th Cir. 2002) (cleaned up).

or more limitations . . . that it found [the accused] product did not contain. Further, there is no record evidence explaining the jury's rationale for its verdict[.]" *Id.* at 1334. Because there was at least one alternative grounds on which the jury could have reached its decision, the Federal Circuit couldn't "conclude from the limited information available that the district court's construction [of a particular claim] proved necessary to the jury's noninfringement decision[.]" *Ibid.*

We find *Novartis* instructive here. Our trial was highly complex, involving two patents, dozens of patent claims, three accused products, and two theories of liability. For the jury to have ruled for SRAM—who, as the plaintiff, bore the *burden* of proving infringement—the jurors would've had to have made *many* determinations in SRAM's favor, not just the handful of determinations SRAM has identified in its New Trial Motion. Maybe SRAM is right that the issues it's identified in its New Trial Motion were in fact central to the jury's thinking. Or maybe SRAM is wrong, and the jury ruled for Princeton for some *other* reason (or reasons). The point is we have no way of knowing. *See Hatfield v. Seaboard Air Line R.R. Co.*, 396 F.2d 721, 724 n.10 (5th Cir. 1968) ("A general verdict [is] shrouded in mystery. . . . But in the spotlight of a special verdict, little doubt remains and the legal issues are excised for our consideration unobscured by the usual impenetrable fog."). And, since we have no way of knowing, we cannot undo the jury's work.

*      *      *

Having carefully considered SRAM's Motion for New Trial to Alter or Amend the Final Judgment, we **ORDER and ADJUDGE** as follows:

1. SRAM's Motion for New Trial to Alter or Amend the Final Judgment [ECF No. 281] is **DENIED**.

2. This case will remain **CLOSED**.

**DONE AND ORDERED** in the Southern District of Florida on August 20, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record